# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| ELECTROLUX HOME PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV103-050 |
| | ) | |
| WHITESELL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ELECTROLUX HOME PRODUCTS, INC.'S BRIEF IN OPPOSITION TO WHITESELL'S MOTION FOR PRELIMINARY RELIEF AND TO ENFORCE SETTLEMENT AGREEMENT

COMES NOW Electrolux Home Products, Inc. ("EHP") and files this Memorandum in Opposition to Whitesell Corporation's ("Whitesell") Motion for Preliminary Relief and to Enforce Settlement Agreement filed with the Court on March 9, 2005 ("Enforcement Motion"). EHP is generally engaged in the business of manufacturing two consumer product lines which include household appliances customarily referred to as white goods and lawn and garden equipment primarily referred to as outdoor products. In December of 2000, EHP and Whitesell entered an agreement titled "Strategic Partnership Agreement" ("SPA"). The SPA is a supply agreement under which EHP agreed to purchase all of the fastener parts used in the production of its products from Whitesell. It was the intent of these parties that through EHP's consolidation of fastener purchases under the SPA, significant economies of sale could be achieved which would result in lower prices for these fastener parts.

I.   **Whitesell's current motion raises completely unrelated issues to those resolved through the parties' prior litigation and is, in effect, an attempt to circumvent the pleading and discovery requirements of the Federal Rules of Civil Procedure.**

Through its Enforcement Motion, Whitesell attempts to resurrect an earlier action filed with this Court by EHP which involved issues totally separate and unrelated to the ones Whitesell seeks to raise through its Enforcement Motion.  As described in Whitesell's Enforcement Motion, this Court referred the earlier case to mediation which was conducted by A. Montague Miller.  The two day mediation was successful and resulted in a Settlement Memorandum which the parties executed on May 28, 2003.  (See Tab 2 to Whitesell's Enforcement Motion).  Upon the parties' Stipulation of Dismissal Without Prejudice and Joint Motion to Retain Jurisdiction to Enforce the Settlement Agreement, the Court entered an order dated June 25, 2003.  The last two sentences of this order state the following: "The Court will retain jurisdiction to enforce the settlement agreement.  Otherwise, this case is **DISMISSED WITHOUT PREJUDICE.**" (Tab 4 to Whitesell's Enforcement Motion).

Even a cursory review of the complaint filed in the predecessor litigation (an accurate copy of which is attached hereto as Exhibit 1), along with the parties' May 28, 2003, Settlement Memorandum, reveals that the substantive issues raised by Whitesell's Enforcement Motion -- primarily concerning EHP's remedies under the SPA in response to Whitesell's attempted increases in the price of parts covered by the agreement -- were not previously litigated nor addressed.  Whitesell does not make any contrary allegation, but instead argues that the Court has ancillary jurisdiction to address these new issues due solely

2

to its contention that the "... Settlement Agreement incorporates by reference the terms and conditions of the Supply Agreement ...." (See Whitesell's Enforcement Motion, p. 2, ¶ 6).[1]

The only reference to the parties' SPA is contained in Paragraph 14 of the Settlement Memorandum and provides in its totality "[t]he Agreement [Strategic Partnership Agreement as defined on Page 1 of the Settlement Memorandum], except as modified herein, shall continue in full force and effect." (Whitesell Enforcement Motion, Tab 2, p. 8, ¶ 14). This fleeting reference to the SPA was only intended to clarify that except as modified by the parties' Settlement Memorandum, the pre-existing SPA continued in effect. Such clarification is insufficient to provide ancillary jurisdiction for the Court to address issues completely outside of the parties' Settlement Memorandum through a motion to enforce settlement.

The cases cited in Whitesell's Enforcement Motion do not countenance a different conclusion. For example, in <u>Kokkonen v. Guardian Life Ins. Co.</u>, 511 U.S. 375, 114 S.Ct. 1673 (1994), the United States Supreme Court held that a district court had no basis for exercising ancillary jurisdiction through a similar enforcement motion because its earlier order dismissing the lawsuit with prejudice did not retain jurisdiction of the parties' settlement agreement by obligating them to comply with its terms and conditions. <u>Id.</u>, 511 U.S. at 381. Specifically, the Supreme Court stated "[t]he judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order." <u>Id.</u> Relying upon the express language of Fed.R.Civ.P. 41(a)(2) which specifies that

---

[1] Whitesell's references to the "Supply Agreement" and EHP's references to the "SPA" all refer to the Strategic Partnership Agreement executed by the parties in December of 2000 and attached as Tab 1 to Whitesell's Enforcement Motion.

an action "shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper," the Supreme Court held that a district court can only retain jurisdiction to enforce the terms of the settlement agreement when such power is specifically and expressly set forth in its order of dismissal. Id.

In the instant case, the Court's dismissal order did expressly retain jurisdiction to enforce the parties' Settlement Agreement but made no mention of the parties' SPA. Through its Enforcement Motion, Whitesell is not seeking enforcement of the Settlement Agreement, but instead seeks to steer the Court down an entirely different path wholly unrelated to the parties' prior litigation and the terms of their Settlement Memorandum. The Court's dismissal order did not retain jurisdiction to address such future disputes concerning the SPA which were not addressed by their Settlement Memorandum. Through its Enforcement Motion, Whitesell seeks to expand and modify the Settlement Agreement to reach additional areas and disputes not contemplated by the parties at the time the Settlement Agreement was reached. Pursuant to binding Eleventh Circuit precedent, Whitesell's attempted modification of the settlement agreement through a motion to enforce settlement must be rejected. See T2 Medical, Inc. Shareholder Litigation, 130 F.3d 990, 995 (11th Cir. 1997) (holding that by retaining jurisdiction to enforce the terms of a settlement agreement, the district court does not retain jurisdiction of matters outside of the settlement agreement, including a litigant's efforts to modify a settlement agreement). Moreover, circuit courts have strictly construed dismissal orders by holding that the district court only retains jurisdiction to enforce those provisions of the settlement agreement which are expressly incorporated into the court's dismissal order. See McAlpin v. Lexington 76 Auto Truck

4

Stop, Inc., 229 F.3d 491, 502 (6th Cir. 2000) (holding that the district court's incorporation into its dismissal order of only a single term of the parties' 20-page settlement agreement is insufficient to support the court's exercise of ancillary jurisdiction over the entire agreement). "The mere reference in a [dismissal] order to [a settlement] Agreement does not incorporate the Agreement into the order." Scelsa v. City University of New York, 76 F.3d 37 (2nd Cir. 1996).

Whitesell's argument in the instant case is even weaker than the factual patterns of the cases discussed above where jurisdiction, through a motion to enforce settlement, was rejected. Here, the Court's dismissal order does not even reference the parties' SPA. Instead, Whitesell relies solely upon the one sentence reference in the Settlement Memorandum that except as modified by the terms of the Settlement Agreement, the SPA remains in full force and effect. The attempted reach of Whitesell's Enforcement Motion is far beyond anything contemplated by the federal judiciary and should be rejected. EHP does not dispute that this Court would have subject matter and personal jurisdiction in the event that Whitesell complied with the pleadings and discovery requirements governing the filing of new actions. However, Whitesell's attempt to circumvent these rules by disguising what amounts to a new and unrelated dispute as a motion to enforce a prior settlement agreement deprives EHP of due process and should be rejected by the Court.

Similarly, Whitesell's reliance on the mediation provision contained in the parties' Settlement Memorandum is also misplaced. This provision states the following:

> If Whitesell or EHP, for any reason, shall determine that it will seek to terminate or modify its performance under the Agreement, due to an unresolved dispute, both parties agree to continue to supply and purchase all parts until such dispute is resolved. Both parties agree to submit such unresolved disputes to mediation.

5

(Whitesell's Enforcement Motion, Tab 2, p. 8, ¶ 12). With respect to the instant dispute, it is EHP's position that it is not seeking to terminate or modify its performance under the SPA, but rather, as discussed *infra*, has acted in complete compliance with the SPA. EHP is certainly not adverse to mediating any disputes which may exist between the parties to this litigation and is further agreeable to employing Mr. A. Montague Miller for this purpose. However, due process and the Federal Rules of Civil Procedure dictate that Whitesell first has the responsibility to sufficiently plead any and all new disputes which it now contends exist between the parties and allow EHP to conduct necessary discovery concerning such claims. If Whitesell's Enforcement Motion and the two plus inches of paper submitted as exhibits to this Motion establish anything, it is that discovery concerning the many new issues Whitesell raises is greatly needed. Accordingly, EHP respectfully requests that this Court deny Whitesell's Enforcement Motion and require it to comply with the Federal Rules of Civil Procedure concerning the filing of new actions with the Court.

**II.    EHP has fully complied with § 5.5 of the SPA in response to Whitesell's extraordinary, attempted price increases.**

The main substantive issue presented by Whitesell's Enforcement Motion concerns Whitesell's attempted price increases and how EHP has responded under applicable provisions of the parties' SPA. As a starting point, it is important to note that the primary factor motivating EHP's decision to enter into the SPA with Whitesell was to achieve a decrease in the cost of fastener parts by consolidating the purchasing of such parts in one supplier. (See SPA attached as Exhibit 1 to Whitesell's Enforcement Motion, p. 4, § 2.0). Even the settlement memorandum subsequently executed by the parties reiterated that

6

Whitesell was committed to provide "... its best efforts to provide EHP with annual Total Cost Reductions." (See Tab 2 to Whitesell's Enforcement Motion, p. 5, § 7). Whitesell was to achieve these cost reductions through the economies of scale resulting from EHP's consolidated purchase of fastener parts and through its effective, on-site management, of EHP's inventory of fastener parts to reduce excess stock and obsolescence. EHP's experience with Whitesell has not resulted in these cost reductions. First, Whitesell has actually increased the cost of fastener parts sold to EHP pursuant to the SPA. For the year 2004 alone, Whitesell price increases on fastener parts equated to an additional $1,495,949 of cost to EHP. Additionally, Whitesell's ineffective management of EHP's inventory resulted in obsolescence payments made by EHP to Whitesell in a total amount of $699,995. In the face of these significant 2004 cost increases, Whitesell has provided notice of its intent to once again increase the price of parts sold to EHP under the SPA during the year 2005. These proposed increases would equate to over $2 million in additional increases for parts currently being purchased by EHP from Whitesell under the SPA.

In response to Whitesell's repeated and significant price increases, EHP exercised its rights under § 5.5 of the SPA which provides, in its totality, the following:

5.5    **COST JUSTIFICATION**:
    It is Whitesell's intent to maintain and hold firm all pricing for the duration of the Agreement. Only if in an adverse market situation that drastically affects Whitesell's costs would Whitesell request a price increase from Electrolux.
    In the event Whitesell requests a price increase for any Good(s) Whitesell provides, then upon the request of Electrolux, Whitesell shall provide such cost increase evidence to Electrolux for any requested changes in any specific unit prices. After supplying reasonable documentation of such cost increase, Electrolux shall make the determination on the price change request.
    After such validation of increased costs, both parties shall have a face to face meeting and within 30 days mutually agree on any price changes to be implemented. Electrolux shall have the sole option to either accept the substantiated price change

7

request on any specific Good(s) that a price change was requested or quote those specific Good(s) with Qualified Suppliers. Whitesell shall be given thirty days to evaluate any bonafide written offer after receiving copies of such third party offer. However, Whitesell shall have the last right of refusal to match all bonafide written offers received by Electrolux on all such Good(s).

(SPA, Tab 1 to Whitesell's Enforcement Motion, p. 7, § 5.5).

After receiving Whitesell's proposed price increases, EHP has repeatedly requested that Whitesell provide the cost increase evidence required by Paragraph 2 of § 5.5. To date, Whitesell's only response has been to send EHP newspaper articles which discuss increases in the price of steel but has to date consistently refused to provide any specific cost justification documentation concerning how much Whitesell's price for the steel it has purchased to produce the fastener and wireform parts supplied to EHP has actually increased. (See Tab 9 to Whitesell's Enforcement Motion). Accordingly, Whitesell has not complied with an essential condition precedent for its proposed price increases under § 5.5.

Notwithstanding Whitesell's failure to produce the cost increase evidence required by § 5.5 of the SPA, EHP has obtained actual quotes from third parties to supply identical parts as those for which Whitesell proposes the 2005 price increases. Within thirty days of receiving the 2005 price increases, EHP has provided bonafide quotes for these same parts from reputable third party companies. Specifically, on February 15, 2005, EHP faxed Mr. Neil Whitesell a quote which it obtained from Northern Wire LLC concerning the wireform parts for which Whitesell has proposed 2005 price increases. (See Exhibit 2). Similarly, on or about March 14, 2005, EHP provided Whitesell with a quotation received from Martin Industrial Supply located in Jackson, Tennessee for each and every one of the fastener parts for which Whitesell has proposed 2005 price increases. (See Exhibit 3).

AUGLIB01 74768 1

In its Enforcement Motion, Whitesell now contends that these price quotations are "bogus" and constitute "misrepresentations." (See Whitesell's Enforcement Motion, pp. 3 and 5). Yet, Whitesell does not cite to a single piece of evidence to support these bald, conclusory and incorrect allegations. EHP stands behind each of these quotations and, if necessary, can produce valid evidence from these third parties authenticating same. It is true that when these price quotations were provided to Whitesell, EHP redacted the supplier's name and certain identifying information. EHP's reason for doing this was to maintain the confidentiality of these documents in the event that they were released by Whitesell for public disclosure. While on the one hand, Whitesell criticizes EHP's attempt to guard the confidentiality of this information (See Whitesell Enforcement Motion, p. 5); on the other hand, it seeks the right to file supplemental exhibits under seal, including these same supplier quotes provided by EHP in order "… to avoid placing the information in the public record." (Whitesell Enforcement Motion, p. 6). When EHP provided the quotes to Whitesell, it clearly informed the involved Whitesell representatives that they could come to Electrolux's home office in Augusta, Georgia, to review this information in greater detail, including the identifying information which was redacted from the quotes. Whitesell never took advantage of EHP's offer but instead has chosen to cast unsupported accusations concerning the validity of these quotes.[2]

Through its Enforcement Motion, Whitesell also seeks to impose additional requirements on EHP which are not provided in § 5.5 of the SPA. For example, Whitesell

---

[2] Whitesell employed a similar tactic with respect to the price quotes EHP provided in response to the proposed 2004 price increases.

contends that "Qualified Suppliers" from whom price quotations may be obtained by EHP under § 5.5 of the Agreement, "… are third party suppliers with the total supply capabilities equal to or greater than Whitesell in terms of domestic and foreign manufacturing capability, engineering and design staff, et cetera."   (Whitesell Enforcement Motion, p. 2, fn. 1). Additionally, Whitesell contends that, in order to determine whether the third party quotes are cheaper than the proposed Whitesell pricing, one must take into account "… all comparable pricing, service and comparable capabilities that Whitesell is providing under this Agreement [SPA] …."   (Whitesell Enforcement Motion, pp. 2-3, ¶ 9).  Neither one of these requirements is contained in § 5.5 of the SPA.  Instead, Whitesell is attempting to lift language from a totally separate provision of the SPA which is contained in § 24.1 titled "Meeting Competition Procedure."  This Meeting Competition Procedure was designed to prevent EHP from requiring Whitesell to meet "cherry-picking" quotations.  The aim of this provision was to prevent EHP from forcing Whitesell to reduce its original pricing under the SPA by obtaining selective quotations on only a limited number of fastener parts from third party suppliers.

EHP is not traveling under the "Meeting Competition" provision of § 24.1.  Instead, EHP has provided the third party pricing quotations in furtherance of the procedures specified in § 5.5 of the Agreement titled "Cost Justification."  The primary purpose of this provision is to protect EHP against price increases during the term of its agreement with Whitesell.  As previously discussed, this is accomplished through two aspects.  First, Whitesell must provide cost justification evidence for its proposed price increases, and second, EHP has the ability to obtain bonafide written offers from third party suppliers.

10

Pursuant to this provision, if Whitesell fails to match the bonafide written offers, EHP is free to begin purchasing these parts from the third party suppliers.

Section 5.5 is only triggered in the event that Whitesell proposes price increases above the pricing contained in the SPA. As a result, a separate standard applies for the third party quotations supplied under § 5.5 as compared to the Meeting Competition Procedure contained in § 24.1 of the SPA. For example, there is no requirement that the third party have supply capabilities equal to or greater than Whitesell. EHP has properly exercised its rights under § 5.5 of the SPA by providing bonafide quotations from reputable third parties. EHP has previously used both Northern Wire and Martin as vendors with positive results. The price quotations supplied to Whitesell from these reputable third parties are not only less than the $2 million in price increases which Whitesell proposes for 2005, but are ten percent less than the prices EHP is currently paying to Whitesell for these same parts. Perhaps, this is why Whitesell has been so steadfast in its refusal to provide the cost increase justification evidence requested by EHP and required by § 5.5 of the SPA.

## III.    Whitesell's other allegations are similarly unfounded.

Contrary to Whitesell's unsupported allegations, EHP has not resourced any of the parts it has previously purchased from Whitesell to any other third party supplies. However, to the extent that Whitesell fails to match the bonafide third party quotations, EHP will have no choice but to exercise its rights under § 5.5 as previously described. On Page 3 of its Enforcement Motion, Whitesell contends that EHP has transferred a minimum of $6 million in annual volume of wireform business from EHP's Orangeburg and McRae facilities. (Whitesell Enforcement Motion, p. 3). As the name implies, wireform parts are constructed

11

from wire and include items like steering shafts and pinion gears on lawn tractors manufactured by EHP's Outdoor Products Division. In the first litigation between the parties, it was EHP's position that these wireform parts were not included in the SPA because, among other reasons, they are not "cold headed/threaded fasteners and various related Class C items" as defined by § 2.0 of the SPA (See Tab 1 to Whitesell's Enforcement Motion, p. 4, ¶ 2.0). However, as part of the settlement agreement executed by the parties, EHP agreed to consider transferring its wireform part purchases to Whitesell. (See Tab 2, p. 2, ¶ 3). In exchange, Whitesell agreed to provide a five percent discount from the price charged to EHP for these parts by Whitesell's predecessor plus a two percent annual rebate provided in § 7 of the Settlement Memorandum. (See Tab 2 to Whitesell Enforcement Motion, p. 3, ¶ 3 and p. 5, ¶ 7).

In compliance with the Settlement Memorandum, EHP has already transitioned certain wireform parts to Whitesell and was in negotiations to transfer additional wireform business to Whitesell when it was discovered that Whitesell is not complying with the above described discount and rebate requirements of the Settlement Memorandum. Furthermore, in addition to its failure to comply with these provisions, Whitesell has also attempted to increase the price of these wireform parts. In fact, the proposed Whitesell increases for wireform parts in 2005 total $954,334 of additional cost to EHP. As previously discussed, EHP has provided Whitesell with a bonafide price quotation for these same parts from Northern Wire which in addition to saving this increased cost would also save EHP ten percent on the price it is currently paying to Whitesell for these same parts. As a result of Whitesell's conduct in failing to honor the provisions of the parties' Settlement

12

Memorandum, EHP did not transition the additional wireform parts to Whitesell. However, EHP has not, as of this point, transitioned any business away from Whitesell.

EHP also disputes Whitesell's contention that it has inappropriately locked out Whitesell management personnel from EHP facilities and improperly prevented Whitesell employees access to EHP computerized inventory forecast programs. While it is true that EHP has taken these actions, EHP vehemently denies that this conduct was inappropriate or that it constitutes a violation of any provision of the Settlement Memorandum or the SPA.

EHP previously provided Whitesell access to its manufacturing facilities and computerized inventory control programs as a convenience to Whitesell in managing EHP's inventory of parts to reduce excess stock and obsolescence costs. Recently, EHP denied this access for two reasons. First, as previously discussed, Whitesell has completely failed in its contractual duty to effectively and efficiently manage EHP's parts inventory. Whitesell's failure in this regard has cost EHP hundreds of thousands of dollars in increased excess stock and obsolescence charges. Perhaps even more significantly, EHP recently discovered that certain Whitesell employees working at EHP manufacturing facilities have improperly obtained access to additional and confidential areas of EHP's computer system beyond the inventory management control program which had been provided by EHP. EHP considers Whitesell's unauthorized access to this computerized information as a significant breach of security and has therefore taken prompt action to minimize any such future breaches.

Finally, on page 5 of its Enforcement Motion, Whitesell alleges four additional breaches of the Settlement Agreement. However, it fails to give any specifics concerning any of these alleged breaches and instead states "[t]he full scope of the breaches will be detailed

13

in a supplemental filing." (Whitesell Enforcement Motion, p. 5). Upon the filing of this supplemental material, EHP will submit specific responses to each and every allegation raised by Whitesell. However, since Whitesell has failed to provide any specific information concerning these alleged breaches, EHP can only respond by stating that it denies each and every one of these claims.

## IV.    Conclusion.

For the reasons discussed in this opposition brief, EHP firmly denies that it has breached any of the provisions of the parties' Settlement Memorandum or the SPA. Furthermore, EHP respectfully requests that the Court deny Whitesell's Enforcement Motion and, instead, require Whitesell to comply with the Federal Rules of Civil Procedure governing the filing of new actions.

Respectfully submitted, this _24th_ day of March, 2005.

**RAYMOND G. CHADWICK, JR.**
Georgia Bar No. 118475
**R. PERRY SENTELL, III**
Georgia Bar No. 635805
**BRIAN K. EPPS**
Georgia Bar No. 231459

**KILPATRICK STOCKTON LLP**
699 Broad Street, Suite 1400
Post Office Box 2043
Augusta, Georgia 30903-2043
(706) 724-2622

*Attorneys For Plaintiff Electrolux Home Products, Inc.*

14

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the within and foregoing *Electrolux Home Products, Inc.'s Brief in Opposition to Whitesell's Motion for Preliminary Relief and to Enforce Settlement Agreement* upon counsel of record by depositing a true and correct copy of same in the United States mail in a properly addressed envelope with adequate postage thereon to:

> **William J. Keogh, III, Esq.**
> HULL TOWILL, NORMAN, BARRETT & SALLEY
> Post Office Box 1564
> Augusta, Georgia 30903

Dated: March 24, 2005.

R. PERRY SENTELL, III

AUGLIB01 74768 1

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

2003 MAR 24 PM 4: 55

CLERK _____
SO. DIST. OF GA.

| | | |
|---|---|---|
| ELECTROLUX HOME PRODUCTS, INC. | ) | CASE NO. _____ |
| | ) | |
| Plaintiff, | ) | **CV103-050** |
| | ) | |
| vs. | ) | |
| | ) | |
| WHITESELL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR
## INJUNCTION AND DECLARATORY JUDGMENT

COMES NOW Electrolux Home Products, Inc. ("Electrolux") and files this Complaint against Whitesell Corporation ("Whitesell") and shows the Court the following:

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Electrolux certifies that the following is a full and complete list of the parties in this action:

| Name | Identification and Relationship |
|---|---|
| Electrolux Home Products, Inc. | Plaintiff |
| Whitesell Corporation | Defendant |

The undersigned further certifies that the following is a full and complete list of officers, directors, or trustees of the above identified parties:

| Name | Identification and Relationship |
|---|---|
| Robert E. Cook | President and CEO of Electrolux Home Products, North America Division |

AUGLIB01 62004 3

**EXHIBIT 1**

| | |
|---|---|
| Roger J. Leon | Senior Vice President of Electrolux Home Products, North America Division |
| Lee Heldt | Senior Vice President of Electrolux Home Products, North America Division |
| Jay Penney | Senior Vice President of Electrolux Home Products, North America Division |
| Trevor Singleton | Senior Vice President of Electrolux Home Products, North America Division |
| Wayne D. Schierbaum | Senior Vice President of Electrolux Home Products, North America Division |
| Marty O'Gorman | Senior Vice President and Chief Financial Officer of Electrolux Home Products, North America Division |
| Gioni Borsetti | President of Electrolux Home Products International, North America Division |
| Matt Young | Executive Vice President Sales, Marketing and Finance of Electrolux Home Products International, North America Division |
| Mario Lanna | Vice President of Sales, Region 2, of Electrolux Home Products International, North America Division |
| P.J. Gursahaney | Vice President, Product Life Processes, of Electrolux Home Products International, North America Division |
| Henrik Bergstrom | President of Electrolux Home Products International, Latin America and Caribbean Division |
| Nelson Samour | Vice President of Electrolux Home Products International, Latin American and Caribbean Division |
| Hector Naranjo | Controller of Electrolux Home Products International, Latin America and Caribbean Division |
| George Weigand | Senior Vice President and Chief Financial Officer of Electrolux Home Products, Inc. |
| Ronald E. Zajaczkowski | Senior Vice President, Finance and Controller of Electrolux Home Products, Inc. |
| Richard S. Pietch | Senior Vice President, General Counsel, and Secretary of Electrolux Home Products, Inc. |
| Mark W. Russell | Vice President, Taxes of Electrolux Home Products, Inc. |
| William G.E. Jacobs | Assistant Secretary of Electrolux Home Products, Inc. |

AUGLIB01 62004 3

| | |
|---|---|
| George E. Hawranko | Assistant Secretary of Electrolux Home Products, Inc. |
| T.D. Parks | Assistant Treasurer of Electrolux Home Products, Inc. |
| Robert E. Cook | Director of Electrolux Home Products, Inc. |
| Richard S. Pietch | Director of Electrolux Home Products, Inc. |
| George S. Weigand | Director of Electrolux Home Products, Inc. |

The undersigned further certifies that the following is a full and complete list of other persons, firms, partnerships, corporations or organizations that have a financial interest in, or another interest which could be substantially effected by, the outcome of this case (including the relationship as parent or holding company or similar relationship):

| Name | Identification, Relationship and Interest |
|---|---|
| Electrolux North America, Inc., an Ohio corporation | Parent Corporation of Electrolux Home Products, Inc. |
| AB Electrolux, a Swedish company | Parent Corporation of Electrolux North America, Inc. |

## INTRODUCTION

1.

Whitesell, a supplier of more than 2000 parts to fourteen Electrolux plants, notified Electrolux on February 28, 2003 that in thirty days it would "suspend or modify its commitments" to supply these parts. Whitesell refuses to specify its intentions beyond this cryptic statement despite (1) an express requirement in the parties' supply agreement that Whitesell provide specific notice of its intentions, (2) Electrolux's written request that Whitesell provide such notice, and (3) Whitesell's knowledge that this willful refusal

3

prevents Electrolux from finding and transitioning to alternative suppliers in sufficient time to avoid a shutdown of the effected plants. Because a shutdown of one or more Electrolux plants will cause irreparable harm, Electrolux seeks to enjoin Whitesell from modifying or suspending its contractual commitments until it complies with the notice provision of the parties' supply agreement. Electrolux also seeks a judgment declaring that it is not contractually obligated to buy certain other parts from Whitesell, as Whitesell contends.

## PARTIES

### 2.

Plaintiff, Electrolux, is a Delaware corporation with its headquarters in Augusta, Georgia. It is a manufacturer of appliances for kitchen, cleaning, and outdoor use such as refrigerators, cookers, washing machines, vacuum cleaners, chain saws, and lawn mowers.

### 3.

Defendant, Whitesell, is an Alabama corporation with its headquarters in Muscle Shoals, Alabama. It is a manufacturer of manufacturing parts such as bolts, screws, rivets, hardware, and metal stampings.

### 4.

Whitesell's registered agent for service of process is Neil Whitesell, 2703 East Avalon Avenue, Muscle Shoals, Alabama 35662.

4

## JURISDICTION AND VENUE

5.

Whitesell is subject to the jurisdiction of this Court because it transacts business in this State.

6.

Venue is proper in this Court because a substantial part of the events giving rise to the claims occurred in Richmond County, Georgia. 28 U.S.C. § 1391. Specifically, Whitesell representatives negotiated terms of the supply agreement out of which this case arises during trips to Electrolux's headquarters in Augusta, Georgia. Moreover, performance of many of the terms of the supply agreement between the parties, including the notice provision upon which injunctive relief is hereby sought, are to occur at Electrolux's headquarters in Augusta, Georgia.

7.

Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because Electrolux is a Delaware corporation with its headquarters in Augusta, Georgia; Whitesell is an Alabama corporation with its headquarters in Muscle Shoals, Alabama; and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

## FACTS

8.

On December 14, 2000, Electrolux and Whitesell executed a written contract that obligates Whitesell to supply fourteen Electrolux plants with cold headed/threaded fasteners

5

and various related Class C items. The contract is hereinafter referred to as the "Supply Agreement", a true copy of which is attached hereto as Exhibit "1".

9.

Whitesell drafted the Supply Agreement.

10.

The initial term of the Supply Agreement is January 1, 2001 until April 1, 2008. The Supply Agreement requires complete transition to Whitesell of all applicable parts that Whitesell demonstrates it has a current capability to manufacture on or before June 30, 2003. The parties allowed such a lengthy transition period because of (1) the significant effort required to transition these goods from other suppliers and (2) Electrolux's desire to honor existing contractual commitments with other suppliers.

11.

The Supply Agreement requires the preparation of a list, the original of which should have been attached to the Supply Agreement as "Exhibit B", that specifies the parts Whitesell is to supply. The Supply Agreement requires updates of the list every six months to delete parts no longer used by Electrolux, and to include newly transitioned parts or parts that Electrolux has just begun using which fall within the scope of the Supply Agreement, so long as Whitesell has demonstrated a current capability to manufacture each such part.

6

12.

Whitesell agreed to prepare the initial Exhibit "B" and update it every six months during the contract term. However, Whitesell did not attach an Exhibit B to the Supply Agreement, and Whitesell prepared only one, incomplete version of Exhibit B in February 2001, which Whitesell never completed or updated.

13.

Currently, the fourteen Electrolux plants purchase more than 2000 different parts from Whitesell.

## COUNT I

## PETITION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

14.

Electrolux hereby incorporates the preceding paragraphs 1-13 above as if fully set forth herein.

15.

On or about January 2, 2002, Whitesell began insisting that the Supply Agreement obligates Electrolux to use Whitesell as the supplier for steering shafts and other parts to tractors manufactured in Electrolux's Orangeburg, South Carolina plant, hereinafter referred to as the "Orangeburg Parts." Electrolux has refused Whitesell's persistent demands because the Orangeburg Parts do not fall within the intent of the Supply Agreement.

7

16.

By letter dated February 28, 2003, Whitesell falsely accused Electrolux of numerous contract breaches, including the failure to purchase the Orangeburg Parts, and declared Electrolux in material breach of the Supply Agreement. Pursuant to Paragraph 26 of the Supply Agreement, Whitesell notified Electrolux that "failure to cure such breaches within 30-days will cause Whitesell to suspend or modify its commitments under this agreement." A true copy of the February 28, 2003 letter is attached hereto as Exhibit "2".

17.

Whitesell offered in the same letter to excuse Electrolux of all alleged breaches if Electrolux would agree to purchase the Orangeburg Parts from Whitesell.

18.

Understandably confused and concerned by Whitesell's cryptic message that it was going to "suspend or modify its commitments", Electrolux asked in a March 18, 2003 letter for written confirmation that Whitesell would not "disrupt the flow of materials" to the Electrolux plants in accordance with Paragraph 26 of the Supply Agreement, which requires thirty days written notice of the extent to which Whitesell's commitments are to be suspended or modified. Electrolux explained that disruption of production at any plant would "be unacceptable and would cause significant damage to Electrolux." A true copy of the March 18, 2003 letter is attached hereto as Exhibit "3".

8

19.

In a reply letter dated March 18, 2003, Whitesell refused to specify, thirty days in advance, the extent to which it plans to "suspend or modify its commitments" under the Supply Agreement. A true copy of the letter dated March 18, 2003 is attached hereto as Exhibit "4".

20.

Whitesell has violated the Supply Agreement by refusing to specify how it plans to modify or suspend its contractual commitments, which prevents Electrolux from finding and transitioning to alternative suppliers in sufficient time to avoid shutdown of the effected plants for the thirty day notice period.

21.

Paragraph 26 of the Supply Agreement authorizes a party to "suspend or modify its commitment" under the Supply Agreement if the other party has committed a material breach. However, suspension or modification of a party's contractual commitment cannot occur until thirty days after written notice that must (1) describe the material breach, (2) set forth conditions with which the party allegedly in breach must comply to cure the alleged breach, and (3) **"specify the extent to which the commitment is to be suspended . . . ."** (emphasis added).

22.

The February 28, 2003 letter from Whitesell does not "specify the extent to which" Whitesell is planning to suspend or modify its contractual obligations. Instead, the letter

9

merely states "Electrolux's failure to cure such breaches to Whitesell's satisfaction within 30-days will cause Whitesell to suspend or modify its commitments under this agreement."

23.

Whitesell's willful refusal to provide specific, timely notice of its intentions prevents Electrolux from finding and transitioning to alternative suppliers in sufficient time to avoid a shutdown of the effected plants.

24.

A shutdown of the effected plants would cause Electrolux to breach significant contracts with its most important customers, irreparably impair its relationships with existing and prospective customers, and place its entire business at risk.

25.

Electrolux is entitled to a temporary restraining order and a preliminary injunction to prevent Whitesell from breaching the Supply Agreement by suspending or modifying its contractual commitments without first providing thirty days written notice that specifies how Whitesell intends to modify or suspend its commitments.

## COUNT II

## PETITION FOR DECLARATORY JUDGMENT

26.

Electrolux hereby incorporates the preceding paragraphs 1-25 above as if fully set forth herein.

10

27.

There is an actual controversy between Electrolux and Whitesell in this case arising out of Whitesell's false accusation that Electrolux is in material breach of the Supply Agreement because it does not purchase the Orangeburg Parts from Whitesell.

28.

The Supply Agreement obligates Whitesell to supply fourteen Electrolux plants with their requirements for parts that (1) classify as cold headed/threaded fasteners and various related class C items and (2) for which Whitesell has demonstrated a current capability to manufacture.

29.

The Orangeburg Parts do not fall within the intent of the Supply Agreement, nor are they components or sub-components of parts that fall within the intent of the Supply Agreement.

30.

Whitsell has never demonstrated a capability to manufacture the Orangeburg Parts. Whitesell did list the Orangeburg Parts in the incomplete version of Exhibit B that it prepared in February 2001; however, Electrolux objected to their inclusion and has never agreed to purchase the Orangeburg Parts from Whitesell.

31.

Electrolux is entitled to a judgment entered on its behalf declaring that the Supply Agreement does not obligate Electrolux to purchase the Orangeburg Parts from Whitesell.

11

32.

Because Whitesell has acted in bad faith by willfully refusing to provide specific notice of its intentions to suspend or modify its contractual commitments as required by Paragraph 26 of the Supply Agreement and by falsely declaring Electrolux in breach of the Supply Agreement for failing to buy parts that clearly fall outside the contract's scope, thereby causing Electrolux unnecessary trouble and expense, Electrolux is entitled to recovery of its litigation expenses pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Electrolux requests the following relief:

1.    Trial by jury;

2.    On Count I, entry of a temporary restraining order and a preliminary injunction preventing Whitesell from breaching the Supply Agreement by suspending or modifying its supply commitments without first providing thirty days written notice that specifies how Whitesell intends to modify or suspend its commitments.

3.    On Count II, entry of a judgment declaring that the Supply Agreement does not obligate Electrolux to purchase the Orangeburg Parts from Whitesell.

4.    Entry of a judgment awarding Electrolux whatever additional relief the Court deems equitable and just.

Respectfully submitted this 24th day of March, 2003.

WYCKLIFFE A. KNOX, JR.
Georgia Bar No. 427300
RAYMOND G. CHADWICK, JR.
Georgia Bar No. 118475
R. PERRY SENTELL, III

12

Georgia Bar No. 635805
**BRIAN K. EPPS**
Georgia Bar No. 231459
**KILPATRICK STOCKTON LLP**
1400 First Union Bank Building
699 Broad Street
Post Office Box 2043
Augusta, Georgia  30903-2043
(706) 724-2622
ATTORNEYS FOR PLAINTIFF,
ELECTROLUX HOME PRODUCTS,
INC

13

## VERIFICATION OF ROGER J. LEON

Personally appeared before me, the undersigned Notary Public duly authorized to administer oaths, ROGER J. LEON, SENIOR VICE PRESIDENT OF ELECTROLUX HOME PRODUCTS, INC., who after being duly sworn deposes and says that the facts alleged in the foregoing Verified Complaint for Injunction and Declaratory Judgment are true and correct.

This 24th day of March, 2003.

ROGER J. LEON
SENIOR VICE PRESIDENT
ELECTROLUX HOME PRODUCTS,
INC.

Sworn to and subscribed before
me this 24th day of March, 2003.

Notary Public

Commission Expires

My Comm Exp
Jan 22. 2006

14

*Signed 12/10/00*

# ELECTROLUX HOME PRODUCTS
## And
# WHITESELL CORPORATION

## Strategic Partnership Agreement

**EXHIBIT 1**

1

Electrolux and Whitesell

TABLE OF CONTENTS                                    PAGE

1.    PARTIES.................................................................    4
2.    INTENT..................................................................    4

2.1    DEFINITIONS.........................................................    4
       2.1.1   CONTRACT ADMINISTRATOR...........................    4
       2.1.2   GOOD(S)......................................................    4
3.     TERM....................................................................    5
       3.1     FASTENER TRANSITION COUNCIL..................    5
4.     PAYMENT TERMS.................................................    5
5.     PRICING...............................................................    5
       5.0.1   WHITESELL DISCOUNT................................    5
       5.0.2   INITIAL PRICING.......................................    6
       5.0.3   SERVICE GOOD(S) PRICING..........................    6
       5.0.4   SUBSEQUENT PRICING................................    7
       5.0.5   COST JUSTIFICATION.................................    7
       5.0.6   NEW GOOD(S) PRICING...............................    7
       5.0.7   OBSOLETE GOOD(S)....................................    7
6.     COST REDUCTION PROGRAMS...............................    8
7.     CASH PAYMENT...................................................    9
8.     TERMS AND CONDITIONS.....................................    9
9.     TOOLING COST.....................................................    9
10.    SAMPLES..............................................................   10
11.    QUALITY...............................................................   10
       11.1    QUALITY GOALS.......................................   10
               11.1.1 TRANSACTION RECOVERY SHORTFALL..............   11
       11.2    QUALITY SHORTFALL................................   11
       11.3    GENERAL QUALITY COMPLIANCE COMMITMENTS........   11
12.    WHITESELL QUALITY COMMITMENTS.....................   12
13.    DEMAND FLOW MANAGEMENT.............................   13
14.    ELECTROLUX QUALITY COMMITMENTS..................   13
15.    DISTRIBUTION......................................................   13
16.    MANAGED INVENTORY PROGRAM.........................   14
17.    SERVICE................................................................   14
       17.1    FLEXIBILTY/PRODUCTION CAPACITY...........   14
       17.2    DESIGN/ENGINEERING ASSISTANCE...........   14
       17.3    REPORTING...............................................   15
18.    WARRANTY...........................................................   15
19.    FORCE MAJEURE...................................................   15
20.    EPIDEMIC FAILURE...............................................   16
21.    IDEMNITY AND INSURANCE...................................   16
       21.1    IDEMNITY BY OTHER PARTY......................   16
       21.2    PRODUCT LIABILITY INSURANCE................   16
22.    MANAGEMENT REVIEW..........................................   16
23.    TERMINATION BY MUTUAL AGREEMENT...................   17

2

23.1    PHASE OUT PERIOD.................................................... 17
23.2    TERMINATION FOR CAUSE........................................ 17
24.    COMPETITION................................................................18
24.1    MEETING COMPETITION PROCEDURE........................... 18
25.    DISPUTE RESOLUTION................................................. 18
26.    BREACH OF PURCHASE COMMITMENT................................. 19
27.    GOVERNING LAW.............................................................. 19
28.    MISCELLANEOUS............................................................  19
28.1    COUNTERPARTS......................................................19
28.2    BINDING EFFECT..............................................\..\.....20
29.    NOTICES...........................................................................20

ELECTROLUX HOME PRODUCTS
And
WHITESELL CORPORATION

# Strategic Partnership Agreement

## 1.0 PARTIES:

This Strategic Partnership Agreement (the "Agreement") is entered into as of the ___14th___ day of December, 2000, by Electrolux Home Products, of White Consolidated Industries Inc, a Delaware corporation, its Affiliates and related organizations, with offices at 250 Bobby Jones Expressway, Augusta, GA 30907, hereafter collectively referred to as "Electrolux," and Whitesell Corporation, with its principal offices at P.O. Box 2571, 2703 East Avalon Avenue, Muscle Shoals, Alabama 35662-2571, hereafter referred to as "Whitesell". {Exhibit A shall set forth the names, and locations of the parties.}

## 2.0 INTENT:

Electrolux and Whitesell desire to enter into a strategic business relationship in which Electrolux is willing to make a long-term commitment to purchase all of its current and future needs of cold headed/ threaded fasteners and various related Class C items hereafter referenced as Good(s) (as herein after defined in section 2.1.2 ) from Whitesell. Whitesell shall receive the uninterrupted benefit of such long-term commitment and is willing to supply such Goods and provide its best efforts to fulfill all requirements designed to improve productivity, to improve the quality of Electrolux's products, to reduce the total cost of manufacturing products, to increase flexibility, and generally to enhance Electrolux's competitive position in the market. Electrolux and Whitesell intend to work cooperatively to develop improved Good(s) which will benefit both parties. Upon request, Whitesell will provide its Standard Industry Classification code (SIC code) to Electrolux.

## 2.1. DEFINITIONS:
For purposes of this Agreement, the following terms will have the meanings specified below:

2.1.1   CONTRACT ADMINISTRATOR shall mean, with respect to each party, the individual specified on Exhibit A, who shall be responsible for monitoring the obligations of the party in which he is employed. The Contract Administrator shall be available to participate and cooperatively resolve internal organizational disputes within his organization, divisional conflict, and shall be authorized to receive on behalf of a party any notices provided for in this Agreement. The Contract Administrators shall be responsible for communicating, negotiating, and finalizing revisions to the Exhibits at the times necessary in this Agreement.

2.1.2   GOOD(S) shall mean, all cold headed/ threaded fasteners, clips, wire ties, nuts, pins, special cold formed parts, screw machined parts, clamps, spacers, plastic fasteners, components, sub-components, or any type of material, whether identified by an Electrolux part number or not assigned to such part, and other Class C items

4

in similar families and /or services. These Goods shall be listed on Exhibit B entitled "Goods to be Purchased by Electrolux from Whitesell." Goods shall be deemed to be added to Exhibit B during each calendar year by the issuance of a FPA and a Production Purchase Orders ("Purchase Orders") to Whitesell for new Goods. This Exhibit B shall be updated no less than every six months under the provisions of the Agreement.

## 3.0 TERM:

This Agreement begins January 1, 2001 and will continue until April 1, 200S,. This Agreement may be renewed only after both parties review and mutually consent in writing to continue, each continuing term must be mutually agreed. The first date for review will occur in October of 2007.

### 3.1 FASTENER TRANSITION COUNCIL:

Both parties agree to develop a Fastener Transition Council to regularly meet as needed until implementation and full transition of all Goods to Whitesell is complete. Both parties agree to use their best efforts to comply with the need to meet mutual goals and objectives. It is the intent of both parties to complete the implementation as soon as possible. Whitesell commits to provide its best efforts to transition as much business as quickly as possible without jeopardizing the integrity of this program. Due to the existing supplier contractual commitments of Electrolux, the transition is to be completed no later than June 30th 2003. Failure to complete the transition by this date shall proportionally extend the initial term of this Agreement.

### 4.0 PAYMENT TERMS:

2% 15; Net 60 days from receipt of Good(s) by Electrolux.

A discount of 2% of the invoice amount may be taken if an invoice is paid and funds received prior to 20 days from receipt of goods. In the event of any payment delays that extended beyond 20 days and if any discounts are taken inappropriately, Electrolux will promptly refund within 15 days after written notice with supportive documentation is delivered to Electrolux of such inappropriate discounts taken.

### 5.0 PRICING:

#### 5.1 WHITESELL DISCOUNT:

Pricing shall be at ten percent (10%) below the Total Electrolux Unit Cost per Exhibit B for cold headed threaded fasteners that Whitesell has the current internal manufacturing capability to produce. All other Goods shall not receive a discount and are to be priced at the Total Electrolux Unit Cost entered into Exhibit B. Such purchase cost shall include all product purchase costs, tooling costs, vendor managed inventory costs, and any other direct purchase costs as referenced in Initial Pricing as set forth in section 5.2. The Electrolux costs used for calculating the discount shall not be less than the actual total costs being paid as of date of this Agreement.

5

## 5.2 INITIAL PRICING:

The price for each Good shall be the Whitesell Unit Price as set forth in Exhibit B; provided, that the Whitesell Unit Price for any Good added to Exhibit B during any calendar year through the issuance of a FPA and Purchase Order shall be the unit price contained in such Whitesell Sales Quotation and Electrolux Purchase Orders.

If necessary, within thirty days of signing this Agreement, Electrolux shall provide spreadsheets of the current costs and annual volumes for evaluation for all Goods to be transitioned to Whitesell. If requested, Whitesell shall have access to such original cost documents and invoices to verify volumes, current costs, vendor managed inventory costs, and other Goods related costs in order to verify the actual total cost currently being paid to establish the Total Electrolux Unit Cost for Exhibit B which shall be used to calculate the discounted or non-discounted Whitesell Unit Cost for each Good(s) as referenced in 5.1.

Within 90 days or less after validating and mutually agreeing on the current Total Electrolux Unit Cost, Whitesell shall provide Goods pricing that cumulatively yields the agreed upon discount. It is agreed that each Good referenced in 5.1 may not receive exactly the same price discount, however, Electrolux shall receive the cumulative full discount from Whitesell. In the event any Goods are shipped to Electrolux prior to the completion by Whitesell of the Initial Pricing, Whitesell shall quote a firm price and that price shall be factored in and utilized in the overall discount pricing by Whitesell. Whitesell shall provide a firm price so that nothing will be shipped to Electrolux with a temporary price. The initial price for any Good, will be fixed and will be used as part of the final pricing but this shall in no way affect or decrease the full discount that shall still be realized by Electrolux.

## 5.3 SERVICE GOOD(S) PRICING:

Whitesell shall make available the same OEM pricing for Goods purchased for service as is available on current Goods, provided a one-carton minimum order is placed with Whitesell and the order can be combined with a current production order. Once a Good has become Obsolete as defined by no current production requirements whether advised by Electrolux or not, Whitesell shall thereafter, provide service pricing which will be at OEM level plus up charges for premium costs (i.e. set-up, outside services, break-in charges, tooling, raw material, extraordinary labor, small production lot charges for quantities under 100,000 pieces, etc.). If Whitesell is required to work overtime to fulfill Good(s) requirements due to causes controlled by Electrolux (i.e. stock loss, schedule changes within specific defined period, etc.), Electrolux will pay an overtime premium equal to ½ of the labor content of the Good(s) required. If overtime is required to satisfy increased purchase requirements, or normal seasonality of the business, Whitesell will not be entitled to an overtime premium and will supply the Good(s) at the Whitesell Unit Price listed in Exhibit B.

## 5.4 SUBSEQUENT PRICING:

Thirty (30) days prior to the commencement of each calendar year during the term of this Agreement, Whitesell shall supply a revised list of Good(s) in a revised Exhibit B. This revised Exhibit B shall reflect any new Good(s) purchased as evidenced by and agreed FPA and Purchase Orders added during the calendar year and shall supercede and replace for the following year the Exhibit B currently in effect.

## 5.5 COST JUSTIFICATION:

It is Whitesell's intent to maintain and hold firm all pricing for the duration of the Agreement. Only if in an adverse market situation that drastically affects Whitesell's costs would Whitesell request a price increase from Electrolux.

In the event Whitesell requests a price increase for any Good(s) Whitesell provides, then upon the request of Electrolux, Whitesell shall provide such cost increase evidence to Electrolux for any requested changes in any specific unit prices. After supplying reasonable documentation of such cost increase, Electrolux shall make the determination on the price change request.

After such validation of increased costs, both parties shall have a face to face meeting and within 30 days mutually agree on any price changes to be implemented. Electrolux shall have the sole option to either accept the substantiated price change request on any specific Good(s) that a price change was requested or quote those specific Good(s) with Qualified Suppliers. Whitesell shall be given thirty days to evaluate any bonafide written offer after receiving copies of such third party offer. However, Whitesell shall have the last right of refusal to match all bonafide written offers received by Electrolux on all such Good(s).

## 5.6 NEW GOOD(S) PRICING:

All new Goods shall be priced at a Whitesell Unit Price comparative with the Whitesell Unit Price charged for the most similar Good in Exhibit B used as a reference guide for a Good having similar characteristics and sold in similar volumes. At the time of quoting a price for a new Good, Whitesell agrees to provide Electrolux with a cost change breakdown for such new Good if requested by Electrolux. If requested, an explanation or example of the cost differentials shall accompany the new price. Examples of cost increase justification that might require cost change submittals include but are not limited to: increased or unique tooling costs, volume differentials, different material costs, special or additional outside service costs (if any), manufacturing changes and their cost (segregated by specific manufacturing process), packaging enhancements, and special inspection or sorting costs if not previously required.

## 5.7 OBSOLETE GOOD(S):

Whitesell shall receive from Electrolux formal written notification of a Good going inactive or Obsolete. On any Good that becomes Obsolete, Electrolux will work with Whitesell in a fair and cooperative manner for full disposition of any inventory that Whitesell may have in stock in an effort to minimize and eliminate any financial burden to Whitesell. It is not Electrolux's intent to place a hardship on Whitesell by not using Goods if Whitesell was trying to meet Electrolux's scheduled needs.

7

It is agreed for those Good(s) rendered obsolete, Electrolux shall be obligated to purchase at a minimum: on Good(s) with an EAU of less than 100,000(minimum production run) up to the complete Whitesell stock of 100,000 pieces; for Good(s) greater than EAU 100,000 Electrolux will take up to 16 weeks of Good(s) or other mutually agreed stock levels on specific unique Good(s) per Exhibit B, based on a 16 week normal average usage during seasonal peak production periods over the last twenty four months upon which EAUs were used for planning purposes until all Good(s) have been transitioned to Whitesell. After the transition is complete, the 100,000 minimum shall be reduced to 50,000 pieces and the 16 weeks reduced to 12 weeks. Whitesell will make every effort to minimize and eliminate Obsolete Goods and yet not run out of Goods for production. As soon as Whitesell receives formalized notice that a Good will be Obsolete, it shall interrupt production, seek alternative buyers, cancel purchase requirements, and do whatever is necessary to rapidly respond. Whitesell will also advise Electrolux of the use-up Goods on hand.

If a change is taking place for a cost reduction and if Whitesell has any stock levels greater than the 16 week average normal usage or other mutually agreed stock level, Electrolux shall use up all the excess Goods. However, such excess Good(s) shall have a reduced use-up price for the excess stock equivalent to the cost reduction pricing. It is both parties' intent to strive to use up all stock to reduce everyone's total Good(s) costs. Obsolescence invoices shall be submitted quarterly or as soon as accurately available and Electrolux will make prompt payment in accordance with payment terms.

## 6.0 COST REDUCTION PROGRAMS:

Whitesell and Electrolux agree to form a joint cost improvement/productivity team, that will work together to reduce costs, improve processes, and generate savings. Whitesell will work for continuous total cost reductions in sku reductions, productivity improvements, quality improvements, engineering projects, SCR incidence rate reductions, administrative cost savings, product tear-down savings, part consolidations, fastener drawing database management, or anything that results in definable, measurable reduction in total costs for Electrolux.

After full transition by plant location, during the initial term to Whitesell, annual cost reduction programs will have a minimum annual cost/price improvement guarantee of 2 % of Whitesell's annual sales to Electrolux of cold headed threaded fasteners it had the in-house manufacturing capability to provide to Electrolux on Good(s) which did receive the initial pricing discounts. Although the guarantee is 2% Whitesell will work toward cost reductions goals of 5% per year. Electrolux and Whitesell agree to define a method of implementation on an individual basis on the Whitesell Cost Savings form (Exhibit D) if applicable. Annual savings over the 2% goal may be credited toward subsequent annual goals or price requirements. Cost savings ideas shall benefit Whitesell from contract start date and accumulate during initial ramp-up / transition. Electrolux agrees that if a project should result in identifiable, viable measurable productivity improvements or cost savings but Electrolux elects not to implement such project, then the cost savings, that would have been realized through implementation of such project, will be credited against Whitesell's 2% annual requirement. Whitesell agrees to test and provide that data to Electrolux. On a

priority basis, Electrolux agrees to verify testing on all cost reductions that Whitesell may introduce. If the cost savings for any project implemented cannot be readily ascertained by measurement of direct reductions in cost to Electrolux, then the parties, in good faith, shall agree on the amount of cost savings to be credited to Whitesell for such project. In the event cost improvement ideas submitted for implementation during a calendar Agreement year do not accumulate to at least 2%, then the unit prices of cold headed threaded fasteners shall be proportionately adjusted by Whitesell in Exhibit B to provide for such shortfall deficiency. Such price reduction will be implemented at the beginning of the next calendar year.

## 7.0 CASH PAYMENT:

At the request of Electrolux, Whitesell shall pay to Electrolux a $2,000,000.00 cash payment paid at the signing of this Agreement in exchange for a long-term purchase commitment from Electrolux to purchase all of its Good(s) from Whitesell.

In the event this Agreement is cancelled prior to the agreed term regardless of any other previsions to the contrary in this Agreement, no matter the cause, reason, or justification, Electrolux shall refund within thirty (30) days the Cash Payment plus interest costs at prime.

## 8.0 TERMS AND CONDITIONS:

During the term of this Agreement or any extensions, any and all sales, purchase orders, service agreements, or contracts for sale of the goods shall be governed by the terms and provisions of this Agreement (including all attachments and amendments hereto), and the terms and conditions of the Electrolux locations if mutually agreed upon. In the event the terms and conditions of the Electrolux locations conflict with terms set forth in this Agreement, the terms of this Agreement shall solely prevail. This Agreement may be amended or modified in whole, or in part, by an agreement in writing or by mutual consent of the parties in writing. The parties acknowledge and agree that all understandings of the parties that may exist as of the date of this Agreement or may be entered into during the term of this Agreement with regard to their relationship must be set forth in writing, and that no oral agreements shall be effective unless and until reduced to writing.

No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties, except that the parties can assign this Agreement to a subsidiary or other entity controlled by its parent company or to its successors by way of a sale of assets or merger. Except as otherwise provided herein, this Agreement shall be binding upon and for the benefit of the parties hereto and their respective permitted successors and assigns. Any initial usage volumes supplied by Electrolux to Whitesell are estimates to assist Whitesell with internal planning. Purchase orders and release/delivery schedules provided in the Demand Flow Management information represent Electrolux's best estimates of its actual needs.

## 9.0 TOOLING COST:

All tooling and equipment (i.e. cutting dies, molds, forms, jigs, new part tooling, printing plates, etc.) paid for by Electrolux or Whitesell shall be proprietary to and owned by

purchaser. Purchaser's proprietary tooling and/or equipment is not to be used for other business without the written consent of purchaser, and in the event purchaser gives such

consent, it shall be compensated a reasonable amount to be negotiated prior to the time of use. The tooling/ equipment usage fee will be paid by other party to purchaser no later than thirty (30) days subsequent to the completion of each calendar quarter. All tooling for Good(s) owned by Electrolux at Agreement date shall be made available and used by Whitesell. Upon tool disposal, the owner of the tool shall replace the existing tool or its equivalent costs.

The other party must comply with the purchaser's tooling/equipment agreement and complete the administrative requirements for UCC (Universal Commercial Code) filing for protection on any purchaser-owned tooling/equipment.

10.0 SAMPLES:

Small quantities of samples (i.e.: under 100 pieces cumulatively) submitted by Whitesell in conjunction with first piece submissions or revisions must comply with all specifications, and will be supplied at no charge unless requested for Electrolux's convenience at expedited costs and agreed by Electrolux in advance.

11.0 QUALITY:

Each Electrolux location shall provide to Whitesell a reject measurement of the actual defective parts per million (hereafter PPM) for tracking of quality. Each location's method will be consistent with Electrolux's quality program for purposes of tracking progress as it relates to this Agreement.

Whitesell agrees to an initial PPM level not to exceed 7500 PPM, on a rolling, company wide cumulative 6-month average. In the event the Electrolux location is not currently doing business with Whitesell, the first six (6) months should be accumulated and establish an average PPM at the end of the first six months. Electrolux and Whitesell agree to track PPM quality performance and progress. Sufficient written notice and mutual agreement are required for any changes in measurement method, or fiscal PPM goal.

11.1 QUALITY GOALS:

1st Year –7500 PPM,  2nd Year – 6750 PPM,  3rd Year – 6075 PPM.

Each subsequent year will show a 10% improvement over the preceding year.

| Excess PPM to requirement: | Reimbursement: |
| --- | --- |
| 0 to 1,000 | 1.0% |
| 1,000 to 2,000 | 1.5% |
| 2,000 and up | 2.0% |

## 11.1.1 TRANSACTION RECOVERY COST:

Electrolux Home Products transaction recovery cost policy shall be defined as the
recovery of transaction costs for downtime and loss of production to be defined as
the direct, verifiable out-of-pocket cost due to unavailable components/materials
caused by Whitesell by a late delivery (excluding demands in side of Whitesell's
lead times) or rejected product due to a quality or non-conforming good not useable
in the production assembly process. In no event shall such out-of-pocket costs
include any amount for loss profits or business goodwill or any other punitive or
indirect cost for consequential damages.

## 11.2 QUALITY SHORTFALL:

If Whitesell's 6-month rolling average PPM quality levels are ever equal to, or
greater than 1% for critical components or 2% for non-critical components Electrolux
may require Whitesell, (notification in writing), to correct such quality PPM
performance shortfall and within five (5) days, Whitesell shall have such non-
conforming Good(s) sorted or monitored and certified by a 3rd party company that is
approved by Electrolux either externally or in Whitesell's facility, at Whitesell's
expense, to make 100% inspection of Good(s) to be shipped to Electrolux. Such
inspection efforts shall continue for a minimum of 30-days, or until a satisfactory
corrective action plan has been submitted to Electrolux, implemented, and actively
demonstrating that the PPM-level is reduced to the acceptable level. If after 90 days,
progress is still insufficient to meet the PPM level for the specific Good(s) that
caused the PPM non-conformance, Electrolux shall notify Whitesell in writing of
such insufficiency detailing the specifics of the deficiencies and further detailing its
performance requirements and needs. After this, in the event Electrolux deems it
necessary to out-source the specific problem Good(s) for quality reasons, Electrolux
shall advise Whitesell of the criteria, consistent with the same third party criteria,
with which it must comply for Electrolux to resume purchases from Whitesell of that
problem Good.

Electrolux and Whitesell agree to establish quality improvement teams with support
from quality, production, engineering, and purchasing.

If the non-conformance with the annual PPM average for the critical and non-critical
clause above is in acted and continues for a period in excess of 6 months, Electrolux
shall have the right to cancel that specific Good from the Agreement and resource
such specific Good(s) that caused the PPM non-conformance.

## 11.3 GENERAL QUALITY COMPLIANCE COMMITMENTS:

Whitesell further acknowledges and agrees that Whitesell's compliance with such
quality requirements will be measured and determined by the methods consistent with
all divisions and mutually agreed and no location shall deviate from this procedure as
it relates to quality compliance. The parties agree that Whitesell will not be required
to effect quality improvement requirements through the implementation of
technology, which is not feasible in the industry utilized to produce a specific
Good(s).

12.0 WHITESELL QUALITY COMMITMENTS:

12.1   To ship lots that meet quality and engineering specification requirements as mutually agreed.

12.2   To document process inspections during the course of manufacture.

12.3   To maintain inspection documents and certificates of conformance, upon request to allow for review, for any article/shipment, shipped, as requested by each Electrolux location. Since Whitesell is ISO9002 and QS9000 certified, if it maintains its certifications in good standing it shall therefore be deemed to have met an even higher manufacturing standard and shall constitute full compliance without further need or audit by Electrolux.

12.4   To insure the latest agreed upon editions of drawings and other documents are used as based on current Purchase Orders, individual releases, and EDI communications; and to expedite implementation of changes based on standard Whitesell manufacturing lead times agreed to by both Electrolux and Whitesell as attached in Exhibit C "LEAD TIMES REQUIRED and FIRM PLAN SCHEDULEING."

12.5   Whitesell will establish an agreed upon Self-Certification First Article approval process which shall be approved and certified by Electrolux.

12.6   To self-certify First Article Samples after major tool adjustments, change of manufacturing method, production moves or other actions that may influence form, fit, or function and to notify any and all affected Electrolux plants of the same.

12.7   To immediately notify Electrolux of any suspicions that the quality requirements are not met in a lot already delivered or in route.

12.8   To replace nonconforming Good(s) found and authorize it be returned from assembly by Electrolux or discovered by Electrolux in some other way; to grant credit for debits regarding returned Good(s); to pay the costs of Electrolux for sorting of fasteners in urgent cases after notification and approval by Whitesell. To calculate accurate defective PPMs, Whitesell shall be allowed to sort or test sort at Electrolux or to return the Good(s) to Whitesell for sorting and Whitesell will report the actual defectives in the respective lots and only the actual defectives after testing or sorting shall be used in the calculation of Average 6-month PPM. Labeling and other similar lot rejections that do not affect line production shall not affect PPM calculations and are to be excluded.

12.9   To establish with Electrolux an ongoing quality improvement program which encompasses the following:

12.9.1  Measurement systems that encompass nonconformance of the most frequently reported or observed defects Electrolux Good(s); which provide that systems are in place to measure data collected at final Good(s) audit, at critical points in the Whitesell's production process, and in Whitesell's incoming inspection of Good(s)s and parts. Procedures and policies should be able to be demonstrated that they are in place and functioning.

12.9.2  Analysis showing the most likely root causes of each of these frequently reported nonconformance.

12.9.3  Time-phased corrective action plans for each of the top ranked defects, so as to eliminate or minimize nonconformance.

12.9.4  Specific objectives, which qualify, targeted nonconformance levels to be reached within stated timing. Future plans should include transition to measuring progress in terms of nonconforming parts per million.

12.9.5  Formal quarterly or semi-annual quality audits and certifications as required by ISO-9000 and QS9000 certification reviews must be initiated by Whitesell.

12.9.6  To attain a "Certified Supplier" status, continue striving towards "Preferred Supplier" status, and to provide "ship to stock" Good(s), thus eliminating need for Electrolux to utilize receiving inspection on Whitesell's Good(s).

12.9.7  Routine ISO9002 or QS9000 re-certification at Whitesell's expense would support the compliance with the above requirements.

12.9.8  The overall goal of Whitesell is to maintain the processes and documentation capability of ISO-9000 and the even more stringent QS-9000 certification, at Whitesell's manufacturing and distribution locations shipping directly to Electrolux.

12.9.9  Whitesell will continue to maintain its Statistical Process Control (S.P.C.).

12.9.10 Whitesell is to inform Electrolux contacts of any manufacturing disruptions that may cause delivery requirements to suffer in volume or timeliness.

12.10  Whitesell shall address any non-conforming responsibilities related to the above and plan a corrective quality plan to eliminate such non-conformance.

## 13.0 DEMAND FLOW MANAGEMENT:

Whitesell is expected to use the Electrolux Web-Site for Good(s) releases, schedule attainment, and information exchange.

## 14.0 ELECTROLUX QUALITY COMMITMENTS:

14.1  To fully support the joint cost and quality improvement programs described above and elsewhere in this Agreement.

14.2  To assist Whitesell in quality planning.

14.3  To participate in joint visits to Whitesell's facilities with the objective of improving communications and understanding of Whitesell's production processes, process control systems, design parameters, capabilities, capacities, and operational problems.

14.4  To contact Whitesell prior to sorting or rework, except when impossible due to emergency requirements or circumstances.

## 15.0 DISTRIBUTION:

Deliveries are to be made F.O.B. destination freight collect. Since Whitesell will be providing a Managed Inventory Program to all locations, in lieu of the above freight terms Whitesell will provide the goods delivered to the divisions and shall bill freight costs to Electrolux based on the freight rates included in Exhibit A. Freight costs are to be invoiced for the usage of Good(s) at the divisions. A mutually agreed determination on freight rates at each division shall be made and rates shall be entered appropriately for each shipping destination on Exhibit A. Less than truckload quantities shipped for the convenience of Whitesell or to cover late shipments will be Whitesell's responsibility at no additional charge to Electrolux over the original cost or rates. Any excess freight cost associated with a change caused by Whitesell is the responsibility of Whitesell except where the change is caused by an Electrolux location failure. Additionally, Whitesell will be responsible for any additional freight costs due to their movement of manufacturing to a qualified backup facility, or to any other location in order to meet Electrolux's requirements. Conversely, if Whitesell incurs any additional expedite costs, fees, break-ins

13

or other charges caused by Electrolux, Whitesell shall invoice the location and it will be paid per agreed pay terms.

Whitesell will also ship, freight collect, Good(s) for service to Electrolux locations, or to the Electrolux Service Parts Center, as directed by Electrolux. Good(s) covered under this Agreement will be listed in Electrolux's Purchase Orders and/or delivery/release schedules (or other methods as defined by Demand Flow Management), which will be supplied to Whitesell by each Electrolux location or the Service Parts Center. Release requirements will be based on mutually agreed (carton/bundle/container/lot.) quantities, with no overages allowed.

Electrolux's locations possess varying schedule techniques. Whitesell will work with each Electrolux location in satisfying schedule requirements.

## 16.0 MANAGED INVENTORY PROGRAM:

Whitesell shall provide an on-site vendor Managed Inventory Program at the locations in Exhibit E. The Managed Inventory program shall be defined as one Whitesell onsite employee or will agree to match any documented and verifiable current on site services provided and paid for by your current suppliers and an On-Site storage concept. Whitesell shall be provided complete facility access and the adequate in plant storage capacity to meet the reasonable economic needs of Whitesell Managed Inventory as defined in Exhibit E. All other costs of the Whitesell Managed Inventory Program or any related services contemplated under this Agreement above this base level shall be reimbursed to Whitesell at its actual cost. Whitesell shall receive regular shipments to its stock; and issue Good(s) on a daily basis and provide such issue information into Electrolux's receiving system-acknowledging transfer of Good(s) ownership and basis for invoicing from Whitesell.

## 17.0 SERVICE:

### 17.1 FLEXIBILITY/PRODUCTION CAPACITY:

Whitesell agrees to guarantee Good(s) and production capacity availability to meet Electrolux's requirements at all participating plant locations once Whitesell assumes responsibility for each Good as defined in a mutually agreed transition plan based on planning requirements supplied by Electrolux (i.e.: production schedules, Bill of Material accuracy, EAU, stock levels on hand, adherence to Whitesell lead time requirements). Any problems regarding conflicting schedules or conflicting demands will be quickly referred to Electrolux's designated plant agent. Whitesell will allocate scarce resources (i.e. time, equipment, or material inventory) to resolve such conflicts. In the event of any shortage, Whitesell shall not give any disadvantage to Electrolux's orders over all other customer orders in any allocation and shall give due consideration to any special needs of Electrolux.

### 17.2 DESIGN/ENGINEERING ASSISTANCE:

Whitesell will support Electrolux in design application and integration. Whitesell will present to Electrolux the latest in design, technology, manufacturing, etc. to ensure that Electrolux is held in a leadership position within their industry. Whitesell will provide assistance in consolidating and rationalizing SKUs in both current production requirements and in Service Parts. Whitesell will also provide use of their testing

14

facilities to Electrolux, upon request, Whitesell shall provide Good(s) to Electrolux's specifications, prints, and request. However, Electrolux agrees to utilize any specific Good(s) that may have a minor non-conformance to print specifications yet such non-conformance will have no functional or adverse affect in the application or its joint integrity. Whitesell will recommend the best Good(s) design in its professional opinion subject to Electrolux approval.

Whitesell shall be responsible to maintain a drawing database for all Good(s) sold to Electrolux under this agreement.

## 17.3 REPORTING:

When requested, Whitesell will provide summarized monthly reports of purchases, including Good(s) purchased for service, by dollar amount and by amount of Good(s), by individual Electrolux location, to the Electrolux Commodity Director and to each appropriate Electrolux location.

## 18.0 WARRANTY:

EXPRESS LIMITED WARRANTY: Whitesell warrants that the Goods will substantially conform to Electrolux's applicable specifications and will be free from defects in workmanship for a period of two (2) years from date of installation. This express limited warranty does not apply to (a) defects resulting from Electrolux's design of the Goods; or (b) Goods that has been abused, damaged, altered or misused by any person or entity after title passes to Electrolux. Notwithstanding anything else in this Agreement, Whitesell assumes no liability for or obligation related to the performance, accuracy, specifications, failure to meet specifications or defects of or due to tooling, designs or instructions produced or supplied by Electrolux and Electrolux shall be liable for costs or expenses incurred by Whitesell related thereto. Upon any failure of a Good to comply with the above warranty, Whitesell's sole obligation, and Electrolux's sole remedy, is for Whitesell to promptly replace such Good.

WHITESELL MAKES NO OTHER WARRANTIES OR CONDITIONS ON THE PRODUCTS, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR COMMUNICATION WITH ELECTROLUX, AND WHITESELL SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Upon written notification from Electrolux, Whitesell will define an implementation plan for Service Call Rate (SCR) improvement for excess field failure solely caused by Whitesell manufacturing deficiencies in the Good(s). In no event shall such reimbursement of out-of-pocket costs include any amounts for lost profits or business goodwill or any other special, punitive or indirect costs or consequential or other damages.

## 19.0 FORCE MAJEURE:

Neither party shall be liable for any failure, inability or delay in performing its obligations hereunder, if such failure, inability or delay be due to any Act of God, war, explosion or sabotage, accident, casualty, government law, order or regulation, or failure or delays in usual sources of supply of components, raw materials domestic or ocean transportation, or of any other cause beyond the reasonable control of the party whose performance is prevented or delayed, but prompt notice, due diligence and every reasonable effort shall be used by each party in curing such cause and in resuming performance, such as substitution of material sources or utilization of overtime or additional workers. Toward that end, evidence of the reason for delay shall be submitted for discussion and arrangements will be made to the fullest extent practicable to minimize adverse impact of the delay on the parties including, if necessary, seeking alternate sources of supply of comparable Goods.

## 20.0 EPIDEMIC FAILURE:

Notwithstanding anything to the contrary in the Agreement, in the event all Goods contain defects for which Whitesell has responsibility, in an amount which exceeds one percent (1 %) for critical components or two percent (2%) for non-critical components of the cumulative total Goods supplied by Whitesell to Electrolux in any calendar quarter during the Term ("Epidemic Failure"), Whitesell shall in addition to normal warranty obligations, be responsible to repair and replace, or reimburse Electrolux for its actual labor rates, and other reasonable direct costs and direct expenses incurred by Electrolux and directly attributable to the failure of such excessively defective Goods. Except as to the foregoing Epidemic Failure, Electrolux shall be responsible for the labor and administration costs of curing defective Goods under the warranty provided by Whitesell.

## 21.0 INDEMNITY AND INSURANCE:

### 21.1 INDEMNITY BY OTHER PARTY:
Each party shall save harmless, defend and indemnify, at its own expense, the other party and its customers or suppliers from and against all liability, costs and expenses (including attorney fees and expenses) arising out of the death or injury to any person or damage to any property, by whomsoever suffered, resulting from:
21.1. (i) Defaulting Party' breach of its obligations under this Agreement,
21.1. (ii) Failure of the Goods to conform to Part Specifications unless within standard industry specifications of goods.
21.1. (iii) Defects in manufacturing unless goods mis-installed

### 21.2 PRODUCT LIABILITY INSURANCE:
Whitesell shall, at its own cost and expense, buy and maintain product liability insurance, which contains contract liability endorsements, with a personal injury limit of not less than Two Million Dollars ($2,000,000.00) and a property damage limit of not less than One Million Dollars ($1,000,000.00). Any such policy shall include Electrolux as an additional named insured and provide that coverage thereunder shall not be terminated or changed during the Term without at least thirty (30) days' notice in writing to Electrolux.

## 22.0 MANAGEMENT REVIEW:

16

Electrolux and Whitesell agree to meet quarterly to review all projects and aspects of this business relationship. Upper management personnel should represent Whitesell with Electrolux being represented by select representatives from cross-functional disciplines.

## 23.0 TERMINATION BY MUTUAL AGREEMENT:

Electrolux or Whitesell may terminate this Agreement at any time by mutual written agreement. Alternatively, either party may terminate this Agreement in its sole discretion. ,after completion of the initial term, or upon expiration of any subsequent term after the initial term, by providing written notice of such termination to the other party not less than six (6) months prior to the end of such term.

### 23.1 PHASE OUT PERIOD:

If notice of termination is given then from and after the delivery of such notice of termination and until the effective date of such termination shall be called the "Phase-Out Period". The parties shall cooperate in good faith and use their best efforts to wind up and complete the full utilization prior to the end of the Phase-Out Period, of all of supplier's product made for Electrolux. Whitesell shall advise the quantities of all finished goods, work-in-process, and committed purchased products and Electrolux shall take delivery of all such Good(s) during this period. To the extent reasonably feasible, any development projects as of the date notice of termination is given shall be completed. Except as otherwise provided herein, all terms and conditions of this Agreement shall continue in effect throughout the Phase-Out Period.

### 23.2 TERMINATION FOR CAUSE:

In addition to any other rights or remedies provided by this Agreement, each of Electrolux and Whitesell shall have the unilateral right to terminate this Agreement for Cause upon the delivery of written notice of termination to the other party (the "Defaulting Party"). For purposes of this Agreement, "Cause" shall be defined as the occurrence of any one or more of the following events:

23.2.1. Assignment: The Defaulting Party attempts to assign this Agreement without approval of the other party as specified in section 8.0.

23.2.2 Dissolution: The voluntary or involuntary dissolution of the Defaulting Party.

23.2.3 Insolvency: The (i) making of a general assignment for the benefit of creditors by the Defaulting Party; (ii) filing of any petition by the Defaulting Party or the commencement of any proceeding voluntarily by the Defaulting Party for any relief under any bankruptcy or insolvency laws or any law relating to the relief of debtors; (iii) consent by the Defaulting Party to the entry of an order in an involuntary bankruptcy or insolvency case; (iv) entry of an order or decree for relief against the Defaulting Party by a court of competent jurisdiction in an involuntary case under any bankruptcy or insolvency laws or any law relating to the relief of debtors, which order or decree is unstated and in effect for a period of thirty (30) consecutive days; (v) appointment, with or without the consent of the Defaulting Party, of any receiver, liquidator, custodian, assignee, trustee, or other similar official of the Defaulting Party or any substantial part of its property; or (vi) admission by the Defaulting Party in writing of its inability to pay its debts generally as they become due.

23.2.4 Except as otherwise provided above, the occurrence of any act or omission by the Defaulting Party that constitutes a material breach of this Agreement as defined in Section 26.0.

18

24.0 COMPETITION:

If it is perceived that a significant offer is made in writing to Electrolux more favorable from a Qualified Supplier with similar supplier capabilities, the following procedure will be utilized. The intent is to establish a course of action that recognizes the need to keep Electrolux competitive and for Whitesell to make a reasonable profit, and the mutual desire to continue the Agreement.

24.1 MEETING COMPETITION PROCEDURE:

If Electrolux is offered the opportunity to purchase the Goods on Exhibit B at a price less than that which Electrolux could realize under this Agreement (taking into account all comparable pricing, service, and comparable capabilities Whitesell is providing under this Agreement ) after the initial term, Electrolux may so notify Whitesell in writing and submit therewith such verifiable third party documentation and written proof of such third party offer. Whitesell shall have the last right of refusal to match all terms and conditions of such offers.

If Whitesell rejects Electrolux's other offer for all Good(s) and fails to match the price and terms of the third party offer within ninety (90) days after Electrolux notifies Whitesell of the offer, Electrolux may buy the Goods from the third party after all Whitesell's existing inventories have been purchased. In applying the foregoing provision, it is the intent of both parties in this Agreement that Whitesell shall not be asked to meet any quotations:

    24.1.1 from a supplier, which does not have similar supplier capabilities and will provide such capabilities that Whitesell provides under this agreement;

    24.1.2 Whitesell is not to be asked to meet "Cherry-Picking" quotations.

25.0 DISPUTE RESOLUTION:

To the extent feasible, the parties desire to resolve any controversies or claims arising out of or relating to this Agreement through discussions and negotiations between each other, and any dispute arising under or alleged breach of this Agreement shall be referred in writing to the Contract Administrators for resolution. Such written notice shall define the problems, issues, and non-compliance with the Agreement and the specific remedies requested for compliance. Within thirty (30) days of such notice, both parties shall meet to use their best efforts in good faith to resolve any disputes, controversies or claims arising out of or relating to this Agreement by face-to-face negotiations with the other party.

In the event that, after good faith discussions, such controversies or claims cannot be resolved solely between the parties, the parties may agree upon any type of informal dispute resolution that is feasible under the circumstances, including referral of any such dispute, controversy or claim to any third party for resolution. In the absence of any such agreement, either party may proceed with resolving any such controversy, claim or dispute through any other proceedings as may be deemed appropriate by such party. If the dispute is a perceived breach of Agreement, the procedures to address these concerns are stated in section 26.0.

## 26.0 BREACH OF PURCHASE COMMITMENT:

Upon material breach of this Agreement by one party, the other party after compliance with the Dispute Resolution procedure, may suspend or modify its commitment to purchase/sell a specific Good(s) so as to preserve the balance of this Agreement. Or, if the breach relates to any other term, covenant or provision of this Agreement, upon the delivery of written notice to the defaulting party and failing to cure such breach within 30-days, the other party may suspend or modify its commitment under this Agreement. Such notice shall state the grounds upon which material breach of this Agreement is asserted, specify the extent to which the commitment is to be suspended, and set forth the conditions under which the other party must comply to cure the breach so that both parties are willing to resume business. It is critical that this be communicated in writing and formally delivered.

## 27.0 GOVERNING LAW:

This Agreement shall be deemed to have been made in the State of Georgia and shall be construed in accordance with the laws of that state.

## 28.0 MISCELLANEOUS:

### 28.1 COUNTERPARTS:

This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.

### 28.2 BINDING EFFECT:

The provisions of this Agreement shall be binding upon and accrue to the benefit of the Parties and their respective heirs, legal representatives, successors and assigns.

**29.0 NOTICES:**

Any notice required or desired to be given in connection with this Agreement shall be in writing and effective upon the earlier of its delivery or 5-days after deposit in the U. S. mail, postage prepaid, certified return receipt requested, addressed as follows, or to such other address as to which either party gives notice to the other:

If to Electrolux:    Electrolux Home Products
                     Attn: Mr. Clarence C. Frauendienst
                     701 33rd Avenue North
                     St. Cloud, MN 56303
                     Fax # 320.240.3493
                     Email: Clarence.frauendienst@electrolux.com

If to Whitesell:     Whitesell Corporation
                     Attn: Mr. Neil L. Whitesell
                     P.O. Box 2571
                     2703 E. Avalon Avenue
                     Muscle Shoals, Alabama
                     35662-2571
                     Fax #: 256.248.8588
                     Email: neil@whitesellcorp.com

The undersigned are duly authorized agents for Electrolux and Whitesell, and do understand and accept without reservation, this Agreement as detailed on Pages 1 through __21__, including all schedules and attachments. Accept as otherwise set forth herein, this Agreement shall not be changed or amended except by a written document, signed and dated by both Electrolux and Whitesell.

Whitesell Corporation

Neil L. Whitesell,
President, CEO

__12-15-00__
DATE

Electrolux Home Products    12/14/00

Paul Bertrand

Roger Leon

Clarence C. Frauendienst

__12/14/00__
DATE

21

# Exhibit A

## Parties, Locations and Notices

Parties:
Electrolux Home Products
White Consolidated Industries,Inc. Augusta, GA

Whitesell Corporation
P.O. Box 2571
2703 E. Avalon Ave.
Muscle Shoals, Alabama 35662-2571

## Notices / Contract Administrators:

For Electrolux:

Mr. Clarence Frauendienst
Frigidare Home Products
701 33rd Avenue North
St. Cloud, Minnesota
56303


Phone 320-240-3471
Fax 320-240-3493
Email:

Clarence.frauendienst@electrolux.com

For Whitesell:

Mr. John C. Duffner
Whitesell Corporation
P.O. Box 2571
2703 E. Avalon Avenue
Muscle Shoals, Alabama
35662-2571

Phone 678-573-0157
Phone 256-248-8567
Fax 256-248-8588
Email:

Jduffner@whitesellcorp.com

23

Page 2)

# Exhibit A
## Parties, Locations and Notices

Delivery Locations:

| Div # | Location | Agreed Freight Cost |
|---|---|---|
| | Anderson, SC | 3.00% |
| | McRae, GA | 2.75% |
| | Orangeburg, SC | 3.00% |
| | Deqeen, AR | 4.00% |
| | Nashville, AR | 4.00% |
| | Webster City, IA | 5.50% |
| | Jefferson, IA | 5.50% |
| | St. Cloud, MN | 6.50% |
| | Greenville, MI | 4.00% |
| | Edison, NJ | 6.50% |
| | Springfield, TN | 2.75% |
| | Kinston, NC | 4.50% |
| | L'Assomption, Quebec City, Canada | 6.50%(4.50% Toronto) |
| | Swainsboro, GA | Actual % |



# Whitesell Corporation

February 28, 2003

Mr. Roger Leon
Contract Administrator
Electrolux Corporation250 Bobby Jones Expressway
Augusta Georgia 30907

RE: **Failure to Resolve Breaches in Dispute Resolution Section 25.0**
    **Formal Notice of Breach of Purchase Commitment Section 26.0**

Dear Roger:

It was with best efforts in good faith that Whitesell has met with you on numerous occasions to attempt Dispute Resolution as well as various correspondences concerning Electrolux current breaches. Whitesell is disappointed that we have failed to come to any Partnership Agreement to resolve any of the disputes or breaches. You cancelled our Dispute Resolution meeting scheduled in Orangeburg on February 21, 2003. You also stated that you will refuse to meet or talk about any open disputes. You refused to talk to or even allow on Electrolux premises under threat of arrest Whitesell's designated Contract Administrator. Whitesell has given proper notice of all the issues and claims both in writing and in meetings with various Electrolux personnel. We have specifically identified the alleged breaches, defined the problems, issues, and non-compliance with the Partnership Agreement and specific remedies requested for compliance. In addition, Whitesell even offered pricing incentives outside of the Partnership Agreement to further encourage compliance.

Electrolux failed to demonstrate a desire to make Dispute Resolution effective.
Electrolux rejected even the additional economic benefits of the pricing incentives offered by Whitesell. All Electrolux had to do was to comply with the Partnership Agreement it signed two years earlier. We formally met in Dispute Resolution on September 4, 2002 and provided a detailed list of breaches most of which is still unresolved. It is clear Electrolux was not going to make any effort to comply with Section 25.0. Electrolux, by failing to even meet, breached section 25.0 requiring them to use their best efforts in good faith to resolve these disputes. Whitesell has fulfilled its obligation under Section 25.0. Dispute Resolution has failed as an effective means to solve these issue per the Partnership Agreement. Whitesell even offered to submit these issues to third party mediation to no avail. Electrolux has also refused to accept or agree to move forward with any of these options. We are extremely disappointed in Electrolux's recent actions and communications as the statements expressed in those correspondences raise very serious concerns as to Electrolux's intent to honor our long-term Partnership Agreement.

1

# EXHIBIT 2

Failing all Partnership Agreement options under section 25.0, Whitesell hereby now enacts section 26.0 Breach of Purchase Commitment in order to preserve Whitesell's interests under the Partnership Agreement.

### 26.0 BREACH OF PURCHASE COMMITMENT:

Upon material breach of this Agreement by one party, the other party after compliance with the Dispute Resolution procedure, may suspend or modify its commitment to purchase/sell a specific Good(s) so as to preserve the balance of this Agreement. Or, if the breach relates to any other term, covenant or provision of this Agreement, upon the delivery of written notice to the defaulting party and failing to cure such breach within 30-days, the other party may suspend or modify its commitment under this Agreement. Such notice shall state the grounds upon which material breach of this Agreement is asserted, specify the extent to which the commitment is to be suspended, and set forth the conditions under which the other party must comply to cure the breach so that both parties are willing to resume business. It is critical that this be communicated in writing and formally delivered.

Please be advised that Whitesell will take all actions it deems necessary to protect itself and its rights under this section of the Partnership Agreement. This is formal notice of breach, failure to comply with Dispute Resolution, failure to accept alternative methods to resolve such Breaches in Dispute Resolution, and therefore, left Whitesell no alternative but to enforce section 26.0. Whitesell intends to exercise all of its rights and obligations under the Partnership Agreement. Full notice of the specific breaches have been previously given and full and adequate discussions on each issue have either been presented, discussed, along with cure options satisfactory to Whitesell to continue its obligations under the Partnership Agreement. We have attached an updated list of breaches along with specific cure options. Electrolux's failure to cure such breaches to Whitesell's satisfaction within 30-days will cause Whitesell to suspend or modify its commitments under this agreement.

Whitesell is disappointed that Electrolux Corporation has refused to honor the long-term Partnership Agreement. Please be assured Whitesell will continue to honor all of its obligations specifically as required by section 26.0 of the Partnership Agreement. We are hopeful Electrolux will take immediate action to resolve all current breaches in a timely manner. Whitesell does not want to take the any measures contemplated in the Partnership Agreement to enforce its rights and believes we can quickly remedy all of these economic disputes with out doing so. We are prepared to make every such effort within the next thirty days.

Sincerely yours,

R/R. Wiese

attachments:  Attachment A:  Breaches and Cures February 28, 2003
              Attachment A:  Breaches and Cures  September 4, 2002

2

# Attachment A

# Strategic Partnership Agreement
## Outline of Electrolux Corporation Breaches
## Definitions, and Suggested Cures
February 28, 2003

**1.    Issue:        Failure to Transition Agreement Products**

Instructions given to Electrolux operating divisions to specifically not honor the Strategic Partnership Agreement, delay transition, suspend future purchases from Whitesell, and intent to unilaterally modify or terminate the contract which is in breach of sections 2.0; 2.1.2; 3.1, and Exhibit B. Specific parts included from these and like vendors:  All parts for Springfield Division, Brunner, Fansteel, Northern Wire, Mitchell-Bissell, Ashley Ward, Demco Gray, Precision, Hawk, etc. for all current and future cold headed/threaded  special cold-formed parts, and screw machined parts.

**Requested Remedy/Solution:**
a.  Written notification to take the Transitions of all products off Hold
b.  A satisfactory reaffirmation by Electrolux confirming the adherence to the continued Transition of all Agreement products (attached Let's Work Together to Resolve: Transition off Hold).
c.  Whitesell can not accept further delays and intentional non-transition for the above parts must be as follows:   Springfield 4/1/03, Fansteel and Northern Wire 8/1/03, Brunner 10/1/03 and balance of other suppliers are to be transitioned on a mutually defined schedule but in no event shall the transition of those suppliers shall it take longer than 12 months.
d.  Affirmation that breach of this issue again during the remaining term of the agreement shall subject Electrolux to an automatic Agreement extension equal to the initial term.

**2.    Issue:  Purchase of Contracted Parts from other Suppliers**

Electrolux is in breach of Section(s) 2.0; 2.1.2; 5.1; 5.2; 5.6; and 24.1 for exclusivity and purchasing all its current and future parts from Whitesell and pricing established on such parts. Electrolux has made purchase commitments to Bamal to purchase parts to be used after the date of originally planned transition date.  This is a breach of the exclusivity of purchase commitments by purchasing parts from Bamal after April 1 at Springfield.  This has been a pattern and practice that has occurred previously at Orangeburg, Arkansas, Webster City, McRae, etc.  Whitesell will work with Electrolux to resolve this but Electrolux has been unwilling to give us the facts or what it needs to do.

**Requested Remedy/Solution:**
a.  To purchase from the transition date on all contracted parts from Whitesell. Electrolux has adequately notified all prior suppliers of its Agreement with Whitesell

and will not purchase Good(s) such that it will delay the transition of product to Whitesell unless mutually agreed with Whitesell.

**3.    Issue:  Failure to pay contract obligations when due**
Electrolux has failed to make full and timely payments pursuant to section 4.0 payment terms and section 5.7 Obsolete payments. Electrolux repeatedly does not pay miscellaneous invoices although repeatedly advised and copied on the problems.  Electrolux refuses to pay for obsolete products covered by the Agreement and then after acknowledging it is accurate then refuses to pay full value for the obsolete items and wants a discounted price.

    a.  Delinquent payments for invoices and miscellaneous items:  $815,998.37
    b.  Obsolete invoices current and delinquent:  $1,063,526.34
    e.  See attached spreadsheet with invoice copies for details

    **Requested Remedy/Solution:**
    a.  Honor the terms and intent of the Agreement and pay obligations timely.
    b.  In the future after the above payments have been made, any failure to make timely payment for obsolescence when due will incur penalty for the amount due of 5% per month delinquent.

**4.    Issue:  Offsite Space and Payments at Orangeburg**
Electrolux has repeatedly failed to honor its obligations under section 16.0 on site space at Orangeburg and reimbursement of labor/costs in excess of contracted amounts.  Not providing adequate space on site damages Whitesell's performance and suffers substantial additional costs to manage the product requirements.  Adequate space also affects the related freight costs noted below. Without on site space, Whitesell cannot offer these the savings previously proposed Whitesell has previously offered to waive payment of the offsite expenses if timely space were made available.  This has not happened. Electrolux has failed to honor and make full and timely payments pursuant to section 4.0 payment terms

    **Requested Remedy/Solution:**
    a.  Electrolux needs to make 8,000 sq. ft available and provide proportionate additional space if needed by Whitesell, as additional products are transitioned.
    b.  Electrolux will pay for the offsite expenses previously billed of $539,000 and the subsequent month's charges of $60,000.  EHP will make as much space available as possible (3,000 to 4,000) and in addition EHP will pay monthly the $15,000 to defray offsite expenses until 8,000 sq. ft are available. Whitesell may acknowledge and accept a lesser space than the 8,000 sq. ft. space to be provided.  Whitesell will provide our line roller racking and line box holders with which it may therefore not require the full 8,000 sq. ft. for the current level of purchases.
    c.  In the future after the above payments have been made, any failure to make timely payment for off site expenses when due will incur penalty for the amount due of 5% per month delinquent.

5.    Issue:  McRae Restructuring of the On Site Activities
Electrolux is not fulfilling its obligations under section 16.0 at McRae with similar programs as
the other divisions.

    Requested Remedy/Solution:
        a.  Whitesell recommends one of two proposals: In or Out?  We ask Electrolux to
            eliminate the debit charged to Whitesell in McRae and either allow Whitesell to
            assume the same role it has at all the other Electrolux facilities.  Have Whitesell buy
            back the inventory (ie: $600,000 estimate), assist Whitesell identify and resolve the
            inventory accounting issues to both parties satisfaction and totally manage the
            inventory or Electrolux agrees to modify the Agreement for that location and assume
            all on site responsibilities previously contemplated by Whitesell.  Part of the solution
            if Whitesell remains involved, Whitesell will put our roller racks at the lines to handle
            the boxes, line box holders, and work with McRae personnel to assure them of
            accuracy of product quantity measurement usage.  We either want to fix the problems
            or back out of it and allow Electrolux to fix it.  We both can fix the problems there.

        b.  Whitesell recommends one of two proposals: In or Out?  The current conditions are
            unworkable for Electrolux personnel and/or Whitesell personnel.  The current process
            is out of control and Whitesell cannot be responsible for outages or their adverse
            effects.  If Electrolux wants to continue to assume total handling responsibility of the
            product at McRae, Whitesell will agree to a price decrease of 1% for McRae
            purchases and remove all of its personnel except for one on site manager.  Whitesell
            does not recommend this alternative and would prefer to repurchase the inventory and
            take full responsibility for the inventory

6.    Issue:  FOB Muscle Shoals Freight Terms
Electrolux has repeatedly failed to honor its obligations under section 16.0 on site space at
Orangeburg and other divisions and reimbursement of labor/costs in excess of Agreement
amounts.  Not providing adequate space on site damages Whitesell's performance and suffers
substantial additional costs to manage the product requirements.  Adequate space also affects the
related freight costs.  Whitesell had proposed additional savings not contractually obligated
under the distribution section 15.0 for the Orangeburg and Arkansas divisions.  Without on site
space, Whitesell cannot offer these additional savings and the Agreement has to be adhered as
agreed.

    Requested Remedy/Solution:
        a.  Whitesell will hold in abeyance the charges for Freight costs at Kinston (3 ¾%),
            Orangeburg (2%), Arkansas (3.1%), and McRae (2%) from the date of this letter if
            EHP timely cures the above breaches within the time prescribed.  Whitesell has
            contributed this savings to Electrolux to date.  This past cost savings remains in effect
            for each of the divisions for all past freight costs.  This is outside of the contract
            terms and commitments and shall be considered additional Total cost reduction
            benefits.  This is not a change in the FOB freight terms previously agreed.  This is not

3

a change, amendment, or modification of the Agreement (section 29.0) but only an additional price incentive Whitesell is offering to Electrolux.

b.  Failure to a timely transition of the Brunner and Wireform business will void this in its entirety.

### 7.     Issue:  Cash Rebate Proposal

Whitesell has unilaterally offered a huge savings of an additional –2% Cash Rebate on **ALL** products Electrolux purchases from Whitesell effective January 1, 2003.  Whitesell offered this merely to encourage a timely transition of the rest of the items already covered in the agreement; and, to encourage prompt compliance with the Agreement on other terms and conditions including payment for obsolescence and off site space expenses.  The additional Cash Rebate is intended to be a price incentive.  It is not intended to be an amendment of or modification of the partnership agreement.

Electrolux can be assured that it will receive payment of the Cash Rebate at the end of the calendar year of 2003 simply by honoring the terms and conditions of the partnership agreement and taking the transition off hold. This would be for purchases beginning January 1, 2003 payable at the end of the year. It is not a contractual modification, change, or addition pursuant to Section 29.0.

#### Requested Remedy/Solution:
a.  Failure to a timely transition of the suppliers and products referenced it Breach item number 1 above will void this in its entirety.
b.  Nothing Required other than to meet the current obligations

### 8.     Issue:  Steel and Excess Inventory Carrying costs

Section 5.5 Cost Justification is now relevant.  We have not received the timely transition of business; we have been postponed and delayed.  We now find purchases from competitors and other issues as noted above.  It was Whitesell's intent to try to hold prices firm in spite of rising steel costs but in the unusual market situations we find today this may not be possible.  Steel costs domestically are up nearly 30%.  Offshore steel prices are now seeing increases in this same category.  "Only if in an adverse market situation that drastically affects Whitesell's costs would Whitesell request a price increase from Electrolux."  We will supply such validation of our material cost increases.  We know that Electrolux is facing this across the board and even having to allocate production time based on steel product availability let alone pricing.  Whitesell is currently reviewing all of its costing and manufacturing availability and looking for alternatives to our higher material costs.  Whitesell had anticipated to have additional purchase volume to defray such cost swings.

#### Requested Remedy/Solution:
a.  Transition additional business to Whitesell as rapidly as possible to assist Whitesell to defray the dramatic cost increase.
b.  None at this time.

4

# ⊠ Electrolux

March 18, 2003

Mr. Robert R. Wiese
Contract Administrator
Whitesell Corporation
2703 East Avalon Ave.
Muscle Shoals, AL 35662-2571

Re: Contract Issue

Dear Bob:

Confirming our discussion yesterday, March 17, 2003, Electrolux is requesting that you provide written confirmation that Whitesell will not disrupt the flow of materials to our facilities while issues of dispute are open either before or after March 28, 2003. We are again advising Whitesell that a disruption of our production at any facility as a result of Whitesell's actions would be unacceptable and would cause significant financial damage to Electrolux.

Unless we receive your written assurances by the end of the business day today, Electrolux will have no choice but to start taking actions to protect its ability to meet its customer commitments, and to mitigate the potential damages of a supply stoppage by Whitesell.

Sincerely,


Roger J. Leon
Contract Administrator
roger.leon@electrolux.com

ELECTROLUX HOME PRODUCTS NORTH AMERICA

MAILING ADDRESS
250 BOBBY JONES EXPRESSWAY, AUGUSTA, GA  30907

TELEPHONE
706 651 1751

TELEFAX
706 651 7113

SITE
www.electrolux.com

**EXHIBIT 3**



## Whitesell Corporation

March 18, 2003

Mr. Roger Leon
Contract Administrator
Electrolux Corporation
250 Bobby Jones Expressway
Augusta Georgia 30907

**RE:  Meeting In Orangeburg March 20th?**

Dear Roger:

We are in receipt of several letters on a variety of issues today.   We are gravely concerned about the severity of your rhetoric and attacks upon Whitesell now that the hour glass is finally running low.  Roger, we met over six months ago in Dispute Resolution of formal breach issues delivered in August 2002.  We met repeatedly over this time attempting to work with Electrolux to resolve these economic issues.  Whitesell has made numerous attempts to work with you and your people to amicably resolve all issues.

On February 21st, we were to meet in final dispute resolution and you cancelled the meeting and refused to even talk with our Contract Administrator.  We set up another meeting for March 20th to resurrect the resolution and today you send a letter to us canceling this meeting as well.  Regardless of your cancellation, Whitesell believes it is in everyone's best interest to meet Thursday March 20th to sit and discuss all these issues.  Whitesell is willing to again to travel and meet and make whatever efforts are necessary to resolve these open issues.  If this day is not convenient, we will try to accommodate your schedule and you are certainly welcome to come to Alabama at any time.  We both should do whatever we can to resolve all issues.

In our Final Notice of Breach of February 28th, we specifically enacted the provisions in the Agreement of  section 26.0 as contemplated when there was a failure in Dispute Resolution.  We are in complete conformance with notice, delivery, and terms of this section.  As we stated in our letter of February 28th:

> **Full notice of the specific breaches have been previously given and full and adequate**
> **discussions on each issue have either been presented, discussed, along with cure**

## EXHIBIT 4

1

> options satisfactory to Whitesell to continue its obligations under the Partnership Agreement. We have attached an updated list of breaches along with specific cure options. Electrolux's failure to cure such breaches to Whitesell's satisfaction within 30-days will cause Whitesell to suspend or modify its commitments under this agreement.

Failure to resolve these disputes in over six months is evidence that Whitesell has gone far beyond the terms contemplated under the agreement. Electrolux has refused to act to timely correct these breaches. We have only asked Electrolux to honor the agreement and move forward. Whitesell will not agree to any terms or conditions that are outside of the agreement regarding your quality qualification criteria as we previously specified in our May 20th, June 25th, July 29th, August 12 and 13th. Electrolux's unilateral quality purchase requirements has established a pattern and practice intended to relieve itself of its purchase obligations under the agreement. Furthermore, Whitesell's performance to date in transitioning over 2,000 products with over 100 suppliers clearly demonstrates Whitesell's ability to supply quality products under the agreement.

Electrolux has total control over this process and the immediate ability to resolve all contract disputes. This is an economic decision to comply with the terms and conditions of the contract, whether you agree with those terms today or not.

We again suggest the following recommendations to move forward:

- Honor the terms and conditions of the agreement and cure the breaches as defined, provide Whitesell a signed letter of commitment for clarity, and enjoy $2,125,000.00 in annual savings not required under the current agreement.
- Mediation. Whitesell has offered mediation to resolve these issue twice and all times Electrolux has refused to avail itself of this option.
- Transition the products you feel you are not obligated to purchase from Whitesell, with the understanding that Whitesell is contractually obligated to stand behind these products on any quality or delivery related issues. The current agreement clearly specifies the quality standards required on all Good(s) covered by the agreement.

As stated above "…Electrolux's failure to cure such breaches to Whitesell's satisfaction within 30-days will cause Whitesell to suspend or modify its commitments under this agreement…" Whitesell has been forced to enact section 26.0 by Electrolux's failure to cure its breaches. Whitesell did everything possible to prevent it; yet failure to adhere to the contract is unacceptable and Whitesell will continue to honor each and every section of the Agreement including section 26.0 in order to maintain all its rights and benefits under the agreement. Our statement is clear in suspension of the Good(s) under the agreement or a modification of the Good(s) committed under the agreement. Instead of the above phrase, we suggest Electrolux focus on "…the conditions under which the other party [Electrolux] must **comply to cure the breach** so that both parties are **willing to resume business**."

2

This should not require such an adverse action to resolve the current open issues. This economic decision to move forward can be easily made by Electrolux. Whitesell therefore is not responsible for the six-month delay in the cures or other inaction that have led to this precipice. Whitesell is in complete compliance with section 26.0. Therefore, Whitesell is not responsible for any damages caused by your inaction. Electrolux can easily avoid any potential adverse affects to either of our organizations. Whitesell will continue to enforce the agreement to secure all its rights and benefits under the terms of the agreement.

As we stated above, we are requesting that the March 20th meeting take place. Whitesell absolutely wants to attempt to resolve all open issues in an open and complete manner. We stand ready to resolve these issues and work through each and every item as long as Electrolux is committed to a final resolution.

Sincerely,


R. R. Wiese
Contract Administrator

# ⊠ **Electrolux**

---

### FACSIMILE TRANSMITTAL SHEET

---

| TO:<br>**ATTN: Neil L. Whitesell** | FROM:<br>**Kim Rio** |
|---|---|
| COMPANY: | DATE:<br>**02/15/05** |
| FAX NUMBER:<br>**256-248-8588** | TOTAL NO. OF PAGES INCLUDING COVER:<br>**4** |
| PHONE NUMBER:<br>**256-248-8500** | SENDER'S PHONE NUMBER:<br>**(706) 826-6958** |
| | SENDER'S FAX NUMBER:<br>**(706) 738-7076** |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

NOTES/COMMENTS: IF YOU HAVE TRANSMISSION PROBLEMS PLEASE CONTACT THE PERSON LISTED ABOVE.

---

**1030 STEVENS CREEK ROAD**
**AUGUSTA, GA 30907**
**PH# 706-826-6900**
**FAX# 706-738-7076**

**EXHIBIT 2**

Date: 2/15/2005
Quotation No.: 41896
Description: Lot 7 and Lot 8 Preliminary Quotation Detail

| LOT # | PART NUMBER | DESCRIPTION | ESTIMATED ANNUAL USAGE | TOTAL UNIT COST | TOTAL EXTENDED COST |
|---|---|---|---|---|---|
| RODS/KEEPERS/LINKS .375 OR LESS | | | | | |
| 7 | 130804 | ROD.BRAKE.BLK.ZINC.26.840 | 340,000 | $ 1.15 | $ 390,705 |
| 7 | 131289 | ROD.BRAKE.MANDREL.LH.4.856 | 27,000 | $ 0.39 | $ 10,650 |
| 7 | 131300 | RETAINER.BELT.2.750X1.562 | 27,000 | $ 0.27 | $ 7,166 |
| 7 | 131491 | ROD.HINGE.42/46 | 670,000 | $ 0.12 | $ 79,662 |
| 7 | 133551 | ROD.PIVOT,W/NIBS | 5,000 | $ 0.49 | $ 2,426 |
| 7 | 134683 | GUIDE .BELT.MOWER.DRIVE.RH. | 500,000 | $ 0.28 | $ 141,695 |
| 7 | 137167 | ROD.ADJ.LIFT.ZINC.10.0WRK.LG. | 86,000 | $ 0.37 | $ 32,036 |
| 7 | 137213 | ROD.BRAKE.ZINC.GT. | 35,000 | $ 0.87 | $ 30,583 |
| 7 | 138228 | ROD.CLUTCH | 17,000 | $ 0.83 | $ 14,070 |
| 7 | 138400 | ROD SHIFT.YARD PRO. UNIVERSAL | 600 | $ 2.93 | $ 1,759 |
| 7 | 140083 | ROD.CLUTCH.SECONDARY.W/NIBS | 8,000 | $ 0.73 | $ 5,821 |
| 7 | 140608 | KEEPER.BELT.LH | 66,000 | $ 0.67 | $ 44,356 |
| 7 | 154778 | KEEPER.BELT.ENGINE.F-PROOF | 670,000 | $ 0.36 | $ 240,728 |
| 7 | 156524 | ROD.PIVOT.CHASSIS/HOOD | 670,000 | $ 0.21 | $ 139,209 |
| 7 | 156557 | KEEPER.IDLER ARM.BOTTOM | 17,000 | $ 0.19 | $ 3,302 |
| 7 | 156973 | GUIDE.BELT.GEAR DR.97 | 18,000 | $ 0.34 | $ 6,143 |
| 7 | 158112 | KEEPER.BELT.REAR.LH.STL.P930 | 140,000 | $ 0.17 | $ 23,691 |
| 7 | 160219 | ROD.SUPPORT.HOOD.HUSQ.P/L | 16,000 | $ 0.86 | $ 13,781 |
| 7 | 161591 | KEEPER.IDLER ARM.TOP.98 | 16,000 | $ 0.19 | $ 2,995 |
| 7 | 164543 | ROD.ADJUST.LIFT.STYT | 20,000 | $ 0.45 | $ 9,015 |
| 7 | 165572 | PIN.MULCHER.92/107CRD | 20,000 | $ 0.40 | $ 7,951 |
| 7 | 165621 | LINK.SHIFT.CRD.PMST.18T.YELLO | 7,000 | $ 1.22 | $ 8,558 |
| 7 | 165932 | KEEPER.FLAT IDLER.3.06".CRD | 19,000 | $ 0.31 | $ 5,964 |
| 7 | 165933 | KEEPER.BELT.IDLER.1.88.CRD | 19,000 | $ 0.25 | $ 4,686 |
| 7 | 169497 | ROD.BYPASS.HG-0510 | 220,000 | $ 0.43 | $ 94,001 |
| 7 | 169498 | ROD.BRAKE.HG-0510 | 220,000 | $ 0.94 | $ 207,63 |
| 7 | 169691 | KEEPER.BELT.CENTER SPAN | 670,000 | $ 0.19 | $ 129,094 |
| 7 | 169971 | ROD.BRAKE.MANDREL.RH | 30,000 | $ 0.39 | $ 11,649 |
| 7 | 170015 | ROD.BY-PASS.CRD.0510 | 13,000 | $ 1.07 | $ 13,942 |
| 7 | 174385 | ROD.TENSION.RELIEF.LEVER.DECK | 45,000 | $ 0.26 | $ 11,556 |
| 7 | 174387 | LINK.TENSION.RELIEF.LEVER.DECK | 45,000 | $ 0.62 | $ 27,990 |
| 7 | 174858 | LEVER.CONTROL.CRUISE | 48,000 | $ 2.44 | $ 117,052 |
| 7 | 175556 | KEEPER.BELT.IDLER.FLAT.2001 | 670,000 | $ 0.37 | $ 251,172 |
| 7 | 175607 | ROD.BRAKE.MAIN.CRD | 35,000 | $ 1.04 | $ 36,460 |
| 7 | 175651 | ROD.BRAKE.PMST.CRD.2001 | 8,000 | $ 0.65 | $ 5,201 |
| 7 | 175765 | ROD.BRAKE.PARKING.LT/YT.01 | 670,000 | $ 0.34 | $ 225,700 |
| 7 | 175896 | ROD.BRAKE.HG-0510.PEDAL CONTROL | 40,000 | $ 1.26 | $ 50,592 |
| 7 | 176600 | ROD.BRAKE.3500 | 40,000 | $ 1.10 | $ 44,05 |
| 7 | 177143 | ROD ASM.BYPASS.3500 | 40,000 | $ 0.81 | $ 32,450 |
| 7 | 177143 SUB1 | SPRING EXTENSION BYPASS CONTROL | | | |
| 7 | 177362 | LINK.CONTROL.CLUTCH | 40,000 | $ 0.63 | $ 25,349 |
| 7 | 177679 | BELT.KEEPER.VGT.GROUND DRIVE | 25,000 | $ 0.27 | $ 6,63 |

Date: 2/15/2005
Quotation No.: 41896
Description: Lot 7 and Lot 8 Preliminary Quotation Detail

| LOT # | PART NUMBER | DESCRIPTION | ESTIMATED ANNUAL USAGE | TOTAL UNIT COST | TOTAL EXTENDED COST |
|---|---|---|---|---|---|
| 7 | 178134 | DISCONNECT ASM.ROD.BYPASS.LTH | 38,000 | $ 0.86 | $ 32,640 |
| 7 | 178134 SUB1 | SPRING EXTENSION BYPASS CONTROL | | | |
| 7 | 178134 SUB2 | 1/8 DIA X 5/8 LG X .028 WALL THICKNESS SLOTTED TYPE ROLL PIN | | | |
| 7 | 178141 | ROD.BRAKE.LTH2000 | 8,000 | $ 0.99 | $ 7,929 |
| 7 | 179607 | ROD.BRAKE.PARKING.LTX.01 | 35,000 | $ 0.49 | $ 17,035 |
| 7 | 180218 | GUIDE.BELT.MWR.DRIVE.RH.CE.002 | 52,000 | $ 0.39 | $ 20,104 |
| 7 | 182402 | MUFFLER GUARD | 62,000 | $ 0.35 | $ 21,740 |
| 7 | 187414 | BELT KEEPER T/A | 320,000 | $ 0.60 | $ 191,782 |
| 7 | 187556 | ROD.TENSION RELIEF | 25,000 | $ 0.60 | $ 14,944 |
| 7 | 187686 | BELT KEEPER T/A | 8,000 | $ 0.73 | $ 5,860 |
| 7 | 188202 | ROD.PIVOT.FBI.CRD | 20,000 | $ 0.38 | $ 7,670 |
| 7 | 190736 | ANTI-ROTATION LT | 100,000 | $ 0.18 | $ 17,700 |
| 7 | 192575 | LINK 38 LEFT BRAKE LINKAGE | 90,000 | $ 0.36 | $ 32,54 |
| 7 | 192576 | LINK 38 RIGHT BRAKE LINKAGE | 90,000 | $ 0.41 | $ 37,32 |
| 7 | 105710X | LINK.CLUTCH.7.66 | 670,000 | $ 0.40 | $ 269,43 |
| 7 | 106735X | ROD. HINGE.BRKT/BLK.ZINC.9.88 | 53,000 | $ 0.20 | $ 10,46 |
| 7 | 108281X | ROD.SHIFT.43.50 | 2,500 | $ 1.36 | $ 3,41 |
| 7 | 109228X | LEVER.LOCK.HANDLE | 81,000 | $ 0.29 | $ 23,33 |
| 7 | 109337X | ROD.SHIFT.31.38 | 8,000 | $ 1.20 | $ 9,63 |
| 7 | 110702X | ROD.SHIFT.CRT | 47,000 | $ 1.46 | $ 68,56 |
| 7 | 120588X | PIN.HINGE.12.00.ZINC | 80,000 | $ 0.14 | $ 11,28 |
| 7 | 121006X | PIN.LEVER ASM | 83,000 | $ 1.00 | $ 83,10 |
| 7 | 121006X SUB1 | PIN - LEVER | | | |
| 7 | 121006X SUB2 | ROD - LEVER | | | |
| 7 | 121980X | ROD.HINGE.BRT/BLK.ZINC.5.75LG | 21,000 | $ 0.17 | $ 3,57 |
| 7 | 126971X | ROD.ADJ.LIFT.ZINC.7.49WRK.LG | 40,000 | $ 0.33 | $ 13,33 |
| 7 | 8393J | PIN.STAKE.DEPTH | 98,000 | $ 0.32 | $ 31,25 |
| | | | | LOT 7: | $ 3,451,60 |
| RODS/SHAFTS GREATER THAN .375 | | | | | |
| 8 | 131679 | ROD.SHF.SDL.LT/YT.STR.BLK.ZINC | 52,000 | $ 0.92 | $ 47,58 |
| 8 | 137648 | ROD.BRAKE.PARKING.GT | 83,000 | $ 0.59 | $ 48,79 |
| 8 | 155070 | SHAFT.PEDAL.FOOT.LT/STL | 670,000 | $ 1.12 | $ 751,4 |
| 8 | 174735 | LINK.TRANSAXLE.PDL.CHG0510.20 | 30,000 | $ 2.58 | $ 77,4 |
| 8 | 175606 | SHAFT.BRAKE.CRD | 35,000 | $ 0.65 | $ 22,6 |
| 8 | 175652 | ROD.BRAKE.HYDRO.CRD.2001 | 8,000 | $ 0.80 | $ 6,3 |
| 8 | 192438 | ROD.SHIFT.YTGT.ROS | 50,000 | $ 1.29 | $ 64,6 |
| 8 | 192502 | ROD.SHIFT.FENDER.ADJ.STLT.ROS | 530,000 | $ 1.27 | $ 672,4 |
| 8 | 192706 | ROD.SHIFT.LT.ROS | 70,000 | $ 1.32 | $ 92,5 |
| 8 | 192757 | ROD.TIE.WIRE FORM | 500,000 | $ 0.93 | $ 464,4 |
| 8 | 122253X | ROD.SHIFT.HI-LO.GT. | 19,000 | $ 0.96 | $ 18,2 |
| | | | | LOT 8: | $ 2,266,84 |

ELECTROLUX HOME PRODUCTS
1030 STEVENS CREEK ROAD
AUGUSTA GA 30907

Quotation No. ____ 41896 ____

PAGE:    1

ATTN: ___ KIMBERLY RIO ___

| Salesman | Freight | Terms | Lead Time | UNDER 4 WEEKS TYPICAL |
|---|---|---|---|---|
| HOUSE ACCOUNT | ██████████ | | | |

| Part No. and Description | Quantity | Price |
|---|---|---|
| PHONE: 706-826-6958 | | |
| PRELIMINARY PART PRICING FOR ARIBA LOTS 7 AND 8.  SEE ATTACHED FOR PRICING DETAIL. TERMS: NET 90 DAYS EHP AGREES TO OBSOLESCENCE COVERAGE FOR PARTS EQUAL TO 30 DAY MAXIMUM STOCK LEVEL FROM DATE OF NOTIFICATION. ███████████ AGREES TO VMI (VENDOR MANAGED INVENTORY). PRICES DO NOT INCLUDE FREIGHT OR WAREHOUSING COSTS. | | |
| 1ST ORDERS MAY REQUIRE ADDITIONAL PREPARATION TIME. THANK YOU FOR CONSIDERING ██████████ | | |

Prices effective for 90 days.
Typographical and stenographical errors

**We trust the above quote will be given your immediate consideration.**



**Date: 2/15/2005**
**Quotation No.: 41896**
**Description: Lot 7 and Lot 8 Preliminary Quotation Detail**

| LOT # | PART NUMBER | DESCRIPTION | ESTIMATED ANNUAL USAGE | TOTAL UNIT COST | TOTAL EXTENDED COST |
|---|---|---|---|---|---|
| 7 | 178134 | DISCONNECT ASM.ROD.BYPASS.LTH | 38,000 | $ 0.86 | $ 32,640 |
| 7 | 178134 SUB1 | SPRING EXTENSION BYPASS CONTROL | | | |
| 7 | 178134 SUB2 | 1/8 DIA X 5/8 LG X .028 WALL THICKNESS SLOTTED TYPE ROLL PIN | | | |
| 7 | 178141 | ROD.BRAKE.LTH2000 | 8,000 | $ 0.99 | $ 7,929 |
| 7 | 179607 | ROD.BRAKE.PARKING.LTX.01 | 35,000 | $ 0.49 | $ 17,035 |
| 7 | 180218 | GUIDE.BELT.MWR.DRIVE.RH.CE.002 | 52,000 | $ 0.39 | $ 20,104 |
| 7 | 182402 | MUFFLER GUARD | 62,000 | $ 0.35 | $ 21,740 |
| 7 | 187414 | BELT KEEPER T/A | 320,000 | $ 0.60 | $ 191,782 |
| 7 | 187556 | ROD.TENSION RELIEF | 25,000 | $ 0.60 | $ 14,944 |
| 7 | 187686 | BELT KEEPER T/A | 8,000 | $ 0.73 | $ 5,864 |
| 7 | 188202 | ROD.PIVOT.FBI.CRD | 20,000 | $ 0.38 | $ 7,670 |
| 7 | 190736 | ANTI-ROTATION LT | 100,000 | $ 0.18 | $ 17,704 |
| 7 | 192575 | LINK 38 LEFT BRAKE LINKAGE | 90,000 | $ 0.36 | $ 32,543 |
| 7 | 192576 | LINK 38 RIGHT BRAKE LINKAGE | 90,000 | $ 0.41 | $ 37,329 |
| 7 | 105710X | LINK.CLUTCH.7.66 | 670,000 | $ 0.40 | $ 269,430 |
| 7 | 106735X | ROD. HINGE.BRKT/BLK.ZINC.9.88 | 53,000 | $ 0.20 | $ 10,461 |
| 7 | 108281X | ROD.SHIFT.43.50 | 2,500 | $ 1.36 | $ 3,412 |
| 7 | 109228X | LEVER.LOCK.HANDLE | 81,000 | $ 0.29 | $ 23,335 |
| 7 | 109337X | ROD.SHIFT.31.38 | 8,000 | $ 1.20 | $ 9,637 |
| 7 | 110702X | ROD.SHIFT.CRT | 47,000 | $ 1.46 | $ 68,561 |
| 7 | 120588X | PIN.HINGE.12.00.ZINC | 80,000 | $ 0.14 | $ 11,285 |
| 7 | 121006X | PIN.LEVER ASM | 83,000 | $ 1.00 | $ 83,105 |
| 7 | 121006X SUB1 | PIN - LEVER | | | |
| 7 | 121006X SUB2 | ROD - LEVER | | | |
| 7 | 121980X | ROD.HINGE.BRT/BLK.ZINC.5.75LG | 21,000 | $ 0.17 | $ 3,570 |
| 7 | 126971X | ROD.ADJ.LIFT.ZINC.7.49WRK.LG | 40,000 | $ 0.33 | $ 13,338 |
| 7 | 8393J | PIN.STAKE.DEPTH | 98,000 | $ 0.32 | $ 31,297 |
| | | | | **LOT 7:** | **$ 3,451,604** |
| **RODS/SHAFTS GREATER THAN .375** | | | | | |
| 8 | 131679 | ROD.SHF.SDL.LT/YT.STR.BLK.ZINC | 52,000 | $ 0.92 | $ 47,583 |
| 8 | 137648 | ROD.BRAKE.PARKING.GT | 83,000 | $ 0.59 | $ 48,792 |
| 8 | 155070 | SHAFT.PEDAL.FOOT.LT/STL | 670,000 | $ 1.12 | $ 751,475 |
| 8 | 174735 | LINK.TRANSAXLE.PDL.CHG0510.20 | 30,000 | $ 2.58 | $ 77,436 |
| 8 | 175606 | SHAFT.BRAKE.CRD | 35,000 | $ 0.65 | $ 22,687 |
| 8 | 175652 | ROD.BRAKE.HYDRO.CRD.2001 | 8,000 | $ 0.80 | $ 6,374 |
| 8 | 192438 | ROD.SHIFT.YTGT.ROS | 50,000 | $ 1.29 | $ 64,665 |
| 8 | 192502 | ROD.SHIFT.FENDER.ADJ.STLT.ROS | 530,000 | $ 1.27 | $ 672,480 |
| 8 | 192706 | ROD.SHIFT.LT.ROS | 70,000 | $ 1.32 | $ 92,588 |
| 8 | 192757 | ROD.TIE.WIRE FORM | 500,000 | $ 0.93 | $ 464,487 |
| 8 | 122253X | ROD.SHIFT.HI-LO.GT. | 19,000 | $ 0.96 | $ 18,282 |
| | | | | **LOT 8:** | **$ 2,266,847** |



**Date: 2/15/2005**
**Quotation No.: 41896**
**Description: Lot 7 and Lot 8 Preliminary Quotation Detail**

| LOT # | PART NUMBER | DESCRIPTION | ESTIMATED ANNUAL USAGE | TOTAL UNIT COST | TOTAL EXTENDED COST |
|---|---|---|---|---|---|
| RODS/KEEPERS/LINKS .375 OR LESS | | | | | |
| 7 | 130804 | ROD.BRAKE.BLK.ZINC.26.840 | 340,000 | $ 1.15 | $ 390,705 |
| 7 | 131289 | ROD.BRAKE.MANDREL.LH.4.856 | 27,000 | $ 0.39 | $ 10,650 |
| 7 | 131300 | RETAINER.BELT.2.750X1.562 | 27,000 | $ 0.27 | $ 7,166 |
| 7 | 131491 | ROD.HINGE.42/46 | 670,000 | $ 0.12 | $ 79,662 |
| 7 | 133551 | ROD.PIVOT.W/NIBS | 5,000 | $ 0.49 | $ 2,426 |
| 7 | 134683 | GUIDE .BELT.MOWER.DRIVE.RH. | 500,000 | $ 0.28 | $ 141,695 |
| 7 | 137167 | ROD.ADJ.LIFT.ZINC.10.0WRK.LG. | 86,000 | $ 0.37 | $ 32,038 |
| 7 | 137213 | ROD.BRAKE.ZINC.GT. | 35,000 | $ 0.87 | $ 30,583 |
| 7 | 138228 | ROD.CLUTCH | 17,000 | $ 0.83 | $ 14,070 |
| 7 | 138400 | ROD SHIFT.YARD PRO. UNIVERSAL | 600 | $ 2.93 | $ 1,759 |
| 7 | 140083 | ROD.CLUTCH.SECONDARY.W/NIBS | 8,000 | $ 0.73 | $ 5,821 |
| 7 | 140608 | KEEPER.BELT.LH | 66,000 | $ 0.67 | $ 44,358 |
| 7 | 154778 | KEEPER.BELT.ENGINE.F-PROOF | 670,000 | $ 0.36 | $ 240,728 |
| 7 | 156524 | ROD.PIVOT.CHASSIS/HOOD | 670,000 | $ 0.21 | $ 139,209 |
| ` | 156557 | KEEPER.IDLER ARM.BOTTOM | 17,000 | $ 0.19 | $ 3,302 |
| ( | 156973 | GUIDE.BELT.GEAR DR.97 | 18,000 | $ 0.34 | $ 6,143 |
| 7 | 158112 | KEEPER.BELT.REAR.LH.STL.P930 | 140,000 | $ 0.17 | $ 23,691 |
| 7 | 160219 | ROD.SUPPORT.HOOD.HUSQ.P/L | 16,000 | $ 0.86 | $ 13,781 |
| 7 | 161591 | KEEPER.IDLER ARM.TOP.98 | 16,000 | $ 0.19 | $ 2,995 |
| 7 | 164543 | ROD.ADJUST.LIFT.STYT | 20,000 | $ 0.45 | $ 9,015 |
| 7 | 165572 | PIN.MULCHER.92/107CRD | 20,000 | $ 0.40 | $ 7,951 |
| 7 | 165621 | LINK.SHIFT.CRD.PMST.18T.YELLO | 7,000 | $ 1.22 | $ 8,558 |
| 7 | 165932 | KEEPER.FLAT IDLER.3.06".CRD | 19,000 | $ 0.31 | $ 5,964 |
| 7 | 165933 | KEEPER.BELT.IDLER.1.88.CRD | 19,000 | $ 0.25 | $ 4,686 |
| 7 | 169497 | ROD.BYPASS.HG-0510 | 220,000 | $ 0.43 | $ 94,001 |
| 7 | 169498 | ROD.BRAKE.HG-0510 | 220,000 | $ 0.94 | $ 207,031 |
| 7 | 169691 | KEEPER.BELT.CENTER SPAN | 670,000 | $ 0.19 | $ 129,094 |
| .7 | 169971 | ROD.BRAKE.MANDREL.RH | 30,000 | $ 0.39 | $ 11,645 |
| 7 | 170015 | ROD.BY-PASS.CRD.0510 | 13,000 | $ 1.07 | $ 13,942 |
| 7 | 174385 | ROD.TENSION.RELIEF.LEVER.DECK | 45,000 | $ 0.26 | $ 11,558 |
| 7 | 174387 | LINK.TENSION.RELIEF.LEVER.DECK | 45,000 | $ 0.62 | $ 27,990 |
| 7 | 174858 | LEVER.CONTROL.CRUISE | 48,000 | $ 2.44 | $ 117,052 |
| 7 | 175556 | KEEPER.BELT.IDLER.FLAT.2001 | 670,000 | $ 0.37 | $ 251,172 |
| 7 | 175607 | ROD.BRAKE.MAIN.CRD | 35,000 | $ 1.04 | $ 36,468 |
| 7 | 175651 | ROD.BRAKE.PMST.CRD.2001 | 8,000 | $ 0.65 | $ 5,201 |
| 7 | 175765 | ROD.BRAKE.PARKING.LT/YT.01 | 670,000 | $ 0.34 | $ 225,704 |
| 7 | 175896 | ROD.BRAKE.HG-0510.PEDAL CONTROL | 40,000 | $ 1.26 | $ 50,592 |
| 7 | 176600 | ROD.BRAKE.3500 | 40,000 | $ 1.10 | $ 44,054 |
| 7 | 177143 | ROD ASM.BYPASS.3500 | 40,000 | $ 0.81 | $ 32,450 |
| . | 177143 SUB1 | SPRING EXTENSION BYPASS CONTROL | | | |
| 7 | 177362 | LINK.CONTROL.CLUTCH | 40,000 | $ 0.63 | $ 25,349 |
| 7 | 177679 | BELT.KEEPER.VGT.GROUND DRIVE | 25,000 | $ 0.27 | $ 6,835 |



CUSTOM
WIRE FORMING
RESISTANCE WELDING
STATISTICAL
PROCESS CONTROL
ZINC ELECTROPLATING

**NORTHERN WIRE** LLC

AUTOMATIC
WORK
CAD/CAM
DESIGN SYSTEM

1100 TAYLOR STREET • P.O. BOX 545 • MERRILL, WI 54452-0545
Phone 715/536-9551 • FAX # 715/536-5389 • 1-888-536-9551

Date _____ 2/15/05

ELECTROLUX HOME PRODUCTS
1030 STEVENS CREEK ROAD
AUGUSTA GA 30907

Quotation No. ____ 41896

PAGE:    1

ATTN: ____ KIMBERLY RIO

| Salesman | Freight | Terms | Lead Time UNDER 4 WEEKS TYPICAL |
|---|---|---|---|
| HOUSE ACCOUNT | F.O.B. MERRILL | __ __ | |

| Part No. and Description | Quantity | Price |
|---|---|---|
| PHONE: 706-826-6958 <br><br> PRELIMINARY PART PRICING FOR ARIBA <br> LOTS 7 AND 8.  SEE ATTACHED FOR PRICING DETAIL. <br> TERMS: NET 90 DAYS <br> EHP AGREES TO OBSOLESCENCE COVERAGE FOR <br> PARTS EQUAL TO 30 DAY MAXIMUM STOCK LEVEL <br> FROM DATE OF NOTIFICATION. <br> NORTHERN WIRE AGREES TO VMI (VENDOR <br> MANAGED INVENTORY). <br> PRICES DO NOT INCLUDE FREIGHT OR <br> WAREHOUSING COSTS. <br> ---------------------------------------- <br> 1ST ORDERS MAY REQUIRE ADDITIONAL PREPARATION <br> TIME. <br> THANK YOU FOR CONSIDERING NORTHERN WIRE. | | |

Prices effective for 90 days.

Typographical and stenographical errors
are subject to correction.  Purchaser
agrees to accept either overage or short-
age not in excess of ten percent to be
charged for pro-rata.

We trust the above quote will be given your immediate consideration.

**Respectfully submitted,**

# QUOTATION

## *ORANGEBURG, SOUTH CAROLINA  29116*

Payment Terms 2% 15 net 60 days    net 90 days from July - Dec
Agreement for obsolescence coverage for 30 day maximum exposure from date of notification
Prices are landed costs to the warehouse in PWE to your warehouses for the balance

### 3/14/2005

| PART # | PRICE | |
|---:|:---|---|
| 73510400 | 0.007011 | |
| 52870 | 0.00648 | |
| 5142H | 0.01332 | |
| 73510600 | 0.016047 | |
| 73610700 | 0.022275 | |
| 3146R | 0.02619 | |
| 12000029 | 0.030528 | |
| 73680700 | 0.03636 | |
| 19131611 | 0.0369 | |
| 11151000 | 0.046035 | |
| 74490544 | 0.05508 | |
| 13060200 | 0.062307 | |
| 174083 | 0.0646839 | |
| 17490440 | 0.0601191 | |
| 174606 | 0.114228 | |
| 73901000 | 0.164925 | |
| 181654 | 1.30698 | |
| 140811 | 0.048672 | |
| 74760644 | 0.04464 | |
| 74760412 | 0.011043 | |
| 19131311 | 0.021555 | |
| 156117 | 0.040212 | |
| 181506 | 0.023265 | |
| 72140512 | 0.0395901 | |
| 160218 | 0.03798 | |
| 4940M | 0.0649665 | |
| 109502X | 0.202365 | |

**EXHIBIT 3**

| | | |
|---|---|---|
| 123800X | 0.039087 | |
| 4939M | 0.02835 | |
| 72010506 | 0.029754 | |
| 17720408 | 0.01431 | |
| 19112410 | 0.057933 | |
| 4497H | 0.01053 | |
| 1370H | 0.019971 | |
| 188528 | 0.161334 | |
| 74610616 | 0.035307 | |
| 17490508 | 0.025011 | |
| 137729 | 0.018405 | |
| 72140608 | 0.040086 | |
| 72140506 | 0.022158 | |
| 110652X | 0.060624 | |
| 72110614 | 0.052461 | |
| 72110608 | 0.040626 | |
| 74760514 | 0.02151 | |
| 73800600 | 0.014643 | |
| 188967 | 0.04419 | |
| 71110814 | 0.086364 | |
| 142432 | 0.017235 | |
| 71081010 | 0.005634 | |
| 72140606 | 0.033696 | |
| 72010520 | 0.06003 | |
| 139888 | 0.049464 | |
| 169612 | 0.04581 | |
| 1700616 | 0.055062 | |
| 17120614 | 0.057465 | |
| 17060620 | 0.057312 | |
| 19131616 | 0.020016 | |
| 74780652 | 0.083736 | |
| 73610600 | 0.01098 | |
| 74610412 | 0.01521 | |
| 170600624 | 0.073503 | |
| 171877 | 0.06462 | |
| 184219 | 0.1404 | |
| 73940800 | 0.024516 | |
| 140296 | 0.091899 | |
| 19091210 | 0.014598 | |
| 19131416 | 0.010026 | |
| 19091416 | 0.0108 | |
| 19131614 | 0.015489 | |
| 183906 | 0.055755 | |
| 19121414 | 0.008514 | |
| 174316 | 0.242649 | |
| 17490628 | 0.061155 | |
| | | |
| | | |
| 3/11/2005 | | |
| | | |
| PART # | PRICE | |
| 74781044 | 0.18711 | |

| | |
|---|---|
| 165891 | 0.135954 |
| 7563R | 0.065925 |
| 137057 | 0.076149 |
| 52160 | 0.00702 |
| 19131610 | 0.02709 |
| 19133210 | 0.088299 |
| 19111610 | 0.02799 |
| 173966 | 0.069831 |
| 19111116 | 0.008514 |
| 19132016 | 0.02205 |
| 7810H | 0.019746 |
| 74760544 | 0.03789 |
| 74760516 | 0.016245 |
| 74760524 | 0.016245 |
| 74780616 | 0.030582 |
| 192334 | 0.05553 |
| 74760512 | 0.02151 |
| 17670608 | 0.035973 |
| 1685H | 0.0102411 |
| 74760724 | 0.0447849 |
| 19171416 | 0.01233 |
| 168937 | 0.023742 |
| 178589 | 0.025443 |
| 19111416 | 0.01107 |
| 74770508 | 0.0300681 |
| 19181511 | 0.03078 |
| 19132012 | 0.051516 |
| 9223R | 0.060912 |
| 73220600 | 0.0099 |
| 126471X | 0.068022 |
| 81328 | 0.0551079 |
| 71110616 | 0.036243 |
| 120183X | 0.023139 |
| 74780564 | 0.06732 |
| 102101X | 0.1829322 |
| 132673 | 0.07074 |
| 104164X | 0.133578 |
| 74180512 | 0.022203 |
| 6177H | 0.056385 |
| 19113812 | 0.07848 |
| 72250810 | 0.259407 |
| 4358J | 0.02646 |
| 74610624 | 0.041652 |
| 74780716 | 0.043065 |
| 12000053 | 0.030996 |
| 166002 | 0.055125 |
| 72140620 | 0.08253 |
| 12000022 | 0.024966 |
| 12000034 | 0.032382 |
| 12000008 | 0.022221 |
| 17000612 | 0.04131 |
| 74020652 | 0.085014 |

| | | |
|---|---|---|
| 174814 | 0.053352 | |
| 127018X | 0.0506529 | |
| 73930600 | 0.013311 | |
| 150696 | 0.0624717 | |
| 110633X | 0.046611 | |
| 4470J | 0.0422478 | |
| 175401 | 0.077544 | |
| 12000039 | 0.018765 | |
| 17670508 | 0.024498 | |
| 9173R | 0.02475 | |
| 73220500 | 0.008595 | |
| 74321016 | 0.011016 | |
| 72110510 | 0.04725 | |
| 74761060 | 0.20691 | |
| 72110508 | 0.02889 | |
| 19133812 | 0.084024 | |
| 74760620 | 0.028377 | |
| 17060612 | 0.049203 | |
| 13320400 | 0.118584 | |
| 108097X | 0.404955 | |
| 176390 | 0.0529659 | |
| 171852 | 0.040662 | |
| 75050612 | 0.008145 | |
| 4921H | 0.014472 | |
| 4929H | 0.089343 | |
| 120426X | 0.042984 | |
| 74780524 | 0.040005 | |
| 74760688 | 0.137997 | |
| 138565 | 0.059742 | |
| 75050616 | 0.010278 | |
| 105190X | 0.037737 | |
| 19131612 | 0.021186 | |
| 187912 | 0.0850158 | |
| 139276 | 0.221805 | |



**111 B Gordon Street**                          **Jackson, TN  38301**

# QUOTATION

Jim Morgan                                  **1-800-935-1387**

## *ORANGEBURG, SOUTH CAROLINA  29116*

Payment Terms 2% 15 net 60 days   net 90 days from July - Dec
Agreement for obsolescence coverage for 30 day maximum exposure from date of notification
Prices are landed costs to the warehouse in PWE to your warehouses for the balance

**3/14/2005**

| PART # | PRICE | LEAD TIME |
|---|---|---|
| 73510400 | 0.007011 | 18-20 WKS. |
| 52870 | 0.00648 | 18-20 WKS. |
| 5142H | 0.01332 | 18-20 WKS. |
| 73510600 | 0.016047 | 1-2 WKS. |
| 73610700 | 0.022275 | 18-20 WKS. |
| 3146R | 0.02619 | 18-20 WKS. |
| 12000029 | 0.030528 | 18-20 WKS. |
| 73680700 | 0.03636 | 18-20 WKS. |
| 19131611 | 0.0369 | 4-6 WKS. |
| 11151000 | 0.046035 | NOT ON LIST |
| 74490544 | 0.05508 | 18-20 WKS. |
| 13060200 | 0.062307 | 6-8 WKS. |
| 174083 | 0.0646839 | 6-8 WKS. |
| 17490440 | 0.0601191 | 6-8 WKS. |
| 174606 | 0.114228 | 18-20 WKS. |
| 73901000 | 0.164925 | 18-20 WKS. |
| 181654 | 1.30698 | 18-20 WKS. |
| 140811 | 0.048672 | NOT ON LIST |
| 74760644 | 0.04464 | 6-7 WKS. |
| 74760412 | 0.011043 | 18-20 WKS. |
| 19131311 | 0.021555 | 18-20 WKS. |
| 156117 | 0.040212 | 7-8 WKS. |
| 181506 | 0.023265 | NOT ON LIST |
| 72140512 | 0.0395901 | 1-2 WKS. |
| 160218 | 0.03798 | 18-20 WKS. |
| 4940M | 0.0649665 | NOT ON LIST |
| 109502X | 0.202365 | 18-20 WKS. |

| | | |
|---|---|---|
| 123800X | 0.039087 | 18-20 WKS. |
| 4939M | 0.02835 | 18-20 WKS. |
| 72010506 | 0.029754 | 18-20 WKS. |
| 17720408 | 0.01431 | 18-20 WKS. |
| 19112410 | 0.057933 | 18-20 WKS. |
| 4497H | 0.01053 | 18-20 WKS. |
| 1370H | 0.019971 | 18-20 WKS. |
| 188528 | 0.161334 | 18-20 WKS. |
| 74610616 | 0.035307 | 18-20 WKS. |
| 17490508 | 0.025011 | 18-20 WKS. |
| 137729 | 0.018405 | 18-20 WKS. |
| 72140608 | 0.040086 | 18-20 WKS. |
| 72140506 | 0.022158 | 18-20 WKS. |
| 110652X | 0.060624 | 4-6 WKS. |
| 72110614 | 0.052461 | 18-20 WKS. |
| 72110608 | 0.040626 | 4-6 WKS. |
| 74760514 | 0.02151 | 4-6 WKS. |
| 73800600 | 0.014643 | 18-20 WKS. |
| 188967 | 0.04419 | 18-20 WKS. |
| 71110814 | 0.086364 | 10-12 WKS. |
| 142432 | 0.017235 | 18-20 WKS. |
| 71081010 | 0.005634 | 6-8 WKS. |
| 72140606 | 0.033696 | 18-20 WKS. |
| 72010520 | 0.06003 | 18-20 WKS. |
| 139888 | 0.049464 | 18-20 WKS. |
| 169612 | 0.04581 | 18-20 WKS. |
| 1700616 | 0.055062 | 18-20 WKS. |
| 17120614 | 0.057465 | 18-20 WKS. |
| 17060620 | 0.057312 | 18-20 WKS. |
| 19131616 | 0.020016 | 18-20 WKS. |
| 74780652 | 0.083736 | 2-3 WKS. |
| 73610600 | 0.01098 | 1 WK. |
| 74610412 | 0.01521 | 1-2 WKS. |
| 170600624 | 0.073503 | 18-20 WKS. |
| 171877 | 0.06462 | 18-20 WKS. |
| 184219 | 0.1404 | 18-20 WKS. |
| 73940800 | 0.024516 | 18-20 WKS. |
| 140296 | 0.091899 | 18-20 WKS. |
| 19091210 | 0.014598 | 18-20 WKS. |
| 19131416 | 0.010026 | 18-20 WKS. |
| 19091416 | 0.0108 | 18-20 WKS. |
| 19131614 | 0.015489 | 18-20 WKS. |
| 183906 | 0.055755 | 18-20 WKS. |
| 19121414 | 0.008514 | 18-20 WKS. |
| 174316 | 0.242649 | 18-20 WKS. |
| 17490628 | 0.061155 | NOT ON LIST |
| | | |
| | | |
| **3/11/2005** | | |
| | | |
| **PART #** | **PRICE** | **LEAD TIME** |
| 74781044 | 0.18711 | 18-20 WKS. |

| | | |
|---|---|---|
| 165891 | 0.135954 | 6-8 WKS. |
| 7563R | 0.065925 | 18-20 WKS. |
| 137057 | 0.076149 | 18-20 WKS. |
| 52160 | 0.00702 | NOT ON LIST |
| 19131610 | 0.02709 | 18-20 WKS. |
| 19133210 | 0.088299 | 18-20 WKS. |
| 19111610 | 0.02799 | NOT ON LIST |
| 173966 | 0.069831 | 18-20 WKS. |
| 19111116 | 0.008514 | 18-20 WKS. |
| 19132016 | 0.02205 | 6-8 WKS. |
| 7810H | 0.019746 | 18-20 WKS. |
| 74760544 | 0.03789 | 8-10 WKS. |
| 74760516 | 0.016245 | 2-3 WKS. |
| 74760524 | 0.016245 | 18-20 WKS. |
| 74780616 | 0.030582 | 18-20 WKS. |
| 192334 | 0.05553 | NOT ON LIST |
| 74760512 | 0.02151 | 18-20 WKS. |
| 17670608 | 0.035973 | 18-20 WKS. |
| 1685H | 0.0102411 | 2-3 WKS. |
| 74760724 | 0.0447849 | 2-3 WKS. |
| 19171416 | 0.01233 | 18-20 WKS. |
| 168937 | 0.023742 | 2-3 WKS. |
| 178589 | 0.025443 | 18-20 WKS. |
| 19111416 | 0.01107 | 18-20 WKS. |
| 74770508 | 0.0300681 | 2-3 WKS. |
| 19181511 | 0.03078 | 4-6 WKS. |
| 19132012 | 0.051516 | 4-6 WKS. |
| 9223R | 0.060912 | 4-6 WKS. |
| 73220600 | 0.0099 | 18-20 WKS. |
| 126471X | 0.068022 | 18-20 WKS. |
| 81328 | 0.0551079 | 8-10 WKS. |
| 71110616 | 0.036243 | 18-20 WKS. |
| 120183X | 0.023139 | 18-20 WKS. |
| 74780564 | 0.06732 | 18-20 WKS. |
| 102101X | 0.1829322 | 2-3 WKS. |
| 132673 | 0.07074 | 18-20 WKS. |
| 104164X | 0.133578 | 2-3 WKS. |
| 74180512 | 0.022203 | 18-20 WKS. |
| 6177H | 0.056385 | NOT ON LIST |
| 19113812 | 0.07848 | 18-20 WKS. |
| 72250810 | 0.259407 | NOT ON LIST |
| 4358J | 0.02646 | 18-20 WKS. |
| 74610624 | 0.041652 | 2-3 WKS. |
| 74780716 | 0.043065 | 18-20 WKS. |
| 12000053 | 0.030996 | 8-10 WKS. |
| 166002 | 0.055125 | 18-20 WKS. |
| 72140620 | 0.08253 | 10-12 WKS. |
| 12000022 | 0.024966 | 18-20 WKS. |
| 12000034 | 0.032382 | 18-20 WKS. |
| 12000008 | 0.022221 | 18-20 WKS. |
| 17000612 | 0.04131 | 18-20 WKS. |
| 74020652 | 0.085014 | 18-20 WKS. |

| | | |
|---|---|---|
| 174814 | 0.053352 | NOT ON LIST |
| 127018X | 0.0506529 | 18-20 WKS. |
| 73930600 | 0.013311 | 18-20 WKS. |
| 150696 | 0.0624717 | 10-12 WKS. |
| 110633X | 0.046611 | 8-10 WKS. |
| 4470J | 0.0422478 | 4-6 WKS. |
| 175401 | 0.077544 | 8-10 WKS. |
| 12000039 | 0.018765 | 8-10 WKS. |
| 17670508 | 0.024498 | 18-20 WKS. |
| 9173R | 0.02475 | 4-6 WKS. |
| 73220500 | 0.008595 | 18-20 WKS. |
| 74321016 | 0.011016 | 18-20 WKS. |
| 72110510 | 0.04725 | 2-3 WKS. |
| 74761060 | 0.20691 | NOT ON LIST |
| 72110508 | 0.02889 | 2-3 WKS. |
| 19133812 | 0.084024 | NOT ON LIST |
| 74760620 | 0.028377 | 2-3 WKS. |
| 17060612 | 0.049203 | 18-20 WKS. |
| 13320400 | 0.118584 | 8-10 WKS. |
| 108097X | 0.404955 | NOT ON LIST |
| 176390 | 0.0529659 | 18-20 WKS. |
| 171852 | 0.040662 | 18-20 WKS. |
| 75050612 | 0.008145 | 18-20 WKS. |
| 4921H | 0.014472 | 8-10 WKS. |
| 4929H | 0.089343 | 18-20 WKS. |
| 120426X | 0.042984 | NOT ON LIST |
| 74780524 | 0.040005 | NOT ON LIST |
| 74760688 | 0.137997 | NOT ON LIST |
| 138565 | 0.059742 | NOT ON LIST |
| 75050616 | 0.010278 | 18-20 WKS. |
| 105190X | 0.037737 | NOT ON LIST |
| 19131612 | 0.021186 | NOT ON LIST |
| 187912 | 0.0850158 | 8-10 WKS. |
| 139276 | 0.221805 | NOT ON LIST |