**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

WHITESELL CORPORATION,           *
                                 *
          Plaintiff,             *
                                 *
     v.                          *          CV 103-050
                                 *
ELECTROLUX HOME PRODUCTS,        *
INC., HUSQVARNA, A.B., and       *
HUSQVARNA OUTDOOR PRODUCTS,      *
INC.,                            *
                                 *
          Defendants.            *

## O R D E R

On March 25, 2010, this Court entered two Orders granting
in part Defendants' separately filed motions for partial
summary judgment concerning the duration term of the parties'
contractual obligations.  Presently before the Court is
Plaintiff Whitesell Corporation's ("Whitesell") motion for
reconsideration of the March 25th Orders as well as other
motions that are ripe for consideration.

## I.  HISTORY

While the factual and procedural history of this case has
been set out in prior orders, the nature of the pending
motions make it necessary to break down the background of the
case into a litigation history and a contractual history.

## A.    Litigation History

The parties in this case entered into a "Strategic Partnership Agreement"[1] almost ten years ago - on December 14, 2000.[2]   This Supply Agreement began a multi-million dollar relationship between the parties that involves thousands of different parts.   This Court's first involvement in the case began when EHP filed a complaint against Whitesell seeking an injunction and a declaratory judgment based upon various disputes arising from the SPA.   EHP's complaint was accompanied by a motion for a temporary restraining order. Pursuant to the parties' telephonic request, the Court entered a Consent Order on April 1, 2003, which denied EHP's motion for a temporary restraining order as moot, appointed a mediator to facilitate resolution of the proceedings, and closed the case for statistical purposes.   (See Orders of Apr. 1 & 15, 2003.)

On June 25, 2003, after being informed that the parties had executed a Settlement Memorandum, the Court granted the parties' "Stipulation of Dismissal Without Prejudice and Joint

---

[1]   This document will hereinafter be referred to as the SPA or the Supply Agreement.

[2]   The original parties to the Supply Agreement were Whitesell and Defendant Electrolux Home Products, Inc. ("EHP").   The Husqvarna defendants became involved when EHP placed its Outdoor Division in a Swedish Corporation, Defendant Husqvarna, A.B.   Husqvarna, A.B. then transferred the Outdoor Division to Defendant Husqvarna Outdoor Products, Inc.   The two Husqvarna defendants have been collectively referred to as Husqvarna.

Motion to Retain Jurisdiction to Enforce Settlement Agreement." (Order of June 25, 2003.) Accordingly, the Court retained jurisdiction to enforce the parties' Settlement Memorandum but otherwise dismissed the case without prejudice. (See id.)

On March 9, 2005, Whitesell filed a "Motion for Preliminary Relief and to Enforce Settlement Agreement," seeking redress for disputes relating to the Settlement Memorandum and the Supply Agreement. (Doc. No. 11.) A Consent Order entered on May 17, 2005 resolved this motion. (Doc. No. 30.) The May 17th Consent Order set forth the parties' obligations regarding the purchase and supply of parts during the pendency of settlement negotiations or litigation regarding the parties' disputes. (See id.) Whitesell was also granted leave to file a third-party complaint in this case setting forth its unresolved claims. (Id.)

On October 17, 2005, Whitesell filed its first third-party complaint against EHP and Husqvarna, A.B.[3] In the Rule 26(f) Report filed thereafter, the parties stated that all discovery served prior to the entry of the Report was "null

---

[3] Defendant Husqvarna Outdoor Products, Inc. was added by amendment on October 20, 2006. Though the parties and the Court used the case caption shown above from that point forward, the docket was not officially changed to reflect that Whitesell was the party plaintiff until the case was re-opened on February 19, 2008.

and void." (Doc. No. 56.) A scheduling order was entered on January 12, 2006, but it was extended on numerous occasions by consent of the parties. Ultimately, discovery was stayed when the Court vacated the scheduling order on June 12, 2008. Presently, there is no discovery schedule in place.

In November of 2006, Whitesell filed three motions for partial summary judgment.[4] On July 27, 2007, Defendants filed their own motion for partial summary judgment. Nevertheless, the parties represented that settlement discussions were ongoing and that additional mediation was being contemplated. For this reason, and because the parties had a history of resolving their disputes without court intervention, the Court entered an Order holding the motions in abeyance and instructing the parties to re-urge the motions if appropriate after they had had an opportunity to explore resolution of the case. (Order of Aug. 6, 2007.)

Unfortunately, in December 2007, settlement discussions between the parties reached an impasse and a new round of litigation followed. Almost immediately, Defendants filed a "Motion for Judgment on the Pleadings or, in the Alternative, Motion for Partial Summary Judgment." (Doc. No. 127.) Shortly thereafter, I decided that a meeting with the

---

[4] Whitesell later withdrew one of the motions, indicating that Defendants had come into compliance with respect to the motion's subject matter.

principals of the party corporations might aid in the resolution of the matter. In anticipation of this meeting, and to hear additional background on the pending motions, oral argument was conducted on March 3, 2008. It was at this time that I first expressed my concern on record that the SPA may not be an enforceable contract.[5] At the conclusion of the hearing, I spoke with counsel for the parties separately in chambers. Two days later, I met with the principals of the party corporations in an effort to determine how far apart the parties were with respect to a global resolution. I met with them again on April 23, 2008 in Atlanta, Georgia. What came from these meetings was an agreement that the use of a mediator/special master could facilitate resolution. Thus, Mr. Wade W. Herring II of Savannah, Georgia, was appointed as the mediator/special master in the case on April 23, 2008. As I stated at a hearing on October 7, 2008, and certainly it was no secret to counsel or the parties, I appointed Mr. Herring with the hope that the parties would submit all of their

---

[5] I also mentioned this concern during a status conference on February 13, 2008, but that conference was not transcribed and is not part of the record. As I stated in a prior Order (Order of Oct. 14, 2008, at 2 n.2), I had concerns regarding the enforceability of the SPA from my initial review of the case in 2003. Yet, because the parties had never raised the issue and had been successfully operating at least on an operational level in complete reliance on the SPA, and because the parties were consistently taking part in mediation and settlement discussions, I was reluctant to raise the issue prior to that point. (See also Comments from the Bench, Hrg. Tr. of Oct. 7, 2008, at 9-11, doc. no. 211.)

disputes to his well-reasoned guidance and experience. (<u>See</u> Doc. No. 211 at 12-13.)

From April 23, 2008 through September 8, 2008, Mr. Herring spent at least 65 hours in the case, over half of which was spent in mediation between the parties on four separate occasions.[6] (<u>See</u> Doc. No. 206.)

In the meantime, the Court issued an Order inviting the parties to address my concerns regarding the enforceability of the SPA and the Settlement Memorandum. (Order of June 12, 2008.) Thereafter, the Court issued its Order of October 14, 2008, both orally and in writing, which concluded that the subject matter of the SPA was too indefinite to be enforced. (Doc. Nos. 211 & 212.) The Court nevertheless determined that the Settlement Memorandum defined the parties' contractual obligations with respect to four categories of parts. The Court directed Mr. Herring to work with the parties to determine the specific identities of all parts falling into these four categories. The Court also invited the parties to present argument regarding the termination date of these contractual obligations.

In the months that followed, it appears that the parties endeavored to resolve their disputes. Indeed, the number of hours (over 100) that Mr. Herring was involved in mediation

---

[6] I also spent many hours in conference with Mr. Herring.

6

and settlement negotiations from December 2008 through August 2009 bears this out. Nevertheless, in a motion filed on September 10, 2009, Whitesell indicated that the parties were unable to resolve the case and requested a status conference. Shortly thereafter, Defendants accepted the Court's prior invitation and filed motions for partial summary judgment concerning the duration term of the parties' contractual obligations.

Instead of granting the requested status conference, the Court pointed out by Order of October 21, 2009, that Mr. Herring had been appointed to resolve the very issues that Whitesell insisted the Court address at a status conference. Accordingly, the Court re-directed the parties to Mr. Herring, retaining the issue of contract duration for itself. (See Order of Oct. 21, 2009.)

Rather than do as the Court directed, Whitesell filed a motion for reconsideration of the Court's October 14, 2008 Order (the Order delineating the four enforceable categories of parts) and a motion to vacate the appointment of Mr. Herring.[7] The next day, on December 22, 2009, Whitesell filed a motion for contempt and a motion for entry of a discovery

---

[7] Of note, this was the first time in one and a half years that Whitesell had voiced an objection to the appointment of Mr. Herring and the terms of his service. Indeed, Whitesell readily embraced the use of a Special Master in the early months of his appointment.

schedule and a trial date.[8]  On February 17, 2010, this Court denied Whitesell's motion for reconsideration of the October 14, 2008 Order and its motion to vacate the appointment of the special master.  Even though the motion to vacate the appointment of Mr. Herring was denied, I went on to state that I would not "saddle Mr. Herring with the vitriolic nature of this litigation, at least not until the Court has addressed the motions for partial summary judgment." (Order of Feb. 17, 2010, at 12.)

In January and February of this year, the parties filed cross motions for partial summary judgment on Whitesell's price increase claims.  Defendants also filed a motion for a protective order, seeking relief from their obligation to respond to Whitesell's requests for production of documents served on February 19, 2010.  These motions are pending.

On March 25, 2010, the Court entered its Orders granting in part Defendants' motions for partial summary judgment with respect to the duration term of the parties' contractual obligation.  At the conclusion of these Orders, the Court again referred very specific issues to Mr. Herring for resolution.

On April 13, 2010, Whitesell filed a motion for reconsideration of the March 25, 2010 Orders.  Whitesell also

---

[8]   These motions are pending.

filed a renewed motion for entry of a discovery schedule and a trial date. Within this motion, Whitesell reiterates its position previously articulated in its motion to vacate the appointment of Mr. Herring that this Court's referral of certain issues to Mr. Herring is improper. These motions are pending.

Finally, in late July, Husqvarna filed a motion for summary judgment on Whitesell's claim concerning the transition of "Brunner" and "Matrix" parts. This motion was only recently fully briefed and will not be addressed herein.

B. **Contractual History**

At the time the SPA was executed between EHP and Whitesell, EHP manufactured appliances for kitchen, cleaning, and outdoor use such as refrigerators, cookers, washing machines, vacuum cleaners, chain saws, and lawn mowers. Pursuant to the SPA, EHP agreed to buy all of its current and future requirements for certain goods from Whitesell during the pendency of the Agreement, and Whitesell agreed to supply all of EHP's requirements for such goods. More specifically, Whitesell was to supply EHP's "current and future needs of cold headed/threaded fasterners and various related Class C items hereafter referenced as Good(s)." (See Doc. No. 127, Ex. 1, SPA § 2.0.) Section 2.1.2 of the SPA described "Good(s)" as:

9

> all cold headed/threaded fasteners, clips, wire
> ties, nuts, pins, special cold formed parts, screw
> machined parts, clamps, spacers, plastic fasteners,
> components, sub-components, or any type of
> material, whether identified by an Electrolux part
> number or not assigned to such part, and other
> Class C items in similar families and/or services.

(Id. § 2.1.2.) This section further provided that "[t]hese
Goods shall be listed on Exhibit B entitled 'Goods to be
Purchased by Electolux from Whitesell.'" ((Id. (emphasis
added).)

This contract did not set up a simple supply-demand
relationship wherein EHP calls upon Whitesell to deliver a
small number of defined parts upon request and as needed.
Rather, the parties intended for their relationship to be a
long-term commitment to each other, the end result of which
would improve EHP's productivity, reduce EHP's manufacturing
costs, and improve the quality of EHP's products, thereby
enhancing EHP's competitive position in the market. (Id. §
2.0.) In fact, Whitesell agreed to implement an onsite
"Vendor Managed Inventory ["VMI"] Program" at certain EHP
locations. (Id. § 16.0.) Through the VMI Program, an onsite
Whitesell employee would be provided with complete facility
access and adequate plant storage capacity to meet the needs
of the Program. (Id.) The designated employee would then
receive regular shipments of "Good(s)" from Whitesell, issue
the "Good(s)" as needed, and "provide such issue information

10

into Electrolux's receiving system acknowledging transfer of Good(s) ownership." (Id.) The number of parts subject to the SPA obligation cannot be quantified, and in the year 2007, the parties' business together totaled just under $70 million. Given that the typical cost of each item is less than a dollar and often less than one cent, their business involved an enormous quantity of individual items.

The initial term of the SPA was January 1, 2001, through April 1, 2008, and, based upon the volume of parts involved, EHP had approximately 2.5 years to completely transition the relevant parts to Whitesell. (Id. §§ 3.0-3.1.) To the extent certain parts could not be transitioned by June 30, 2003, the Supply Agreement was to be proportionally extended until the transition process was completed. (Id.) Thus, the duration term of the SPA was April 1, 2008 for all parts transitioned before June 30, 2003. However, for parts transitioned after June 30, 2003, the SPA does not provide a definitive termination date.

As discussed in the Order of October 14, 2008, Exhibit B to the SPA - which was to define the scope of goods to be purchased by EHP from Whitesell - was never created. Nevertheless, Whitesell began supplying parts to EHP soon after the SPA was executed. Eventually, a dispute arose between the parties regarding whether the SPA obligated EHP to

purchase from Whitesell certain parts for lawn tractors manufactured by EHP at its Orangeburg, South Carolina plant (the "Orangeburg Parts"). This dispute led EHP to file this lawsuit on March 23, 2003. On May 23, 2003, after mediation, the parties executed a Settlement Memorandum. (See Doc. No. 127, Ex. 3.)

Pursuant to the Settlement Memorandum, the parties agreed to prepare a "clarified Exhibit 'B'" that would include: (a) all parts Whitesell was supplying to EHP as of the date of the Settlement Memorandum; (b) all parts in the process of being transitioned by Whitesell; and (c) all Springfield Division parts currently being supplied by Bamal (another fastener supplier) as of January 1, 2003. (Id. ¶ 1.) The parties also agreed that certain "Brunner"[9] and wire form[10] parts would be supplied by Whitesell under the terms of the SPA, as modified by the Settlement Memorandum. The Brunner and wire form parts were to be listed on an Exhibit B-1. (Id. ¶ 3.)

The Settlement Memorandum modified the initial term of the SPA for all covered parts to begin on December 31, 2003, with a termination date of November 1, 2008. As to Exhibit B parts which were not transitioned by December 31, 2003, the

---

[9] "Brunner" parts are parts which were being supplied by Brunner Drilling and Manufacturing, Inc., at the time the Settlement Memorandum was executed.

[10] The scope of "wire form" parts subject to transition is disputed by the parties.

initial duration term "for those parts not transitioned will be proportionately extended by the time it takes to fully transition those parts." (Id.) Also, with respect to any Exhibit B-1 parts added to make up for any short fall relating to the 2002 purchase levels, the duration term for those substitute parts "will be proportionately extended by the time it takes to fully transition these parts." (Id.)

Unfortunately, just as the parties never created an initial Exhibit B to the SPA, they never created the "clarified" Exhibit B or the Exhibit B-1 referenced in the Settlement Memorandum. Accordingly, this Court concluded in its Order of October 14, 2008, that the subject matter of the SPA was too indefinite to be enforced. The Court nevertheless determined that the Settlement Memorandum defined the parties' contractual obligations with respect to four categories of parts: (1) all parts Whitesell was supplying to EHP as of the date of the Settlement Memorandum; (2) all Springfield Division parts which were being supplied by Bamal as of January 1, 2003; (3) the "Brunner" parts; and (4) all parts supplied through the parties' course of performance. (Id. at 22-25.)

When the Court was called upon to determine the duration term that EHP must obtain these categories of parts from Whitesell, it did so through the March 25, 2010 Orders, albeit

13

leaving some limited and defined work for Mr. Herring to do. Whitesell presently urges reconsideration of these Orders. The Court will address this motion before turning to other pertinent issues in the case raised by other pending motions.

## II.   RECONSIDERATION OF THE MARCH 25, 2010 ORDERS

In the March 25th Orders, this Court determined as a matter of law that the termination date of the supply term for covered parts varied depending upon whether a part was transitioned prior to December 31, 2003.[11]  That is, there is a distinction between parts transitioned before and parts transitioned after December 31, 2003 with respect to the application of the Settlement Memorandum's duration term provision.

In the March 25th Orders, the Court first determined that EHP's and Husqvarna's obligation to purchase parts transitioned to Whitesell prior to December 31, 2003 (as well as parts which first came into use by EHP and Husqvarna after that date but were immediately transitioned to Whitesell) terminated on November 1, 2008.  Whitesell does not take issue with this determination in its motion for reconsideration.

---

[11]   The Court mistakenly refers to the relevant transition date as December 1, 2003 in several places in the March 25th Orders.  To be sure, the transition date referenced in the Settlement Memorandum is December 31, 2003.

14

The Court next considered the duration term for parts fully transitioned after December 31, 2003. With respect to these parts, the Court determined that each part was to have an initial term of four years and ten months from the date the part is fully transitioned. Thus, the parts transitioned after December 31, 2003 would have varying termination dates.

Based upon this legal conclusion, which was a matter of contract interpretation, the Court made certain legal determinations relative to particular parts. Specifically, with respect to EHP, the Court determined that the end dates listed on Exhibit 7 to the Affidavit of Donald J. Market are the termination dates for the listed part (excepting from the list the "L'Assomption parts"). The Court further concluded that because the transition date of the L'Assomption parts and parts listed in the Padilla letter of December 12, 2005, had not been determined, the end dates could not be determined. Thus, the Court referred the matter to the Special Master on the limited basis of determining the transition dates for the parts in question. The Court specifically stated that Mr. Herring should permit any necessary discovery to aid in the determination of the transition dates of these parts.

With respect to Husqvarna, Whitesell had raised an issue of whether it had received the requisite notice of termination for parts that were fully transitioned prior to December 31,

2003. Upon concluding that Husqvarna had supplied the requisite notice, the Court determined the termination dates of these parts as a matter of law. The Court then turned to the parts transitioned after December 31, 2003. Husqvarna sought summary judgment as to the parts listed in an exhibit attached the Affidavit of Ryan Sadler. However, the Court determined that there are genuine issues of fact respecting the full transition date of the listed parts. Accordingly, there are genuine issues of fact respecting the termination date of the parts. Thus, the Court referred the matter to the Special Master on the limited basis of determining the transition dates for the parts in question. The Court specifically stated that Mr. Herring should permit any necessary discovery to aid in the determination of the transition dates of these parts.

Following entry of the March 25th Orders, Whitesell chose not to utilize the Special Master for the matters specifically referred to him. Instead, Whitesell filed the instant motion for reconsideration, wherein it also objects to the reference of matters to the Special Master.

Reconsideration is appropriate only if Whitesell demonstrates: (1) an intervening change of law; (2) the availability of new evidence; and (3) the need to correct a clear error of law or prevent manifest injustice. <u>E.g.</u>,

Center for Biological Diversity v. Hamilton, 385 F. Supp. 2d 1330, 1337 (N.D. Ga. 2005); Estate of Pidcock v. Sunnyland America, Inc., 726 F. Supp. 1322, 1333 (S.D. Ga. 1989). In considering a motion for reconsideration, a court must balance the need for finality and judicial economy against the need to render just decisions. Consequently, a motion for reconsideration should not be used to relitigate issues which have already been found lacking.[12] Gov't Personnel Servs., Inc. v. Gov't Personnel Mut. Life Ins. Co., 759 F. Supp. 792, 793 (M.D. Fla. 1991), aff'd, 986 F.2d 506 (11th Cir. 1993). In fact, a court's reconsideration of an earlier order is an extraordinary remedy, which should be granted sparingly. Region 8 Forest Servs. Timber Purchasers Council v. Alcock, 993 F.2d 800, 805-06 (11th Cir. 1993).

In the present motion, Whitesell asks the Court to reconsider two rulings that were determined to be matters of contract interpretation: (1) whether the Settlement Memorandum contemplated a single term for all parts transitioned after December 31, 2003, or a four-year and ten-month term for each

---

[12] A motion for reconsideration is not an appeal. It is improper on a motion for reconsideration to "ask the court to rethink what it ha[s] already thought through-rightly or wrongly." Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983), quoted in Weitz Co. v. Transportation Ins. Co., 2009 WL 1636125, at *1 (S.D. Fla., June 11, 2009) and Vidinliev v. Carey Internat'l, Inc., 2008 WL 5459335, at *1 (N.D. Ga., Dec. 15, 2008).

such part from the date of full transition; and (2) whether Husqvarna gave Whitesell sufficient notice of termination. With respect to these issues, Whitesell has not presented any new evidence or argument or demonstrated that the Court overlooked any facts or a legal principle that would warrant reconsideration of the Court's rulings. The Court specifically notes that while Whitesell again offers the Neil Whitesell letter of May 28, 2003 as evidence that the parties agreed on a single term for those parts transitioned after December 31, 2003, the Court finds no language in the letter to support this interpretation.[13] Moreover, Whitesell can point to no language in the SPA that requires the identification of specific parts in a termination notice. Accordingly, Whitesell's insistence that the Court erred in finding the termination notices adequate is misplaced.

As a third ground for reconsideration, Whitesell claims that there existed a genuine issue of material fact with respect to the full transition dates of the various parts transitioned after December 31, 2003. In doing so, Whitesell disingenuously contends that it has never agreed upon the transition dates offered by Defendants in various exhibits. For example, with respect to Exhibit 7 to the Affidavit of

---

[13] Moreover, Whitesell's reliance upon O.C.G.A. § 13-2-4 as authority to use the Whitesell letter as evidence of the parties' intentions is misplaced because the Court has determined that the duration term provision of the Settlement Memorandum is unambiguous.

Donald J. Market, Whitesell argues that while it may have agreed to the "first ship" dates for the listed parts, this was not an agreement to the "full transition" date. This argument, however, ignores the fact that Mr. Sean Scarboro of EHP testified that not only did Whitesell help calculate the first "start date" listed for the parts on Exhibit 7, it was also involved in calculating the termination dates - which are also listed on Exhibit 7.[14] Simply put, Whitesell cannot help determine the end dates and then complain that they are not the end dates, particularly when it has not come forward with any evidence to demonstrate that such determinations were inaccurate. Further, in its motion for reconsideration, Whitesell takes issue with this Court's determination that the parts listed in Exhibits 2 and 3 to the Affidavit of Ryan T. Sadler were either parts fully transitioned to Whitesell prior to December 31, 2003 or parts that came into use after that date but were immediately transitioned to Whitesell. Yet, in response to the motion for summary judgment, Whitesell did not dispute the characterization of these parts. Such characterization is important because if the listed parts fall

---

[14]   Whitesell's contention that it was not afforded the opportunity to respond to the Scarboro affidavit because it was appended to EHP's reply brief may be fairly characterized as fatuous given that four months lapsed between the filing of the reply brief and the March 25th Orders and the docket shows that Whitesell has filed a motion for leave to file a surreply involving another pending motion.

into one of these two categories, then the termination date is November 1, 2008. At summary judgment, Whitesell only argued that the notice of termination was inadequate or that there may have been a lapse of supply for some of the listed parts. Thus, Whitesell will not be heard now to complain that the parts listed in Exhibits 2 and 3 to the Affidavit of Ryan T. Sadler do not fall into the category of parts with a termination date of November 1, 2003.

In conclusion, Whitesell's reconsideration arguments do not compel the Court to rethink or modify its prior rulings on summary judgment. Thus, Whitesell's motion for reconsideration (doc. no. 321) is hereby **DENIED**.

As a final note, the Court rejects Whitesell's contention in its motion for reconsideration that the Court has no authority to refer to the Special Master the matters referred at the conclusion of the March 25th Orders. Federal Rule of Civil Procedure 53(a)(1)(C) expressly provides for the referral of pretrial matters that cannot be timely and *effectively* addressed by the district judge.

Pursuant to the March 25th Orders, the Court referred the following matters to the Special Master: (1) with respect to EHP, a determination of the date upon which the L'Assomption parts were fully transitioned and whether there are any remaining parts, referenced in the Padilla December 12, 2005

20

letter, that have not been fully transitioned to Whitesell; and (2) with respect to Husqvarna, a determination of the date the parts listed on Exhibit 5 were fully transitioned, and if the date is different from the date listed on the exhibit, to seek resolution of any lapse in supply issue. Whitesell contends that this referral deprives it of a jury determination on a central issue of liability.

In referring these very specific matters to the Special Master, it occurred to me that the determination of a transition date for a list of parts could be made by simple reference to the records in the possession of the parties. In fact, it would be inefficient for this Court to sift through the documents to determine the transition date of hundreds, if not thousands, of parts. Of course, when mention is made of documents, there must be discovery. Rule 53 specifically contemplates that discovery issues may be handled by a Special Master. Further, the documents, with the assistance of knowledgeable employees, should speak for themselves on the date of transition. Once the date of transition is determined, my rulings on the issues of contract interpretation will necessarily determine the termination date for the parts. In short, the issues referred to the Special Master are precisely the type of issues that are appropriately referred under Rule 53(a)(1)(C).

I recognize that there may be issues regarding alleged lapses in supply from the date of full transition to the termination date. At the time of penning the March 25th Orders, I believed that those issues could be resolved by a Special Master through mediation and resolution, particularly since the parties had the benefit of rulings on the contract interpretation issues. It has now become apparent that such issues, essentially breach of contract issues, may not be referred to a Special Master given Whitesell's current aversion to this Court's use of a Special Master. One thing is certain, however. The reference of essentially pre-trial matters, that necessarily involve discovery issues, have been and are still properly referred to a Special Master: (1) with respect to EHP, a determination of the date upon which the L'Assomption parts were fully transitioned and whether there are any remaining parts, referenced in the Padilla December 12, 2005 letter, that have not been fully transitioned to Whitesell; and (2) with respect to Husqvarna, a determination of the date the parts listed on Exhibit 5 were fully transitioned. The Special Master shall report his findings on the transition dates of these very specific parts within sixty (60) days of the date this Order is entered. Further, the Special Master shall permit and direct any discovery necessary to ascertain these dates.

## III.  MOTION FOR CONTEMPT

Mr. Herring was appointed as Mediator/Special Master in the case on April 23, 2008.  After nearly a year and a half of mediation efforts, however, it appeared that Whitesell had given up any meaningful intention of resolution through mediation as indicated in its motion for a status conference filed on September 10, 2009.  In that motion, Whitesell complains about Husqvarna's refusal to transition the Brunner and Matrix parts, stating that "[w]hile the parties continue to discuss these issues, further intervention from this Court may be necessary."  Whitesell also complained of Husqvarna's failure to pay for outstanding accounts receivable and for certain inventory.  Husqvarna responded that its efforts to transition the Brunner and Matrix parts and to purchase excess inventory had been thwarted by Whitesell's own inexcusable conduct.  Husqvarna also represented that Whitesell had rejected Husqvarna's proposal to submit their disputes about the outstanding accounts receivable to the Special Master.[15]

---

[15] Remarkably, the use of the Special Master to resolve disputes relating to outstanding invoices of this sort was exactly what the presiding judge and corporate principals discussed in the Atlanta meeting.  It was an issue that appeared to be capable of resolution within the context of the case in that it could be handled apart from a global resolution through which Whitesell would receive at least some payment while the rest of the litigation was ongoing.  Through Mr. Herring's appointment, the Court afforded Whitesell the facility to present evidence and have a thorough Report and Recommendation expeditiously presented to this Court for final ruling.  Whitesell has, for unknown reasons, declined this seemingly advantageous opportunity.

Upon consideration of the motion for a status conference, it seemed that issues concerning outstanding accounts receivable and obligations to transition certain parts and to purchase excess inventory were matters better addressed to the Special Master. I said as much in an Order dated October 21, 2009, which denied the motion for a status conference. The parties were thereupon "directed to address without further delay their disputes to Mr. Herring as outlined in the status conference request and response." (Doc. No. 233, at 3.) I believed that even if the parties could not reach a global resolution of the case, they could substantially narrow the issues for trial by reference of these distinct issues to the Special Master.

Rather than consult Mr. Herring as directed, Whitesell's next move was to file a motion to vacate the appointment of Mr. Herring, arguing that such appointment should be limited to discovery issues and issues involving outstanding invoices. For instance, Whitesell contended that the Court's referral of issues related to the four categories of enforceable parts following the October 14, 2008 Order was outside the scope of the Court's Reference Order and Rule 53. Ultimately, the Court did not grant the motion to vacate but essentially relieved Mr. Herring of dealing with any issues that were not

specifically identified and referred to him.[16]  (See Order of
Feb. 17, 2010, at 12-13.)

The Court details this procedural history in the context
of Whitesell's motion for contempt for two reasons.  First, it
demonstrates Whitesell's recent yet persistent unwillingness
to utilize the Special Master to seek resolution of any matter
in this case irrespective of global resolution.  It appears
Whitesell is now of the mindset that any alternative dispute
resolution which may not yield an entirely satisfactory result
is unacceptable.  That said, Whitesell has every right to turn
to a court of law to litigate its genuine disputes.  Second,
the issues raised in the present motion for contempt are the
very same issues previously raised in Whitesell's motion for
status conference.  In other words, the motion for contempt is
an end-around the Court's Order of October 21, 2009, referring
those issues to the Special Master.  For example, Whitesell
moves to hold Husqvarna in contempt for the following alleged
violations: (1) failure to pay $5.8 million in past due
accounts receivable; (2) failure to pay $3.8 million in Matrix
wireform inventory that Husqvarna approved and directed; (3)
failure to pay $2.9 million in Brunner inventory that was

---

[16]  The Court specifically stated: "The truth is that the parties
have given Mr. Herring scant opportunity to resolve or even narrow the
issues in the case.  The parties have squandered their opportunity to
utilize a highly qualified and talented Special Master . . . . [T]he
Court is not inclined at this time to saddle Mr. Herring with the
vitriolic nature of this litigation . . . ."

manufactured at Husqvarna's insistence; (4) failure to pay $11.2 million in "other historical inventory;" and (5) failure to pay $22.5 million for price increases owed under the contract.

Of utmost importance, the parties filed motions for summary judgment related to the disputes involving the price increases and the transition of Brunner and Matrix parts while the motion for contempt has been pending. Accordingly, rather than address these disputes in the context of a contempt proceeding, the Court will do so in the context of summary judgment proceedings. Indeed, if Husqvarna has violated the contract, the Settlement Memorandum, or the Consent Order of May 17, 2005, the matter ultimately should be reduced to judgment. In short, contempt proceedings are not the proper vehicle to address the issues raised in Whitesell's motion, especially where the issues are hotly disputed and will be addressed through dispositive motions.

Upon the foregoing, Whitesell's motion for contempt (doc. no. 252) is **DENIED**.

### IV. MOTIONS FOR ENTRY OF DISCOVERY SCHEDULE AND TRIAL DATE

On December 22, 2009, Whitesell filed a motion requesting the Court to enter a discovery schedule and to set a trial date. The motion was filed on the same day that Whitesell

filed its motion for contempt, and the grounds asserted therein mirror the grounds Whitesell sets forth in its motion for contempt. That is, Whitesell complains of several ways in which Husqvarna has violated the SPA, the Settlement Memorandum, and this Court's prior Orders. Whitesell argues that the imposition of a discovery schedule would promote resolution of the case and prevent harm to Whitesell. On April 15, 2010, Whitesell reurged this same motion.

In response, Defendants have pointed out that there are many outstanding issues to be resolved prior to the imposition of a discovery schedule. Since the filing of Whitesell's first motion for entry of a discovery schedule, this Court issued the March 25th Orders that offered specific legal rulings on the contract duration term. Certain matters were referred to the Special Master for resolution, and as discussed above, the discovery necessary to resolve the remaining transition date issues will be permitted and will proceed by and through the oversight of Mr. Herring.

Presently, there remain other issues that the Court had hoped would be resolved through mediation with the Special Master but have become the subject of pending motions for summary judgment, such as the parties' disputes on price increases and the transition of Brunner and Matrix parts. The Court has not addressed these motions yet, and there may be

27

issues presented therein that necessitate a specific discovery schedule. That remains to be seen. Suffice it to say, the Court will not enter a blanket discovery schedule in a case as complicated as this, particularly with the many outstanding issues that could narrow the scope of discovery.[17] Accordingly, Whitesell's motions for entry of a discovery schedule (doc. nos. 256 & 323) are **DENIED**.

## V.   MOTION FOR PROTECTIVE ORDER

On February 19, 2010, Whitesell served a Request for Production of Documents upon Defendants, which contained the following two requests:

> 1.   All documents, including, without limitation, emails, price quotes, purchase orders, or invoices, from January 1, 2001 to the present, evidencing any communications evidencing or relating to the supply of GOODS to EHP or Husqvarna between any supplier or distributor of GOODS, on the one hand, and either EHP or Husqvarna, on the other hand, including, without limitation, communications with the suppliers identified in Document Requests No. 129-140 in Whitesell Corporation's Fifth Request for Production of Documents to Defendants dated November 30, 2007.

> 2.   All documents from November 30, 2007 to the present, including, without limitation, internal emails, emails between EHP and Husqvarna, notes,

---

[17]   The Court recognizes that there remain disputes about what parts fall into the four categories of enforceable parts. This issue had been referred to the Special Master for resolution at the conclusion of the October 14, 2008 Order. Following the resolution of the pending motions for summary judgment, the Court will entertain the parties' suggestions on how to proceed in the case on this and any other remaining issues.

memoranda, invoices, or price quotations, referring or relating to: (a) Whitesell; (b) any aspect of the supply relationship between Whitesell and Defendants, including, without limitation, the Strategic Partnership Agreement, Settlement Memorandum, and/or Consent Order; or (c) communications with any supplier or distributor evidencing or relating to the supply of GOODS to EHP or Husqvarna.

(Doc. No. 304, Ex. A.) The Request for Production of Documents defines "Goods" as follows: "[A]ll moveable things, including specially manufactured goods, and all cold headed/threaded fasteners, clips, [etc.], . . . and other Class C items in similar families, and/or services, as defined in section 2.1.2 of the [SPA]." (<u>Id.</u>) Defendants filed a motion for protective order on March 22, 2010, contending that the requests were overly broad, unduly burdensome, and in contravention of this Court's prior rulings, particularly referring to the Order of October 14, 2008 which defines the four categories of enforceable parts. Whitesell opposed the motion, Defendants filed a reply brief, and Whitesell filed a surreply.[18]

Whitesell's reference to Section 2.1.2 of the SPA to define the scope of goods applicable to the request for documents does not comport with this Court's prior rulings

---

[18]    Whitesell actually filed a motion for leave to file a surreply, attaching its proposed surreply as Exhibit A. The Court has read and considered the surreply; thus, Whitesell's motion for leave to file (doc. no. 335) is **GRANTED**. The Clerk shall redocket Exhibit A as "Plaintiff's Surreply in Opposition to Defendants' Motion for Protective Order."

that the "Goods" definition in the SPA is too indefinite to provide the subject matter of a contract. Instead, there are only four categories of parts that constitute the universe of parts that Whitesell is required to supply to Defendants and Defendants are expected to purchase from Whitesell. A dispute concerning the fourth category of parts - those that may be defined through the parties' course of performance - has manifested itself through the present motion for protective order.

In brief, Whitesell contends that it must be allowed to discover information pertaining to those parts that should have been transitioned to Whitesell but that Defendants elected not to transition. Whitesell states that Defendants agreed to purchase all of their current and future requirements for certain categories of parts for a prescribed time so that there may be parts that fall within a family of parts subject to the "course of performance" category which Defendants have wrongfully decided not to transition to Whitesell. Thus, Whitesell seeks to discover information "concerning items that Defendants were purchasing from other suppliers that fall into the categories or families of parts that Defendants were purchasing from Whitesell under the supply agreements." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Protective Order, at 4.) For example, Whitesell argues, if

Defendants purchased a 1/2-inch bolt from Whitesell but purchased massive quantities of a 3/8-inch bolt from another supplier, Whitesell would be entitled to include that in the "course of performance" category because the parts fall within the same family of parts, i.e. bolts.  (Id. at 4-5.)

Defendants counter that there can be no "course of performance" for a group of parts, that is, "parts enter the fourth category **individually** upon the offer and acceptance of a particular part."  (Defs.' Reply Mem. in Supp. of Mot. for Protective Order, at 5 (emphasis added).)  Whitesell finds this notion troubling because it would allow Defendants to unilaterally decide not to include a particular item within the scope of the contract by simply not ordering it.

The Court agrees with Defendants that Whitesell's insistence on discovering information pertaining to a "family of parts" relies upon a misconstruction of the Court's prior rulings.  To be clear, the Order of October 14, 2008 was an attempt to provide definiteness to the contractual relationship between the parties where there was none.  In that Order, I explained that the "course of performance" category exists because the parties' conduct - Defendants demand and Whitesell supplies - cured the indefiniteness of the subject matter of the contract.  Thus, the "goods" are

defined by the performance of supply and demand. I specifically noted:

> In order to become part of the reconstructed contract, an action will only be considered "performance" if it was offered by one party and accepted by the other. In this case, that definition encompasses all goods <u>supplied</u> by Whitesell to EHP that EHP <u>accepted</u>. Any additional goods Whitesell supplied to EHP but which EHP refused to accept do not become part of the agreement by virtue of past performance. Likewise, any goods that Whitesell refused to tender to EHP or for which Whitesell refused to accept payment are also excluded from the universe of goods ratified by past performance.

(Order of Oct. 14, 2008, at 24, n.14 (emphasis added).) Yet, Whitesell now seeks to place parts in this category that Defendants never accepted or paid for because such parts are within a family of parts that Defendants accepted and paid for. The inclusion of such parts would contravene the stated and intended definition of the "course of performance" category of parts. That is, it would again require the Court or a jury to classify parts within "families" "without any workable objective standard." (<u>See</u> Comments from the Bench, Hrg. Tr. of Oct. 7, 2008, at 38, doc. no. 211.) The concept of "families" of parts is too vague and indefinite to be enforced.

The "course of performance" category was intended to capture those particular parts that were actually supplied by Whitesell and purchased or used by Defendants. To determine

the parts that fall within this category, the parties must examine their records and determine what specific individual parts have been supplied by Whitesell and accepted by Defendants. To the extent that this ruling has allowed Defendants to withhold demand of parts that Whitesell believes would have otherwise fallen within the scope of their contractual relationship according to some relational definition of parts, Defendants have been able to unilaterally determine what parts are subject to the contract. This result is quite simply the natural consequence of the fact that, without a course of performance respecting a part, there is no contractual relationship as to that part.[19]

Upon the foregoing, and in consideration of the summary judgment motions that are before the Court, Defendants' motion for a protective order (doc. no. 304) is **GRANTED.** Defendants are not required to respond to the Request for Production of Documents served upon them on February 19, 2010.

## VI.   CONCLUSION

For the foregoing reasons, Whitesell's motion for reconsideration (doc. no. 321) is **DENIED.** Whitesell's motion for contempt (doc. no. 252) is **DENIED.** Whitesell's motions

---

[19]  The Court is of course excepting from this statement the three other enforceable categories of parts identified in the Order of October 14, 2008.

for entry of a discovery schedule (doc. nos. 256 & 323) are **DENIED.** Defendants' motion for a protective order (doc. no. 304) is **GRANTED.** Also, Whitesell's motion for leave to file a surreply (doc. no. 335) is **GRANTED.** The Clerk shall redocket Exhibit A to the motion as "Plaintiff's Surreply in Opposition to Defendants' Motion for Protective Order."

At present, the Court has taken under advisement the pending motions for summary judgment and will issue its rulings in due course. In the meantime, the parties are directed to work with the Special Master on the limited pre-trial matters that have been referred to him herein. The Court notes that in relation to its motion pertaining to the Brunner and Matrix parts, Husqvarna recently filed a motion for extension of time to file certain responsive pleadings. Plaintiff consented to the requested extensions. Accordingly, Husqvarna's motion (doc. no. 355) is **GRANTED.** The responsive pleadings that Husqvarna filed on October 6, 2010, pursuant to the consent extension will be considered in due course.

**ORDER ENTERED** at Augusta, Georgia, this _15th_ day of October, 2010.

UNITED STATES DISTRICT JUDGE