FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2011 JUN -8 AM 10: 53

CLERK _L. Flchden_
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| WHITESELL CORPORATION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 103-050 |
| | * | |
| ELECTROLUX HOME PRODUCTS, | * | |
| INC., HUSQVARNA, A.B., and | * | |
| HUSQVARNA OUTDOOR PRODUCTS, | * | |
| INC., | * | |
| | * | |
| Defendants. | * | |

## O R D E R

Presently before the Court is Defendant Husqvarna Outdoor Products Inc.'s ("Husqvarna") motion for summary judgment on Plaintiff Whitesell Corporation's ("Whitesell") claims concerning the transition of Brunner and Matrix parts. In addition to filing materials and a brief in opposition to the motion, Whitesell filed a "Response Under Federal Rule of Civil Procedure 56(f)"[1] and a "Motion to Strike." The parties have thoroughly briefed all motions, and they are ripe for consideration.

---

[1] On December 1, 2010, Rule 56 was amended. Rule 56(f) now appears as Rule 56(d).

## I.  INTRODUCTION

The parties to this lawsuit have been in a business relationship with each other since at least December 14, 2000, the date upon which Electrolux Home Products, Inc. ("EHP") and Whitesell executed a purported Supply Agreement entitled "Strategic Partnership Agreement."  Throughout most of that time, the parties have been involved in this litigation with numerous stops and starts attributable in large part to their efforts to resolve their business differences.

The present motion is another attempt by the defendants to narrow the issues through the elimination of one of Whitesell's claims.  It is worth noting at the outset, however, that this motion for summary judgment requires the Court to delve into matters pertaining to the parties' course of conduct to evaluate issues of good faith and fair dealing. This is an area, unlike contract interpretation, that typically is better left to the province of a jury.[2] Moreover, as Whitesell points out in its Rule 56(f) response, discovery in the case has been limited despite the age of the case.  And, while the Court does not suggest that additional

---

[2]   The Court's prior orders addressing summary judgment motions largely revolved around matters of contract interpretation.  For instance, in the Order of October 14, 2008, the Court determined that the Supply Agreement was too indefinite to be enforced.  In the Orders of March 25, 2010, the Court considered the duration term of the contract and applied it to information provided by the parties which was largely undisputed. Finally, the cost justification provision of the Supply Agreement was at issue in the Order of November 4, 2010.

discovery is necessary in order for Whitesell to "present facts essential to justify its opposition"[3] to Husqvarna's motion, I am wary of disposing of an integral fact-intensive claim based upon the competing representations and averments of witnesses who have never been deposed.

The arguments and hyperbole of counsel in brief and the finger-pointing tenor of the declarations filed in support are stark reminders that there are indeed two sides to every story. For whatever reason, the Brunner and Matrix parts have never been fully transitioned to Whitesell.[4] The attribution of fault is not a matter for a judge of the law but one for a jury. It really is as simple as that. Nevertheless, I will now discuss the relevant factual background and attendant allegations of the parties. In doing so, the number of factual disputes becomes fairly obvious.

## II.  FACTUAL BACKGROUND

Pursuant to the "Supply Agreement," Husqvarna agreed to buy all of its current and future requirements for certain goods from Whitesell during the pendency of the Agreement, and Whitesell agreed to supply all of Husqvarna's requirements for

---

[3]  See Fed. R. Civ. P. 56(d).

[4]  The term "transition" as it is used herein and by the parties refers to the transfer of Husqvarna's supply of relevant parts from its existing parts supplier (such as Brunner Drilling and Manufacturing, Inc. and Matrix Wire, Inc.) to Whitesell.

such goods.[5]  (See generally Ex. 1 to the EHP Compl., Doc. No. 1.)  The problem with the Supply Agreement, however, is that it never defined the "goods" that were subject to the agreement.  Indeed, the first dispute to come before this Court in March of 2003 was whether certain parts used in the production of outdoor products (the "Brunner" parts) fell within the scope of the Supply Agreement.[6]  (See EHP Compl., Doc. No. 1.)

After filing suit, the parties entered into mediation, which yielded a Settlement Memorandum dated May 28, 2003. (Settlement Memorandum, Doc. No. 127, Ex. 3.)  The Settlement Memorandum definitively placed the Brunner parts within the scope of the Supply Agreement as follows:[7]

> Whitesell will make product supply capability presentations to [Husqvarna] for any or all of the

---

[5] EHP, not Husqvarna, was an original party to the Supply Agreement. On June 12, 2006, EHP transferred its outdoor products division to Husqvarna A.B., which in turn transferred the business to Husqvarna Outdoor Products, Inc.  The Matrix and Brunner parts are primarily used in outdoor products; thus, the instant dispute involves only Husqvarna Outdoor Products, Inc., which the Court refers to herein as "Husqvarna." For the sake of convenience, the Court will substitute "Husqvarna" in place of "EHP" when referring to relevant events that occurred prior to June 12, 2006.

[6] In filing its original suit, Husqvarna (formerly EHP) had sought a declaratory judgment that it was not obligated to purchase from Whitesell certain parts for use at its Orangeburg, South Carolina plant, at which Husqvarna manufactures outdoor equipment such as chainsaws and lawnmowers.  While the complaint referred only to the "Orangeburg" parts, the parts are now referred to as the "Brunner" parts because they have been supplied by Brunner Drilling and Manufacturing, Inc. at all relevant times.

[7] In fact, because the Settlement Memorandum mentioned the Brunner parts by name, the Court named the "Brunner parts" as one of the four categories of enforceable parts in its Order of October 14, 2008.  (See Doc. No. 212, at 23.)

4

> Brunner and/or wireform parts.[8]  To the extent that
> [Husqvarna] does not transition the supply of all
> Brunner and wireform parts to Whitesell,
> [Husqvarna] agrees to transition additional
> mutually agreed upon parts for Whitesell to supply
> in an amount which creates gross purchases . . .
> equal to the calendar year 2002 purchase value of
> the Brunner and wireform parts not transitioned
> (hereinafter, "substitute parts.")  While the
> parties will immediately begin the process of
> determining which Brunner, wireform and/or
> substitute parts to transition to Whitesell, full
> transition will not be made until December 31,
> 2003.

(Id. ¶ 3.)  The Settlement Memorandum went on to provide that

the parties would list the Brunner and wireform parts to be

supplied in an exhibit and that Whitesell would offer

Husqvarna a 5% discount off of the prices then being paid to

incumbent suppliers of Brunner and wireform parts.  (Id.)

While the parties were presumably operating under the

Settlement Memorandum, this case was closed.  On March 9,

2005, however, Whitesell filed a motion to enforce the

Settlement Memorandum outlining various pricing and supply

disputes.  In an attempt to maintain the status quo, the

parties entered into a Consent Order on May 17, 2005, "to

preserve and govern the rights of the parties prior to this

Court's final judgment on the parties' disputes regarding the

interpretation, enforcement, validity and meaning of the

---

[8]    While the Settlement Memorandum referred specifically to the
Brunner parts, it did not refer to the "Matrix parts."  Nevertheless, the
parties do not dispute that the term "wireform parts" as used in the
Settlement Memorandum encompasses the parts supplied by Matrix Wire, Inc.
("Matrix").  The parties also do not dispute that Matrix parts fall within
the enforceable parts categories delineated in the October 14, 2008 Order.

5

parties' Settlement Memorandum and [Supply Agreement]." (Doc. No. 30, at 4.)

In October of 2005, Whitesell filed its Third-Party Complaint, in which the subject claim appears, against Husqvarna, A.B. Whitesell filed an Amended Complaint on October 20, 2006, in which Husqvarna Outdoor Products, Inc. was added as a defendant.[9] In Counts I, II and III of Whitesell's Third-Party Complaint and Amended Complaint, Whitesell alleges that Husqvarna breached the Supply Agreement, the Settlement Memorandum, and the 2005 Consent Order due in part to its failure to transition covered parts to include the "Brunner and wireform parts or other mutually agreeable parts . . . ." (See, e.g., Doc. No. 47, ¶ 37.)

Through its present motion for summary judgment, Husqvarna claims it is entitled to judgment as a matter of law on Whitesell's breach of contract claims as they relate to the failure to transition the Brunner and Matrix parts because Whitesell has "stymied" Husqvarna's attempt to do so at every turn. (Doc. No. 340, at 2.) In particular, Husqvarna asserts the affirmative defense found at O.C.G.A. § 13-4-21: "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." (Id. at 1-2.) Husqvarna

---

[9] The docket was not officially changed to reflect that Whitesell was the party plaintiff until the case was re-opened on February 19, 2008.

6

contends that the evidence of record indisputably shows that the parties' inability to fully transition the Brunner and Matrix parts to Whitesell was directly caused by Whitesell's nonperformance under the governing contracts and its lack of good faith and fair dealing. The Court will now set forth the relevant facts relating to the parties' course of performance with respect to the Brunner and Matrix parts.

### A.   Early Transition Efforts (Prior to Whitesell Filing its Complaint Against Husqvarna)

It is worth reiterating that the claim upon which Husqvarna seeks summary judgment is a claim for breach of the Supply Agreement executed in 2000, the Settlement Memorandum executed in May 2003, and the 2005 Consent Order. Whitesell first filed this claim in October of 2005. Thus, the events that took place prior to October of 2005 form the initial basis of Whitesell's claim that Husqvarna failed to transition the Brunner and Matrix parts as required by these three agreements. The Court will begin there.

According to Husqvarna, Whitesell expressed no interest in completing the transition of Matrix parts in the early years of their business relationship. On the other hand, the transition of Brunner parts was a focus of the parties, particularly as Husqvarna's multi-year supply contract with

7

Brunner Drilling and Manufacturing, Inc. was set to expire on September 30, 2003.

The Brunner parts were specialized parts that no other supplier was qualified to supply; thus, Husqvarna claims it had always stressed that if Whitesell was interested in supplying the parts, it would need to obtain qualification from Husqvarna to supply all of the Brunner parts before Husqvarna could replace Brunner Drilling and Manufacturing, Inc.[10] (Doc. No. 336, Leon Decl. ¶ 10.) It is undisputed that Whitesell planned to provide all of the Brunner parts to Husqvarna by September 30, 2003. (Id., Ex. 4 - Letter dated Nov. 19, 2001 from Whitesell, stating: "We will plan on a 100% transition to occur for all [Brunner] parts no later than September 30, 2003 when the Brunner contract expires.") Whitesell, however, was unable to obtain PPAP approval for all of the Brunner parts prior to September 30, 2003.[11] (Id. ¶ 12.) As a result, Husqvarna entered into another multi-year contract with Brunner Drilling and Manufacturing, Inc. in order to continue to receive competitive terms and pricing for the subject parts. (Id.)

---

[10] The qualification process is referred to as "PPAP approval." PPAP is an acronym for "Production Part Approval Process." (Doc. No. 347, Whitesell Decl. ¶ 21.) When a part is PPAP approved, it signifies that the supplier has demonstrated to the purchaser that it is capable of producing the part according to the purchaser's specifications. (Id.)

[11] Whitesell became qualified to supply 33 Brunner parts, which was approximately 50% of the parts Husqvarna was purchasing from Brunner Drilling and Manufacturing, Inc. at that time. (Doc. No. 336, Leon Decl. ¶ 12.)

Husqvarna has produced an email sent to it by Mr. Neil Whitesell, Chief Executive Officer of Whitesell, dated August 23, 2003, which states: "[Whitesell] accept[s] and understand[s] the decision [Husqvarna] has made in regards to not awarding us the Brunner business and I am totally committed to doing whatever we possibly can to support your decision and minimize any adverse effects regarding that decision. We had a[n] agreement and I certainly understood this could occur." (Id., Ex. 7.)

Whitesell offers additional information on its early attempted transition of Brunner parts however. According to Whitesell, it worked for two years to have all the Brunner parts qualified and built an inventory of parts worth approximately $5 million. (Doc. No. 347, Whitesell Decl. ¶ 2.) However, at a critical time in the transition efforts, Husqvarna disputed Whitesell's right to supply the Brunner parts under the Supply Agreement, and in February 2003, Husqvarna sent a notice of termination of the Supply Agreement. (Id. ¶ 3; Doc. No. 348, Duffner Decl. ¶ 4.) Husqvarna then filed the instant lawsuit, claiming that the Brunner and wireform parts were not covered by the Supply Agreement. The lawsuit caused Whitesell to stop work on the Brunner transition until the parties signed the Settlement Memorandum at the end of May 2003. (Doc. No. 347, Whitesell Decl. ¶ 3.)

Whitesell also complains that in June and July of 2003, Husqvarna further delayed Whitesell's efforts to qualify the Brunner parts by redesigning the Brunner steering shafts and adding new, critical dimensions to the prints for other Brunner parts. (Id. ¶ 4.)

Then, in August 2003, one month before its contract with Brunner Drilling and Manufacturing, Inc. was set to expire, Husqvarna informed Whitesell that it had entered into a new contract with Brunner Drilling and Manufacturing, Inc. Whitesell believed at that time, however, that Husqvarna would make up for any shortfall in revenue caused by the failure to transition the Brunner parts by transitioning other "mutually agreed upon" parts by the end of 2003, as provided for in Paragraph 3 of the Settlement Memorandum quoted above. (Id. ¶ 5.) Indeed, in the aforementioned email of August 23, 2003, Mr. Whitesell states: "Besides you will be replacing this [Brunner] business volume with other business for us anyway." (Doc. No. 336, Leon Decl., Ex. 7.) Whitesell contends that this substitute part transition never occurred. Whitesell states that it is this failure to transition the Brunner parts or other "mutually agreed upon" parts that led to its filing of a motion to enforce the Settlement Memorandum in 2005.

The 2005 Consent Order was signed shortly after Whitesell filed its motion to enforce the Settlement Memorandum. The 2005 Consent Order required Husqvarna to transition all

10

wireform products used or to be used by the Orangeburg plant (which would include the Brunner parts) and all parts that were to be transitioned under the Settlement Memorandum by December 31, 2005. Shortly thereafter, however, Husqvarna took the position that it may not be bound to the Supply Agreement, Settlement Memorandum, or 2005 Consent Order because it was a spin-off of EHP and not a party to the contracts. (Doc. No. 347, Whitesell Decl. ¶ 7 & Ex. F.) According to Whitesell, this position caused another delay in the transition of parts. (Id. ¶ 7.) Ultimately, in October 2005, Whitesell filed the subject breach of contract claims against Husqvarna through its Third-Party Complaint.

### B. Transition Efforts After October 2005

With respect to the Matrix parts, Husqvarna contends that Whitesell expressed no interest in completing the transition of the Matrix parts pursuant to the Consent Order. Husqvarna has produced an email dated December 20, 2005 from Whitesell which states that no Matrix parts were to be transitioned at that time. (Doc. No. 270, Agee Decl., Ex. 1.) Contrarily, Whitesell contends that the decision to postpone the transition of Matrix parts was a joint decision because other wireforms were being transitioned at that time and there were several new product launches involved. (Doc. No. 348, Duffner Decl. ¶ 5.) Moreover, Husqvarna agreed to allow Whitesell to

supply some Matrix parts, which Whitesell submitted to Husqvarna for PPAP approval in late 2005.[12]  (Id.)

In January 2007, Whitesell indicated that it was preparing to supply all the Matrix parts to Husqvarna for the 2008 season.[13]  (Doc. No. 271, Sentell Decl., Ex. 1.)  On March 13, 2007, Husqvarna tendered its Matrix parts to Whitesell.[14]  (Doc. No. 338, Sentell Decl., Ex. 1.)  And, on March 28, 2007, Husqvarna also tendered a select number of Brunner parts.  (Doc. No. 347, Whitesell Decl. ¶ 8 & Ex. G.)  In the ensuing months, Whitesell requested physical samples of each part and copies of the invoices paid by Husqvarna to the incumbent Matrix and Brunner suppliers.[15]  (See, e.g., Doc. No. 338,

---

[12]  Viewing the evidence in the light most favorable to Whitesell, the Court will assume that postponing the transition of Matrix parts was a joint decision.  Even so, Husqvarna could not be in breach of contract for failing to transition the Matrix parts until Whitesell indicated a willingness to supply all the Matrix parts to Husqvarna.

[13]  Husqvarna complains in brief, however, that Whitesell initially conditioned this offer upon Husqvarna's concession that it would accept the parts unpainted.  (Husqvarna's Memo. in Supp. of Mot. for Summ. J., at 11-12.)  Husqvarna further contends that, when that concession was not forthcoming, Whitesell demanded an agreement to supply parts outside of the scope of the Supply Agreement and Settlement Memorandum.  (Id. at 12-13.)  Whitesell, on the other hand, contends that Mr. Roger Leon of Husqvarna originated the idea to supply unpainted parts for Husqvarna to paint.  (Doc. No. 347, Whitesell Decl. ¶ 9.)  Whitesell also disputes that its provision of Brunner parts was in any way conditioned upon the provision of additional parts; rather, Whitesell contends that it was simply requesting more information.  In any event, the scope of the Supply Agreement had always been a hotly debated issue between the parties, which was ultimately resolved in part by this Court's October 14, 2008 Order.

[14]  Through the letter of March 13, 2007, Husqvarna supplied pricing information, prints and specifications for the Matrix parts.  (Doc. No. 338, Sentell Decl., Ex. 1.)

[15]  The invoices were arguably relevant to a determination of pricing for the Brunner and Matrix parts in that the Settlement Memorandum provided that Husqvarna would pay prices equal to the prices then being paid to incumbent suppliers less a 5% discount.  (Settlement Memorandum,

Sentell Decl., Ex. 2.)  Husqvarna complains that Whitesell's requests were unreasonable;[16] yet, it provided the part samples and invoices to Whitesell by the end of 2007.  (See, e.g., id., Ex. 3.)  Whitesell complains of Husqvarna's delay in responding to its requests.[17]  (See Doc. No. 347, Whitesell Decl. ¶ 8.)

Following the supply of parts and pricing information, Husqvarna inquired of Whitesell about receiving price quotes on the subject parts.[18]  (Doc. No. 337, Sadler Decl., Ex. 1.)

---

Doc. No. 127, Ex. 3, ¶ 3.)

[16]  Specifically, Husqvarna asserts, inter alia, that it "exerted tremendous, time-consuming effort in manually searching through its archives to pull and copy Matrix and Brunner part invoices." (Husqvarna's Memo. in Supp. of Mot. for Summ. J., at 14.)

[17]  Of note, Husqvarna conceded to Whitesell in a letter dated June 13, 2007, that it had put its transition efforts on hold because it believed Whitesell had been making unreasonable demands for the transition of parts that fell outside the scope of the parties' agreements. (Doc. No. 347, Whitesell Decl., Ex. H.)  As previously stated, until the Court's Order of October 14, 2008, the parties continually disagreed about the scope of their Supply Agreement.

[18]  While Husqvarna demanded of Whitesell price quotes, Whitesell demanded of Husqvarna inventory commitment data in order to establish firm transition dates, which, according to Whitesell, was not forthcoming. Whitesell has produced several email communications from Whitesell to Husqvarna to support its position that Husqvarna delayed the Brunner and Matrix transitions by withholding the commitment data, to wit:

- February 4, 2008 - "We have not heard back from you on the Brunner transition with the information we outlined as needed to continue the process." (Doc. No. 347, Whitesell Decl., Ex. K.)

- February 15, 2008 - "Do we know the Brunner and Matrix commitments?  Really need to know to set fixed transition dates and keep this going forward . . . ."  (Id., Ex. L.)

- February 21, 2008 - "[Whitesell] really need[s] to hear from [Husqvarna] on the stock and commitment data for the Brunner and the Matrix parts to able us to set firm transition dates. Whitesell has been requesting this data for months and has continually been put off for one reason or the other." (Id.)

13

Although Whitesell initially indicated that it did not have enough information to finalize price quotes (see id.), the parties do not dispute that some agreement was reached in March or April of 2008 concerning the pricing for the transition of the Matrix and Brunner parts. (Doc. No. 336, Leon Decl. ¶ 3; Doc. No. 347, Whitesell Decl. ¶ 11.) In particular, the parties agreed that the initial pricing for the transitions would be the incumbent supplier pricing minus a 5% discount as provided in the Settlement Memorandum. The parties further agreed that any final pricing disputes would be resolved through the instant litigation. (Doc. No. 347, Whitesell Decl. ¶ 11; Doc. No. 337, Sadler Decl. ¶¶ 6-7.)

It appears, however, that while the parties agreed in theory on the price structure, the specific prices for the Brunner and Matrix parts were not finalized in March or April

---

- February 24, 2008 - Whitesell is at a loss as to why we can not get any response from [Husqvarna] in regards to the commitment data regarding the Matrix and Brunner transition." (Id.)

- March 19, 2008 - "Once we have the final commitment numbers from Brunner and Matrix we can work with the Divisions to establish firm transition dates." (Doc. No. 337, Sadler Decl., Ex. 3.)

In these emails, Whitesell asserted that it had "fully ramped up on these parts and ha[d] millions of dollars of these parts produced and waiting to be transitioned," but it had been met by the "continued delays and roadblocks" of Husqvarna. (Doc. No. 347, Whitesell Decl., Exs. K & L.) Husqvarna explains that it told Whitesell during this time that it could not supply the inventory commitment data without notifying its incumbent suppliers that it planned to transition the parts to Whitesell. (Doc. No. 337, Sadler Decl. ¶ 5 & Ex. 2.) Husqvarna explained that it was reluctant to do so unless and until Whitesell confirmed its pricing and qualifications. (Id.)

14

of 2008.[19]  For instance, in an email dated April 7, 2008 from Husqvarna to Whitesell, Husqvarna stated that it had been waiting on the pricing verification.  (Doc. No. 336, Leon Decl., Ex. 1.)  Similarly, in an email dated April 8, 2008 from Husqvarna to Whitesell, Husqvarna referred to its attached proposed pricing list but then asked to receive price quotes from Whitesell.  (Doc. No. 337, Sadler Decl., Ex. 4.) Nevertheless, both parties indicated a willingness to proceed with the transition of the parts.  (Id., Exs. 4 & 5.) According to Whitesell, by March 2008, Husqvarna had completed PPAP approvals and line trials on the Matrix parts and PPAP approvals on select Brunner parts.  (Doc. No. 348, Duffner Decl. ¶ 8.)

In mid-April 2008, Husqvarna notified its incumbent suppliers that the Brunner and Matrix parts would be transitioned to Whitesell.  (Doc. No. 337, Sadler Decl. ¶ 8 & Ex. 6.)  According to Husqvarna, both incumbent suppliers raised prices on their subject parts following this notice; also, Matrix Wire, Inc. began imposing temporary surcharges to cover short term spikes in the cost of steel to manufacture

---

[19]   Husqvarna will probably disagree with the statement that the specific prices were not finalized because it appears that Husqvarna contends the parties agreed to use the pricing it provided when it tendered the parts in March 2007.  However, Husqvarna relies upon an unrecorded telephone conversation and an ambiguous follow-up email to establish that specific pricing is an undisputed fact.  (See Doc. No. 336, Leon Decl. ¶ 3 & Doc. No. 337, Sadler Decl., Ex. 6.)  This evidence is simply too uncertain to establish that the parties, particularly Whitesell, agreed on pricing provided in March 2007 during a March 2008 telephone conversation.

its parts. (<u>Id.</u> ¶ 9.) On May 12, 2008, Whitesell began

requesting information regarding the price increases of the

incumbent suppliers:

> Please verify any of the specific associated costs
> per part mentioned above or any additional cost per
> part we may not be aware of that are related to the
> Brunner/Matrix parts not included in or new since
> the tendered sales prices supplied to Whitesell by
> Husqvarna on 03/28/2007.

(<u>Id.</u>, Ex. 7.) Husqvarna responded:

> May I remind you that the official answer to
> proceed with transition came only after Neil
> Whitesell and Roger Leon came to agreement on the
> 5% discount pricing as reflected in my email to you
> dated April 8, 2008. We later heard back that your
> position had changed yet again, citing a need for
> MORE information regarding the cost of these
> products since the transition had been announced.
> Such information is clearly irrelevant to
> determining incumbent supplier pricing under
> pertinent parameters, and your request for such
> information is directly at odds with the pricing
> agreement previously reached.
>
> Clearly Whitesell's request for additional
> pricing information is an attempt to break the
> agreement on the 5% discount pricing and capitalize
> on our misfortune since the suppliers have acted in
> a hostile manner in response to the transition
> announcement. [Husqvarna] is absorbing tremendous
> risk to its production and additional excessive
> costs in order to follow through and transition
> these parts to Whitesell as we agreed.

(<u>Id.</u>, Ex. 8.) In brief, Whitesell contends that Husqvarna has

offered no support for its contention that the incumbent

suppliers raised their prices in response to Husqvarna's

notification of termination; rather, Whitesell contends that

discovery will show the incumbent suppliers raised prices

because of the dramatic worldwide increase in steel prices.[20] (Whitesell's Memo. in Opp'n to Mot. for Summ. J., at 12.)

By the end of June 2008, the parties had failed to agree on pricing, and the transition of Brunner and Matrix parts had not been accomplished. Whitesell's point of view at that time was as follows:

> Husqvarna chose to ignore for years its obligations to buy [the Brunner and Matrix] parts from [Whitesell], despite the clear language of the 2003 Settlement Memorandum and the 2005 Consent Order. It is not right for [Husqvarna] to now demand that Whitesell immediately compromise for less than [Husqvarna] promised. . . . Whitesell invested millions to ramp up for a transition based on prior Husqvarna promises. Even as we speak, the damages continue to increase as [Whitesell] pay[s] to store significant quantities of inventory [Husqvarna] refused to buy.

(Doc. No. 336, Leon Decl., Ex. 3.) For Husqvarna's part, it explained at about the same time:

> [Husqvarna] would like nothing more than to complete the transition of all Matrix and Brunner parts to Whitesell pursuant to the terms of our Agreements; however, we must have Whitesell's cooperation to do so. [Husqvarna does] not want to continue to absorb excess cost and be exposed to risk since notifying the suppliers. We have been operating toward the goal of complete transition for some time now. The point is that this hogwash about an intentional delay is exactly opposite; however, Whitesell's flip flopping decisions regarding agreement to the transition language and pricing calculations in the settlement memorandum

---

[20] As further evidence that only a price structure and not specific prices had been agreed upon, Mr. John Duffner of Whitesell testified that Whitesell had requested updated pricing information from Husqvarna in May 2008 to "establish the relevant pricing for the transitions under the Partnership Agreement." (Doc. No. 348, Duffner Decl. ¶ 9 (emphasis added).)

have continuously set us back. . . . [Husqvarna] never stopped working on [transition] despite constantly shifting demands from Whitesell.

(Doc. No. 337, Sadler Decl., Ex. 8.)

On July 2, 2008, the matter entered into another mediation phase with the court-appointed Mediator and Special Master. In the ensuing thirteen-month period, the parties engaged in extensive mediation efforts with the goal of reaching a global resolution of all remaining issues in the case to include the transition of Brunner and Matrix parts.[21] Those efforts failed in August 2009.

### C. Transition Efforts After August 2009

Without a global resolution of matters, the parties turned back to the transition of Brunner and Matrix parts. Husqvarna prepared a proposed transition plan for both the Brunner and Matrix parts entitled "Memorandum of Understanding" ("MOU"). The Brunner and Matrix MOUs were drafted, exchanged, and redrafted over a several week period. The MOUs, however, were never fully executed. According to Husqvarna, Whitesell's demands in negotiation of each of the MOUs were unreasonable and further evidence of Whitesell's

---

[21] Also during this period, this Court entered its Order of October 14, 2008, defining the four categories of enforceable parts.

continued course of conduct in refusing to allow the Brunner and Matrix transitions to take place.[22]

### 1. The Matrix MOU

According to Husqvarna, it made several concessions less favorable to its business position in drafting the Matrix MOU. For instance, the Matrix MOU contained a price adjustment mechanism which was tied to the movement of a steel prices index known as the "CRU Index." (Doc. No. 272, Sadler Decl., ¶ 8.) Husqvarna also agreed to forego the 5% discount provided in the Settlement Memorandum. (Id. ¶ 9.) Nevertheless, Whitesell refused to finalize the Matrix MOU unless the pricing on Matrix parts included the steel surcharges that had been imposed by Matrix Wire, Inc. in April 2008. (See Doc. No. 271, Sentell Decl., Ex. 6.) Husqvarna argues that this pricing was unreasonable given that Matrix Wire, Inc. had stopped imposing the surcharge in March 2009, and thus, it was not part of the incumbent supplier's pricing at the time of negotiating the MOU. Moreover, according to Husqvarna, the surcharges were only imposed as a result of Whitesell's refusal to transition the Matrix parts in April 2008, a point that Whitesell claims has yet to be proven.

---

[22] Whitesell has filed a motion to strike all evidence and argument related to the negotiation and preparation of the MOUs under Federal Rule of Evidence 408 on the basis that the negotiations were "settlement discussions." This motion will be addressed below.

Whitesell counters that Husqvarna had previously agreed to the inclusion of the steel surcharges during their mediation efforts. Whitesell first points to an email dated December 12, 2008, that it received from Husqvarna along with a "matrix spreadsheet" of pricing information which included the steel surcharges. (Doc. No. 254, Whitesell Decl., Ex. K.) Then, in an April 14, 2009 letter, Husqvarna summarized its position on the mediation efforts to date, and, in discussing the transition of Matrix and Brunner parts, Husqvarna stated:

> Finally, with or without a global resolution, the parties must finalize transition plans for the Brunner and Matrix parts, and [Husqvarna] needs a definite commitment from Whitesell concerning these. . . . The beginning pricing for the Brunner and Matrix parts currently being held in Whitesell's on-hand inventory will be as provided by the e-mail from [Husqvarna] to [Whitesell] dated December 12, 2008.

(Doc. No. 255, Washburn Decl., Ex. A.) Mr. Neil Whitesell further testified that the parties confirmed this agreement during a meeting on July 8, 2009. (Doc. No. 254, Whitesell Decl., ¶ 30.)

In response, Husqvarna points out that the steel surcharges were included in the December 12, 2008 pricing sheet only because they were in place at that time. Husqvarna then argues that the use of this pricing was conditioned upon the parties reaching a global resolution of the litigation at that point. As evidence, Husqvarna submits an email to that effect dated August 3, 2009 - seven months after the December

20

12, 2008 pricing email. (Doc. No. 337, Sadler Decl., Ex. 9.)

Ultimately, the pricing dispute prevented the parties from executing the Matrix MOU.

### 2. The Brunner MOU

Husqvarna provided similar concessions in the Brunner MOU as it had in the Matrix MOU concerning the use of the CRU Index and the forbearance of the 5% discount rate. Husqvarna contends that an agreement was reached on the transition of Brunner parts through an email dated November 11, 2009, in which Whitesell provides: "[Husqvarna's] proposed changes . . . are acceptable to Whitesell. Please make the changes and have [Husqvarna] execute the MOU and send it to [Whitesell]." (Doc. No. 338, Sentell Decl., Ex. 7.) Accordingly, on November 30, 2009, Husqvarna emailed Whitesell an executed Brunner MOU for Whitesell's signature. (Id., Ex. 8.)

Whitesell did not execute the MOU, but instead redrafted it with additional modifications including a requirement that Husqvarna purchase all on-shelf inventory within the first year and a change to the on-shelf quantities Whitesell was required to provide under the MOU. (See id., Ex. 9.) Nevertheless, Husqvarna made further concessions or modifications to the Brunner MOU and resubmitted it to Whitesell for approval. (Id., Ex. 11.)

On December 17, 2009, Whitesell rejected the proposal, indicating that the "fundamental problem" with the Brunner MOU was the inclusion of Husqvarna's right to the "unilateral selection of a third party expert coupled with a veto right that the contract does not currently provide." (Id., Ex. 12.) Whitesell continues: "In light of Husqvarna's past efforts to create quality and other production supply issues where none existed, Whitesell will never agree to give Husqvarna the unilateral right to refuse to purchase Whitesell's goods based upon some undefined standard of 'production readiness' which can be determined by someone of Husqvarna's exclusive choosing." (Id.)

The term "production readiness" appears in Paragraph 2 of the MOU as a pre-condition to the determined transition date: "The February 15, 2010 transition date for these parts is contingent upon Whitesell's assurance of the following on-shelf quantities and production readiness . . . (3) full production readiness on all 02/15/10 Brunner transition parts by January 1, 2010." (Doc. No. 338, Sentell Decl., Ex. 4.) This provision remained unchanged and was included in all drafts of the MOU until Husqvarna sent an amendment to Whitesell on December 15, 2009, which provided: "The assurance of 'full production readiness' set forth in Paragraph 2 of the Brunner MOU will be conducted by an independent, qualified third party consultant of Husqvarna's choosing." (Id., Ex.

22

11.)  Whitesell lodged its complaint about this provision on December 17, 2009, as set forth above.

Husqvarna explains that the requirement of "full production readiness" is intended to ensure that Whitesell can meet its peak demands for the Brunner parts.[23]  Husqvarna points out that the Settlement Memorandum similarly provides for a requirement that "Whitesell will make product supply capability presentations to [Husqvarna] for any and all of the Brunner and/or wireform parts."  (Settlement Memorandum, Doc. No. 127, Ex. 3, ¶ 3.)

For its part, Whitesell contends that it had understood the production readiness requirement to simply involve Husqvarna visiting Whitesell to verify on-shelf quantities. (Doc. No. 347, Whitesell Decl. ¶ 22.)  Yet, by December 17, 2009, Whitesell viewed Husqvarna's production readiness requirement as a contract modification that it was not required to agree to; thus, Whitesell now contends that its failure to agree cannot excuse Husqvarna's failure to transition the Brunner parts.  In support of its position that Husqvarna was imposing a new requirement, Whitesell points out that the Brunner parts had been PPAP approved, which evidenced Whitesell's capability of producing the parts to Husqvarna's

---

[23]  Husqvarna contends that "full production readiness" is of paramount importance with respect to the Brunner parts because aside from Brunner Drilling and Manufacturing, Inc., with whom relations were strained, Husqvarna did not have a qualified supplier for many of the parts.

specifications. Also, Whitesell had had no supply problems in the previous nine years of supplying billions of parts to Husqvarna, and it already had several months' worth of Brunner parts in stock. Finally, Whitesell points out that Husqvarna never demanded an inspection of Whitesell's plants in 2004, when Husqvarna purchased and used $5 million of Brunner parts manufactured by Whitesell, or in 2007 and 2008, when Husqvarna tendered the Brunner business to Whitesell and notified its incumbent supplier of the transition.

Ultimately, despite Husqvarna's attempts to allay Whitesell's concerns about this requirement, Whitesell did not sign the Brunner MOU.

### III.  LEGAL ANALYSIS

### A.  Motion to Strike

In response to Husqvarna's instant motion for summary judgment, Whitesell filed a motion to strike, pursuant to Federal Rule of Evidence 408, any arguments or evidence pertaining to the 2009 negotiations surrounding the Brunner and Matrix MOUs. Whitesell contends that these negotiations constitute inadmissible settlement discussions between the parties. Husqvarna, on the other hand, contends that the negotiations were business discussions. The Court agrees with Husqvarna.

24

First, as admitted by Mr. Neil Whitesell, the mediation efforts aimed at a global settlement broke down in August 2009. (See Doc. No. 347, Whitesell Decl. ¶ 19.) Second, if Whitesell's position, i.e., that any efforts between the parties to transition parts are settlement discussions, then a large majority of the communications between the parties since Whitesell filed its breach of contract claims in October of 2005 should be considered settlement discussions.[24] Finally, the draft MOUs contain a provision which states:

> [B]oth Parties hereby waive and release the other Party from any and all claims challenging the pricing for [Brunner or Matrix] Parts, including, but not limited to, Husqvarna's claim for entitlement to a five percent pricing discount for [Brunner or Matrix] Parts. This waiver and release shall not prevent either Party from asserting claims or defenses to such claims with respect to the alleged delay in the transition of [Brunner or Matrix] Parts, or for claims of breach of representation and warranty concerning Exhibit A pricing contained in Paragraph 3 of this MOU. Except for the pricing claims discussed above, execution of this MOU does not waive any of the Parties' other claims, including, but not limited to, Husqvarna's claim for entitlement to a two percent annual rebate for future purchases of [Brunner or Matrix] Parts.

(E.g., Doc. No. 338, Sentell Decl. Exs. 4, 5, 8, 9 & 14 (emphasis added).) Thus, the MOUs clearly did not settle the subject claims for breach of contract based upon Husqvarna's failure to transition the Brunner and Matrix parts prior to

---

[24] It is of little moment that communications regarding the MOUs occurred between counsel for the parties. Counsel have been intimately involved in communications between these parties for several years now.

the anticipated execution of the MOUs.[25]    Accordingly,

Whitesell's motion to strike (doc. no. 363) is **DENIED**.

## B.    Motion for Summary Judgment

The Court should grant summary judgment only if "there is
no genuine issue as to any material fact and . . . the movant
is entitled to a judgment as a matter of law."  Fed. R. Civ.
P. 56(c).   The purpose of the summary judgment rule is to
dispose of unsupported claims or defenses which, as a matter
of law, raise no genuine issues of material fact suitable for
trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In considering a motion for summary judgment, all facts
and reasonable inferences are to be construed in favor of the
nonmoving party.   Hogan v. Allstate Ins. Co., 361 F.3d 621,
625 (11th Cir. 2004).   Moreover,

> [t]he mere existence of some factual dispute will
> not defeat summary judgment unless the factual
> dispute is *material* to an issue affecting the
> outcome of the case.    The relevant rules of
> substantive law dictate the materiality of a
> disputed fact.   A genuine issue of material fact
> does not exist unless there is sufficient evidence
> favoring the nonmoving party for a reasonable jury
> to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (*en
banc*) (quoted source omitted) (emphasis supplied).   The party

---

[25] Whitesell's attempt to differentiate between a claim for failure
to transition the parts and a claim for unwarranted delay in transition of
the parts is unavailing.

26

opposing the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue to be tried." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Clerk has given the nonmoving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 342.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

In this case, Husqvarna seeks judgment as a matter of law on Whitesell's breach of contract claims involving Husqvarna's alleged failure to transition the Brunner and Matrix parts. More particularly, Husqvarna contends that undisputed material facts show that Whitesell's nonperformance under the contract should excuse Husqvarna's performance with respect to the transition. In short, Husqvarna asks this Court to conclude as a matter of law that no reasonable juror could conclude that Husqvarna should not be excused from its performance based upon Whitesell's conduct related to the transition efforts.

As the factual background shows, the parties characterize the many dealings between them differently, and, importantly, each party has submitted evidence to support its

27

characterization. For instance, Husqvarna claims that the reason the Brunner parts were not transitioned in the early years is because Whitesell did not qualify its parts in a timely fashion. Whitesell, however, places the blame for its delay on Husqvarna. Indeed, Whitesell presents evidence that Husqvarna redesigned certain parts and the record shows that Husqvarna participated in certain procedural posturing, such as a refusal to recognize that it was bound to the Supply Agreement, which may have delayed the transition process. Another example lies in the 2007 and 2008 transition efforts, wherein Whitesell has presented evidence that tends to show Husqvarna's delay in providing sample parts and arguably necessary invoices. Whitesell has also produced several emails from early 2008 that tend to show Husqvarna was non-responsive to Whitesell's inquiries and demands.

In viewing the totality of the facts, the Court notes at least two material disputes that contributed to the failure to transition the Brunner and Matrix parts. First, the parties differ on the manner and level of qualification that Whitesell had to demonstrate before the Brunner parts could be transitioned. Second, the parties differ on the specific pricing to be used for the transitioned parts. Through its motion, Husqvarna contends that Whitesell's positions on these matters is simply unreasonable. Yet, the reasonableness of a parties' position vis-á-vis the contracts and the parties'

course of performance is a jury question. That is, the Court cannot determine that one party's conduct, which was based in large part upon subjective interpretations of certain events and communications, was unreasonable as a matter of law.

One example of a genuine issue of material fact arises out of the negotiations of the Matrix MOU in 2009. Whitesell believed that the steel surcharges that had been applicable in December 2008 should apply to the Matrix MOU because Husqvarna had agreed to that pricing. Whitesell submits an email in which Husqvarna agrees to this pricing. Yet, Husqvarna conclusorily argues that this position is unreasonable and provides its own evidence, albeit seven months after the fact, that the December 2008 pricing with steel surcharges was conditional upon a global resolution. Based upon this evidence, the Court cannot conclude that no reasonable juror could find that Whitesell was justified in insisting upon the use of pricing with steel surcharges for the Matrix MOU.

In short, Husqvarna's motion seeks a determination from this Court that Whitesell's conduct at every turn was unjustified. Yet, at every turn, Whitesell has a reasonable explanation, supported by evidence, of its own conduct. Simply put, Husqvarna has failed to establish as a matter of law that Whitesell's performance or non-performance under any agreement between the parties was sufficient to excuse Husqvarna of its obligations under the agreements.

29

Accordingly, Husqvarna is not entitled to summary judgment on Whitesell's breach of contract claims based upon O.C.G.A. § 13-4-23.

## IV.  CONCLUSION

Upon the foregoing, the motion for summary judgment filed by Husqvarna Outdoor Products, Inc. on Plaintiff's claims concerning the transition of Brunner and Matrix parts (doc. no. 339) is hereby **DENIED**.  Plaintiff's motion to strike (doc. no. 353) is also **DENIED**.

**ORDERED ENTERED** at Augusta, Georgia, this _8th_ day of June, 2011.

UNITED STATES DISTRICT JUDGE