IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WHITESELL CORPORATION,             *
                                   *
        Plaintiff,                 *
                                   *
    v.                             *       CV 103-050
                                   *
ELECTROLUX HOME PRODUCTS,          *
INC., HUSQVARNA, A.B., and         *
HUSQVARNA OUTDOOR PRODUCTS,        *
INC.,                              *
                                   *
        Defendants.                *

**O R D E R**

On February 11, 2019, this Court conducted a hearing on Defendants' "Motion for Sanctions and to Stay the Joint Discovery Plan" ("Sanctions Motion"). (Doc. No. 1070.) At the outset of the hearing, having thoroughly reviewed the extensive briefs of the parties and evidence of record prior thereto, the Court announced its finding that Plaintiff Whitesell Corporation ("Plaintiff") had violated its discovery obligations and had misled Defendants and the Court. The only issue to be determined at that point was the matter of sanctions. The Court afforded Plaintiff an opportunity to present evidence and argument in mitigation of this finding. Defendants also presented evidence and argument of the prejudice they have suffered. The Court took the matter of

sanctions under advisement. Presently, and upon careful consideration, the Court has determined that the only appropriate sanction in this case is to strike Plaintiff's claim for lost profits as requested by Defendants in their Sanctions Motion.

## I. BACKGROUND[1]

Through its Second Amended Complaint, Plaintiff claims that Defendants failed and refused to fully transition and purchase from Plaintiff all parts as required under the parties' Strategic Partnership Agreement, their Settlement Memorandum, and the 2005 Consent Order. Plaintiff seeks lost profits resulting from these breach of contract claims. Defendants have consistently maintained that any breach of their commitment obligations under the various agreements was caused by Plaintiff's own conduct, alleging in part that Plaintiff did not have the capability of supplying the parts.

Product cost information (i.e., cost per part) has been sought by Defendants throughout discovery. Defendants have unequivocally sought any data or information, whether Plaintiff relied upon it or not, that related in any way to

---

[1] The Court relies upon and incorporates herein the extensive briefs related to the Sanctions Motion to provide a more detailed factual background of the case. This short overview is designed only to provide a general sense of the Court's finding of sanctionable conduct.

2

the cost of parts on a per-part basis. Defendants had reason to believe from prior litigation testimony that Plaintiff's IFS system contained such information.[2] Defendants filed a motion to compel, unsatisfied that Plaintiff did not possess such information. The Court concluded early in the discovery process that the most efficient and meaningful way to resolve the parties' numerous discovery disputes was to conduct regular discovery hearings.[3] The production of product cost information often took center stage at these hearings. Plaintiff represented to this Court and to Defendants time and time again that per-part cost data does not exist in IFS or anywhere else.[4] Upon the Court's pointed inquiry on this issue, Plaintiff maintained that it would be using only company-level financial documents (such as tax returns and general ledgers) and monthly earning reports to calculate part costs for purposes of its lost profits claim. The Court instructed Plaintiff to be sure that it had no responsive

---

[2] The IFS is Plaintiff's Enterprise Resource Planning ("ERP") system. Plaintiff replaced its previous ERP system known as Tools with the IFS in May 2003.

[3] Though this case has been pending since 2003, the discovery phase related to the relevant requests did not begin until the summer of 2014. The first discovery hearing was conducted on March 12, 2015.

[4] (See Hrg. Tr. of Aug. 14, 2015, Doc. No. 683, at 29-49; Hrg. Tr. of Jan. 21, 2016, Doc. No. 775, at 70-94; Hrg. Tr. of Apr. 27, 2016, Doc. No. 819, at 102-28; and Hrg. Tr. of Nov. 16, 2016, Doc. No. 873, at 85-103.)

information, lamenting that it could not order production of something that did not exist. On July 14, 2017, Plaintiff certified to the Court that it had "produced all responsive data and information, in its possession, custody and control concerning product costs and expenses."[5] (Doc. No. 923.) Plaintiff continued its representation that no additional per-part cost data existed in a letter to Defendants on March 23, 2018. (See Doc. No. 1099, Ex. 12, at 1.)

In May 2018, Defendants deposed Plaintiff's employee, Chris Jones, who testified that every part entered into IFS contains a "Unit Cost" data field, i.e., product level cost data. When confronted with this testimony and upon Defendants' demand for the information, Plaintiff refused to provide the data because, in its estimation, it was unreliable.[6] Plaintiff further maintained that the data was irrelevant to the case because its damages expert did not intend to rely upon it in his calculations. Defendants filed a motion to compel seeking this data from the IFS system on July 13, 2018. And so began over seven months of litigation

---

[5] Plaintiff similarly certified its production was complete in court during the discovery hearings. (See n.4, *supra*.)

[6] (See Pl.'s Ltr. of June 25, 2018, Doc. No. 1099, Ex. 15, at 21 (stating "we cannot agree to inject unreliable 'data' into the case where no party could defensibly rely upon it").)

4

related to Plaintiff's wrongful withholding of the product cost information in the IFS system. Plaintiff did produce the requested information in July 2018, but only after the close of fact discovery-including the four-day Rule 30(b)(6) deposition of Mr. Neil Whitesell, Plaintiff's principal.[7]

To be sure, Plaintiff has violated its discovery obligations in failing to timely provide responsive information to the requests of Defendants and this Court. Plaintiff consistently denied the existence of per-part cost data, and when its deceit was revealed, it refused to produce the information because it is "unreliable" and unnecessary to support its claim of lost profits. This position, however, is antithetical to the purpose and scope of discovery. Federal Rule of Civil Procedure 26(b)(1) provides that parties may obtain discovery that is "relevant to **any** party's claim or defense" (emphasis added). Relevance for discovery purposes is much broader than relevance for trial purposes and should be allowed "unless it is clear that the information sought has no possible bearing on the subject matter of the action." Dunkin' Donuts, Inc. v. Mary's Donuts, Inc., 2001 WL 34079319, *2 (S.D. Fla. Nov. 1, 2001). The party resisting discovery

---

[7] Of note, Plaintiff produced the data in its Inventory Transactions Spreadsheets on July 3, 2018, but did not reveal to Defendants that the information they sought was included therein until fact discovery was closed.

has the burden to show that the information is not relevant or is of such marginal relevance that the potential harm the discovery may cause would outweigh the presumption in favor of broad disclosure. EEOC v. AutoZone, Inc., 2007 WL 9717741, *2 (S.D. Ala. Aug. 3, 2007). In this case, Plaintiff did not "resist" production of the per-part cost data in IFS (thereby allowing the Court to adjudge the propriety of withholding the information); rather, it denied its existence. A party may not unilaterally determine what evidence it will disclose and produce based upon its own evaluation of its usefulness or relevance.

Now that the information has been produced, Plaintiff persists that the data is unreliable and useless and therefore Defendants have suffered no prejudice. In closing statements at the hearing, Plaintiff's counsel suggested that this Court should wait until the close of expert discovery to ascertain the relevance of the undisclosed data. He further surmised that a jury would also readily determine that the IFS per-part cost data is not reflective of Plaintiff's product costs. But that is the Court's point. It was not within Plaintiff's authority to make that decision for the jury, or for the Court for that matter, by withholding the information.

## II. LEGAL ANALYSIS

A. <u>Federal Rule of Civil Procedure 37</u>[8]

Rule 37(b)(2)(A) provides for sanctions for a party's failure to obey a court order to provide discovery, including the ability to strike pleadings in whole or in part. An oral order may provide the requisite basis for a Rule 37(b)(2)(A) sanction. <u>Malautea v. Suzuki Motor Company</u>, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) (citing <u>Avionic Co. v. General Dynamics Corp.</u>, 957 F.2d 555, 558 (8th Cir. 1992) ("Oral proceedings compelling discovery that 'unequivocally give a litigant notice' of the discovery required are sufficient for Rule 37(b)(2) sanctions.")). In this case, the Court orally pronounced during the discovery hearings that Plaintiff should provide any and all per-part cost data in its possession in response to the challenged discovery requests. Plaintiff failed to obey the Court's directives when it failed to disclose the existence of the subject IFS data.

Rule 37(c)(1) addresses a party's failure to disclose or

---

[8] Defendants invoke both Federal Rule of Civil Procedure 37 and the Court's inherent authority in moving for sanctions. Indeed, "if, in the informed discretion of the court, neither the statutes nor the rules are up to the task, the court may safely rely on its inherent power" to sanction bad-faith conduct in the course of litigation. See <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 50 (1991). The Court has determined that Rule 37 provides a sufficient basis to impose sanctions in this case, but also relies upon its inherent sanctioning authority to address bad-faith litigation.

supplement an earlier response to a discovery request. It states:

> If a party fails to provide information . . . as required by Rule 26(a) or (e)[9], the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of reasonable expenses, including attorney's fees, caused by the failure; or
>
> (B) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

The sanctions listed in Rule 37(b)(2)(A)(i)-(vi) include striking pleadings in whole or in part. In this case, Plaintiff failed to disclose and supplement its discovery responses with the IFS unit cost data.

Plaintiff has violated both Rule 37(b)(2)(A) and Rule 37(c)(1). Rule 37 grants this Court discretion to choose a sanction that is just and appropriate, and Defendants' requested sanction of striking Plaintiff's lost profits claim is specifically listed as an available sanction for both violations.

---

[9] Rule 26(e) imposes a duty to supplement or correct any prior response to an interrogatory or request for production "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."

8

B.  <u>Sanctions</u>

The sanctions of Rule 37 come into play upon a party's violation of the rule, notwithstanding any lack of willfulness or bad faith. <u>In re Seroquel Products Liability Litigation</u>, 244 F.R.D. 650, 656 (M.D. Fla. 2007) (cited sources omitted). However, considerations of the offending party's reasons for the violation, the presence of willfulness or bad faith, the prejudice that may befall the opposing party, and the lack of available lesser sanctions are important in fashioning the appropriate sanction. <u>Id.</u>; <u>Perrymond v. Lockheed Martin Corp.</u>, 2011 WL 13269790, *3 (N.D. Ga. June 9, 2011) (cited source omitted); <u>see also</u> <u>Searock v. Stripling</u>, 736 F.2d 650, 653 (11th Cir. 1984) (explaining that the dismissal of an action as a sanction should be based on evidence of the sanctioned party's willfulness, bad faith or fault).

A brief background of Plaintiff's lost profits claim is warranted here. The parties' Settlement Memorandum obligates Defendants to transition to Plaintiff any and all Brunner and wireform parts by December 31, 2003. To the extent that Defendants did not transition these parts, Defendants agreed to "transition additional mutually agreed upon parts for [Plaintiff] to supply in an amount which creates gross purchases . . . equal to the calendar year 2002 purchase value" of Brunner and wireform parts ("substitute parts").

9

There is no dispute that the Brunner and wireform parts were not transitioned at any time in the case, and there is no dispute that substitute parts were not identified. Instead, the parties dispute the reason behind this non-transition. For Plaintiff's part, it claims it had expended money and resources for two years prior to the Settlement Memorandum in order to either make the custom parts or obtain the parts from sub-suppliers; however, Defendants never purchased the parts (nor did they ever intend to purchase the parts). For Defendants' part, they claim that Plaintiff was unable to meet their demands and that per-part cost data, particularly as it relates to sub-supplied parts, could show that the supply of the parts would result in a negative profit margin for Plaintiff. The claim that arises out of this dispute is Whitesell's claim for lost profits.[9]

A claim of lost profits necessarily involves a calculation of product costs. It is understandable then that Defendants would seek all information about product costs from Plaintiff to test or verify any lost profit calculation. But Defendants have maintained throughout this litigation that product cost data could also aid their theory of defense. Product cost data could speak to Plaintiff's profitability and

---

[9] The lost profits claim involves more parts than the Brunner and wireform parts, but these parts comprise the largest part of the claim.

readiness to supply parts.

Defendants' need for <u>any</u> product cost data is amplified because of two factors beyond their control. First, Plaintiff has maintained that it does not measure its profitability on a per-part or even a product line basis. Without benchmarks or snapshots of per-part costs, Defendants have been subject to the whim of Plaintiff's expert from the outset. Second, Plaintiff failed to maintain any information pertaining to product costs and purchase order history from its prior ERP system at this crucial time in the parties' relationship. Defendants argue that Plaintiff failed to maintain data and spreadsheets manually created outside of the prior ERP system as well, showing that contemporaneous e-mails reference attached documents that have not been found and produced. Thus, any contemporaneous information about product costs is magnified in importance to Defendant.

In short, Defendants have been hampered by the lack of product cost information both in supporting their theory of defense and in evaluating any lost profits calculation. Thus, the withholding of the IFS "unit cost" data is particularly egregious in the context of this case.

In mitigation of its conduct, Plaintiff offers evidence that the unit cost data in IFS was not maintained on an on-going basis. Plaintiff explains that while IFS requires entry

11

of a number in this field when entering a part into the system, the number is of no value because it cannot be supported. Plaintiff's attempt to discredit the evidence, however, is unavailing for several reasons. First, it is difficult to imagine that the person inputing a unit cost into IFS would make up numbers such as 0.0484000 or 0.0157620. Second, Defendants presented evidence tending to show that the unit costs were updated or changed. Third, Defendants presented evidence that in several instances, the prices negotiated by Plaintiff with a sub-supplier were the same as the unit cost entered into IFS. Fourth, Defendants presented evidence showing a correlation between the per-part cost associated with a purchase order in the 2016 Purchase Order History Document and the unit cost listed in IFS for the same part and purchase order. Fifth, Defendants showed an example of a part that had a negative profit margin when assessed with the withheld IFS product cost. While admittedly this sampling by Defendants is small in relation to the number of Parts in Suit, it must be remembered that Plaintiff did not retain any potential supporting documentation existing prior to May 1, 2003, the date it implemented the IFS system. Finally, Mr. Neil Whitesell testified that all the detailed data maintained in the IFS system which will go into the calculation of per-part costs for purposes of its lost profits damages claim is

accurate; yet, he would have the Court believe that the only field that is completely inaccurate is the one that was not disclosed to Defendants.

The unit cost data in IFS is a snapshot in time of product costs. Even Mr. Neil Whitesell admitted as much in his testimony.[10] While the data may not reflect the ultimate product cost of a particular part, it is a starting point, a reference, a piece of a puzzle. <u>Any challenges to the data's accuracy should have played out in the discovery process.</u>

In producing the data only after the close of fact discovery, Defendants have been deprived of the opportunity to select deponents based on and to question deponents about the data. They have expended considerable resources working under the assumption that product cost data does not exist and crafting their theory of defense without the benefit of potentially vital information. Their experts have labored to analyze and evaluate Plaintiff's lost profits claim without the benefit of per-part costs. The prejudice worked against Defendants is extraordinary.

---

[10] Mr. Whitesell actually referred to the entry field as a "little snippet of a snapshot" which is unsupported by any documentation and does not take into account design changes and other costs such as raw material costs, labor costs and tooling costs. He also testified that the unit cost entry was "just [] what you paid a supplier for that cost at some point in time." While a transcript of the hearing is not available at this time, the Court is able to listen to the audio file of the hearing on its internal recording system, For The Record ("FTR").

13

So too it is irreparable. The Court cannot unring the discovery bell or rewind time to put Defendants in the position of making decisions and conducting depositions armed with the withheld information. The Court readily determines that the only appropriate sanction in this case is to strike Plaintiff's lost profits claim. There is simply no alternative.

The Court also readily finds that Plaintiff acted in bad faith. One need only review the hearing transcripts referenced in footnote 4, *supra*, to conclude that all parties in the courtroom, particularly the presiding judge, clearly and unequivocally understood Defendants' quest for contemporaneous per-part cost data and the reasons therefor. Equally manifest is the Court's directive that any per-part cost data be produced. Time and time again Plaintiff represented that no such data existed. When found out, Plaintiff double-downed and opted to withhold the information by insisting that production was unwarranted because the data had no value to *its* case. Then, Plaintiff essentially triple-downed, obfuscating the issues with semantics and qualifications as to what Defendants and the Court actually requested of it. This is willful. This is bad faith. In addition to allaying the prejudice caused to Defendants, the Court must vindicate its authority. The harsh sanction imposed here is the denouement.

### III. CONCLUSION

Upon the foregoing, the Court hereby **GRANTS** the Sanctions Motion (doc. no. 1070) and **STRIKES** Plaintiff's claim for lost profits on its breach of contract claims. Defendants' motion to compel Plaintiff's production of the IFS per-part cost data (doc. no. 1028) and Plaintiff's motion to withdraw the motion to compel (doc. no. 1032) are **DENIED AS MOOT**. Plaintiff's motion to stay ruling on the Sanctions Motion (doc. no. 1121) and its motion to strike the Sanctions Motion (doc. no. 1130) are **DENIED**.

The Court will award reasonable attorney's fees and costs associated with Defendants' Sanctions Motion. Defendants are invited to submit an application for their costs and attorney's fees incurred in drafting and filing the Sanctions Motion and the attendant briefs, the costs and attorney's fees incurred in responding to Plaintiff's motion to stay the Sanctions Motion and the motion to strike the Sanctions Motion (doc. nos. 1121 and 1130), and the costs and attorney's fees incurred in preparing for and attending the hearing on February 11, 2019. Defendants' application for fees and costs shall be filed within twenty-one (21) days hereof.

Finally, two days after the hearing of February 11, 2019, Plaintiff filed a motion to stay the decision on this Sanctions Motion pending resolution of its own sanctions

motions - one filed on January 9, 2019 (doc. 1134) and one not yet filed. Plaintiff contends that it seeks as a sanction default judgment as to the liability on its lost profits claim. The basis of Plaintiff's first motion for sanctions centers around the deposition of Kim Rio taken on September 6, 2017, and relates to allegedly false affidavits created in 2005. Plaintiff contends that its theory of deception was *confirmed* at the deposition of Bill Shnowske on April 12, 2018. The facts underlying the unfiled motion for sanctions - the missing Roger Leon e-mails - was known to Plaintiff in 2015. Yet, Plaintiff has waited until the shadow is on the door to file its motions for sanctions. The Court will not abide by this gamesmanship. Plaintiff's motion to stay the decision of this Court on the Sanctions Motion (doc. no. 1155) is hereby **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 14th day of February, 2019.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA