IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WHITESELL CORPORATION,          *
                                *
        Plaintiff,              *
                                *
    v.                          *    CV 103-050
                                *
ELECTROLUX HOME PRODUCTS, INC., *
HUSQVARNA, A.B., and HUSQVARNA  *
OUTDOOR PRODUCTS, INC.,         *
                                *
        Defendants.             *

O R D E R

Presently before the Court in the captioned matter are cross-motions for summary judgment on the parties' separate claims concerning Annual Rebates. (Doc. Nos. 1035, 1109.) In particular, Plaintiff Whitesell Corporation ("Whitesell") asserted in Count V of its Second Amended Complaint that Defendants improperly took partial Annual Rebates under their Settlement Memorandum without satisfying a condition precedent.[1] (Doc. No. 578, ¶¶ 159-65.) Conversely, in Count I of their Counterclaims, Defendants seek payment of Annual Rebates earned but not taken. (Husq. Ans., Doc. No. 584; EHP Ans., Doc. No. 585.) The cross-motions for summary

---

[1] Defendant Electrolux Home Products, Inc. ("EHP") contends that Count V fails to state a claim against it. Because of the ruling announced herein, the Court need not address this contention.

judgment call upon the Court to resolve the entitlement to Annual Rebates as a matter of law.

I. FACTUAL BACKGROUND

On December 14, 2000, the parties to this lawsuit executed a purported Supply Agreement entitled "Strategic Partnership Agreement" ("SPA").[2] (See SPA, Ex. 1 to Second Am. Compl., Doc. No. 578-1.) Pursuant to the SPA, Defendants agreed to buy all of their current and future requirements for certain goods from Whitesell during the term of the Agreement, and Whitesell agreed to supply all of Defendants' requirements for such goods.

Section 6.0 of the SPA provided for "Cost Reduction Programs," whereby the parties agreed to "work together to reduce costs, improve processes, and generate savings." It further provides:

> <u>After full transition by plant location</u>, during the initial term to Whitesell, annual cost reduction programs will have a minimum annual cost/price improvement guarantee of 2% of Whitesell's annual sale to Electrolux of cold headed threaded fasteners it had the in-house manufacturing capability to provide to Electrolux on Good(s) which did receive the initial pricing discounts. Although the guarantee is 2% Whitesell will work toward cost reductions goals of 5% per year. . . . In the event cost improvement ideas submitted for implementation during a calendar Agreement year do not accumulate to at least 2%, then the unit prices of cold headed threaded fasteners shall be

---

[2] EHP and Whitesell were the original parties to the SPA and to the Settlement Memorandum of May 23, 2003. On June 12, 2006, EHP transferred its outdoor products division to Husqvarna A.B., which in turn transferred the business to Husqvarna Outdoor Products, Inc. ("Husqvarna").

2

proportionately adjusted by Whitesell in Exhibit B to provide for such shortfall deficiency. Such price reduction will be implemented at the beginning of the next calendar year.

(SPA, § 6.0 (emphasis added).)

Whitesell began supplying EHP with goods shortly after the SPA was executed; however, a dispute arose between the parties regarding whether the SPA obligated EHP to purchase certain parts for lawn tractors manufactured by EHP at its Orangeburg, South Carolina, Plant. This dispute led to EHP's filing of this lawsuit in March 2003.

After mediation, the parties executed a Settlement Memorandum on May 23, 2003. (See Settlement Memorandum, Ex. 2 to Second Am. Compl., Doc. No. 578-2.) The Introductory Section of the Settlement Memorandum states that "EHP and Whitesell desire to resolve any and all disputes which they have with each other arising out of the [SPA]." The Settlement Memorandum further provides that the SPA, "except as modified herein, shall continue in full force and effect." (Id. ¶ 14.) Relevant here, the parties agreed as follows in Paragraph 7:

> Whitesell agrees, at the end of each calendar year beginning with calendar year 2003, to pay to EHP a two percent (2%) rebate of the total receipts for all parts purchased which Whitesell receives from EHP during that calendar year. Such rebate satisfies all of Whitesell's obligations of the unit piece price under Section 6.0 of the Agreement however Whitesell will continue to provide its best efforts to provide EHP with annual Total Cost Reductions.

3

(Id. ¶ 7.)

It is undisputed that both Husqvarna and EHP took partial annual rebates in the amount of $3,931,187.34 and $969,901.60, respectively.[3] (Defs.' Resp. to Whitesell's Counterstatement of Undisputed Material Facts, ¶¶ 75-76.) In Count V of its Second Amended Complaint, Whitesell seeks reimbursement of these monies plus interest. Whitesell alleges that Defendants did not comply with the provisions of the Settlement Memorandum by failing and refusing to fully and timely transition and purchase all parts required by the parties' agreements; Whitesell points to the Brunner and wireform parts that were never fully transitioned to Whitesell. Whitesell draws the Court's attention to the condition precedent in Section 6.0 of the SPA, which reads "[a]fter full transition by plant location." Because of the failure to fully transition, Whitesell contends Defendants are not entitled to the Annual Rebate.

For their part, Defendants contend that their entitlement to the Annual Rebate provided in Paragraph 7 of the Settlement Memorandum is not dependent on the "full transition" of parts. Rather, Defendants claim that Paragraph 7 of the Settlement Memorandum supersedes Section 6.0 of the SPA.

In April 2011, Defendants filed a motion for summary judgment

---

[3] Husqvarna took annual rebates in years 2003 to 2008. EHP took annual rebates in years 2003 to 2005.

4

asking this Court to declare that Whitesell is obligated to pay Defendants a 2% Annual Rebate on their total calendar year purchases from Whitesell, beginning in 2003. There, Defendants similarly argued that the unambiguous language of Paragraph 7 of the Settlement Memorandum compelled this result. By Order of March 29, 2013, this Court terminated Defendants' motion to allow for discovery, noting that the motion "brought into focus the intent behind Paragraph 7 of the Settlement Memorandum and the fact-intensive claims of failure of consideration and estoppel." (Order of Mar. 29, 2013, Doc. No. 496, at 4.) In particular, the parties have consistently and vehemently pointed the blame finger at each other when it comes to the transition failure. (See generally Order of June 8, 2011, Doc. No. 429.) To be sure, the failure to transition the Brunner and Matrix parts is a fact-intensive matter, and the "attribution of fault is not a matter for a judge of the law but one for a jury." (Id. at 3.) That said, if Defendants are correct that Paragraph 7 of the Settlement Memorandum supersedes Section 6.0 of the SPA and its requirement of "full transition by plant location," these factual matters concerning transition fall to the wayside.

## II. LEGAL STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled

5

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In considering a motion for summary judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoted source omitted) (emphasis added). The party opposing the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue to be tried." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

Because "the construction of a contract is a question of law for the court," O.C.G.A. § 13-2-1, the resolution of this Annual Rebate matter is well-suited for summary judgment. See Sim's Crane Serv. Inc. v. Reliance Ins. Co., 514 F. Supp. 1033, 1036 (S.D. Ga.

6

1981) ("[C]onstruction and interpretation of a written contract is matter of law for the court, and therefore, is properly subject to disposition by summary judgment." (cited sources omitted)). If, however, an ambiguity remains after application of all applicable rules of construction, then a jury question may be presented. Id.

### III. LEGAL ANALYSIS

#### A. *Liability*

The cross-motions for summary judgment involve a straight-forward matter of contract interpretation. The issue presented is whether Paragraph 7 of the Settlement Memorandum supersedes Section 6.0 of the SPA, thereby obviating the condition precedent of full transition for entitlement to an Annual Rebate.

The parties do not contend, nor does the Court find, that either provision is ambiguous. Indeed, "a contract is not ambiguous, even though difficult to construe, unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more permissible meanings represents the true intention of the parties." Runyan v. Econ. Lab., Inc., 248 S.E.2d 44, 46 (Ga. Ct. App. 1978). Here, the parties do not offer differing meanings of the terms in the relevant provisions. In fact, both parties agree that Section 6.0 unambiguously provided that full transition of parts was a pre-condition to any obligation of Whitesell to provide an Annual

7

Rebate. Concomitantly, both parties agree that Paragraph 7 of the Settlement Memorandum does not expressly contain a similar pre-condition. Rather, Whitesell wishes to apply the pre-condition of Section 6.0 of the SPA to Paragraph 7 of the Settlement Memorandum without a clear indication from the contractual language that it should be.

In interpreting Paragraph 7 of the Settlement Memorandum, the Court is mindful that the agreement was intended as a global resolution of all disputes existing between the parties at that time with a few exceptions not relevant here. (See Settlement Memorandum, at 1 & ¶ 13.) Accordingly, the Settlement Memorandum embodied bargained-for terms and conditions binding upon the parties. That is not to say that the SPA became invalid or unenforceable; rather, the SPA remained in "full force and effect" except as modified by the Settlement Memorandum. (Id. ¶ 14.) One of the terms of the SPA so modified was the "Cost Reduction Programs" provision, Section 6.0. Section 6.0 guaranteed to EHP that Whitesell would provide a cost reduction of 2% per annum. If the 2% guarantee was not realized, Whitesell agreed to proportionately adjust the piece unit prices of cold headed threaded fasteners listed on Exhibit B to provide for any shortfall deficiency. (See SPA, § 6.0)

This obligation to adjust the piece unit pricing became unnecessary under the parties' modified cost reduction provision

announced in Paragraph 7 of the Settlement Memorandum. Pursuant to Paragraph 7, Whitesell unequivocally agreed to pay EHP a 2% annual rebate of the total receipts for all parts purchased during the calendar year. The parties then announced that this rebate "satisfies all of Whitesell's obligations of the unit piece price under Section 6.0 of the Agreement." This declaration by the parties, that Whitesell's obligations under Section 6.0 would be satisfied by provision of the 2% Annual Rebate, demonstrates that Section 6.0 was superseded by a new cost reduction provision. Moreover, the parties anticipated that full transition would not occur until at least December 31, 2003, and provided for proportional term extensions in the event that the deadline was not met. It would not be reasonable to provide for an Annual Rebate conditioned on full transition in a calendar year in which full transition was not required prior to the end of that year. It should also be noted that Paragraph 7 contains a promise that "Whitesell will continue to provide its best efforts to provide EHP with annual Total Cost Reductions." (Settlement Memorandum, ¶ 7.) It would have been unnecessary for the parties to include this statement had Section 6.0 of the SPA not been superseded because Section 6.0 already required Whitesell to "work for continuous total cost reductions." (SPA, § 6.0.)

In short, the Court concludes as a matter of law that Paragraph 7 of the Settlement Memorandum supersedes Section 6.0 of

9

the SPA in its entirety. Thus, Paragraph 7 of the Settlement Memorandum governs the parties' obligations regarding the Annual Rebate. Paragraph 7 is plain, unambiguous and capable of only one interpretation - there is no condition precedent to payment of the Annual Rebate to Defendants. The full transition of parts is not required before the Annual Rebate must be paid. In fact, there is no language anywhere in the Settlement Memorandum that conditions payment of the Annual Rebate on the full transition of parts.

Whitesell argues that it does not make commercial sense for it to have increased its own obligation by granting an Annual Rebate on all parts sold to Defendants while eliminating Defendants' obligation to fully transition parts. Even assuming this is true, it does not change the unambiguous nature of Paragraph 7 of the Settlement Memorandum which clearly does not contain a condition precedent. And, where the terms of a contract are clear and unambiguous, a court looks to the contract alone to ascertain the parties' intent. See, e.g., Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998); Watson v. Union Camp Corp., 861 F. Supp. 1086, 1089 (S.D. Ga. 1994) ("A court may not, however, impose upon unambiguous language a different meaning to comport with the drafter's claimed intent, or use extrinsic evidence to create an ambiguity in an otherwise unambiguous contract." (citations omitted)). The unambiguous intent of Paragraph 7 of the Settlement Memorandum was to supersede

Section 6.0 of the SPA. Whether this intention makes good business sense to Whitesell is immaterial. Besides, even if full transition was the consideration Whitesell bargained for in agreeing to a 2% Annual Rebate in entering into the SPA, the Settlement Memorandum was entered into three years after the parties had begun their supply relationship such that the initial consideration inquiry is likewise irrelevant.

In conclusion, a plain and unambiguous reading of Paragraph 7 of the Settlement Memorandum shows that it supersedes Section 6.0 of the SPA. Stated another way, nothing in the Settlement Memorandum subjugates Paragraph 7 to Section 6.0 of the SPA. Accordingly, the implementation of Paragraph 7 is not limited by anything in Section 6.0 or elsewhere. For this reason, Defendants are entitled to a 2% Annual Rebate of the total receipts for all parts purchased from 2003 to 2014.

### B. Damages

The parties do not dispute that the amount of damages owed to Defendants by virtue of the Court's grant of summary judgment on their Counterclaims is readily calculable from Whitesell's discovery responses. In particular, Whitesell produced a "Corrected Exhibit 17" on August 15, 2016, which provides its annual monetary receipts for parts purchased by each of the Defendants' plants. (See Defs.' Mot. for Summ. J., Doc. No. 1035, Ex. E.) Whitesell also produced "Exhibit 18" in discovery, which

lists the rebates Defendants took and the dates such rebates were taken by each of the Defendants' plants.[4] (See id., Ex. F.) Upon this undisputed evidence, Defendants calculated their damages in terms of rebates Whitesell owes them as $619,691.06 to Husqvarna and $2,033,712.62 to EHP.

Additionally, the parties do not dispute that Defendants are entitled to pre-judgment interest at a rate of 7% per annum as provided in O.C.G.A. § 7-4-15 and § 7-4-2(a)(1)(A). In brief, Defendants calculated pre-judgment interest as of August 1, 2018. At that time, Defendants sought judgment in their favor in the amount of $817,578.28 for Husqvarna and $3,239,304.06 for EHP, both inclusive of the pre-judgment interest.

## IV. CONCLUSION

Upon the foregoing, Defendants' motion for summary judgment (doc. no. 1035) on Count V of Plaintiff's Second Amended Complaint and on Count I of Defendants' Counterclaims concerning Defendants' entitlement to annual rebates is hereby **GRANTED**. Concomitantly, Plaintiff's cross-motion for summary judgment (doc. no. 1109) on its claim asserted in Count V of its Second Amended Complaint that

---

[4] Husqvarna's records show that Whitesell failed to include a rebate Husqvarna took at its McRae, Georgia facility in 2004. Husqvarna has included this rebate in its calculations of rebates already taken; thus, the apparent disputed data will inure to the benefit of Whitesell. (See generally Defs.' Mot. for Summ. J. at 15-16.)

12

Defendants must return to Whitesell all annual rebates they have taken is **DENIED**. Accordingly, Defendants are entitled to judgment in their favor in the liquidated amount of $619,691.06 to Husqvarna and $2,033,712.62 to EHP plus pre-judgment interest at a rate of 7% per annum. Before the close of business on December 10, 2019, Defendants are directed to submit proposed Judgments for the Court's consideration, computing pre-judgment interest as of December 31, 2019. Plaintiff shall have seven (7) days from the date of submission to object to any erroneous calculations. The Court intends to enter judgment on Count I of Defendants' Counterclaims on December 31, 2019.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of November, 2019.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA