FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 MAR 25 AM 11: 38

CLERK _____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WHITESELL CORPORATION,          *
                                *
          Plaintiff,            *
                                *
     v.                         *          CV 103-050
                                *
ELECTROLUX HOME PRODUCTS, INC., *
HUSQVARNA, A.B., and HUSQVARNA  *
OUTDOOR PRODUCTS, INC.,         *
                                *
          Defendants.           *

                        O R D E R

     On March 14, 2019, at the Court's direction, the parties in

the captioned matter filed a Joint Submission in which they list

the remaining claims in the case. (Doc. No. 1171.) The listed

claims include (1) Plaintiff Whitesell Corporation's breach of

contract claim against Defendant Husqvarna Outdoor Products, Inc.

("Husqvarna") for its alleged failure to pay for excess fastener

inventory, which is Count III of Plaintiff's Second Amended

Complaint filed on June 5, 2014 (doc. no. 578),[1]    and (2)

_____

[1] Count III of the Second Amended Complaint indicates that
Defendant Electrolux Home Products, Inc. ("EHP") "took and paid
for substantially all of Whitesell's inventory of parts" during
the Phase-Out Period of the parties' contractual relationship.
(Sec. Am. Compl. ¶ 149.) Husqvarna, on the other hand, "refused
to take all of Whitesell's inventory as required by Section 23.1
[of the Strategic Partnership Agreement]." (Id.) Count III goes
on to allege that Husqvarna's failure to pay for the excess
inventory is a breach of its implied covenant of good faith and

Defendants' breach of contract claim against Whitesell for its alleged failure to comply with its phase-out inventory obligations, which is Count II of each Defendants' Answer and Counterclaims (doc. no. 584 (Husqvarna) and doc. no. 585 (EHP)). The parties have filed motions for summary judgment addressing these two claims, which the Court will resolve herein. More specifically, the Court will now consider Defendant Husqvarna's motion for summary judgment with respect to Plaintiff's claim for the payment of excess fastener inventory and Plaintiff's partial motion for summary judgment with respect to Defendants' counterclaims for the payment of expedite fees. It is appropriate to consider these motions together because they both concern the

---

fair dealing that caused damage to Whitesell. (Id. ¶¶ 150-51.) Notably, the motion for summary judgment on the issue of excess fastener inventory was brought by Husqvarna only, with the following proviso: "In the event Whitesell makes any suggestion [that Count III is asserted against EHP] in its response, EHP has indicated that it will join" the motion for summary judgment. (Def. Husqvarna's Mot. for Summ. J. on Excess Fastener Inventory, Doc. No. 1034, at 1 n.1.) Whitesell did not represent that it has a claim against EHP for any alleged failure to pay for excess fastener inventory in its responsive brief or sur-reply to the motion for summary judgment. Instead, seven months later, in its April 12, 2019 expert disclosures, Whitesell included damages from EHP related to excess fastener inventory. Thus, EHP filed a motion to join Husqvarna's motion for summary judgment. (Doc. No. 1190.) Given the lack of factual allegations against EHP in Count III, the Court concludes that Whitesell has not asserted a claim against EHP in the Second Amended Complaint for failure to pay for excess fastener inventory. Also, Whitesell's failure to affirmatively respond to the contrary in its briefs waived any claim for excess fastener inventory related to EHP parts. Accordingly, EHP's motion to join Husqvarna's motion for summary judgment (doc. no. 1190) is **DENIED AS MOOT.**

parties' conduct during the Phase-Out Period of their contractual relationship - that is, the period of time from April 24-25, 2008 to November 1, 2008, as detailed below.

## I.  BACKGROUND

The contractual relationship at issue in this case began with a Strategic Partnership Agreement ("SPA") entered into on December 14, 2000.   Under the SPA, EHP agreed to purchase and Whitesell agreed to provide all of EHP's "current and future needs of cold headed/threaded fasteners and various related Class C items" from January 1, 2001 through April 1, 2008.[2]  (See generally Sec. Am. Compl., Ex. 1, SPA.)   The initial duration term of the contract was later modified by the parties' Settlement Memorandum to expire on November 1, 2008.  (Id., Ex. 2, ¶ 3.)

The SPA provided a termination provision whereby a party could terminate the supply agreement after completion of the initial duration term of the contract if the party provided written notice not less than six months prior to the end of such term.   (Id. ¶

---

[2]   On June 12, 2006, EHP spun off its outdoor division into a subsidiary of the Swedish company, Husqvarna A.B.   The resulting subsidiary, Defendant Husqvarna herein, remained bound to the parties' contractual agreements.  (See SPA, § 28.2.)

23.0.) The termination provision also set forth the parties'
obligations respecting the Phase-Out Period,[3] providing:

> The parties shall cooperate in good faith and use their
> best efforts to wind up and complete the full utilization
> prior to the end of the Phase-Out Period, of all of
> supplier's product made for [Defendants]. Whitesell
> shall advise the quantities of all finished goods, work-
> in-process, and committed purchased products and
> [Defendants] shall take delivery of all such Good(s)
> during this period. . . . Except as otherwise provided
> herein, all terms and conditions of this Agreement shall
> continue in effect throughout the Phase-Out Period.

(Id. ¶ 23.1.)

On April 24, 2008, Husqvarna sent a termination letter to
Whitesell, providing written notice that pursuant to Section 23.0
of the SPA Husqvarna intended to terminate the supply agreement on
November 1, 2008, as to all parts terminable on that date.[4] (Decl.
of Joy Odom in Support of Pl.'s Mot. for Partial Summ. J. on
Expedite Fees, Doc. No. 1037-1, Ex. 15.) On April 25, 2008, EHP
sent a similar termination letter to Whitesell, providing for the
same termination date of November 1, 2008. (Id., Ex. 6.) Both
letters recognized that the parties were in the midst of settlement
discussions with Defendants representing that they would continue

---

[3] "If notice of termination is given then from and after the
delivery of such notice of termination and until the effective
date of such termination shall be called the 'Phase-Out Period.'"
(Id. ¶ 23.1.)

[4] The parts that were terminable on November 1, 2008 were all
parts transitioned to Whitesell by December 31, 2003, and any parts
which first came into use after December 31, 2003 and were
immediately transitioned.

4

to negotiate terms to possibly include an extension of the supply agreement. Past that, Defendants remarked that the parties "would need to begin the 'Phase-Out Period' described in Section 23.1 of the SPA and cooperate in good faith and use their best efforts to wind up and complete full utilization of parts prior to the end of the Phase-Out Period on November 1, 2008." The letters further stated: "By May 1, 2008, [Defendants] will provide a list specifically identifying parts subject to this notice and would appreciate Whitesell providing information concerning 'the quantities of finished Goods, work-in-progress (sic), and committed purchased products' as required by Section 23.1 of the SPA." These letters provided the requisite six-month notice of termination for parts that Whitesell was supplying and whose contract duration terms would be expiring on November 1, 2008.

The Phase-Out Period was a momentous time in this case. The parties' eight-year relationship was coming to a partial close while pivotal disputes regarding their contractual obligations toward one another remained unresolved. The parties were at odds with each other on crucial terms of their agreements. Nevertheless, the parties were engaging in global settlement discussions, which included reference to a Special Master (see Order of Apr. 23, 2008, Doc. No. 183). Finally, the Court entered an Order on June 12, 2008, informing the parties that it had grave concerns about the validity, and therefore enforceability, of the

5

SPA.[5] (Doc. No. 191.) Of note, discovery in the case was stayed at the time. The two motions at issue here involve this period of time.

First, Husqvarna moves for summary judgment on Whitesell's claim that Husqvarna is liable for the excess fastener inventory that Whitesell had on hand on November 1, 2008. (Doc. No. 1034.) Husqvarna contends that Whitesell's conduct during the Phase-Out Period was indisputably a material breach of its good faith obligations under Section 23.1 of the SPA. Husqvarna explains that Whitesell intentionally provided an untimely and grossly inaccurate list of inventory in August 2008; thus, Whitesell cannot now seek payment for excess inventory that it essentially hid from Husqvarna until hours prior to the termination time. Whitesell counters that while the inventory list may have been inaccurate, there are triable issues of fact respecting Husqvarna's own bad faith that preclude summary judgment.

This is not the first iteration of this particular motion. In March 2011, Husqvarna filed the same motion. (Doc. No. 391.) While the matter was fully briefed and evidence submitted on both sides, Whitesell filed a Rule 56(d) declaration in which it claimed that Husqvarna's motion was premature because "no meaningful

---

[5] The Order of June 12, 2008 would not have surprised the parties since the Court expressed its concerns at a February 13, 2008 status conference and in a hearing on March 3, 2008.

discovery ha[d] occurred in this lawsuit since 2006." (Decl. of James A. Washburn, Doc. No. 408, ¶¶ 3-4.) Through its Order of March 29, 2013 terminating the motion, the Court agreed with Whitesell, stating that while the parties had submitted thorough declarations of the principal players in the dispute, neither party had had the opportunity to cross-examine these witnesses. (Doc. No. 496, at 3.) The Court observed: "[T]he declarations demonstrate various points of contention as to why each party conducted itself in the manner it did during [the Phase-Out Period]. **I will not comment on whether those points of contentions are material**; suffice it to say, the disputed facts concerning the parties' course of conduct are numerous." (<u>Id.</u> (emphasis added)[6].)

The record now contains the referenced declarations, correspondence between the parties, internal e-mails, and other documentary evidence, as well as the deposition testimony of the key players, all of which provide ample evidence of the parties' dealings during the Phase-Out Period. This evidence is integral in determining whether summary judgment is appropriate on the instant motions, both of which call upon the Court to examine the parties' good faith and fair dealings during the Phase-Out Period.

---

[6] This portion of the prior ruling is emphasized to negate any present assertion that the Court previously found **material** disputes of fact precluding summary judgment.

The second motion resolved herein is Whitesell's motion for summary judgment on Defendants' claim that it owes them expedite fees, that is extra fees incurred by Defendants from alternative suppliers in providing parts that should have been supplied by Whitesell during the Phase-Out Period. (Doc. No. 1037.) Whitesell contends that to the extent that Defendants incurred expedite fees, if they even did, it was the result of Defendants' own delay in ordering the parts from alternative suppliers. Defendants counter that there are factual issues concerning whether Whitesell's failure to provide a timely and accurate inventory list caused any delay. Moreover, Defendants contend that Whitesell's own conduct in threatening to terminate supply of *all* parts that it was supplying to Defendants caused them to incur much of the expedite fees at issue in the case.

The Court will now set forth the facts as revealed by the evidence mentioned above.

As described above, the April Termination Notices represented that Defendants would provide lists of parts that would be terminating on November 1, 2008 and demanded Whitesell comply with Section 23.1 of the SPA in providing a Phase-Out Inventory List. Defendants did not provide their lists of parts until July 1, 2008. Whitesell, however, also failed to provide the Phase-Out Inventory List expeditiously. Rather, Whitesell made clear during this time that it believed Defendants were wrongfully terminating the supply

8

agreement. (See, e.g., Smith Ltr. of Aug. 4, 2008, Ex. 9 to the Decl. of R. Perry Sentell, Doc. No. 390; Whitesell Ltr. of Aug. 20, 2008, Ex. 3 to Def. Husqvarna's Mot. for Summ. J. on Excess Fastener Inventory.) Whitesell also refused to give Defendants assurances that it would provide continued supply until the end of October. (See Smith Ltr. of Aug. 4, 2008, at 3.)

On Wednesday, August 20, 2008, four months into the six-month Phase-Out Period, Whitesell supplied a Phase-Out Inventory List, dated August 4, 2008. (Def. Husqvarna's Mot. for Summ. J. on Excess Fastener Inventory, Doc. No. 1034, Ex. 3.) The testimony of Whitesell's principal and chief executive officer, Mr. Neil Whitesell, concerning this list is consequential. Mr. Whitesell received the list from Whitesell's purchasing department a few days prior to its disclosure. (N. Whitesell Dep., Doc. No. 1070-3, at 236-37, 240.) Mr. Whitesell modified the list, "reducing the quantities dramatically." (Id. at 237.) Mr. Whitesell testified that he did so as a result of "economic duress," explaining: "[Defendants] were basically trying to put me out of business, assassinate me, and I was reacting to all of the games they were playing. And I did this list. It was inaccurate." (Id. at 237-38; see also id. at 240 ("Q: "[I]n frustration you just reduced the quantities to some arbitrary number that would probably not meet the defendant's (sic) demands from the phase out date? A: That was the intent, yes. Just to say you want to play that

9

game, we'll play that game."); N. Whitesell Dep., Doc. No. 1070-1, at 308 ("If you're trying to make an emphasis here that I intentionally gave an inaccurate list, I absolutely did."). Mr. Whitesell further testified that he cut the quantities on his own without telling his employees about the changes. (N. Whitesell Dep., Doc. No. 1070-3, at 241.) Mr. Whitesell sent this modified Phase-Out Inventory List to Defendants with an expectation that Defendants would "buy this inventory." (Whitesell Ltr. of Aug. 20, 2008, at 2.) The Phase-Out Inventory List understated Whitesell's inventory positions by $22 million. (N. Whitesell Dep., Doc. No. 1070-3, at 295-302.)

Defendants were immediately wary of the Phase-Out Inventory List, questioning the August 4th date of the list just two days later, on Friday, August 22nd. (Sentell E-mail of Aug. 22, 2008, Ex. 1 to the Decl. of P. Sentell, Doc. No. 390.) Moreover, it appeared that Whitesell had included all parts it had been supplying to Defendants, not just the terminating ones. (See N. Whitesell Dep., Doc. No. 1070-2, at 346.) Then, on Monday, August 25th, Defendants expressed greater concern about the list. In particular, Defendants were troubled that "if the numbers are anywhere near accurate, the quantities listed for many covered parts are grossly inadequate to supply Electrolux's requirements until November 1, 2008." (Sentell Ltr. of Aug. 25, 2008, Ex. 2 to the Decl. of P. Sentell, Doc. No. 390.) Defendants represented

that 140 of the 905 parts purchased by EHP would be used up before the end of the week. (Id.) Defendants were also unsettled by the apparent position that Whitesell was taking that all parts currently supplied would be terminated on November 1, 2008. (Id.) Whitesell's immediate response was to reaffirm its position that Defendants were wrongfully terminating the supply agreement. (Balser Ltr. of Aug. 25, 2008, Ex. 7 to the Decl. of P. Sentell, Doc. No. 390.) Whitesell further responded that it had complied with its only obligation during the Phase-Out Period by providing the Phase-Out Inventory List and reiterated that it expected Defendants to purchase the inventory on that list. (Id.)

As the ensuing exchange of correspondence illuminates, the parties were "worlds apart on their understandings" of their respective obligations. (See Sentell Ltr. of Aug. 27, 2008, Ex. 3 to the Decl. of P. Sentell, Doc. No. 390, at 1.) For Whitesell's part, it not only contended that the April Termination Notices were wrongful but that it was not obligated to meet Defendants' supply requirements through November 1, 2008. Based on this interpretation, on August 26th, Whitesell offered to meet Defendants' requirements through November 1st if they "were willing to pay market price for the inventory." (Balser Ltr. of Aug. 26, 2008, Ex. 10 to the Decl. of P. Sentell, Doc. No. 390.) In response, Defendants deplored the fact that Whitesell had provided no notice to them of its new position in the four months that it

continued to supply parts since the April Termination Notices. (Sentell Ltr. of Aug. 27, 2008, at 2.) In analyzing the Phase-Out Inventory List, Defendants stated: "[I]t now appears that Whitesell has terminated its supply chain and allowed inventory levels to be extinguished to the point that production could be severely impacted by late this week or early next week." (Id. at 1.) Defendants estimated that the quantity levels of 20% of the parts on the Phase-Out Inventory List were inadequate. (Id.) Defendants warned Whitesell that they would "immediately begin to use their best efforts to fill the premeditated shortfalls in inventory levels and expedite the supply of these parts from other suppliers." (Id. at 2.) Finally, Defendants demanded an accurate inventory list.[7] (Id. at 3.) This demand was emphasized again in an email on that same day, wherein Defendants expressed their "most immediate need" to "expedite the confirmation and purchase of [Whitesell's] existing inventories, so that [Defendants] can do their best to cover whatever shortages may exist." (Sentell E-mail of Aug. 27, 2008, Ex. 4 to the Decl. of P. Sentell, Doc. No. 390.)

Without providing an updated or accurate inventory list, and "to avoid any further unnecessary dispute regarding the phase out, Whitesell [agreed] to supply all of defendants' production

---

[7] Defendants provided several specific examples of the list's inaccuracies in the August 27th letter.

12

requirements as stated on the DFC as of August 21st (the date we provided our phase out list) to November 1, 2008 at current contract prices." (Balser E-mail of Aug. 28, 2008, Ex. 12 to the Decl. of P. Sentell, Doc. No. 390.) Unhappy with utilizing the Phase-Out Inventory List as the basis of any agreement, Defendants submitted a counter-proposal to resolve the matter of closing out the Phase-Out Period. (See Sentell Ltr. of Aug. 29, 2008, Ex. 4 to the Decl. of P. Sentell, Doc. No. 435.)

From there, the parties volleyed various terms and conditions back and forth over the course of the next several weeks, with Defendants all the while expressing concern about Whitesell's ability to meet their demands for parts through November 1, 2008 despite Whitesell's assurances that it would. Moreover, on September 5, 2008, Defendants offered to purchase and take immediate delivery of active parts listed on Whitesell's Phase-Out Inventory List in exchange for Whitesell's promise to fill any shortages by Defendants until November 1, 2008.[8] (Sentell Ltr. of Sept. 5, 2008, Ex. 5 to the Decl. of P. Sentell, Doc. No. 390.) Defendants reiterated that they must know "whether Whitesell is in

---

[8] Defendants renewed this offer to "purchase all of the active parts contained on Whitesell's August 4, 2008 Phase-Out List for parts subject to Defendants' termination notices" by letter of October 31, 2008. (See Sentell Ltr. of Oct. 31, 2008, Ex. 2 to the Decl. of P. Sentell, Doc. No. 435.) Later that day, Whitesell would send its updated Inventory List to Defendants that included 80% more inventory.

fact willing to immediately provide the level of parts necessary to meet the Defendants' requirements until November 1, 2008." (Id.) Defendants pointed out that the longer this issue remained unresolved, "the more costly it is for the Defendants to cover the potential interim shortages." (Id.) This proposal was not accepted, although Whitesell represented that it would continue to keep Defendants supplied with all of their production requirements up to November 1, 2008. (See, e.g., Balser Ltr. of Sept. 17, 2008, Ex. 13 to the Decl. of P. Sentell, Doc. No. 390, at 1.)

During this same time frame, the parties were negotiating a global settlement strategy with the assistance of a Special Master. Then, on October 7, 2008, the Court invited the parties to a courtroom proceeding in which it was pronounced that the SPA was too vague and indefinite to be enforced.[9] (See generally Hrg. Tr. of Oct. 7, 2008, Doc. No. 211.) A written Order followed on

---

[9] As the Court mentioned earlier, this pronouncement was not a shock to the parties. Rather the presiding judge, the Honorable Dudley H. Bowen, Jr., had had doubts about the contract for years, but deferred ruling that the parties were operating under an invalid contract so long as they continued to have a functioning and productive relationship. As Judge Bowen expressed at the October 7th hearing: "[W]hile we were talking settlement and while we were talking mediation, I saw no reason to talk about the seminal document and its potential deficiencies while the parties were not addressing that issue. And, if this relationship could be saved without my bringing up the holes in the contract, I favored saving the relationship. By June 12th, it appeared to me that there was no hope in doing so." (Hrg. Tr. at 11.) In point of fact, by June 12, 2008, the April Termination Notices had been sent.

14

October 14, 2008, wherein the Court recognized four categories of parts that remained subject to the parties' contractual relationship. (Doc. No. 212.) Whitesell filed a motion for emergency clarification of the Order of October 14, 2008, for which the Court convened another hearing on October 30, 2008, to hear argument of counsel. On October 31, 2008, the Court entered an Order explaining that Whitesell did not seek clarification so much as it asked the Court "to affirmatively enjoin the Defendants to continue to purchase parts" from it. (Order of Oct. 31, 2008, Doc. No. 216, at 2.) The Court explained that to "issue an order prohibiting Defendants from terminating the supply relationship and requiring Defendants to continue doing business with Plaintiff for a term lacking a foreseeable end . . . would require the Court to rule on the complex issue of contract termination" without the benefit of argument. (Id. at 3.) Accordingly, the Court left the decision to terminate the supply agreement to Defendants at their own peril of committing breach of contract. (Id. at 6.)

Following receipt of the October 31st Order denying its motion for emergency clarification, Whitesell sent an updated Inventory List to Defendants in the early evening of Friday, October 31, 2008. It is undisputed that Defendants did not know Whitesell's actual inventory positions until they received the list on October 31st. (N. Whitesell Dep., Doc. No. 1070-3, at 254.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012).

As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [the non-movant's] favor," see United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and quoted source omitted). Additionally, the party opposing summary

16

judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576—77 (11th Cir. 1990).

The Clerk gave the nonmoving parties in this matter notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. Nos. 1039 & 1041.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

The briefing with submissions of evidentiary support was complete on the motions for summary judgment in November 2018. At that point, the time for filing materials had expired, and the motions were ripe for consideration. Nevertheless, more than a year later, Whitesell filed a memorandum in support of its motion for partial summary judgment on Defendants' counterclaims for expedite fees. Therein, Whitesell contends that the depositions of expert witnesses taken during September 2019 provided additional support for its motion. Defendants opposed the late filing as untimely and on its merits. Whitesell filed a reply brief on January 29, 2020. The matter is once again ripe for consideration.

### III. LEGAL ANALYSIS

#### A. Husqvarna's Motion for Summary Judgment with Respect to Excess Fastener Inventory

In Count III of the Second Amended Complaint, Whitesell claims that Husqvarna breached Section 23.1 of the SPA in failing to complete the full utilization of its inventory prior to the end of the Phase-Out Period. Thus, Whitesell claims Husqvarna must pay for the excess fastener inventory as it existed on November 1, 2008. Husqvarna contends it is entitled to summary judgment on this claim because Whitesell's provision of an intentionally false Phase-Out Inventory List on August 20, 2008, was a material breach of its obligations under Section 23.1 of the SPA.

The Court starts with the contract provision Husqvarna allegedly breached that would entitle Whitesell to the damages it seeks. Section 23.1 provides that both parties shall "cooperate in good faith and use their best efforts to wind up and complete the full utilization [of Whitesell's product made for Husqvarna] prior to the end of the Phase-Out Period." Whitesell's claim invokes this promise of "full utilization." Section 23.1, however, further provides that Whitesell is required to advise Husqvarna of the quantities at issue such that Husqvarna "shall take delivery of all such Good(s) during this period." As explained by David Agee of Husqvarna, the provision of an accurate inventory was beneficial to both parties. An accurate list would have provided

for the "use up" of Whitesell's inventory, and it would have allowed Husqvarna to "make determinations where [it] needed to concentrate [its] efforts on shortfalls" in inventory. (Dep. of David Agee, Ex. C to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. as to Expedite Fees, Doc. No. 1051, at 138-39.)

It is undisputed that on August 20, 2008, Whitesell not only provided an inaccurate Phase-Out Inventory List, but an intentionally false inventory list. Indeed, Whitesell does not attempt to contradict Mr. Whitesell's testimony that he dramatically reduced the inventory on the list provided by his employees to "play that game."[10] This deceitful conduct is the antithesis of the good faith and best efforts required by the SPA. See Black's Law Dictionary (10th ed. 2014) (defining "good faith" as "honesty in belief or purpose," "faithfulness to one's duty or obligation," and "absence of intent to defraud") and (defining "best efforts" as "diligent attempts to carry out an obligation"). Moreover, Whitesell refused to provide an accurate list to Husqvarna in the face of repeated requests to do so after August 20th. Whitesell's late assurances that it would continue to meet supply requirements until November 1, 2008, does nothing to inform

---

[10] Whitesell does dispute that it never sent an accurate inventory list, pointing to the disclosure of the list *hours* prior to the end of the Phase-Out Period. It would be farcical at best to suggest that this last hour provision of an accurate list comports with the notions of "good faith" and "best efforts."

Husqvarna of its inventory positions such that Husqvarna could make plans for utilization. Indeed, it would not be reasonable to expect Husqvarna to fully utilize inventory about which it was completely unaware during the six-month Phase-Out Period. See O.C.G.A. § 13-4-23 ("If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance.") In short, no reasonable jury could conclude that Whitesell complied with its obligations of good faith and best efforts under Section 23.1 in light of the undisputed fact that Mr. Neil Whitesell provided an intentionally false Phase-Out Inventory List despite Whitesell's obligations under the SPA.[11]

In response to the motion for summary judgment, Whitesell contends that Husqvarna also acted in bad faith. Whitesell argues that it is Husqvarna's bad faith that put Mr. Neil Whitesell in such a state of "economic duress" that he had to respond in kind with this false Phase-Out Inventory List. Whitesell continues that Husqvarna's behavior creates genuine disputes of material fact related to the respective good-faith, or in this case, bad-faith conduct of the parties such that only a jury can resolve the matter. More specifically, Whitesell states: "[T]here remains an

---

[11]   The Court recognizes that matters of "good faith" and "best efforts" are typically fact-intensive questions for the jury. Here, however, the fact of intentional bad faith and lack of best efforts on Whitesell's part is undisputed.

open question whether Defendants inhibited Whitesell from providing [an accurate] list sooner through their own bad faith." (Pl.'s Opp'n to Def. Husqvarna's Mot. for Summ. J. on Excess Fastener Inventory, Doc. No. 1053, at 14.) The Court must now then examine the alleged bad faith conduct of Husqvarna to determine whether a genuine dispute of fact exists for jury resolution.

As evidence of Husqvarna's bad faith, Whitesell points out that it did not receive a list of terminating parts from Husqvarna until July 1, 2008, two months after its self-imposed deadline in the April Termination Notice. However, the provision of a list of terminating parts was not required under the contract and was not a condition precedent to Whitesell's provision of the Phase-Out Inventory List. (See Order of Mar. 25, 2010, Doc. No. 307, at 13 ("Section 23.0 does not provide that Husqvarna identify the specific parts that would fall subject to the November 1, 2008 end date for the notice to be effective.").) The April Termination Notice provided that the terminating parts included all parts transitioned to Whitesell by December 31, 2003, and any parts which first came into use after December 31, 2003 and were immediately transitioned. This Court has already determined that the April Termination Notice was effective to terminate these types of parts and importantly, that Whitesell, as the supplier, should have known what parts fall into these categories. (Id.) Moreover, Whitesell

does not explain how the July 1st lists provided by Husqvarna impeded its ability to provide an accurate Phase-Out Inventory List.[12]  It is particularly noteworthy that the Phase-Out Inventory List provided by Whitesell on August 20th included all active parts whether they were terminable or not.  (See N. Whitesell Dep., Doc. No. 1070-2, at 346.)  Finally, there is no evidence that any inaccuracies in the list of terminating parts provided by Husqvarna were intentional or in any other way an act of bad faith.[13]

Whitesell next points to the fact that Husqvarna chose to send the April Termination Notice in the midst of their global settlement negotiations.  However, there is no evidence that the

_____

[12]  The argument that Whitesell needed these lists prior to being able to supply a Phase-Out Inventory List is contradicted by the fact that Whitesell had obtained most of the parts in its inventory through purchase orders in late 2007 and early 2008.  (Decl. of John Duffner, Doc. No. 411, ¶¶ 16, 19.)  Besides, the Court has already determined that Whitesell had the ability to figure out what parts fell within the category of terminable parts from its own system.
[13]  There is a dispute of fact about the accuracy of the July 1, 2008 lists provided by Husqvarna.  Apparently, Husqvarna provided two lists - one of terminating parts and one of parts that would not be terminating on November 1, 2008.  Mr. John Duffner of Whitesell averred that the lists were "very inaccurate and confusing."  (Duffner Decl. ¶¶ 8-9.)  Mr. Agee of Husqvarna testified that they were not aware of any errors in the lists when they were submitted to Whitesell in July and that the inaccuracies were not major.  (Agee Dep. at 173-74.)  Ryan Sadler similarly testified that the lists reflected information from Husqvarna's system which he believed was correct at the time. (Dep. of Ryan T. Sadler, Ex. 8 to the Decl. of Joy Odom, Doc. No. 1037, at 217-18.)  Even viewing the evidence in the light most favorable to Whitesell, that the lists were very inaccurate and confusing, this is not evidence of bad faith on Husqvarna's part.

parties mutually agreed to abstain from exercising the contractual right to terminate the supply of parts after their initial term. In fact, Whitesell previously insisted that the Consent Order of May 17, 2005 placed an ongoing obligation on the parties to continue their relationship "[u]ntil the issues between the parties [we]re resolved." (See Order of Oct. 31, 2008, at 4 (citing Consent Order of May 17, 2005, Doc. No. 30, at 2).) The Court rejected this argument on October 31, 2008, pointing out that the Consent Order itself provides that the parties were only obligated to continue their supply agreement "through the end of the initial term." (Id. at 4-5 (citing Consent Order of May 17, 2005, at 2, ¶ 1.) In short, no reasonable juror could find that the lawful exercise of a contractual right to terminate is bad faith. See Automatic Sprinkler Corp. of Am. v. Anderson, 257 S.E.2d 283, 284 (Ga. 1979) ("There can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do.")

Next, Whitesell points out that even though Husqvarna sent the April Termination Notice, it insisted, contrary to the terms of the SPA, that Whitesell continue to supply Husqvarna's requirements through the end of the contract. Thus, it was bad faith for Husqvarna to expect Whitesell to wind down the supply of terminating parts and simultaneously expect assurances that

Whitesell would provide continuous supply until November 1, 2008. The problem with this argument is that it is based on a faulty premise, that is, that Husqvarna's insistence on supply through November 1, 2008 was *contrary to the terms of the SPA*. It was not. Section 23.1 provides that "[e]xcept as otherwise provided herein, all terms and conditions of [the SPA] shall continue in effect throughout the Phase-Out Period." Section 3.0 of the SPA provides that the contract term "begins January 1, 2001 and will continue until April 1, 2008 (later modified to be November 1, 2008)." The termination provision, SPA § 23.0, did not provide for an alternate termination date - such as the date a notice of termination is sent. Rather, Section 23.0 provides that the termination of the supply agreement was effective "after completion of the initial term," which was November 1, 2008. Moreover, the parties' Consent Order of May 17, 2005 provides that Whitesell shall supply "100 percent of [Defendants'] requirements for all goods and parts" "through the end of the initial term of the Supply Agreement." (Doc. No. 30, at 2, ¶ 1.)

Finally, Whitesell argues that Husqvarna has not established that it suffered any prejudice by the provision of an intentionally false Phase-Out Inventory List. This assertion is belied by Defendants' evidence of the effect that this false list had on their efforts to wind-down their business with Whitesell, as discussed in relation to Defendants' claim for expedite fees,

*infra*. Further, it is Whitesell that asserts a breach of contract claim against Husqvarna for failure to fully utilize its inventory. Husqvarna is defending the claim by asserting that under Georgia law, the nonperformance of a party to a contract is excused from performance if the nonperformance is "caused by the conduct of the opposite party." O.C.G.A. § 13-4-23. Thus, Whitesell cannot enforce the "full utilization" term of the phase-out provision if its conduct is the cause of Husqvarna's nonperformance. An affirmative showing of prejudice on the defending party's part is not required.

In conclusion, Section 23.1 of the SPA required Whitesell to provide accurate and timely inventory positions to allow Husqvarna to "complete the full utilization" of that inventory during the six-month Phase-Out Period. The provision of an intentionally false Phase-Out Inventory List is a material breach of that obligation as a matter of law. That is, no reasonable jury would award Whitesell damages to cover the cost of inventory that was intentionally not disclosed to Husqvarna during the phase-out period. Moreover, Whitesell has demonstrated no genuine dispute of material fact that would mitigate, alter, or put into question this determination. Accordingly, Husqvarna's motion for summary judgment on Claim III of the Second Amended Complaint (seeking damages for excess fastener inventory) is **GRANTED**.

**B.   Whitesell's Partial Motion for Summary Judgment with Respect to Defendants' Expedite Fees**

Count II of each Defendant's Answer and Counterclaims asserts that Whitesell breached its obligation to provide timely and accurate information regarding its inventory positions during the Phase-Out Period.   Defendants further allege that this failure forced them to expedite the supply of parts, including parts which were not subject to the April Termination Notices, from other suppliers at higher prices to ensure that their production operations continued uninterrupted.   Thus, Defendants seek damages related to these extra costs, which the parties have come to call "expedite fees."

Presently, Whitesell moves for summary judgment on Defendants' claims for expedite fees.   Whitesell's argument is twofold.   First, Whitesell contends that Defendants have not identified any expedite fees or increased part charges actually incurred as a result of Whitesell's misconduct.   Second, Whitesell contends that to the extent Defendants incurred expedite fees, the fees were indisputably caused by Defendants' failure to line up alternative suppliers in a timely manner.

In response, Defendants first present evidence that they have incurred expedite fees.   (See generally Ex. 10 & 11 to the Decl. of Joy Odom in Support of Pl.'s Mot. for Partial Summ. J. on Expedite Fees, Doc. No. 1037-1; and Exs. D, E & F to Defs.' Opp'n

to Pl's Mot. for Partial Summary J. on Expedite Fees, Doc. No. 1051; see also Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. on Expedite Fees, at 5.) In reply, Whitesell does not dispute the existence of this evidence; rather, it contends that the evidence post-dates the relevant period of time. More specifically, Whitesell points out that four days after its disclosure of the false Phase-Out Inventory List, it committed to supply Defendants all of its requirements until November 1, 2008. Accordingly, Whitesell could only be liable for expedite fees incurred in that four-day window because that is the only time that would have had any bearing on Defendants' planning, and there is no evidence of any extra fees incurred during this time period.

Whitesell's argument in this respect goes to the heart of the parties' dispute with respect to expedite fees - what was the cause of incurring the expedite fees? According to Defendants, they needed accurate information to plan for the use-up of inventory not only during the Phase-Out Period, but if necessary beyond that Period, in order to meet its obligation under Section 23.1 for "full utilization" of Whitesell's inventory.[14] That is, an

---

[14] Whitesell suggests that Defendants represented that they had no intention of purchasing parts from Whitesell after November 1, 2008, pointing to an isolated statement in the parties' negotiations from the end of August 2008. (See Pl.'s Reply in Supp. of its Mot. for Partial Summ. J. on Expedite Fees, Doc. No. 1078, at 8 (quoting Sentell Ltr. of Aug. 29, 2008).) However, this statement must be read in context. It is undisputed that at this time Whitesell had represented, through the falsely

accurate Phase-Out Inventory List was essential to their planning to use up Whitesell's inventory and effectively time their commitments to other suppliers. (See Decl. of Ryan T. Sadler, Doc. No. 389, ¶ 3.)

Defendants' witnesses have testified that an accurate inventory list would have allowed them to "make determinations about when exactly [Defendants] would need the new product to start arriving." (Agee Dep. at 139.) Without it, Defendants "had to proceed as if they had to supply everything November 1, 2008." (Id. at 140.) Mr. Agee of Husqvarna explained that while they had started making arrangements with other suppliers in May and June of 2008, they waited as long as they could to make commitments because they were still under their good faith contractual obligation to use Whitesell's inventory. (Id. at 150, 210; id. at 148 ("[W]e knew it was a risk, but we wanted to wait as long as we could so that if we got the list in a reasonable amount of time, we could use up what we could.").) Ultimately, when they could not wait any longer to be assured of Whitesell's inventory

---

understated Phase-Out Inventory List, that its inventory would fall short of Defendants' phase-out period requirements. How much short remained a mystery to Defendants. In any event, the fallacy created by Whitesell's false inventory list infected all efforts of negotiation. At the very least, it creates disputes of material fact with respect to the parties' intentions and representations during this time period.

28

positions, they committed to other suppliers.[15]  (Id. at 150, 210-11; id. at 181 ("[W]e had to operate under the assumption that there would be nothing on November 2nd. So we -- we had to incur those fees.").)

Whitesell, however, points to evidence arguably demonstrating that had Defendants made arrangements to transition their business to alternative suppliers prior to the August-November time frame, they would not have incurred expedite fees.[16]  (Sadler Dep. at 204 (admitting that the more time provided for transition, the lower the risk of incurring expedite fees); Agee Dep. at 210-11 (admitting that Husqvarna was later than it should have or could

---

[15] Mr. Sadler of Husqvarna explained that Whitesell's inconsistent representations caused the expedite fees. He stated that Whitesell maintained that the understated Phase-Out Inventory List was accurate and refused to provide any other information. (Sadler Decl. ¶ 7.)  Whitesell also rejected Defendants' offer to purchase the active parts on the Phase-Out Inventory List. (Id.)  Finally, even though Whitesell subsequently agreed to meet all requirements until November 1, 2008, it also represented it had no obligation to do so. (Id.)  "Given the positions Whitesell communicated, Husqvarna had no choice but to continue its efforts to expedite and commit to immediate supply of the terminating parts from other suppliers." (Id.; see also Dep. of Donald J. Market, Ex. G to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. as to Expedite Fees, Doc. No. 1051, at 203-04 ("That list was woefully short of getting us to the end of the phase-out period, which was the end of the contract.  We immediately went into crisis mode and had to go out and source -- expedite and source parts.").)

[16] It must be noted that Defendants contend that Whitesell represented it would cease supply of all parts on November 1, 2008. Thus, there would be no reason to set up a supply chain for these parts ahead of time.  Defendants claim they incurred expedite fees related to the alternative supply of non-terminable parts as well.

have been in committing to other suppliers).)  Indeed, many parts required a lead time of 12 to 16 weeks to transition to other suppliers.  (See Decl. of Joy Odom in Support of Pl.'s Mot. for Partial Summ. J. on Expedite Fees, Doc. No. 1037-1, Exs. 25 & 26; Dep. of David Agee, Ex. 17 to the Decl. of Joy Odom in Support of Pl.'s Mot. for Partial Summ. J. on Expedite Fees, Doc. No. 1037-1, at 182-83.)  And, Defendants acknowledge that they could have begun the search process for alternative suppliers even prior to sending the April Termination Notices.  (Sadler Dep. at 204-05.)

The Court is struck by the following passage in Whitesell's most recent reply brief in support of its motion:

> The fundamental premise underlying this Reply is the Defendants sent Whitesell a termination notice in April 2008.  The Defendants then belatedly provided a list of parts to Whitesell that they intended to terminate. Whitesell then told the Defendants it would supply them through the end of the contract term, October 31, 2008. Moreover, in an e-mail dated August 29, 2008, from the Defendants' counsel, Mr. Perry Sentell, to Whitesell's counsel Mr. David Balser, the Defendants confirmed that they would not purchase any parts after November 1, 2008. The Defendants then, despite terminating certain parts, failed to line up alternative suppliers.  Put simply, Whitesell cannot be responsible for expedite fees prior to the end of the contract term because Whitesell told the Defendants it would supply them (and indisputably had the parts and capability to supply the Defendants) and cannot be responsible for expedite fees after the end of the contract duration term because the Defendants terminated Whitesell, which means the Defendants had an obligation to line up alternative suppliers.

(Pl.'s Reply Br., Doc. No. 1347, ¶ 3 (citation omiited).)  This is certainly one way to describe the events that took place during

30

the Phase-Out Period. And a jury may find it to be so. For purposes of Whitesell's motion for summary judgment, however, it ignores evidence that Defendants never had an accurate understanding of Whitesell's inventory positions throughout the Phase-Out Period so they could effectively plan its use and transition to another supplier *because of* the intentional deception of Mr. Neil Whitesell. Moreover, Whitesell refused to update or correct the misinformation, only representing that it would continue to supply parts until November 1, 2008. It is not difficult to imagine that Defendants could not or did not rely upon this representation when the inventory positions were, in some instances, grossly inadequate. Also, Whitesell had represented during this time frame that it planned to terminate the supply of *all* active parts, putting Defendants in an even more precarious position. Finally, Whitesell's reliance upon one statement of defense counsel (on August 29, 2008) in the midst of the turmoil created by the false inventory list, failed settlement negotiations, and the Court's ruling that the SPA was unenforceable, is rather guileful. That is to say, the Court finds there is evidence to support Defendants' side of the story on the expedite fees:

> Whitesell's successful efforts to mislead Defendants
> about the quantities of parts in its inventory, along
> with its contemporaneous expressions of unwillingness to
> supply any parts to Defendants following November 1,
> 2008, created the foreseeable result which now confronts
> Whitesell — Defendants' incurrence of substantial
> expedite fees and Whitesell's remaining inventory of

31

> hidden parts. Had Whitesell provided truthful information concerning its inventory positions on a timely basis, Husqvarna, consistent with the acknowledged intent behind § 23.1 of the SPA, would have had this inventory available to utilize in planning a smooth transition to Supply Tech at non-expedited prices. Whitesell's egregious conduct made this an impossibility.

(Defs.' Resp. in Opp'n, Doc. No. 1337, at 4-5 (citation and footnote omitted).)

In short, there are genuine disputes of material fact regarding the cause of any expedite fees incurred by Defendants. Whether they were caused, in whole or in part, by Whitesell's failure to provide a timely and accurate Phase-Out Inventory List or whether Defendants simply waited too long to create an alternative supply chain is an issue for jury resolution. Whitesell's submission of expert testimony concerning Defendants' calculations of those fees, and its criticisms thereof, do not remove the material factual disputes on causation. Moreover, determinations of what and when expedite fees were incurred by Defendants and for what reason they were incurred, i.e., the damages, if any, resulting from the parties' conduct, are also matters for jury resolution. Accordingly, Whitesell's motion for partial summary judgment with respect to Defendants' claims for expedite fees is **DENIED**.

### IV.   CONCLUSION

Upon the foregoing, Defendant Husqvarna's motion for summary judgment with respect to Count III of the Second Amended Complaint (doc. no. 1034) is **GRANTED**.   Thus, Defendant Husqvarna is not liable for the excess fastener inventory that existed for terminated parts on November 1, 2008.   Further, Plaintiff Whitesell's partial motion for summary judgment with respect to Defendants' claim that Whitesell pay their expedite fees (doc. no. 1037) is **DENIED**.   There exists a triable issue of fact on whether Defendants incurred expedite fees as a result of its own delay or as a result of Whitesell's conduct and representations during the Phase-Out Period.

**ORDER ENTERED** at Augusta, Georgia, this 25th day of March, 2020.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA