IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

WHITESELL CORPORATION,            *
                                  *
          Plaintiff,              *
                                  *
     v.                           *      CV 103-050
                                  *
ELECTROLUX HOME PRODUCTS, INC.,   *
HUSQVARNA, A.B., and HUSQVARNA    *
OUTDOOR PRODUCTS, INC.,           *
                                  *
          Defendants.             *

_____

O R D E R

_____

Presently pending before the Court is Defendant Husqvarna, A.B., and Husqvarna Outdoor Products, Inc.'s ("Husqvarna") motion for summary judgment as to Certain of Plaintiff Whitesell Corporation's ("Whitesell") Accounts Receivable Pricing Discrepancy Claims. This motion seeks consideration of the evidence respecting Count VI of Whitesell's Second Amended Complaint ("SAC"). Upon consideration of the parties' briefs, the record, and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment as discussed herein.

## I.  BACKGROUND

On December 14, 2000, the parties to this lawsuit executed a purported Supply Agreement entitled "Strategic Partnership

Agreement" ("SPA").[1]   (See SPA, Ex. 1 to SAC, Doc. No. 578-1.) Pursuant to the SPA, Defendants agreed to buy all of their current and future requirements for certain goods from Whitesell during the term of the Agreement, and Whitesell agreed to supply all of Defendants' requirements for such goods.  The SPA, however, never defined the "goods" that were subject to the agreement.  And, while the parties nevertheless began their supply relationship shortly after execution of the SPA, understandably disputes concerning the scope of goods ensued.  In fact, the first dispute that came before the Court in March 2003 concerned whether certain parts used at Defendants' Orangeburg, South Carolina plant fell within the scope of the SPA.

As once described by the Court, the case has suffered "numerous stops and starts."  (See Order of Nov. 12, 2013, Doc. No. 541, at 2).   In the interim, the parties entered into a Settlement Memorandum dated May 28, 2003 (Settlement Memorandum, Ex. 2 to SAC, Doc. No. 578-2) and a Consent Order dated May 17, 2005 (Consent Order, Ex. 4 to SAC, Doc. No. 578-4), which are relevant here.  Ultimately, Whitesell filed its SAC on June 5,

---

[1] Defendant Electrolux Home Products, Inc. and Whitesell were the original parties to the SPA.  On June 12, 2006, EHP transferred its outdoor products division to Husqvarna A.B., which in turn transferred the business to Husqvarna Outdoor Products, Inc. ("Husqvarna").   The instant motion apparently concerns parts supplied only to Husqvarna.

2014.   The SAC along with Defendants' Answers and Counterclaims thereto are the operative pleadings in the case.

Count VI of the SAC, entitled "Breach of Contract (Failure to Pay Invoices)," complains that Defendant Husqvarna has refused to pay "valid and undisputed invoices" for parts Whitesell supplied to it.   (Doc. No. 578, ¶ 170.)   Lists of these past due invoices pertaining to Husqvarna are attached to the SAC as Exhibits 6 and 7, which reference invoice numbers and the amount due to Whitesell on each invoice.   Exhibits 6 and 7 do not refer to individual part numbers.   According to Husqvarna's calculations, Whitesell claims through Exhibits 6 and 7 that Husqvarna owes over $4,000,000 for unpaid invoices.   (Husq.'s Mot. for Summ. J. as to Certain Accounts Receivable Pricing Discrepancy Claims, Doc. No. 1290, at 4.)

On April 12, 2019, Whitesell submitted the report of its financial accounting expert, Mr. Peter Karutz.   The report was amended on August 12, 2019.   (Karutz Report, Doc. No. 1314-13.) According to Schedule 6.1 of the report, Mr. Karutz has opined that Husqvarna is liable to Whitesell in the amount of $1,549,769 on the Pricing Discrepancy Claims. It appears from excerpts in the record, Schedule 6.1 is organized on a part number basis.  So, for a particular part at issue, Mr. Karutz identifies an invoice number, the invoice date, the quantity of that part, the price per part charged by Whitesell on the invoice, and the price per part Husqvarna actually paid on the invoice.   The discrepancy between

3

price charged and price paid is then listed in terms of money owed to Whitesell.[2,3]   (See generally Schedule 6.1 Excerpts in Exs. A-V & X-Z to Husq.'s Mot. for Summ. J.)

Husqvarna's motion for summary judgment targets 25 different parts.   As to these parts, Whitesell claims that Husqvarna owes the pricing discrepancy between the price charged by Whitesell on the part and the price Husqvarna actually paid on that part.   A so-called "pricing discrepancy" claim as to a specific part spans multiple invoices and years of supply.   Through its motion for summary judgment, Husqvarna contends that the price it actually paid on the specifically identified parts is the price called for by the parties' supply agreements as a matter of law.   Thus, because Husqvarna paid the contractually mandated price, it owes no more to Whitesell and is entitled to summary judgment.

---

[2]   Mr. Karutz also computed prejudgment interest at a rate of 7% per annum on Schedule 6.1.

[3]   Husqvarna's expert, Mr. Charles M. Phillips, breaks down the difference between Whitesell's invoice claim in its SAC and the Karutz Report as follows:  Of the over 1500 invoices listed on Exhibits 6 and 7 of the SAC, Whitesell has now excluded 326 of them but added 317 new invoices.  Moreover, 651 of the invoices now reflect a different amount owing from the SAC to the Karutz Report.  (See Defs.' Mot. to Strike Prejudgment Interest Claim, Doc. No. 1305, Ex. A (identified as Phillips Report, Am. Schedule 7).)

## II.  LEGAL STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party.  Id. at 252; accord Gilliard v. Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012).

As required, this Court will view the record evidence "in the light most favorable to the [nonmovant]," see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will "draw all justifiable inferences in [the non-movant's] favor," see United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and quoted source omitted).  Additionally, the party opposing summary

5

judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Walker v. Darby</u>, 911 F.2d 1573, 1576—77 (11th Cir. 1990).

The Clerk gave the nonmoving party in this matter, Whitesell Corporation, notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 1292.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.

The Court notes that Husqvarna failed to file a separate statement of facts as required by Local Rule 56.1.[4] Instead, upon Whitesell's prompting in opposition, Husqvarna attached to its Reply Brief a separate statement of material facts and a counterstatement to Whitesell's statement of material facts, thereby correcting the deficiency albeit belatedly. Whitesell contends that the motion for summary judgment must be denied based upon Husqvarna's non-compliance. The Court declines to do so because Whitesell has suffered no prejudice.

---

[4]   Husqvarna explains that because its motion required the explanation of extensive data and factual information, it opted to include these facts in the context of its brief rather than repeat the same facts in a separate statement. (Husq.'s Reply Br., Doc. No. 1379, at 7 n.8.) The Court admonishes Husqvarna that Rule 56.1 does not provide exceptions.

### III.   LEGAL ANALYSIS

Husqvarna contends that the pricing provisions of the parties' supply agreements determine the amount Whitesell could charge for the subject parts.  The majority of the parts subject to Husqvarna's motion for summary judgment (22 of the 25 parts) are so-called wireform parts, the pricing for which are governed by the Settlement Memorandum and Consent Order.  The Settlement Memorandum provides:

> In addition to the annual rebate provided in Section 7 of this Memorandum, all Exhibit "B-1" Brunner, wireform or substitute parts transitioned to Whitesell will receive a five percent (5%) discount from the EHP piece price, plus freight, now being paid by EHP, unless other terms and pricing are mutually agreed to by the parties in writing.

(Settlement Memorandum, ¶ 3.)  The Consent Order was issued at a time that Husqvarna's Orangeburg plant had redesigned many of its tractor models in connection with its "Tractor Excellence" project commonly referred to as "TEX."  Accordingly, the Consent Order of May 17, 2005, reaffirmed the Settlement Memorandum's pricing provision for then existing wireforms but also created a new pricing provision for the "redesigned" wireforms used in the TEX models, stating:

> Wireform Pricing to be completed reflecting a 5% price reduction per part price savings off of Northern Wire and Mitchell Bissell pricing for all current Orangeburg wireforms as of 12-01-04 and also the same 5% savings on all McRae wireform pricing as of 12-01-04 from all suppliers being replaced.  Due to the new platform designs being implemented in 2005, all new replacement

7

> or redesigned wireforms due to design modifications for
> the Northern Wire and Mitchell Bissell parts shall be
> priced at 4% less than verified Northern Wire and
> Mitchell Bissell quoted prices and shall be eligible for
> a 2% rebate represented (sic) a total savings of 6%
> annually.

(Consent Order, Doc. No. 30, Ex. 1.)

For its part, Whitesell disputes that these pricing provisions are the only source upon which the parties may rely to establish the applicable price per part. Rather, Whitesell contends that a higher price for each part was established through the parties' course of conduct, as more fully explained below.

The remaining three parts subject to Husqvarna's motion for summary judgment are "new parts," i.e., parts that had not been purchased previously from another supplier. The new parts are subject to a pricing provision in the SPA, which will be discussed more fully in Section III.B., *infra*.

A.  Wireform Parts

As stated, 22 parts at issue herein are wireform parts. According to Husqvarna, the correct pricing for each of these parts may be determined by simply applying a 5% discount on the incumbent supplier's price as of December 1, 2004 per the pricing provisions quoted above. In furtherance thereof, Husqvarna provides the actual incumbent supplier purchase data for each of these parts. From that price, Husqvarna applies a 5% discount and calculates the price that should have been paid for each part. Whitesell

8

contends these parts should have a higher price.  For the first eight parts, Whitesell ties its claimed prices to evidence other than the actual incumbent supplier purchase data.  For the remaining 14 parts, Whitesell does not dispute the starting point for each part's price is the incumbent supplier price.  Instead, Whitesell claims that price should be discounted only 1%, not 5%.

**Wireform Part Nos. 187101, 196338, 155452, 175606, 187784, 8393J, 109228X & 198725**

For these eight parts, Husqvarna claims that the contractually mandated price is the incumbent supplier's price as of December 1, 2004 less a 5% discount.  In reality, Husqvarna either paid that price per part (in two instances) or paid a price close to the incumbent pricing, resulting in a slight over- or underpayment by Husqvarna.  For instance, with respect to Part Nos. 196338 & 175606, Husqvarna paid the incumbent supplier's price as of December 1, 2004 less a 5% discount during the entire term of the parties' relationship.  For Part Nos. 155452 and 187784, Husqvarna's starting point was based on a purchase it made from its incumbent supplier a few months after December 1, 2004 less a 5% discount - both of which resulted in a slight overpayment by Husqvarna.  For the remaining parts, Part Nos. 187101, 8393J, 109228X and 198725, Husqvarna paid a price that was close to the incumbent supplier's price as of December 1, 2004 less a 5%

discount, but its payments resulted in slight underpayments to Whitesell. This information is summarized below:

| Part No. | Incumbent Supplier's Price per Part as of 12-01-04[5] | Incumbent Supplier's Price less 5% | Actual Price per Part paid by Husq. | Under/Over Payment |
|---|---|---|---|---|
| 187101 | .13 (Ex. A-1) | .1235 | .1140 | ($-3,573.66) |
| 196338 | .36 (Ex. B-3) | .3420 | .3420 | $0 |
| 155452 | .17712 (Ex. C-3) | .168264 | .1710 | $1,009.82 |
| 175606 | .610 (Ex. D-3) | .5795 | .5795 | $0 |
| 187784 | .7 (Ex. E-3) | .665 | .817 | $3,209.33 |
| 8393J | .396 (Ex. F-3) | .3762 | .2883 | ($-2,543.21) |
| 109228X | .522 (Ex. G-2) | .4959 | .4784 | ($-300.62) |
| 198725 | .466 (Ex. H-3) | .4427 | .4370 | ($-11.57) |

Whitesell claims it is entitled to a much higher price than the incumbent supplier price of December 1, 2004, summarized as follows:

| Part No. | Incumbent Supplier's Price less 5% discount | Whitesell's Claim of Price Per Part | Whitesell's Damages Claim |
|---|---|---|---|
| 187101 | .1235 | 1.1580 | $392,726.70 |
| 196338 | .3420 | 1.3666 | $97,382.08 |
| 155452 | .168264 | .2784 .9500 | $39,639.94 |
| 175606 | .5795 | .82370 | $39,825.85 |
| 187784 | .665 | 1.3870 | $12,034.98 |
| 8393J | .3762 | .57600 | $8,324.02 |
| 109228X | .4959 | 1.0910 | $10,517.04 |
| 198725 | .4427 | .8858 | $911.06 |

---

[5] These prices are supported by evidence from Husqvarna's 2015 discovery production of prices paid to prior suppliers for parts subject to Whitesell's Pricing Discrepancy Claims. The referenced Exhibits are excerpts from this production filtered by part number and are attached to Husqvarna's motion for summary judgment, doc. no. 1290.

Whitesell's claimed prices per part are based on what it refers to as a course of conduct. According to Whitesell, it provided Husqvarna with a quote on a part. (Aff. of John Duffner, Doc. No. 1361-2, ¶ 9.) The part was approved through the part production approval process ("PPAP") and loaded by Husqvarna onto Whitesell's Demand Flow Center ("DFC") for Whitesell to begin supply. (Id.) Whitesell then ships the parts to Husqvarna pursuant to the DFC. (Id.) Whitesell contends that the acts of loading the part onto the DFC and accepting shipment of the part indicate Husqvarna's approval and acceptance of the quoted price. As an example of this scenario, Whitesell sent a quote to Husqvarna on Part No. 175606 on January 25, 2007, quoting a price per part of .82370. Presumably, Husqvarna approved the part production, loaded it on the DFC, and took delivery of the part. According to Whitesell, because Husqvarna had the price quote in hand before this conduct, without questioning or objecting to the price, it should be the price with respect to its Price Discrepancy Claim. It is undisputed that Husqvarna never paid this price for this part; rather, Husqvarna continued to pay the incumbent supplier's price as of December 1, 2004 less a 5% discount for the entirety of their relationship. By way of further example, for Part Nos. 196338, 155452 and 187784, Whitesell relies upon a pricing schedule entitled "McRae Wireform Pricing 03-29-06" for its claimed higher price. It is undisputed that Husqvarna took delivery of these

11

parts throughout their relationship, but it never paid the higher price reflected on this schedule.

Essentially, Whitesell's contention that the Court should accept Whitesell's price quotes to Husqvarna rather than the contractually mandated price of the incumbent supplier is one of waiver.   Whitesell argues, "[T]he parties mutually agreed to the prices which were contained on Whitesell's quotes, those on which [Husqvarna] relied on to place a purchase order by virtue of adding the parts on the DFC, and those which [Husqvarna] clearly agreed to, accepted, and used." (Whitesell's Resp. to Mot. for Summ. J., Doc. No. 1360, ¶ 36; see also ¶ 34 ("There are clear genuine issues of material fact related to whether [Husqvarna] waived its ability to enforce the pricing provisions in the parties' agreements through its course of conduct.")

The Court starts with the observation that Whitesell does not dispute the applicability of the pricing provisions of the Settlement Memorandum and Consent Order relative to incumbent prices as of December 1, 2004 less a 5% discount on these eight parts.   Nor does Whitesell dispute the claimed price per part derived by Husqvarna upon applying these provisions.   Whitesell argues that the Court must go beyond the agreements to conclude that the evidence creates a triable issue of fact as to waiver.

Continued performance under a contract *may* constitute waiver of a contractual right; such waiver

12

> may be express, or may be inferred from actions, conduct,
> or a course of dealing.  Waiver of a contract right may
> result from a party's conduct showing his election
> between two inconsistent rights.  Acting on the theory
> that the contract is still in force, as by continuing
> performance, demanding or urging further performance, or
> permitting the other party to perform and accepting or
> retaining the benefits under the contract, may
> constitute waiver of the breach.  However, all the
> attendant facts, taken together, must amount to an
> intentional relinquishment of a known right, in order
> that a waiver may exist.

Young v. Oak Leaf Builders, Inc., 626 S.E.2d 240, 243 (Ga. Ct.
App. 2006) (quoted source omitted); see also Yash Solutions, Inc.
v. New York Global Consultants Corp., 834 S.E.2d 126, 133 (Ga. Ct.
App. 2019) ("An implied waiver is one shown by a party's decisive,
unequivocal conduct reasonably inferring the intent to waive.").
Furthermore, "[w]here the only evidence of an intention to waive
is what a party does or forbears to do, the actions, or omissions
to act relied upon must be so manifestly consistent with a waiver
of a right that no other reasonable explanation of his conduct is
possible." Rockwell Int'l Corp. v. Riddick, 668 F. Supp. 674, 679
(N.D. Ga. 1987) (emphasis added).

    Here, Whitesell claims that Husqvarna waived its right to
insist upon the pricing provisions in the agreements when it
accepted its higher quotes by entering the parts into the DFC and
accepting delivery of the parts.  This conduct, however, is not
"manifestly consistent with a waiver" when Husqvarna continued to
pay for the parts at the prices dictated by their agreements.
Indeed, other than its say so, Whitesell has presented no evidence

13

that Husqvarna's loading the part into the DFC constituted approval
of its higher quote.   That is simply not enough under the case
law.   That is to say, Husqvarna did not do anything to manifest
its intent to accept the higher quoted price.   Quite the opposite,
Husqvarna loaded the part into the DFC, accepted delivery, and
paid at the contractually agreed upon prices in the face of
invoices that charged the higher prices.   If anything, this is
manifest intent not to accept the higher prices.

In short, Whitesell has not provided any evidence of
Husqvarna's "decisive, unequivocal conduct" or "intentional
relinquishment of a known right" from which a jury could reasonably
infer that it intended to waive its right to insist upon the
contractually agreed upon pricing.[6]   Instead, the evidence shows
that Husqvarna insisted upon enforcing the pricing provisions of
the Settlement Memorandum and the Consent Order to determine the
appropriate price of these eight wireform parts, i.e., the
incumbent supplier price as of December 1, 2004 less a 5% discount.
Accordingly, Husqvarna is entitled to summary judgment with
respect to Whitesell's Pricing Discrepancy Claims in that the
appropriate price that should have been invoiced on Part Nos.
187101, 196338, 155452, 175606, 187784, 8393J, 109228X and 198725
is determinable as a matter of law.   Having so concluded, and upon

---

[6] The issue of waiver is decided by a jury only when the evidence
is in conflict.   <u>Yash</u>, 824 S.E.2d at 133.   Here, there is no
evidence of Husqvarna's conduct reasonably suggesting waiver.

14

application of the pricing provisions as a matter of law, the Court further concludes that Whitesell is entitled to payment in the principal amount[7] of $6,429.06, the amount Husqvarna underpaid Whitesell on the subject invoices.[8]   Judgment will be entered in Whitesell's favor at a later time.

**Wireform Part Nos. 192757, 187556, 187414, 170015, 182402, 193413, 175652, 188202, 165932, 169498, 193412, 190736, 169497 & 180218**

With respect to these fourteen parts, Whitesell does not dispute that their pricing is based upon the incumbent supplier's price as of December 1, 2004.   The dispute between the parties arises with respect to the proper discount to be applied to that price.   Husqvarna paid the invoices at a 5% discount as provided for in the Settlement Memorandum and Consent Order.   Whitesell invoiced these parts at only a 1% discount, however.   Whitesell contends that the 5% discount called for by the agreements must be reduced to 1% by deduction of the 2% annual rebate and 2% early payment discounts.   Based upon this pricing discrepancy, Whitesell claims it is owed over $80,000 on invoices related to these parts.

The annual rebate discount appears in Section 7 of the Settlement Memorandum, providing that Whitesell shall pay Defendants a 2% rebate on their total calendar year purchases from

---

[7] The issue of prejudgment interest as it pertains to Count VI will be resolved in the Court's Order on Defendants' Motion to Strike Whitesell's Claims for Prejudgment Interest (doc. no. 1305).

[8] In the absence of a counterclaim, the Court will not award Husqvarna the amount it overpaid on these invoices.

Whitesell beginning in 2003.  The plain language of the Settlement Memorandum contradicts Whitesell's contention that this annual rebate must be deducted from the 5% pricing discount.  The pricing provision of the Settlement Memorandum provides that the 5% pricing discount is "in addition to the annual rebate provided in Section 7 of this Memorandum."  (Settlement Memorandum, § 3 (emphasis added).)  The early payment discount referenced by Whitesell appears in the SPA, but not in Section 5.0 entitled "Pricing." Rather, Section 4 of the SPA entitled "Payment Terms" provides that a 2% discount of the invoice amount "may be taken if an invoice is paid and funds received prior to 20 days from receipt of goods." (SPA, § 4.0.)  The SPA does not contemplate that these early pay discounts will play into the appropriate price of a part, particularly since the discount is only realized upon early payment of the invoiced amount.

To be sure, the pricing provisions of the Settlement Memorandum and the Consent Order do not support Whitesell's application of these 2% discounts to the pricing discount of 5%. And, Whitesell has presented no evidence creating an ambiguity with respect to the application of a full 5% discount to the incumbent supplier's price as of December 1, 2004 as provided in the agreements.  Moreover, it is not lost upon the Court, in consideration of Whitesell's motion as a whole, that Whitesell did not seek these same deductions to the 5% discount in assessing its

16

Price Discrepancy Claims on the first eight wireform parts discussed in this section, *supra*. That is to say, in calculating damages as to those eight wireform parts, Mr. Karutz used the full 5% discount of the incumbent supplier's price to determine Husqvarna's alleged underpayment as compared to Whitesell's claimed higher prices.

Upon the foregoing, the Court concludes that Husqvarna properly paid the invoices related to these 14 parts at the incumbent supplier's price as of December 1, 2004 less a 5% discount in accordance with the pricing provisions applicable to wireform parts. Accordingly, Whitesell is owed nothing, and Husqvarna is entitled to summary judgment on Whitesell's Pricing Discrepancy Claims respecting Part Nos. 192757, 187556, 187414, 170015, 182402, 193413, 175652, 188202, 165932, 169498, 193412, 190736, 169497 and 180218.

**B. New Parts**

The three remaining parts subject to Husqvarna's motion for summary judgment are Part Nos. 71020748, 199162 and 73971000. These parts are considered "new parts" in that they had not been previously purchased from another supplier. As such, the SPA provides "New Good(s) Pricing" as follows:

> All new Goods shall be priced at a Whitesell Unit Price comparative with the Whitesell Unit Price charged for the most similar Good in Exhibit B used as a reference guide for a Good having similar characteristics and sold in similar volumes.

(SPA, § 5.6.)

The Court first observes that without an Exhibit B, Husqvarna's motion is not based upon a strict application of the contract's pricing provision as a matter of law. The Court is also unable to determine a definitive timeline of events from the record. What appears to be so is that Whitesell used a "two-tiered" approach by quoting an "import" price and a higher "domestic" price on each part. Whitesell contends that the two prices were necessary to account for different lead times. Based upon these quotes, Husqvarna paid the lower import price even though Whitesell invoiced the higher domestic price. For its part, Whitesell references Section 17.1 of the SPA and claims the lower import price was not to take effect until a certain production capacity was reached.

By way of illustration, Part No. 199162 was originally quoted at an "import" price of $.0996 per piece and at a "domestic" price of $.15370 per piece on April 27, 2005. (See Husq.'s Mot. for Summ. J., Ex. Y-2, at 2-3.) The only difference in the two quotes is the applicable "lead times." (See id.) There is nothing in the record to show which price was accepted by Husqvarna, though it apparently loaded the lower price of $.0996 in the DFC and paid that price throughout the parties' relationship. On May 19, 2006, however, Whitesell informed Husqvarna that its pricing at the lower rate was incorrect, did not comport with the quoted price, and

18

should be updated immediately "[t]o avoid further accruals." (Id. at 6.) Husqvarna presumably refused to correct the price as requested, though the record contains no written objection. Whitesell now claims Husqvarna owes $26,974.26 on invoices pertaining to this part.

Through its motion for summary judgment, Husqvarna claims that this "two-tiered pricing quote" contravenes the applicable pricing provision. Yet, the application of the applicable pricing provision is impossible, and without undisputed evidence in the record to support Husqvarna's position that the lower price is the contractually mandated price, the Court is unable to resolve the issue as a matter of law.

In short, there appears to be genuine disputes of material fact regarding the appropriate price of these parts. Unlike the other 22 parts at issue here, the Court cannot apply a contractual pricing provision to resolve the matter. And, because the parties hotly dispute what price should have been applied even in the first instance, Husqvarna is not entitled to summary judgment with respect to Part Nos. 71020748, 199162 and 73971000. A jury must decide the issue.

## IV. CONCLUSION

Upon the foregoing, Defendant Husqvarna's motion for summary judgment as to Certain of Plaintiff Whitesell's Accounts

19

—

Receivable Pricing Discrepancy Claims (doc. no. 1290) is **GRANTED IN PART** and **DENIED IN PART**.  The appropriate price per part on 22 of the 25 subject parts is determinable as a matter of law by reference to the pricing provisions of the parties' agreements. Therefore, Defendant Husqvarna's motion for summary judgment is granted in part on Plaintiff Whitesell's Pricing Discrepancy Claims respecting Part Nos. 187101, 196338, 155452, 175606, 187784, 8393J, 109228X, 198725, 192757, 187556, 187414, 170015, 182402, 193413, 175652, 188202, 165932, 169498, 193412, 190736, 169497 and 180218.  Upon application of the pricing provisions, Plaintiff Whitesell Corporation is entitled to judgment to be entered at a later time in the amount of $6,429.06.  Defendant Husqvarna's motion for summary judgment on Plaintiff Whitesell's Pricing Discrepancy Claims respecting Part Nos. 71020748, 199162 and 73971000 is denied.[9]

 **ORDER ENTERED** at Augusta, Georgia, this _13th_ day of August, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[9]  The Court notes Husqvarna's contention that it is entitled to summary judgment on any Pricing Discrepancy claim that is not included in the Karutz Report.  Obviously, to the extent a claim is not included in the Karutz Report, there would be a failure of proof on the issue of damages.  Whitesell does not dispute Husqvarna's motion in this regard.