IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| WHITESELL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:03-cv-00050-JRH |
| | ) | |
| ELECTROLUX HOME PRODUCTS, INC., | ) | |
| HUSQVARNA A.B. and HUSQVARNA | ) | |
| OUTDOOR PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST REPORT AND RECOMMENDATION OF SPECIAL MASTER

Pursuant to the Court's Order of September 17, 2021, the undersigned Special Master herein submits his First Report and Recommendation:

My assignment, according to the Order of September 17, 2021, is two-fold. First, I am to "examine the facts presented by the parties and recommend summary judgment where appropriate and in accordance with Federal Rule of Civil Procedure 56." Second, addressing whatever remains to be tried of the claims referred to me and the issues they involve, I am to consult with the parties "for the purpose of developing a detailed trial plan" and submit such a plan to the Court. Order of September 17, 2021, Dkt. 1496, p. 2.

Since this will be my first Report and Recommendation to the Court, I make some preliminary observations:

1. Several of the issues the parties have presented to me are intertwined. Sometimes my determination on one issue would, strictly speaking, obviate the need for determination of another issue. Anticipating that, on the objections of a party to my conclusions and recommendations (which I am confident will be filed), the Court may disagree with some of my decisions, I intend

1

to try to make a recommendation on as many issues as I can that might provide an alternative basis for resolution of any of the claims referred to me for pretrial purposes.

2.  I intend to address the summary judgment motions that have been made in a proactive manner to the extent permitted by Rule 56 and my job as a special master.  This may involve calling for extra briefing or even additional evidence.  I have satisfied myself that if I were the Court in such a situation, I would be within my authority to do this, and that it will help me to accomplish my assignment as noted above and the resolution of the claims referred to me.

3.  I am bound by the Court's prior determinations and rulings in this case.  I have assumed the validity of all such Orders of the Court and have considered that my recommendations must be based, to the extent applicable, on these Orders and their necessary implications.

4.  In particular, the Court's Order of October 14, 2008, Dkt. 212, found and concluded that the original Strategic Partnership Agreement, Dkt. 578-1 (the "SPA") entered into by the parties was too vague to create an enforceable contract, because it did not sufficiently specify the items (the "parts") which it covered.  The Court found, however, that the settlement memorandum entered into by the parties as of May 28, 2003, Dkt. 578-2 (the "Settlement Memorandum") did create an enforceable requirement contract between the parties as to certain categories of parts.  In this and all succeeding reports and recommendations, I will refer to the SPA and the Settlement Memorandum as such, and I will call the resulting enforceable requirements contract, consisting of the SPA as modified by the Settlement Memorandum, the "Contract" between the parties.

5.  Finally, I have kept a file (the "File List") of document submissions made only to me (and in accordance with the terms of the Order appointing me, not filed with the Court).  With this First Report and Recommendation, I am submitting the portions of the File List that pertain to the motions addressed herein, together with any necessary correspondence.  The File List items will

be identified with the numbers I have attached to each.  Since this First Report deals with several motions and responses submitted by the parties, it seems necessary that the Court will have the complete submissions of the parties.  The numbers will not be sequential, since my submissions will be limited to those items pertaining to the motions addressed herein.

*STATUS AND SCOPE*

In this first Report and Recommendation, I address the first two motions made to me:  a motion for partial summary judgment submitted by Defendants (the "PSJ Motion," File List 1), and a cross motion (the "Cross Motion," File List 6) for partial summary judgment submitted by Plaintiff ("Whitesell") in response to the PSJ Motion

Both the PSJ Motion and the Cross Motion relate to claims referred to me that involve Section 5.7 of the SPA and the remaining inventory of "obsolete" parts held by Whitesell (the "Obsolescence Claims").  Four other motions have been submitted to me.  In this Report I will address two of these:  the motion of Whitesell to strike a Declaration of Sadler submitted by Defendants, and Defendants' motion for partial summary judgment regarding prejudgment interest.  The former pertains to the PSJ Motion and Cross Motion.  The latter affects recovery on the Obsolescence Claims and on certain other claims submitted to me.  The other two are motions for partial summary judgment from Whitesell, pertaining to claims other than the Obsolescence Claims.  I will address these as soon as possible.

*SUMMARY OF ISSUES AND RECOMMENDATIONS*
*RELATING TO OBSOLESCENCE CLAIMS*

The issues presented by the PSJ Motion and the Cross Motion turn on the interpretation of Section 5.7 of the SPA.  SPA, Dkt. 1, Exhibit 2.  A copy of Section 5.7 is also attached to the PSJ Motion as Exhibit 1.  File List Item 2. Section 5.7 addresses payment by Defendants to Whitesell

3

for certain amounts "at a minimum" of remaining inventory of parts covered by the Contract which Whitesell has on hand because the parts have become "obsolete" and thus no longer needed by Defendants.  These are the Obsolescence Claims.

Section 5.7 consists of three paragraphs.[1]  The first is somewhat general in nature, but it does provide that "Whitesell shall receive from Electrolux formal written notification of a Good going inactive or Obsolete."  It also states that "Whitesell will make every effort to minimize and eliminate Obsolete Goods and yet not run out of Goods for production."  Later in Section 5.7, in what appears to be a second paragraph, it is further stated that "[a]s soon as Whitesell receives formalized notice that a Good will be Obsolete, it shall interrupt production, seek alternative buyers, cancel purchase requirements, and do whatever is necessary to rapidly respond."

The apparent second paragraph of Section 5.7 provides the measure for an amount of Whiteside's remaining inventory for which Defendants shall pay Whiteside.  The measure is separated into a higher amount (the "Higher Prong") that applies "until all Good(s) have been transitioned to Whitesell" and a lower amount (the "Lower Prong") that applies "after the transition is complete."

The parties agree as to the number of Obsolescence Claims against each Defendant, the parts involved, and amounts claimed by Whitesell for each.  They have also confirmed to me that the claims referred to me other than the Obsolescence Claims do not involve the interpretation of Section 5.7.  Finally, they agree that as to some of the Obsolescence Claims, formal written notification was properly given by Defendants.  I refer below to those Obsolescence Claims as to

---

[1] This is apparently so. The page break in the middle of Section 5.7 in the SPA as signed makes it impossible to be certain.

which Whitesell denies that formal written notification was given as the "Disputed Notice Obsolescence Claims.

Saying that Defendants "seek a ruling on two threshold, contract interpretation questions that have significant, if not dispositive, importance" on the Obsolescence Claims, the PSJ Motion asks for a determination of the meaning and effect of Section 5.7 in two respects: (1) "that the Obsolescence Calculation in the second paragraph of Section 5.7 of the SPA governs Whitesell's obsolescence invoice claims and is not rendered meaningless in the absence of formal written notification"; and (2) "that the transition of Good(s) referenced in Section 5.7 is complete and therefore the lower prong of the Obsolescence Calculation should be used when calculating Whitesell's obsolescence invoice claims." Defendants' PSJ Motion, File List 1, p. 3. Defendants' resulting position is that the measure of the amount of inventory for which Defendants must pay on Whitesell's Obsolescence Claims is provided by the Lower Prong of Section 5.7. *See id*.

On the other hand, Whitesell contends that (1) Defendants repeatedly breached the Contract by failing to give formal written notification of obsolescence in the case of four of Whitesell's Obsolescence claims against Defendant Electrolux Home Products, Inc. ("EHP") and in the case of all of its Obsolescence Claims against Husqvarna Outdoor Products, Inc. ("Husqvarna") (these being collectively the Disputed Notice Obsolescence Claims as I have defined them above); (2) as a result of these contract breaches by Defendants, Whitesell is entitled to payment for its entire remaining inventory of the parts covered by the Disputed Notice Obsolescence Claims; and (3) to the extent that any of the Obsolescence Claims are governed a choice between the Higher and Lower Prongs, the Higher Prong applies rather than the Lower Prong. See generally, Plaintiff's Cross Motion, File List 6.

In summary, I have found and concluded as follow:

1.   Defendants failed to give formal written notification as required by Section 5.7, as to all parts on which the Disputed Notice Obsolescence Claims are based.  This is a breach of the Contract by Defendants.  It is unnecessary to determine whether Defendants' breaches of the Contract are material breaches, because Whitesell affirmed the Contract, after its knowledge of breach by Defendants, by continuing to perform under the Contract and accepting benefits under the Contract.

2.   Whitesell is not estopped to claim that Defendants breached the Contract by failure to give formal written notification has occurred, either by virtue of an admission *in judicio*, because of statements made in Whitesell's prior briefs or other filings in this case, or by Whitesell's failure to mention the claimed breach in prior filings at any time in this case.

3.   Notwithstanding Defendants' breaches of contract, the amount of remaining inventory of an obsolete part for which Defendants must pay on all of the Obsolescence Claims is governed by the Higher Prong of Section 5.7.

These conclusions and recommendations have consequences for the trial of this case and particularly for what burden of proof must borne by which side at trial.   After explaining the basis for my conclusions below, I separately address these consequences.  I have directed the parties to provide me, no later than June 28, with a joint submission, similar to what would be required in a pretrial order, presenting all of their evidence pertaining to the Obsolescence Claims (and for other claims, but this is not addressed in this Report and Recommendation) separately for each such claim and invoice. My hope is that, once the parties disclose all of their evidence on the Obsolescence Claims, it will be possible to eliminate some of them from the category of jury questions, or at least to eliminate some issues that might in theory be litigated as to some of the

Obsolescence Claims. I announced this direction to the parties at a status conference on May 27 and gave them until June 1 to object to my direction. No party has objected.

## *DISCUSSION*

The PSJ Motion and the Cross Motion present three overall issues: (1) whether "formal written notification" of obsolescence, as required by Section 5.7 of the SPA, was given by Defendants (the "Notification Issue"); (2) to the extent that Whitesell's right of recovery for remaining inventory involves a choice between the Higher Prong and the Lower Prong, which prong applies (the "Which Prong Issue"); and (3) if and to the extent that formal written notification under Section 5.7 was not given as to the parts underlying the Disputed Notice Obsolescence Claims, what, if anything, is the measure of the amount of inventory for which Whitesell may recover (the "Measure of Recovery Issue"). I discuss each separately below.[2]

## I.  The Notification Issue

### A.  Two preliminary issues

Before considering the meaning of "formal written notification" and whether Defendants failed to provide such notification where Plaintiff denies that they did so, I address two preliminary but related points.

### *(1)  Whitesell's motion to strike*

Whitesell has moved[3] for me to strike the Declaration of Ryan Sadler,[4] which Defendants submitted in support in their reply of their PSJ Motion and in opposition to Whitesell's Counter

---

[2] Because based on my overall conclusions the "Which Prong Issue" is relevant to all Obsolescence Claims, both the Disputed Notice Obsolescence Claims and those where Whitesell concedes that proper notification was given, I address the "Which Prong Issue" second. I trust this will not be overly confusing. The intertwining of the issues makes it difficult to choose an order of discussion.
[3] Plaintiff's Motion, File List 14.
[4] File List 13.5, Exhibit C.

Motion.   In opposing[5] Whitesell's motion to strike, Defendants state that their Sadler Declaration was submitted only to counter the Declaration of John Duffner,[6] which Whitesell submitted in support of its Counter Motion and in opposition to Defendants' PSJ Motion.  Having read and considered the contents of these two declarations, I find that neither contains any information that affects the determinations I am making in this Report and Recommendation. Although the Sadler Declaration does contain some rather general statements pertaining to alleged methods of supposedly notifying Whitesell of a part's obsolescence, alternative to what I have determined below to be "formal written notification," the basis of my resolution below of the notification issue renders them irrelevant to any issue now before me.  Thus, there is no need to rule on Whitesell's motion to strike.  I therefore recommend that the motion to strike be denied as moot.

If it were necessary for me to rule on Whitesell's motion to strike the Sadler Declaration, however, I would grant it.  Paragraphs 2 and 3 of the Sadler Declaration are insufficient to show that Mr. Sadler can testify of his own personal knowledge as to the rather general and conclusory statements that follow.  In striking the Sadler Declaration, however, I would on my own initiative also strike the Duffner Declaration. The Duffner Declaration states nothing concerning Mr. Duffner that shows that he has personal knowledge of the "facts" stated in the Declaration.  These "facts" consist of nothing more than legal arguments taken verbatim, or almost so, from Whitesell's brief, including legal conclusions.  The Declaration contains no competent evidence and must therefore be completely disregarded.

I also note that, as explained below, I believe I have been able to resolve the parties' dispute as to what constitutes "formal written notification" within the meaning of SPA Section 5.7, by the

---

[5] Defendants' Response to Motion, File List 17.
[6] File List 6, Exhibit B.

application of well-established Georgia canons of contract construction, and without reference to any extrinsic evidence. This makes it improper for me to resort to statements in either the Sadler or the Duffner Declarations for purpose of resolving this point of difference between the parties.

*(2) estoppel issue*

Defendants contend that Whitesell is estopped to argue that Defendants have breached the Contract by failure to give formal written notification under Section 5.7 as to the Disputed Notice Obsolescence Claims. Defendants argue that this estoppel results from what Defendants contend is an admission *in judicio* in Whitesell's prior pleadings herein, which prior to 2007 made no mention of any issue as to notification and argued solely about which prong of Section 5.7 applies to its Obsolescence Claims. Defendants also contend that these prior pleadings evidence Whitesell's construction of the term "formal written notification" under Section 5.7, which would therefore bind the parties based on the principle stated in O.C.G.A. § 13-2-4. This is a preliminary matter only insofar as Defendants argue that such pleadings raise an estoppel against Whitesell.[7]

I conclude that Defendants are wrong in their estoppel contentions. Whether formal written notification was given as to the Disputed Notice Obsolescence Claims depends entirely on the construction of the term "formal written notification" in accordance with the text of Section 5.7 and the Contract as a whole. As I will explain below, Whitesell's previous failure to mention its present contention as to lack of proper notification does not amount to an admission *in judicio*.

---

[7] Although Defendants have raised an issue of whether the parties by their practical construction of the Contract have established the nature of the remedy to which Whitesell is entitled under Section 5.7, it is not clear to me that they have or have intended to raise such an issue of practical construction as to the meaning of "formal written notification". I address this matter below. I note it here only to make it clear that this would be a separate issue from the estoppel matter I am discussing in this subsection (2).

Similarly, Whitesell's prior legal position *in its pleadings and arguments to this Court* does not estop Whitesell from maintaining its current position.

Defendants' argument is based on the fact that "[a]t no point in its briefs [on an earlier summary judgment motion] did Whitesell contend that Defendants failed to provide adequate notice or that the Obsolescence Calculation was inapplicable."  Defendants' PSJ Motion, File list 1, p. 9.  However, the failure to make a legal contention in a partial summary judgment brief is not an admission *in judicio* that no such legal contention exists.  An admission *in judicio* must be an admission of fact, not a legal argument. *See Clift & Goodrich, Inc. v. Mincey Mfg. Co.*, 41 Ga. App. 38, 43, (1930).

Mixed in with Defendants' argument concerning Plaintiff's alleged admission *in judicio* is a theory that should be analytically distinct from Defendants' claim regarding an admission *in judicio,* but which Defendants evidently do not treat as such.  Defendants correctly cite *Eickhoff v. Eickhoff,* 263 Ga. 498, 505 (1998), for the proposition that "[t]he construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." *Id.* However, they seek to apply this maxim, not to Whitesell's actual behavior during the performance of the Contract, but rather to Whitesell's failure to raise an argument concerning "formal written notification" in their prior summary judgment motion. In my opinion Defendants are in error in this argument.

Under Georgia law, an admission *in judicio* requires a clear concession of fact be made in a filing with the Court. *See Clift & Goodrich, Inc. v. Mincey Mfg. Co.*, 41 Ga. App. 38, 43 (1930). A party cannot be held to have admitted *in judicio* an opinion or urged legal conclusion. *Id.*; *accord Jabaley v. Jabaley*, 208 Ga. App. 179, 179, (1993).

Here, though, Defendants urge that Whitesell's "failure to contend that Defendants failed to provide adequate notice or that the Obsolescence Calculation was inapplicable." Defendants' PSJ Motion, File List 1, p. 8. Defendants own phrasing in their brief betrays their argument. I can find no Georgia law that would support binding a party to a supposed admission *in judicio* for a *failure* to raise a legal, or even factual, matter (emphasis added).  Perhaps, as Defendants suggest in their brief without naming the legal doctrine, Whitesell might have been estopped from arguing the notice portion of Section 5.7 claims by *res judicata* or the law of the case if the Court had ruled on the motion for summary judgment, but as Whitesell correctly observes, the motion was never ruled upon, so that no law of the case was established as to this point. I therefore believe that Whitesell has not conceded "formal written notification" as to all of the obsolescence invoices under Section 5.7 by way of admission *in judicio*.

Relatedly, as I have noted, Defendants also seek to bind Whitesell, pursuant to O.C.G.A. § 13-2-4, as having made clear its interpretation of the contract, in particular Section 5.7. To this end, Defendants argue that Whitesell, by taking the position that it was entitled to calculate its alleged damages under the Higher Prong rather than the Lower Prong of Section 5.7 without raising the notice issue, has conceded that formal written notice was given by Defendants as to the Disputed Notice Obsolescence Claims. Defendants Reply, File list 13, pp. 9-10. But this argument by Defendants similarly misses the mark. Georgia law is clear that O.C.G.A. § 13-2-4 "is not applicable unless the contract is ambiguous." *Holloway v. Brown*, 171 Ga. 481, 483 (1930) (citing same language in Georgia Civil Code (1910), § 4267). Further, the principles underlying Section 13-2-4 seek to divine the intention and interpretation of the parties at the time of execution of the contract, not constructions of the contract applied years later during litigation. *See Smith v. Freeport Kaolin Co.*, 687 F. Supp. 1550, 1557 (M.D. Ga. 1988) ("The court further notes that the

statute contemplates an expression of meaning contemporaneous with the execution of the contract, and it does not indicate that an expression of meaning by one party years after such execution imposes any obligation upon the other party to object to such an expression."). Since both Whitesell and Defendants agree[8] with the Special Master that Section 5.7 is unambiguous and ripe for determination as a matter of law, then the principles of contract construction set forth in O.C.G.A. § 13-2-4 are inapplicable to the present dispute, and these principles of contract interpretation certainly cannot apply to supposed interpretations of the contract by Whitesell that did not occur until after the Contract came into force and in fact until after litigation commenced.

I emphasize that I do not by this conclusion as to estoppel dismiss any of Defendants' arguments as to practical construction of the Contract as recognized by what was formerly subsection (1) of O.C.G.A. § 11-2-208, now found in O.C.G.A. §11-1-303. This is a very different thing than a claim that Whitesell is estopped. I read Defendants' arguments concerning practical construction as being limited to the matter of remedy under Section 5.7 of the SPA, and not as touching the meaning of "formal written notification), but I discuss this below.

B.  "Formal written notification" and whether such was given in the case of the Disputed Notice Obsolescence Claims

The above clears the ground for consideration of the meaning of the term "formal written notification" in Section 5.7 of the SPA and whether such notice was given by Defendants in the case of the Disputed Notice Obsolescence Claims. These matters are properly presented by the PSJ Motion and the Cross Motion. Although Defendants in the PSJ Motion seek to reserve the fact question of whether notice as given for later determination,[9] it is squarely presented as a part of the Cross Motion, so that all parties were obliged to present evidence as to this point: Whitesell to

---

[8] Defendants' PSJ Motion, File List 1, p. 7; Plaintiff's Cross Motion, File List 6, p. 6.
[9] Defendants' PSJ Motion, File List 1, p. 9, fn 7.

present such evidence as it considers establishes that such notice was not given, and Defendants to present such evidence as they consider makes a genuine issue of fact that it was not.

*(a) language of the SPA itself*

I find that the meaning of the term "formal written notification" can be derived from the SPA itself, an integral part of the Contract, without resort to extrinsic evidence. Nevertheless, I conclude that, under what is now O.C.G.A. § 11-1-303, evidence which Defendants proffer to establish a course of performance under the Contract bearing on the meaning of the term must be considered in reaching a decision on this important. Considering the position of the parties and all the evidence submitted to me, I conclude as a matter of summary judgment that "formal written notification" was not given by Defendants to Whitesell as to any of the "Disputed Notice Obsolescence Claims."

As to whether formal written notification was properly given, the parties disagreement amounts to a dispute as to what can constitute "formal written notification" under the Contract. Defendants have not sought a determination as to this point, apparently attempting to reserve it for trial or later consideration.  Defendants' PSJ Motion, File List 1, p. 9, fn 7.   However, Whitesell in its Counter Motion has squarely presented the issue for summary judgment, seeking a determination that formal written notification was not given by Defendants as to the Disputed Notice Obsolescence Claims.  Both parties were obliged to come forward with evidence and argument on the Cross Motion as to what "formal written notification" means in Section 5.7.  The matter should now be resolved on summary judgment if possible.

The words "formal written notification" appear together only once in the SPA, this being in Section 5.7, and are not defined anywhere in the SPA, either together or individually.  Neither party has noted to me, that in the last paragraph of Section 5.7, the words "formalized notice" are

used, presumably because the parties recognize (and I agree) that the context of this use establishes that "formalized notice" and "formal written notification" refer to the same thing.

Whitesell has conceded that Defendant EHP gave formal written notification as required by Section 5.7 as to the parts involved in all the Obsolescence Claims other than the Disputed Notice Obsolescence Claims. Neither party has informed me as to the means by which Defendants (to Whitesell's conceded satisfaction) gave such notice, but the question is immaterial. Confining Whitesell's concession to its proper limits, it has no applicability to the question of what constitutes formal written notification as it relates to the Disputed Notice Obsolescence Claims.

Only a brief review of well-established Georgia rules of statutory construction is required to explain my procedure in resolving these questions. The Georgia Court of Appeals has recently noted the often-stated principle that "'[c]ontract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court.'" *High Tech Rail & Fence v. Cambridge Swinerton Builders,* 2022 Ga. App. LEXIS 136, *5 (March 10, 2022) (footnote omitted). Furthermore, and importantly for the present case, "[c]onstruing the language of a contract presents a question of law for the court, unless the language presents an ambiguity *that cannot be resolved by the rules of construction.*" *Id.* (emphasis supplied). The principles that must control my construction are succinctly stated in *Envision Printing, LLC v. Evans,* 336 Ga. App. 635 (2016):

> The construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. The existence or nonexistence

14

of an ambiguity is a question for the court.  If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction in O.C.G.A. § 13-2-2.

*Id.* at 638; *accord Cahill v. United States,* 303 Ga. 148, 151 (2018):  there "is no jury question raised unless the ambiguity remains after the application of the pertinent rules of construction."

Georgia law commands that I attempt to eliminate any ambiguity in the Contract by applying the canons of construction.  Only if this proves impossible am I to leave the matter for jury determination and deny summary judgment.  *Envision,* 336 Ga. App. 640.

"The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(4).  "The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other.  In extreme cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied." O.C.G.A. § 13-2-2(6).

Of importance for the present inquiry is the principle that all parts of the contract are to be given effect if possible, or to put it another way, that if possible a construction should be avoided "that renders portions of the contract language meaningless." *Community & Southern Bank v. First Bank*, 338 Ga. App 341, 344 (2016).  A natural corollary to this principle is that "specific provisions in a contract prevail over any conflicting general language." *Id.*

In short, looking at the wording in dispute and the Contract as a whole, I must attempt to apply the rules of construction provided by Georgia law to resolve any apparent ambiguity.  If after applying these rules only one reasonable interpretation of the issue in dispute arises, then there is no jury issue and summary determination of the issue is appropriate.  If more than one

reasonable interpretation arises, I may have recourse to extrinsic evidence and if this conflicts there will be a jury issue precluding summary determination.

For there to be such an ambiguity in contractual language as to require jury determination, there must be a choice between at least two "reasonable" constructions of the language in dispute. This is often implicit in formulations of the rules about construction of ambiguities. Sufficiently often, however, the qualification that the two interpretations must both be reasonable is made specific. *See, e.g., Bogard v. Inter-State Assur. Co.,* 263 Ga. App. 767 (2003) ("Under Georgia law, an insurance contract is considered ambiguous only if its terms are susceptible to two or more reasonable interpretations"); *accord Bowers v. Today's Bank,* 347 Ga. App. 615, 618 (2018) (there is no jury issue where there is "only one reasonable interpretation") and *In re Estate of Boyd,* 340 Ga. App. 744, 747 (2017).

No party has mentioned to me two particularly clear parts of the SPA.  In relevant part, Section 2.1.1 provides as follows:

> CONTRACT ADMINISTRATOR shall mean, with respect to each party, the individual specified on Exhibit A, *who shall be responsible for monitoring the obligations of the party in which he is employed.*  The Contract Administrator . . . shall be authorized to receive on behalf of a party *any notices provided for in this Agreement.*

Exhibit A to the original SPA, Dkt. 578-1, shows under the heading "Notices/Contract Administrators" that Clarence Frauendienst is named Contract Administrator for Defendants and John Duffner is named Contract Administrator for Whitesell.  Prompted by the information that Mr. Frauendienst soon left Electrolux, I inquired of the parties as to who was the Contract Administrator for each party during the life of the Contract.  In response, Whitesell provided a list of Contract Administrators, showing that there was always a Contract Administrator for both parties and that apparently the Contract Administrator for Whitesell was briefly Bob Wiese, and

then, for most of the relevant period, Neil Whitesell was the Contract Administrator.  Whitesell's Supplemental Brief of May 17, 2022, File List 16, p. 7.  Defendants provided a somewhat different list of Contract Administrators, but it shows that either Mr. Freundienst or Roger Leon was in this role during the relevant period, and Don Market for "after the spinoff."  Defendants' Supplemental Brief of March 17, 2022, File List 17. This difference does not matter for the present analysis.

The logical intent of Section 5.7's specification that notice of obsolescence should be "formal" and "written" is to ensure that notice of obsolescence should be provided to the Contract Administrator, who according to the SPA is the person "responsible for monitoring the obligations" of his party.  High among these obligations would be those of Whitesell when told that a part was going obsolete, and which became operative, imperative and immediate upon Whitesell's receipt of such notice: "As soon as Whitesell receives formalized notice[10] that a Good will be Obsolete, it shall interrupt production, seek alternative buyers, cancel purchase requirements, and do whatever is necessary to rapidly respond." Indeed, the use of the term "formalized notice" at least implies that there may be lesser degrees of notice that would not trigger these duties and supports the conclusion that "formal written notice" must refer to something more substantial.

Defendants have argued that information "electronically communicated" to Whitesell through these programs satisfies the notice requirement of Section 5.7.  Defendants' PSJ Motion, File List 1, p. 9, fn 7.  I do not agree.

It is true, as Defendants have pointed out, that various persons within the parties' respective organizations obtained a considerable volume of information concerning the needs and supplies of Goods covered by the Contract, through computer systems called the Demand Flow Center

---

[10] Which as I have noted above must from the context mean "formal written notification."

("DFC"), set up and jointly used by the parties.  However, it is obvious, and the only reasonable construction of the language, that Section 5.7, when it specifies that "Whitesell shall receive from Electrolux formal written notification of a Good going inactive or Obsolete" (referred to later in the same paragraph as "formalized notice"), it is referring to the kind of notice contemplated by Section 2.1.1.  The words "formal written" seem to me to be custom-made to distinguish "notice" as contemplated in Section 5.7 from the kind of notice that might arise from information loaded into a jointly operated computer system. The only alternative notice that Defendants have proposed to come within the notice requirement of Section 5.7 is information gathered by a party through the DFC.  This interpretation would make the words "formal written" of no effect and would violate the canon of construction that says that all words of a contract should be given effect if possible. It is therefore clear to me that, as a matter of law, Defendants cannot offer any evidence of "formal written notice" as to obsolescence of the parts at issue in the Disputed Notice Obsolescence Claims. This conclusion is strengthened by reference to "formalized notice" later in Section 5.7. The context of this mention requires the conclusion that "formalized notice" is "formal written notification."

I note that Section 29.0 of the SPA, captioned "NOTICES" states expressly that "Any notice required or desired to be given in connection with this Agreement *shall be in writing* and shall be effective upon the earlier of its delivery or 5-days after deposit in the U.S. mail . . . addressed as follows, or to such other address as to which either party gives notice to the other" (emphasis supplied).[11]

---

[11] Followed by the street addresses of the parties and email addresses of an individual representative of each party.

A review of the entire contents of the SPA shows that it contemplates the exchange of a great deal of information between the parties. However, I find only five sections which provide specifically for "notice" or "notification" (which from their use in Section 5.7 I find to be synonymous terms). *See* Sections 5.7, 11.2, 12.9.5, 18.0 and 26.0. It must be the case that a requirement of "written" notification must be distinguished from the exchange of other information, which clearly is mainly to be exchanged on the joint computer system. None of the other references to "notice" or "notification" are qualified, as is the notice specified in Section 5.7, as requiring "formal" or "formalized" form. I can attach no other meaning, then, to the addition of these terms to the 5.7 notice requirement, except that they require special treatment.

The parties obviously took steps in the preparation of their Contract to ensure that the particularly important notice of Section 5.7 would be timely received by someone at Whitesell who would have the opportunity, amid the welter of information that is contemplated to be passed between the parties in the operation of the contract, to be distinctively informed of its contents. It is admitted that for a time after the commencement of the relationship between the parties, the parties agreed on when and how notice was given. Most clearly, for a time after the Settlement Memorandum, which supposedly resolved prior controversies and set the parties on a clear track going forward, Defendant EHP complied with the SPA by giving written notice, apart from electronic messages through the DFC, when a part was going obsolete. This is all reasonable, considering that this notice was to trigger "immediate" and substantial duties of Whitesell to reduce its inventory of the obsolescent part, which were a predicate for Defendants' obligation to pay Whitesell for inventory which Whitesell had accumulated to meet Defendants' future needs.

Although neither party drew my attention to it, I am aware that Section 5.3 of the SPA refers to "Once a Good has become Obsolete as defined by no current production requirements

whether advised by Electrolux or not," Whitesell shall provide service pricing at a certain level. This provision strengthens my view that "formal written notification" means something other than communication through the DFC (as argued by Defendants). Quite clearly, the dropping of current production requirements, even to zero, as shown in the computer system, is not considered to be the formalized written notice required by Section 5.7, which is the manner of notice that initiates Whitesell's duties with respect to reducing its inventory. Defendants have argued that a decrease in computer forecast requirements should be equivalent to "formal written notification" of obsolescence of a part, but this cannot be reconciled with Section 5.3 in this regard. Also, Whitesell provided me, without rebuttal from Defendants, with several instances in which a part's forecast production requirements went to zero, but subsequently returned, as a result of the fact that some products' sales were markedly seasonal. *See* Whitesell's Supplemental Brief of March 17, 2022, File List 16, pp. 7-10. In fact, Defendants themselves note in other briefing to me that the DFC contains only "the quantity of parts that Defendants forecast are needed *for a particular time period*" (emphasis supplied). Defendant's Surreply Brief of April 15, 2022, File List 24, p. 2. This statement by Defendants matches, rather than contradicts, the evidence Whitesell put forth that the Defendants, through the DFC, could forecast zero parts for a time, then later increase its forecast again.

The purpose of Section 5.7 was to benefit both parties: to allow Whitesell to reduce its inventory with confidence that doing so would not cause it to be unable to fulfill its basic obligation to supply Defendants with parts as required, and to allow Electrolux to count on such reductions, which would reduce its eventual liability for remaining inventory under the prongs of Section 5.7. The giving of formal written notification is the signal that the parties can proceed with the certainty

that the part will not be needed again.  I discuss the consequences of Defendants' failure to give such notice in Section C below.

Defendants have therefore seemingly breached the requirements of formalized written notice under Section 5.7 at least as to the Disputed Notice Obsolescence Claims.[12]  I hasten to say, however, that Defendants are not precluded by their breach from arguing that their liability, if any, should be reduced to the extent they can show that Whitesell had actual knowledge of obsolescence of a part as to which it was not formally notified.  I discuss this under "Consequences" below.

*(b) course of performance*

Based on the reasoning expressed above, I have concluded that, based simply on the wording of the SPA itself, the "formal written notification" required by Section 5.7 of the SPA must be a written document delivered to Whitesell's Contract Administrator.  This, however, does not necessarily end the inquiry as to the meaning of the term.

Defendants have contended that, as a matter of construction of the SPA without reference to any extrinsic evidence, "formal written notification" includes electronic communication through the DFC from unstated persons representing Defendants to unstated persons at Whitesell.  I have rejected this argument above.  However, I am concerned as to whether, though they do not do so explicitly, Defendants might implicitly rely on an alleged course of performance with respect to the meaning of "formal written notification" of obsolescence, to establish the meaning of the term through extrinsic evidence, that is, evidence of a mutual course of performance.  When asked to address course of performance issues, Defendants did not mention any course of performance as

---

[12] I need not decide the materiality of these breaches because Whitesell necessarily affirmed the contract by continuing to deliver goods for sale to Defendants.

relevant to the notification issue.  Nevertheless, I believe a short discussion of this subject is necessary for completeness.

In making their argument that Whitesell is estopped from claiming that it did not receive formal written notification of obsolescence, Defendants quote from *Eickhoff v. Eickhoff, supra,* to the effect that the "construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." PSJ Motion, File List 1, p. 8. Defendants have used this principle to justify their admission and estoppel arguments, which I have rejected.

As to course of performance, in response to an inquiry from me on the topic, Defendants have only presented evidence which they say shows that Whitesell has acquiesced in the limitation of their *remedy* for a breach of Defendants' notification obligation to payment for remaining inventory based on either the Higher or the Lower Prong of Section 5.7.  I discuss this under **III. The Measure of Recovery Issue**, below.  I write at this point, however, to say that, if Defendants had made an explicit claim that the course of performance of the parties shows that "formal written notification" includes electronic communication through the DFR, I would reject the contention.

In all of the invoices underlying Disputed Notice Obsolescence Claims that I have been asked to examine, where Whitesell has sought to be paid for 100% of its remaining inventory, Whitesell has stamped these invoices with a notation that "notice was not given" or words to that effect.  The very fact that Whitesell has in such cases invoiced Defendants for its full remaining inventory shows that Whitesell has not acquiesced in being notified only through the DFR.

Under **III. The Measure of Recovery Issue** below, I also discuss the law pertaining to when the course of performance of parties to a contract can be used to "explain or supplement" the meaning of terms of a contract, even where the language is unambiguous when considered

without such extrinsic evidence.  In the interest of space, I will not anticipate that discussion here, except to note that the applicable provisions of the Uniform Commercial Code as adopted in Georgia, which supplement O.C.G.A. § 11-2-202, upon which Defendants would have to rely, make it clear that a course of performance cannot be used for this purpose unless it evidences the "practical construction" given to a term by both parties.  On the issue of the meaning of "formal written notification," no evidence has been provided that shows that Whitesell ever, in its course of performance, acquiesced in or accepted Defendants' expansive definition of this term.  Below under "**III. The Measure of Recovery Issue**," I discuss the relevant provisions of Georgia law in the context of Defendants' clear contention that the parties' course of performance has limited the remedy to which Whitesell is entitled in the event of a breach of Defendants' breach of their obligation of notification of obsolescence. In considering the possible issue of course of performance as to the meaning of "formal written notification," however, all that needs to be said is that Whitesell clearly has never acquiesced in Defendants' expansive definition of "formal written notification," by any action it has taken as part of a course of performance.

I once more I hasten to add that this conclusion of mine, which is the basis for my recommendation that the Court find as a matter of summary judgment that Defendants have breached the Contract by failing to give proper notice of obsolescence, does not mean that Whitesell is entitled to recover for its entire remaining inventory of a particular part for which proper notice was not given, as it contends it should, or even to recover for the amount of its inventory specified by the Higher Prong of Section 5.7. I discuss this issue below in **II. The Which Prong Issue**.

## II.  The "Which Prong" Issue

The parties further disagree as to, if one of the two prongs established in Section 5.7 controls all or some of the Obsolescence Claims, which "prong" of section should govern. Defendants' contend for the Lower Prong.  Plaintiff, while disputing that either prong applies where the Disputed Notice Obsolescence Claims are concerned, contend that when and if Section 5.7 does apply, it is the Higher Prong that will be determinative.  This dispute turns on the meaning of the term "the transition" in Section 5.7, since the Higher Prong yields to the Lower Prong at the point in time that "the transition is complete."

Defendants contend that "the transition" as used in Section 5.7 means a transition specific to each individual part that becomes obsolete.  Under this reading, by definition in this case the transition has been completed as to the Obsolescence Claims, so that the Lower Prong would apply. Whitesell contends that "the transition" means the transition of all parts that are going to be transitioned and says that since this transition has never occurred, the Higher Prong must apply to all the Obsolescence Claims.  In reply, Defendants raise a further point. They say that, even if "the transition" refers not to the transition of each individual part as they contend, but rather to the transition of a larger group of parts considered together, as Whitesell argues, nevertheless this larger group cannot include certain parts, the "Brunner parts," which were added to the Contract by the Settlement Memorandum.  No party has contended that parts other than Brunner parts have not been transitioned, and no party has contended that the Brunner parts have been transitioned.

This issue requires a two-part analysis.  First, I must determine if possible whether (1) "the transition" is complete for purposes of Section 5.7 at various points, according to when particular parts are "transitioned" completely over to Whitesell, or whether (2) "the transition is complete" only when all parts collectively that are to be transitioned have actually been transitioned to

Whitesell.  Second, if I determine that the latter is the correct interpretation, I must consider Defendants' contention that the "Brunner parts" are not properly to be included within the parts which must be collectively transitioned to Whitesell before the Lower Prong takes effect.

These issues are governed by the same principles of construction of contracts that I summarized above in construing the requirement of "formal written notification."

In short, looking at the wording in dispute and the Contract as a whole, I must attempt to apply the rules of construction provided by Georgia law to resolve any apparent ambiguity.  If after applying these rules only one reasonable interpretation of the issue in dispute arises, then there is no jury issue and summary determination of the issue is appropriate.  If more than one reasonable interpretation arises, then I may have recourse to consider extrinsic evidence. If this evidence conflicts, then there will be a jury issue precluding summary determination.

Applying Georgia canons of construction, I find that there is only one reasonable interpretation of the language of Section 5.7 concerning the meaning of "the transition" and when the shift from the Higher Prong of Section 5.7 to the Lower Prong occurs.  In passing, however, I note that the parties have supplied no extrinsic evidence on this point.  Whitesell's argument is based entirely on the wording of the SPA as a whole.  The Declarations of Mr. Sadler, submitted by Defendants, and Mr. Duffner, submitted by Whitesell, both discussed above in my treatment of the Notification Issues, do not contain, and have not been argued by the parties to contain, any evidence that bears on the interpretation of the words "the transition." True, Defendants make the assertion that their interpretation "is consistent with the practicalities of supply, as greater buffer stock quantities are often obtained for parts that are in the process of transition,"[13] but they have not provided any evidence to support this factual claim.  Nevertheless, I note that I have considered

---

[13] Defendants' Motion, File List 1, p. 17

this rationale for Defendants' interpretation, even though it is not supported by evidence, and it does not change my mind as to the determination of this issue.  The language of the Contract as a whole does not permit Defendants' construction.

A contract is not ambiguous, and must be enforced according to its plain terms "where examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation." *York v. RES-GA LJY,* 336 Ga. App. 253, 256 n. 10 (2016).  The obvious meaning of the term "the transition" in Section 5.7 is that it means "the transition of all Goods to Whitesell."   Also, I can rely to some extent on the finding of the Court in its Order of October 14, 2008, (Dkt. 212), that "[t]he term 'transition' as it is used amongst the parties, refers to the changeover from Defendants' existing parts suppliers for the relevant goods to Whitesell." *Id.,* p. 4 fn 5.   This does not quite deal with Defendants' argument, but the natural reading of this finding of the Court is also in favor of reading "the transition" as referring to one overall transition of all parts that are to be transitioned.

The SPA contemplates that it will take some time for the manufacture and supply of parts under this requirements contract to be moved over to Whitesell from the present suppliers to Defendants.  In Section 3.1 of the SPA, "[b]oth parties agree to develop a Fastener Transition Council to meet as needed until implementation and full transition of all Goods to Whitesell is complete."   The parties state that they intend to complete this "implementation as soon as possible," but recognized that "[d]ue to the existing supplier contractual commitments of Electrolux, the transition is to be completed no later than June 30, 2003."  It is also recognized that there may be factors on Whitesell's side that will affect the speed of "transition": "Whitesell commits to provide its best efforts to transition as much business as quickly as possible without jeopardizing the integrity of this program." *Id.*  In other words, in the beginning of the parties'

contractual relationship, some time was going to be needed to change over from Electrolux's existing suppliers to Whitesell as exclusive supplier. The process of change-over was referred to simply as "the transition." While a definite date was set for the transition to be "completed," a proportional extension of the term of the SPA was provided in case the transition was not completed as soon as hoped: "Failure to complete the transition by this date shall proportionally extend the initial term of this Agreement." *Id.* The transition, however, was not to be an indefinite process, but was to be an introductory phase of the SPA. It is important to note here that, by definition, "the transition" cannot apply to parts that were not, at the inception of the SPA, being supplied to Defendants by someone other than Whitesell. The only "transition" known to the Contract has to involve a shifting of supply from a third party to Whitesell.

In the present case, the parties contemplated that from time to time Defendants' needs for certain parts would disappear, which would render some parts "obsolete." In Section 5.7, the parties contracted for, in effect, some insurance for Whitesell against the variability created by obsolescence, in the form of an obligation on Defendants to pay for a portion of Whitesell's leftover inventory of parts that became obsolete and so could not be sold to Defendants to meet Defendants' needs. How the parties agreed on the details of Section 5.7, including why they created two measures of payment and provided that one would succeed the other in time, is part of the basis of the bargain embodied in the SPA, but it is irrelevant and further has not been addressed by the parties with any evidence. Possibly there is no evidence available at this late date.

There is nothing in the SPA to suggest that a "transition" process, as the term "transition" is used, would exist for any particular part other than those parts that were being supplied to Defendants by parties other than Whitesell at the time the SPA was entered into. The term "transition" never refers to anything other than a changeover from previous suppliers of

Defendants to Whitesell.  Any parts different from those being supplied to Electrolux by others as of the inception of the SPA would obviously not be "transitioned" to Whitesell, because Whitesell was to be the exclusive supplier of the designated categories of parts.  New parts might become required of Whitesell, but they cannot, with any regard to the English language, be said to be being "transitioned" to Whitesell.

The only support for Defendants' construction that can be found in the wording of the SPA or the Contract as a whole comes from the use of the term "Good(s)" instead of simply "Goods" in the fourth sentence of Section 5.7: "until all Good(s) have been transitioned to Whitesell."   On analysis, though, this support turns out to be illusory.

The second paragraph of Section 5.7 sometimes refers to "a Good" (first and second sentences), where the reference is clearly to a singular Good.  It refers to "Goods" without any parentheses where reference is clearly to a plural (third sentence and last sentence).  It uses the term "Good(s)" only in its (long) fourth and operative sentence for the present inquiry:

> It is agreed for those Good(s) rendered obsolete, Electrolux shall be obligated to purchase at a minimum:  on Good(s) with an EAU of less than 100,000 (minimum production run) up to the complete Whitesell stock of 100,000 pieces; for Good(s) greater than EAU 100,000 Electrolux will take up to 16 weeks of Good(s) or other mutually agreed stock levels on specific unique Good(s) per Exhibit B, based on a  16 week normal average usage during seasonal peak production periods over the last twenty four months upon which EAUs were used for planning purposes until all Good(s) have been transitioned to Whitesell.

This sentence, primarily concerned with stating the amount of remaining inventory of obsolete parts for which Defendants must pay, based upon the amount of each such part that had been expected to be needed, uses the handy, if not particularly felicitous, device of indicating a possible plural with a parenthetical (s).  Better English would have avoided this device in the entire second paragraph of Section 5.7.  Rather than referring to "those Good(s) rendered obsolete" and so forth,

28

it would have been better to refer to "each Good" and so forth.  It appears that the use of the (s) device ran over into "until all Good(s) have been transitioned to Whitesell," where it was entirely unneeded.  Any other reading would render this Section regarding *the* (singular) "transition" meaningless.

This single example of imprecise drafting cannot override the obvious import of the Contract as a whole.   "All Good" means nothing at all in this context, whereas "All Goods" is a meaningful expression.  Furthermore, "Good(s)" is defined in Section 2.1.2 of the SPA in a way that patently refers to "all" Goods that would be subject to the Contract.  Most importantly, the whole concept of a "transition" as used in Section 5.7 must be related to its use in Section 3.1 discussed above.  "The transition" is the name of a process that occurs during and delineates the inescapable time required by the factors discussed in Section 3.1 for the changeover to Whitesell from Defendants' existing suppliers.  This is not a period limited to the changeover of supply of one part, but rather the general period during which Whitesell does not have the full benefit of the requirements contract, that is, the period during which it would not be supplying all the parts covered by the SPA.

This conclusion is bolstered by the observation that the transition period was clearly intended by the parties to be temporary.  There was to be a period of transition, and then a period after transition.  In both periods, Whitesell was to have some limited "insurance" against being stuck with obsolete parts.  If "the transition" referred to the transition of an individual parts, "the transition" would never end.  The Contract contemplates a continuous process of replacing parts with better or different parts, through the contract term.  There would presumably always be parts going obsolete.

Having concluded that "the transition" as originally used in Section 5.7, refers to the transition to Whitesell from third party suppliers of all parts being supplied as of the inception of the SPA by third parties and to which the SPA applied, I must now decide whether the parts added to the Contract by the Settlement Memorandum are part of the transition, so that the transition is still not complete, even though all the parts originally contemplated in the SPA to be transitioned may have been transitioned. Specifically, in light of the facts of transition on which the parties agree, I am required to decide whether the Brunner Parts must have been transitioned to Whitesell for the Lower Prong to replace the Higher Prong as the calculation governing the amount of inventory to which the Obsolescence Claims pertain. The terms of the Settlement Memorandum and the Court's Order of August 14, 2008 make it clear that the Brunner parts must necessarily be transitioned to Whitesell in order for "the transition" to be complete.

The Court's Order of October 14, 2008, finds that, prior to May 23, 2003, there was no contract between the parties, because the parts to be subject to the contract were not stated in the SPA with sufficient clarity and definiteness to establish a meeting of the minds as to the essential matter of the purported agreement. Dkt. 212, p. 22. Nevertheless, the Court found that an enforceable contract was formed as of the date of the Settlement Memorandum, because as of that time the SPA and the Settlement Memorandum together managed to establish "three categories of parts which are objectively determinable: (1) all parts Whitesell was supplying to EHP as of the date of the Settlement Agreement; (2) all Springfield Division parts which were being supplied by Bamal as of January 1, 2003, and (3) the 'Brunner' parts." *Id.*, pp. 22-23. The Court concluded that, as to these categories of parts, the terms of the SPA, "as modified by the Settlement Agreement," constituted an enforceable requirements Contract. *See id*. The Order of October 14, 2008 states that "the only identifiable parts which fall under the SPA's terms as modified by the

Settlement Agreement, include the three categories previously mentioned."[14]   Order of October 14, 2008, Dkt. 212, p. 24.  The Court then went on to say that the "parties have performed under their Agreements and this course of performance cures the indefiniteness of the subject matter to the extent of the goods defined by their performance." *Id.,* p. 24.

Immediately before stating this conclusion, the Court noted that "the parties in this case did not somehow ratify the original, vague contract language by their performance to the extent that the Court may now entertain the parties' theories on the meaning of the terms in Section 2.1.2," and that "[i]nstead, the parties have performed without the aid of binding contractual language." *Id.*  The Court substituted the provisions that it found in the Settlement Agreement, to the extent they were identifiable, for the definition of "Good(s)" in Section 2.1.2 of the SPA. *See id*.

I note also that the Court's Order of October 14, 2008 referred to the Consent Order of May 17, 2005 as stating that "EHP was to transition the wire form parts used by EHP's Orangeburg, South Carolina, and McRae, Georgia, Plants, as well as all parts that were to be transitioned under the Settlement Memorandum, to Whitesell by December 31, 2005."  Order of October 14, 2008, Dkt. 212, p. 10 (quoting from Consent Order of May 17, 2005, Dkt. 30, pp, 2-3).

In addition to addressing other issues, the  Settlement Memorandum states that "[t]o the extent that EHP does not transition the supply of all Brunner parts and wireform parts to Whitesell, EHP agrees to transition additional mutually agreed upon parts for Whitesell to supply in an amount which creates gross purchases, plus freight charges (unless freight charges are already included in the price paid for these parts), equal to the calendar year 2002 purchase value of the Brunner and wireform parts not transitioned . . ." Settlement Memorandum, ¶ 3, Dkt. 578-2.  It is

---

[14] These being the three listed by the Court at the bottom of page 22 and the top of page 23 of the Order of October 14, 2008.

clear that at the time of the Settlement Memorandum the parties regarded the Brunner parts as among those that were to be "transitioned."

I can see no basis for Defendants' contention that the Brunner Parts should not be considered among "all Goods" that were to be transitioned, just because they were not part of the original SPA agreement. The parties agree that the Brunner Parts were added by the Settlement Memorandum, which discusses them at some length and specifically states that they will be transitioned to Whitesell.  Settlement Agreement, Dkt. 578-2, ¶ 3. It provides for a substitute for the Brunner Parts, but no party has suggested that this substitution was made. The Settlement Agreement clearly contemplates that the Brunner Parts will be covered by the Contract and will be transitioned to Whitesell. When it says that "The Agreement [meaning the SPA], except as modified herein, shall continue in full force and effect" (Settlement Memorandum, paragraph 14), this can only mean that "the transition" referred to in Section 5.7 of the SPA, now includes the Brunner Parts. The Contract between the parties, as found by the Court, consists of the SPA and the Settlement Memorandum. In fact, the Court's Order of October 14, 2008, Dkt. 212, specifically says that by the terms of the Settlement Memorandum "the parties agreed that certain "Brunner" and "wire form" parts would be supplied by Whitesell *under the terms of the SPA, as modified by the Settlement Agreement.*" Order, p. 8 (emphasis supplied). The Settlement Memorandum does not modify the terms of Section 5.7, it just modifies the designation of the parts that are subject to the Contract and to which Section 5.7 applies if they go obsolete.

The inescapable conclusion of the foregoing references is that the Brunner Parts should be included among the parts that were to be transitioned under the enforceable Contract that was formed when the Settlement Memorandum was agreed to by the parties.  Since the change from the Higher Prong to the Lower Prong of Section 5.7 was to occur only when all parts to be

transitioned had been transitioned, there is no basis for supposing that "all" parts to be transitioned does not include the Brunner parts. The inclusion of the Brunner Parts within the category of parts that were to be transitioned to Whitesell is an integral part of the Settlement Memorandum.  Since the parties agree that these parts have never been transitioned, the conclusion is likewise inescapable that the calculation of the amount Defendants are to pay Whitesell for excess inventory is governed by the Higher Prong of Section 5.7, not the Lower. There is no need for recourse to anything other than the wording of the SPA, the Settlement Memorandum, and the Court's Order of October 14, 2008.  I note, however, that were this not so, no party has presented any evidence on this point extrinsic to the wording of the SPA, the Settlement Memorandum and the Court's Order.

### III.  The Measure of Recovery Issue

From all the above it follows that on all the Obsolescence Claims other than the Disputed Notice Obsolescence Claims, the measure of the amount of inventory for which Whitesell is entitled to be paid will be provided, subject to factors discussed below, by the Higher Prong of Section 5.7, to the exclusion of the Lower Prong.  As to the Disputed Notice Obsolescence Claims, however, a further discussion is required.

Even as to the Disputed Notice Obsolescence Claims, the parties agree, as discussed below, that Section 5.7 should provide the measure of inventory for which Whitesell is entitled to be paid. However, they have a sharp disagreement as to what this means.  Whitesell contends that the actual language of Section 5.7 provides that, where Defendants have breached their notification of obsolescence obligation, Defendants must pay for 100% of Whitesell's remaining inventory of the part in question.  Defendants, on the other hand, contend that (1) Section 5.7 does provide the appropriate measure of recovery, but it limits recovery to one of the two prongs it establishes, and

(2) the course of performance of the parties shows that this must be the Higher Prong.  I have found above that if the measure of inventory to be paid for is provided by one of the prongs of Section 5.7, it must be the Higher Prong.  However, Defendants' contentions require a separate analysis, because Defendants contend that other language in Section 5.7, not one of the two prongs, provides the proper measure.

As I have done with other issues, I will address this first by considering only the SPA language itself, then considering the evidence Defendants say shows a relevant course of performance.

### (a)  without consideration of course of performance

 Whitesell contends, on the basis of language appearing in the Section 5.7 but to which I have not yet referred, that it is entitled to recover for 100% of its inventory. Transcript, File List 39, pp. 38-39. Defendants, while not conceding that they failed to give proper notice, contend that nevertheless the limit and measure of the amount of inventory for which Whitesell is entitled to be paid is provided exclusively by the second paragraph of Section 5.7 (the prongs). Defendants' Response, File List 13, pp. 3-4. The parties have had full opportunity to present their evidence and arguments on this issue, and it is ripe for determination on summary judgment.

Before proceeding to explain my conclusion on this matter, I find it necessary to consider a matter of pleading which confused me for some time, so as to provide a clear record for the Court on the objections of parties to my Report which I foresee.  At an earlier stage in my consideration of this issue, I was under the impression that Whitesell was attempting to assert a measure of damages for breach of the notification requirement of Section 5.7, arising from general principles of contract damages, rather than from Section 5.7 itself.  This appears, or at least appeared to me at the time, to have been the view taken by Defendants in their Reply and Response of February

17, 2022, File List 13, where they argue at some length that Whitesell asks the Court to create a remedy out of whole cloth, untied to any rights of recovery for remaining inventory specified in the SPA itself.  Under this view, I thought it very unlikely that Whitesell could establish its damages with sufficient certainty to recover, and highly questionable whether Whitesell had preserved such a claim in its pleadings.

I find that the need to resolve these concerns was obviated when, at the status conference of May 27, 2022, Whitesell's counsel explained that Whitesell's claims in Count VI are based on its view that Section 5.7 itself provides Whitesell with a right of recover for 100% of its remaining inventory of obsolete parts, as to the parts whose obsolescence was never the subject of formal written notification from Defendants.   Transcript, File List 39, pp. 38-41.

 At the status conference, Whitesell's counsel explained that the source of its claim to be paid for 100% of its remaining inventory of obsolete parts, where proper notice was not given, is the following language appearing in the first paragraph of Section 5.7[15]:

> On any Good that becomes Obsolete, Electrolux will work with Whitesell in a fair and cooperative manner for full disposition of any inventory that Whitesell may have in stock in an effort to minimize and eliminate any financial burden on Whitesell. It is not Electrolux's intent to place a hardship on Whitesell by not using Goods if Whitesell was trying to meet Electrolux's scheduled needs.

This wording, I note, immediately follows the sentence in Section 5.7 that establishes "Whitesell shall receive from Electrolux formal written notification of a Good going inactive or Obsolete."

At the end of the status conference of May 27, I emphasized that all parties should address this issue of Whitesell's remedy as fully as they desired, in briefs, and if necessary evidence, to be

---

[15] Whitesell's counsel very properly drew my attention to the exposition of this theory contained in Exhibit A to its Brief of May 25, 2022, but as of the morning of the status conference on May 27, I had not had the opportunity to review all the exhibits to that and other filings of May 25.

filed by June 1.  Transcript, pp. 41-43.[16]  I also emphasized that I would not consider new evidence

or further argument on this point after submission of the June 1 briefs.  Transcript, pp. 44-45.  I

consider that all parties have had a full opportunity to address the source and nature of Whitesell's

right to recover for Defendants' breach of Section 5.7's requirement of notice of obsolescence.  I

therefore proceed to state my conclusions as to Whitesell's entitlement to payment on account of

its remaining inventory of the Disputed Notice Obsolescence Claims.

First, as the parties seemingly admit, and as I must conclude, Whitesell's claim to payment

for any part of its inventory of remaining parts as to which proper notice was not given, as pleaded

and now before me, stands or falls on the provisions Section 5.7 of the SPA. Having concluded so,

I further conclude that Section 5.7 does not support Whitesell's contention that it is entitled to

payment for 100% of its remaining inventory on the Disputed Notice Obsolescence Claims. My

reasons follow.

The language Whitesell relies on is contradictory.  It says that Electrolux will work with

Whitesell "for *full* disposition of any inventory that Whitesell may have in stock in an effort to

*minimize and eliminate* (in itself a grammatical oddity which can only be made intelligible by

substituting "or" for "and") *any* financial burden to Whitesell" (emphasis supplied).  It then says

that Electrolux has no intent to harm Whitesell by "not *using* Goods if Whitesell was trying to

meet Electrolux's scheduled needs" (emphasis supplied). Immediately after this, however, it sets

a minimum amount for which Whitesell will be paid for what is not used by Electrolux but remains

with Whitesell, an amount to be paid "at a minimum" which is far less than the entire amount of

such remaining inventory.

---

[16] The transcript at this citation suggests the due date for briefs was May 31, but the parties and
Special Master agreed to set the date for June 1 at a later time. *See* Transcript, p. 52.

Given the sophistication of the parties and the great financial significance of the SPA, it may be presumed that Section 5.7 was carefully drafted and represents the outcome of significant negotiations. *See, e.g., First Ala. Bank, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1087 (11th Cir. 1990) (negotiated contract terms between "two powerful and sophisticated corporations" reflect "deliberate choice[s]."). Whitesell has furnished me with no significant argument explaining how this curious language can mean that, if Defendants do not timely give Whitesell formal written notification of obsolescence of a part, Whitesell is entitled to 100% of its remaining inventory of that part. It would have been easy to state this, had this been the parties' intent. Admittedly, it would be unusual for a contract to specify a particular penalty for a particular breach, but certainly not unheard of. Whitesell has left me to speculate as to how to contort the language upon which it relies into a provision for the remedy it seeks. I cannot do it.

It is clear to me how Section 5.7 was intended to operate. Electrolux had a plain obligation to furnish Whitesell with notice of the obsolescence of a part, and to do so in a particular manner. Electrolux also had a clear obligation to "work in a fair and cooperative manner for full disposition of any inventory that Whitesell may have in stock in an effort to minimize and eliminate any financial burden to Whitesell." It is not stated in Section 5.7 that this obligation of Defendants, "to work [etc.]," would become effective when Electrolux notified Whitesell of obsolescence, though this is surely implied by its statement immediately after the provision of the notice obligation.

Nevertheless, I find as a matter of law, in the absence of any admissible evidence to the contrary, that the obligation arose at the time Electrolux knew that the part in question had become obsolescent, regardless of whether it has complied with its notice obligation or not. I consider that any other construction would be unreasonable, and a contract provision is not to be construed to

37

create an unreasonable result.  Furthermore, the provision that Electrolux will "work with Whitesell" necessarily implies that Whitesell has a reciprocal obligation. That obligation is specified in the next to the last sentence of the second paragraph of Section 5.7: "As soon as Whitesell receives formalized notice that a Good will be Obsolete, it shall interrupt production, seek alternative buyers, cancel purchase requirements, and do whatever is necessary to rapidly respond."  Again, it is not stated in this last sentence that Whitesell's obligation to do these things arises even when it does not receive formal notice, but again I find that the only reasonable construction of this language, read with the preceding language about the parties working together is that, when and to the extent that Whitesell gains actual notice that a part is obsolescent, it must engage in the same activities that are stated as incumbent upon it when it receives formal written notification.

The issue for a factfinder to decide in that case would be when Whitesell obtained such knowledge.  In this respect, only one thing is certain. Whitesell had such knowledge as of the time it submitted an invoice to the respective Defendant calculated on the basis of 100% of its remaining inventory of the part.

Somehow, the above scheme must find room to accommodate the statement of Section 5.7 that "at a minimum," Electrolux must pay Whiteside for the amount of inventory specified in the Higher or Lower Prongs of the second paragraph of the Section.  What can "at a minimum" mean in this connection?  It must mean that, after each party has complied with its duties, Electrolux must pay Whitesell for the specified percentage of what inventory remains.  (Otherwise, "at a minimum" has no meaning at all.)

This language ("at a minimum") also implies that upon proper proof Whitesell would be entitled to recover for more than the minimum specified percentage of its remaining inventory.

(Again, if it does not, the words "at a minimum" have no meaning.)  Section 5.7 does not, however, include any language suggesting that, in the absence of proper notice or otherwise, Defendants must pay for 100% of Whitesell's remaining inventory.

*(b) course of performance*

Defendants would be required, for any claim that course of performance by the parties' (sometimes called "practical construction) to base their contention legally on O.C.G.A. § 11-2-202.  This section provides in pertinent part that, although "[t]erms . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms" (which is certainly the case with the term "formal written notification" in Section 5.7 of the SPA)  "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement," nevertheless the meaning of such terms may be "explained or supplemented . . . [b]y course of performance., course of dealing or usage of trade."  O.C.G.A. § 11-2-202 and subsection (a).

Furthermore, not cited by either party but clearly applicable, O.C.G.A. § 11-1-303 (formerly, in pertinent part, O.C.G.A. § 11-2-208), provides in pertinent part the following rules:

(a) A "course of performance is a sequence of conduct between the parties to a particular transaction that exists if:

(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

. . .

(d) A course of performance . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement.  . . .

39

> (e)   Except as otherwise provided in subsection (f) of this Code section, the express terms of an agreement and any applicable course of performance . . . shall be construed whenever reasonable as consistent with each other.  If such a construction is unreasonable:
>
> > (1) Express terms prevail over course of performance . . .

The first question that confronts me is whether this provision can be used in the absence of ambiguity remaining in the contract language after application of the canons of construction.  From a consideration of *Golden Peanut Co. v. Hunt,* 203 Ga. App. 469 (1992), one would think that the answer is no.  A contract for the sale of peanuts "provided for deferred pricing of the peanuts," but provided that upon a disagreement about the price, the disagreement would be settled with reference to a "written, *bona fide* and verifiable offer" which the seller was to obtain from some third party.  The seller obtained what he contended was such an offer, but the buyer contended that the offer was not *bona fide* because it was not obtained from a "federally registered peanut handler."  Although no such qualification of the meaning of the term "*bona fide* offer" was stated in the contract, buyer proffered evidence "that it is common knowledge in the peanut industry that the words '*bona fide* offer' in a peanut contract mean an offer from a federally registered handler."

The Court of Appeals rejected this evidence with the following comments:

> [w]hile it is true that O.C.G.A. § 11-2-202 does allow for a written contract to be explained or supplemented by usage of trade evidence, it does not allow the use of such parol evidence to alter or vary the terms of the contract. . .
>
> The parol evidence offered by [buyer] does not merely explain or supplement the plain, unambiguous contract entered into by the parties; rather, it contradicts the clear language of the agreement and seeks to place additional terms and conditions on the parties.

203 Ga. App. at 471.

However, the Georgia Supreme Court in a subsequent case, has disagreed with the Court of Appeals: "Moreover, O.C.G.A. § 11-2-202 was meant to liberalize the common law parol evidence rule to allow evidence of agreements outside the contract, *without the prerequisite finding that the contract was ambiguous*." *Golden Peanut Co. v. Bass,* 275 Ga. 145, 148 (Ga. 2002) (emphasis supplied).

For this proposition the Supreme Court cited *Southern Concrete Services v. Mableton Contractors,* 407 F.Supp. 581, 582-583 (N.D. Ga. 1975).  It is true that the Court in this case is not bound by *Southern Concrete Services* (the opinion of another federal district court)[17] and it is also true that *Southern Concrete Services* involved a "trade usage" argument rather than a "course of performance" argument, which may be subject to differing analyses.   Nevertheless, the Georgia Supreme Court's opinion in *Golden Peanut v. Hunt* did involve a "course of performance" argument, just as the present case does.

Corbin on Contracts has the following comments:

> Course of performance is an exception to the plain meaning rule that is applied in some jurisdictions.  A court may say that because the meaning of a contract is plain and unambiguous, a different meaning will not be adopted on the basis of practical interpretation by the parties.  In saying this, however, the court should not mean that the words of the contract define themselves.  It should first, rather, consider carefully all the usual sources and measures of interpretation, including the practical interpretation of the parties.  A UCC comment to the section that establishes that course of dealing may explain or supplement a contract states, "This section definitely rejects:  . . . [t]he requirement that a condition precedent to the admissibility of "evidence of course of performance is an original determination by the court that the language used is ambiguous [citing to Official Comment 1(c) to Uniform Commercial Code § 2-202].

---

[17] Shepard's Citations says that this decision was affirmed without opinion by the Fifth Circuit Court of Appeals, though I have not located a record of this affirmance.  In view of my resolution of the matter, this is irrelevant.

5 Corbin on Contracts Section 24.16.

Considering the clarity of the Supreme Court's remarks quoted above, and their conformity with scholarly opinion, I conclude that it is the law of Georgia that evidence as to the meaning of a contract term, drawn from the parties' course of performance, is admissible to "explain or supplement" (or "give particular meaning to," in the words of O.C.G.A. § 11-1-303(d))  a contract term, even where the term, standing alone and after application of relevant canons of construction, but without consideration of extrinsic evidence, is not  ambiguous.

My confidence in the rightness of my conclusion is strengthened by the consideration of a carefully reasoned opinion from the Court of Appeals of Missouri, which I incorporate by reference in this Report in the interest of brevity.  *Empire Gas Corp. v. UPG, Inc.,* 781 S.W.2d 148 (Mo. App. 1989).  However, I think it is apposite here to repeat a quotation taken by the Missouri court from the First Circuit United States Court of Appeals:

> The morass of business dealings between two companies described on this record, their promises oral and written, the disparity of their understandings, the frustration of expectations, the inevitable recriminations and conflicting memories—all this is not unique, new, or infrequently encountered.  The law in its effort to facilitate just resolutions of such controversies has, over the centuries, developed certain aids or guides to decision . . .the first is the substantive principle that when, in the course of business transactions between people or corporations, free and uncoerced understandings purporting to be comprehensive are solemnized by documents which both parties sign and concede to be their agreement, such documents are not easily bypassed or given restrictive interpretations.

*Id.* (quoting *Intern. Business Machines v. Catamore,* 548 F.2d 1965, 1973 (1st Cir. 1976), *cert. denied* 431 U.S.A. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

I note that, in this process, because of my conclusions below, I do not consider the course of performance argument set forth by Defendants' counsel in regards to the email from Bob Wiese

of Whitesell in October 2006. *See* Defendants' Response to Inquiry, File List 30, pp. 3-7; *See also* Wiese Email, File List 30-3. If it were necessary for me to consider this email, I would reject it as evidence under the Georgia law earlier described. The Wiese email says that it has been the practice of the parties that the Section 5.7 calculations apply where the obsolete goods are "calculated, agreed, and previously paid for" goods. However, as to the Disputed Notice Obsolescence Claims, it is not "agreed" that formalized written notice that the goods were "obsolete" was ever given.   There is no indication in the Wiese email that it was intended to apply to situations where Whitesell contended that written notification was not given.

Additionally, it undisputed that, at least in some instances, Whitesell did invoice the whole amount of obsolete inventory regardless of the calculations provided in Section 5.7.   Defendants seek to use the Wiese email to "explain or supplement" or to "give particular meaning to" the interpretation to the application of Section 5.7 as a course of dealing; namely, that Whitesell has conceded that any damages must necessarily be governed by the prongs of Section 5.7. *See* O.C.G.A. § 11-1-303). I cannot read the email this broadly, as it seems clearly constrained to the instances described above where there was an agreement on obsolescence and notice, and the only dispute was whether to apply the Higher Prong or Lower Prong. Thus, although I need not reach the interpretation of this email or its supposed import as to course of performance, to the extent it might aid the Court or parties in the future, I state that I would agree with Whitesell's construction of the email and disregard it as course of performance evidence.

I explain the necessary contours of Whitesell's remedy in the case of all the Disputed Notice Obsolescence Claims in the "Consequences" section below. I use this space simply to make a few observations about the "rules" I set forth therein and the practical implications of them. I am skeptical that Defendants will be able to present evidence to show a date upon which Whitesell

had actual notice of obsolescence, but a determination of that will have to await an evaluation of their evidence at trial. I note, however, that I have already determined that the drop to zero of their current requirements for a part will not, *alone,* amount to such proof.  I am also skeptical that Whitesell will be able to produce evidence to show that Defendants failed to perform the rather vague standard provided by the second and third sentences of the first paragraph of Section 5.7, but again I think that matter must await such evidence as may be offered.  I also make no suggestion as to the extent to which any of these matters would require expert testimony.

I realize that the above "solution" on my part is subject to attack on the point that it gives Whitesell much (though not entirely, see below) the same remedy where proper notice was given as it is left with where proper notice was not given.  In my view, this is a consequence of the joint fault of the parties. I have no way of knowing why Whitesell has never presented a claim for payment based directly on general contract principles.[18]  I would not be surprised to learn that it refrained from doing so because of what I consider would be the extreme difficulties of proof that such a claim would entail. Nevertheless, given the pleadings and arguments of counsel on brief and at the hearing conducted on May 29, 2022, I can only conclude that Whitesell's claim to recover on any of the Disputed Notice Obsolescence Claims invoices is limited to what I can find in Section 5.7 by way of basis for a claim.

---

[18] I will permit myself the observation that Whitesell's arguments in this case in general seem to have been rather protean.  I have rejected Defendants' effort to have Whitesell penalized by its failure to mention its notification defense in earlier pleadings in this case, before the referral of Count VI claims to me, but I cannot extend the same indulgence to Whitesell in this instance.  The Court had made it very clear in its Order of May 15, 2017 (Dkt. 896) that it will construe the Second Amended Complaint strictly as a statement of what claims Whitesell will be allowed to present.  That is what I have done.  Whitesell's Count VI claims do not extend to a claim for violation of the notice requirement without reference to the other portions of Section 5.7.

Nor does my conclusion fail to impose any consequence on Defendants arising from Defendants' breach of the notice requirement. My conclusion shifts the burden of proof to Defendants to show a date helpful to Defendants when Whitesell's duty to reduce becomes effective, beyond the obvious *terminus ad quem* of Whitesell's invoice for 100% of its inventory. The result may well be that Defendants will be required to pay Whitesell the Higher Prong calculation for its remaining inventory of parts underlying the Dispute Notice Obsolescence Claims, just as it will probably have to do with the Obsolescence Claims as to which adequate notice is conceded, but that is a matter for resolution at trial.

<u>Consequences</u>

I have directed that the parties, on or before June 28, 2022, shall provide to me a joint submission, similar to what would be required for a pretrial order, setting forth, separately for each remaining Count VI claim and invoice in this case, including but not limited to those discussed above, (a) all documentary evidence proposed to be submitted by each party with respect to such claim and invoice, and (b) a list of all witnesses whom a part may present as evidence with respect to such claim and invoice, with a precis of the testimony expected of each such witness. When this is done, I intend to examine the available evidence for each claim and invoice, to determine whether the claims and issues that must be presented to a jury in this case can be reduced.

Based on all my conclusions above, I believe the following rules should govern the presentation of this case at trial, including the burden of proof:

*(a) for Obsolescence Claims where proper written notification has been admitted by Whitesell*

As to those Obsolescence Claims involving parts as to which formal written notification is not disputed (these being all but four of Whitesell's Obsolescence Claims against Defendant

Electrolux Home Products, Inc., Inc.), the measure of the amount of inventory for which Defendants respectively must pay Whitesell is the Higher Prong rather than the Lower Prong.

This does not automatically establish, however, the amount of inventory Whitesell must pay. Whitesell must establish as a matter of fact what amount of inventory it has remaining. This cannot be an amount which, once the Higher Prong calculation is applied to it, would yield a payment higher than the amount of Whitesell's relevant invoice or invoices on which its claim is based. This is because the claims of Count VI are based exclusively on invoices, which must govern the maximum extent of recovery. Neither the PSJ Motion nor the Cross Motion require or permit, on the evidence submitted, a conclusion as to what the entire amount of Whitesell's remaining inventory is as to any particular part. I trust that the evidence of the parties, as provided in a joint submission which I have directed the parties to present to me as to each claim referred to me, as a part of the process of preparing for trial, will make this clear.

However, Defendants have contended in briefing that Whitesell's general ordering process for building up an inventory of parts was in violation of certain of its contractual duties under the SPA, including those arising from Sections 5.7 and 16 of the SPA. Defendants' Reply and Response, File List 13, pp. 15 and following. Nothing in this Report and Recommendation is intended to express any view or make any ruling as to whether Defendants should have an opportunity at trial to show that the amount of Whitesell's remaining inventory of a particular part, to which the prongs of Section 5.7 would apply, reflects Whitesell's accumulation of inventory in violation of its contract duties. I trust that after review of the evidence provided by the parties in the June 28 joint submission which I have directed, it may also be possible to determine whether Defendants have a valid defense to present in that regard.

*(b) for Disputed Notice Obsolescence Claims*

The Disputed Notice Obsolescence Claims require slightly more complicated rules. I have explained this above, but I will briefly reiterate it for the Court:

1.   The amount of Whitesell's remaining inventory of a part will be presumptively the amount to which the Higher Prong of Section 5.7 will be applied to determine the amount for which Defendants must pay.

2.   Whitesell's duty to reduce its inventory will be considered to become effective upon the date that Whitesell had actual notice of obsolescence.  This date will be the date of rendering of Whitesell's invoice calculated on 100% of its remaining inventory, unless Defendants show that Whitesell had actual notice earlier.  The quantum of notice necessary to constitute actual notice for this purpose will be for determination after consideration of all relevant evidence as to the part, but it will not be sufficient to show *only* that production requirements as shown in the computer system fell to zero for any particular period.[19]

3.   Defendants may attempt to reduce the amount of remaining inventory to which the Higher Prong must be applied in two ways:

a.   by showing that Whitesell accumulated excess inventory through "over-ordering" before Whitesell had "actual notice" of obsolescence; and/or

b.   by showing when Whitesell had actual notice of obsolescence, and then showing that after that date Whitesell failed to fulfill its duty to reduce inventory, as specified in the next to last sentence of the second paragraph of Section 5.7.

---

[19] On the other hand, it is certainly possible that internal documents from Whitesell, or inquiries to Defendants from Whitesell, might show such actual knowledge.  I have no knowledge at this time as to what evidence may exist concerning actual notice, and certainly as to its kind and persuasiveness.

4.  As to its remaining inventory above the portion specified to be paid for by the Higher Prong of Section 5.7, Whitesell may seek to be paid for this amount by showing that Defendants respectively failed to "cooperate with Whitesell in a fair and cooperative manner" to dispose of some or all of the remaining inventory, including but not limited to using as much as possible of the remaining inventory.

### Other Issues

Whitesell's Cross Motion seeks attorneys' fees and expenses of litigation, but an award of attorneys' fees to Whitesell in this litigation has been completely foreclosed by this Court's Order of December 11, 2020, Dkt. 1433, which denies a claim for such fees to Whitesell on grounds that apply as fully to its Obsolescence Claims as to any other claims in this case.  By correspondence in response to my inquiry, counsel for Whitesell, while reserving its rights of later appeal from the Court's Order of December 11, 2020, has recognized this conclusion to be the case.  Letter of Mr. Devisse from May 18, 2022, attached.

Defendants also seek to foreclose, by motion, Whitesell's request for prejudgment interest on its claims in Count VI of this litigation.[20]  The matter has been fully briefed, and I address it below.

*SUMMARY OF ISSUES AND RECOMMENDATIONS*
*RELATING TO PREJUDGMENT INTEREST*

By a "Motion for Reconsideration and for Summary Judgment Concerning Plaintiff's Prejudgment Claims Relating to Pricing Discrepancy and Obsolescence Invoices" submitted April 28, 2022 (the "Prejudgment Interest Motion"), Defendants seek to have me recommend to the Court that it grant a partial summary judgment to the effect that Whitesell is not entitled to

---

[20] File List 28.

prejudgment interest pursuant to O.C.G.A. § 7-4-16 on any of its Count VI claims that involve either obsolescent parts (the "Obsolescence Claims") or pricing discrepancies (the "Pricing Discrepancy Claims").[21] Defendants recognize that to do this would require the Court to reconsider its Order of August 13, 2020, Dkt. 1408, and its Order of August 27, 2020, Dkt. 1409, and a reversal of much of the Court's conclusions in those two orders.  In addition to reversing the Court's conclusions as to prejudgment interest as reached in these two orders, Defendants would have me recommend that Whitesell's claim for prejudgment interest under O.C.G.A. § 7-4-16 should be struck as a matter of summary judgment, including both those that were the subject of the prior orders and those which remain undetermined as to prejudgment interest at this time.[22]

Although the question is presented by Defendants in two different procedural postures, one involving reconsideration and subsequent summary judgment to the contrary of previous rulings, the other just a matter of summary judgment, the issue posed is the same as to all claims to which Defendants' motion is directed.   The issue is simply what makes a claim liquidated and whether the claims at issue can, at this stage of this proceeding, be shown certainly to be unliquidated.

Whitesell has argued at some length that Defendants are not entitled to reconsideration of the Orders of August 13 and August 27, 2020, because they have not met the rather high standard applicable to a motion for reconsideration.  I agree. Defendants do not grapple with what standard

---

[21] The Court has previously rejected claims for prejudgment interest under O.C.G.A. § 4-7-16 on claims not referred to me, and it has rejected Whitesell's attempt to add claims under the general prejudgment interest statute, O.C.G.A. § 13-6-13 to any claims, whether under Count VI or otherwise.  The latter determination has been made as a matter of evaluating Whitesell's Second Amended Complaint, rather than on a basis of substantive law pertaining to prejudgment interest. I do not view these actions of the Court as within my purview as Special Master.

[22] Defendants do not seek at this time to obtain the rejection of Whitesell's prejudgment interest claim as to the third category of invoice claims referred to me (the "Other Claims"), but they indicate that they may do so in the future.  The application of the law governing O.C.G.A. § 7-4-16 as to Other Claims therefore is not before me at this time.

they must meet in their brief. Plaintiffs advocate for the following standard, which this Court has applied in the context of Fed. R. Civ. Proc. 59(e): "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." *Usry v. EquityExperts.org, LLC*, No. CV 116-010, 2020 U.S. Dist. LEXIS 211709, at *1-2 (S.D. Ga. Nov. 12, 2020) (Hall, J.) (internal citations omitted). It is unclear to me whether such a standard should apply to motions to reconsider interlocutory orders that are far outside of the 28-day window of Rule 59(e); however, I have located at least one recent instance in this District in which the same test has been applied in the context of a Rule 54(b) interlocutory order. *See Melvin Banks v. McIntosh Cty.*, No. 2:16-cv-53, 2021 U.S. Dist. LEXIS 138834, at *8 (S.D. Ga. July 26, 2021) (Baker, J.) (internal citations omitted). Thus, I will analyze the motion for reconsideration portion of Defendants' motion by this standard.

Defendants have raised no argument that could possibly be construed as an argument in favor of an intervening change in law or due to the availability of new evidence. If Defendants should prevail on the motion for reconsideration portion of their submission, then it must be on the basis of "the need to correct clear error or prevent manifest injustice." *Usry*, 2020 U.S. Dist. LEXIS 211709, at *1-2. I do not believe Defendants can meet this high standard here.

The essence of a large portion of the argument in Defendants' brief is that Georgia law provides two different standards, one under O.C.G.A. § 7-4-16, and another under O.C.G.A. § 13-6-13, for assessing whether a claim is liquidated or unliquidated for purposes of awarding prejudgment interest, and that the Court in its previous Order applied the incorrect standard. *See* Defendants' Prejudgment Interest Motion, File List 28, p. 4. I do not believe Defendants have supplied any Georgia case law that makes any distinction, let alone a clear distinction, between the standard for liquidated claims under O.C.G.A. §§ 7-4-16 and 13-6-13. Despite Defendants'

criticism of the Court's use of the "readily determinable" language,[23] there is no discernible difference in the case law when prejudgment interest is awarded on a liquidated claim, whether under O.C.G.A. § 13-6-13 or O.C.G.A. § 7-4-16. *See Walker v. Gwinnett Hosp. Sys.*, 263 Ga. App. 554, 559, (2003) (applying O.C.G.A. § 7-4-15's liquidation standard to O.C.G.A. § 13-6-13); *see also Norair Eng'g Corp. v. Saint Joseph's Hosp.*, 147 Ga. App. 595, 606 (1978) (holding a court may award prejudgment interest under O.C.G.A. § 13-6-13 "as a matter of law" once the claim is liquidated). The true distinction is that a factfinder may award prejudgment interest under O.C.G.A. § 13-6-13 on unliquidated claims in its discretion, but I can find no evidence in the case law that the standard for determining whether a claim is liquidated is different whether the claim for interest is brought under O.C.G.A. § 13-6-13 or O.C.G.A. § 7-4-16. I further believe that any finding that the claim is liquidated would necessarily mean that the amount due is "readily determinable" based on the facts and law before the trial court. For these reasons, I do not believe Defendants have demonstrated any "need to correct clear error or prevent manifest injustice," and so the motion for reconsideration portion of Defendants' filing could be disposed of on this procedural ground alone.

Nevertheless, both because I must address the portions of Defendants' submission asking me to recommend summary judgment to the Court on other prejudgment interest claims, and because I believe the Court would benefit from substantive analysis of the legal issues, I will proceed to analyze the merits of Defendants' arguments in its brief.

The Court has heretofore made its decisions on this issue (whether a claim is liquidated or unliquidated, and thus whether prejudgment interest under O.C.G.A. § 7-4-16 is proper) based on

---

[23] *See* Defendants' Motion, File List 28, p. 3 (quoting Order of August 27, 2020, Dkt. 1409, p. 7, fn 4.

the line of cases represented by *Electric Works CMA, Inc. v. Baldwin Tech. Fabrics, LLC* (2010). Order of August 27, 2020, Dkt. 1409, p. 6. *Electric Works* was a case involving a commercial account and Section 7-4-16, wherein the Court of Appeals reiterated and applied what I conclude to be the true and invariable rule of Georgia law governing this issue: "[w]e have repeatedly held that a commercial account at issue is liquidated (and therefore subject to pre-judgment interest) even though the defendant has unsuccessfully contested the amount due . . .[and e]ven  though the amount awarded is less than that requested, or the amount is offset by a counterclaim amount." *Electric Works*, 703 S.E.2d at 707 (quoting *Hampshire Homes v. Espinosa Constr. Svcs.,* 288 Ga. App. 718, 723 (2007)).

This general rule teaches that a commercial account based on a rendered statement for a definite amount remains liquidated even though (1) a defendant has unsuccessfully questioned the amount due, (2) a plaintiff has failed to obtain from a jury the amount he has demanded, *or* (3) a counterclaim has reduced the award to the plaintiff. *See Electric Works, supra.* Defendants, however, argue that the last two circumstances that do not make a claim unliquidated are limited to situations in which a "credit or offset" diminishes a plaintiff's recovery. Defendants' Motion, File List 28, p. 2. As I explain below, Defendant is incorrect.

The reasoning behind the rule of *Electric Works* and *Hampshire Homes* is stated at length in the latter case in words partly taken from a prior decision: *Buck Creek Indus. v. Crutchfield & Co.,* 133 Ga. App. 80 (1974).  I quote from *Hampshire Homes* rather than *Buck Creek* because *Hampshire Homes* edits *Buck Creek*'s language in immaterial ways to improve clarity, and because *Hampshire Homes* notes *Buck Creek* as a "physical precedent only." *Hampshire Homes*, 288 Ga. App. at 722-723, n.10.   Most important is that *Hampshire Homes's* discussion of the rationale for the rule is incompatible with Defendants' proffered distinction in the present case:

> [quoting *Buck Creek*] Can a liquidated demand be converted into an unliquidated demand by one of the parties to the contract without the consent of the other?  If so, an unsuccessful plea of failure of consideration or any other defense, although not sustainable, would absolve the defendant from payment of interest.  This is not the intent of the law.  An unliquidated claim is one which one of the parties to the contract cannot alone render certain.  Here the amount is certain; one of the parties cannot by means of an *unsuccessful* defense render it uncertain . . . A defendant is not entitled to set up a defense against payment, and, when it is established that the defense is invalid, still profit by being absolved from the payment of interest on money illegally retained by it.  If this were true, for example, every action on a promissory note would involve a write-off of interest during litigation even though it was established that the defendant had no defense against the note.
>
> . . .
>
> Thus, we have repeatedly held that a commercial account at issue is liquidated (and thus subject to pre-judgment interest) even though the defendant has unsuccessfully contested the amount due.

*Hampshire Homes,* 288 Ga. App at 722-723.

The first example given in the above quotation, that of an unsuccessful plea of failure of consideration, is clearly not an "offset" or a "credit" in any restrictive sense.  This emphasizes the essential point that Georgia law will not take a commercial account for a sum certain and treat it as an unliquidated claim based on defenses, offsets, credits or anything else that may reduce a factfinder's award to the plaintiff below what the plaintiff has requested so long as the amount demandable by plaintiff is certain.  To do so would eliminate prejudgment interest even to a successful plaintiff in nearly every instance.  The exception would swallow the rule and result in many cases in failure to make the plaintiff whole.

Whether a claim is liquidated or unliquidated is not necessarily dependent on the asserted defenses of the defendant. The alleged basis for the plaintiff's claim is of consequence; for example, a claim is more likely to be unliquidated where recovery is sought on a quasi-contractual basis such as through quantum meruit. See, e.g., *Dalcor Mgmt. v. Sewer Rooter*, 205 Ga. App. 681, 683 (1992). In some cases, whether a claim is liquidated will be determinable from the pleadings or at other stages of the litigation. However, it will often be the case that the character of the claim as liquidated or unliquidated will depend on the evidence produced at trial.

The Court has already found that certain of the invoices on which Whitesell's Count VI claims are based make it possible to calculate what is owed to Whitesell, and the Court has done so. As to these invoices, the Court has determined that the claims are liquidated so as to entitled Whitesell to prejudgment interest under O.C.G.A. § 7-4-16. Order of August 27, 2020, Dkt. 1409. Defendants' request that I recommend reconsideration of this holding of the Court is not based on any alleged misapprehension of the facts by the Court, but rather on its general view of that the rule stated in *Electric Works* is limited in a way that neither reported cases nor reason supports. I will later explain my conclusion herein that the Court applied the right standard in its Order of August 27, 2020, and in light of this conclusion, I need not re-examine the facts and evidence underlying or illustrating these invoices. For this reason, I do not recommend reconsideration of the part of the Court's Order of August 27, 2020.

As to that part of the Order that reserves ruling on prejudgment interest for other claims until the time of trial, Defendants' basic objection to the manner in which the Court has heretofore classified Count VI claims as liquidated or unliquidated is their view that O.C.G.A. § 7-4-16 is "only applicable to commercial accounts composed of liquidated demands *which are fixed and not changeable by proof.* Defendants' Brief, File List 28, p. 1 (emphasis supplied). They rely heavily

on the wording of Kitchen *Int'l, Inc. v. Evans Cabinet Corp,* 714 S.E.2d 139 (Ga. App. 2011) that "[f]or damages to be liquidated, the damages must be in a certain and fixed amount, 'a sum which cannot be changed by proof; it is so much or nothing.'"  *Kitchen Int'l*, 714 S.E.2d at 143.

Confusion is introduced into the question of liquidated *vel non* by cases such as *Kitchen Int'l* itself. For instance, the actual holding in *Kitchen Int'l* was that "[f]or the court to conclude *upon default* that damages are liquidated and dispense with an evidentiary hearing on damages, the plaintiff must have alleged facts sufficient to show how the amount of damages claimed was calculated, or the plaintiff must attach to his complaint the relevant contract, invoices or other documents demonstrating that the plaintiff is due the amount claimed" or, in other words, "the trial court must be able to ascertain 'the amount due under the terms of the agreement without reference to evidence outside the pleadings . . ..'"  *Id.* at 143-144 (emphasis supplied).  In a case of default, the defendant has admitted all the allegations of the complaint, including the authenticity of any documents attached to the complaint, by virtue of his default.  Also, in a case of default, under Georgia law, a court can enter a judgment for the amount claimed in the complaint without a hearing only if the amount due is certain, that is, liquidated. *See* O.C.G.A. § 9-11-55. The question then becomes whether a court can award prejudgment interest.

Tracing the use of this particular language ("a sum which cannot be changed by proof; it is so much or nothing"), I find that *Kitchen Int'l* quotes from *GMC Group, Inc. v. Harsco Corp.,* 304 Ga. App. 182 (2010), a default case which in turn quotes from *Mitchell v. Gilwil Group, Inc.,* 261 Ga. App. 882 (2003).  *Mitchell* is also a default case, as is *Carter v. Ravenwood Dev. Co.*, 249 Ga. App. 603, (2001), the case *Mitchell* cites from. This continues on and on[24] until reaching the

---

[24] *Carter* cites *Sellers v. Nodvin*, 207 Ga. App. 742, 746, (1993); *Sellers* cites *Anderson v. State*, 2 Ga. 370 (1847); *Anderson* cites *Nisbet v. Lawson*, 1 Ga. 275 (1846).

original purveyor of the language about "unchangeable by proof" and "all or nothing," which appears to have been Justice Nisbet in the ante-bellum case of *Anderson v. State,* 2 Ga. 370 (Ga. 1847), citing his Judge Lumpkin's opinion in *Nisbet v. Lawson*, 1 Ga. 275 (1846). This line of cases demonstrates that this language has apparently not been used in a non-default case since antebellum days, and perhaps more notably, since the predecessor of O.C.G.A. § 7-4-16 was enacted in 1858. *See* Ga. L. 1858, p. 90, § 1. It would make sense that, where a party is entitled to default, its proof of damages must be liquidated on the face of its complaint and attached documents and unchangeable by proof in order to obtain its damages as a matter of law and without the hearing procedure in O.C.G.A. § 9-11-55. However, this is distinguishable from the manner in which Defendants incorrectly urge the Court to apply this language; that is, to hold that in order to award interest under O.C.G.A. § 7-4-16, the Court must find that there is no colorable defense as to the cost of the goods or services.

After an extensive review of Georgia law on this topic, I will set forth what I believe to be the best method for analyzing whether a claim is liquidated. I start with the simple premise that a debt is liquidated "where by agreement or otherwise the sum to be paid is fixed or certain." O.C.G.A. § 7-4-15; *accord Hazlett & Hancock Constr. Co. v. Virgil Womack Constr. Co.*, 181 Ga. App. 25, 27, (1986) (a debt "is liquidated when it is rendered certain what is due and how much is due"). The debt must also be due on a date certain in order to be liquidated. *See Hub City Atlanta Terminals, Inc. v. Expert Freight Brokerage, Inc.*, 176 Ga. App. 862, 863, (1985); *see also* O.C.G.A. § 7-4-15 (liquidated demands "bear interest from the time the party shall become liable and bound to pay them"). The first step of the analysis is therefore to determine whether the debt

is a sum certain demandable and due on a specific date.[25] *See Cont'l Carriers, Inc. v. Seaboard C. L. R. Co.*, 129 Ga. App. 889, 890, (1973) (claim was not liquidated where the plaintiff could establish the debt, but not the date the charges were due and payable).

The cases bear out that this first step is necessarily a fact-intensive inquiry, which is perhaps why the cases can appear, as Defendants contend, somewhat inconsistent at first blush. For example, in *Kroger Co. v. U. S. Foodservice of Atlanta, Inc.*, 270 Ga. App. 525 (2004), the Court of Appeals went to great lengths to explain how a distributor serviced 150 Kroger stores by using an electronic system that would track shipments and invoices. *Id.* at 525-526. Undelivered, damaged, or returned items were electronically marked as "credits" to Kroger's account. *Id.* The invoices would then be corrected and re-delivered to each local store with a notice regarding the due date of payment. *Id.* The distributor would electronically deliver to the corporate office of Kroger a total weekly statement each week, which would also note any adjustments to the payment price. *Id.*

The court further explained that issues arose when Kroger changed their payment system to exclude invoice numbers. *Id.* Kroger would then make periodic payments without the underlying invoice data, and without the benefit of having those payments correspond to invoices, the distributor would post Kroger's payments to the oldest pending invoices. *Id.* When Kroger stopped purchasing from the distributor, the distributor calculated the remaining balance due at $121,070.69. The jury awarded $117,637.46 at trial. *Id.* This was seemingly due to the difficulty of calculating the "shorts" or "credits" to the account. *Id.* Nevertheless, the Court of Appeals determined that because the evidence permitted the jury to determine that Kroger was owed the

---

[25] Of course, this entire analysis presupposes that there is a debt that is actually owed and that is or will be reduced to judgment in some amount.

certain and fixed amount of $117,637.46, this was sufficient to make a showing of a claim for a liquidated sum. *See id.* at 528, 532.

The next step is to determine whether the principal of the liquidated debt to be awarded on judgment is to be reduced, and if so, how it is to be reduced. The case law on this point can be harmonized, but not in the way that Defendant seeks to harmonize it.

The rule is simply that a claim is liquidated, even if the principal of the claim is reduced at judgment, where the reduction is due to a credit, off-set, or counterclaim rather than a successful bona fide dispute as to the reasonable value of the goods or services. *Compare Kroger*, 270 Ga. App. at 532 *with Dalcor*, 205 Ga. App. at 683. Therefore, a claim is still liquidated, and prejudgment interests can be awarded under O.C.G.A. § 7-4-16, even where the plaintiff does not obtain the full amount of his requested remedy.

Defendants seem to agree that where a claim is reduced at judgment due to an offset, credit, or counterclaim, the claim may still be liquidated. Defendants Motion, File List 28, p. 14; *see Hampshire Homes, Inc. v. Espinosa Constr. Servs.*, 288 Ga. App. 718, 723 (2007) ("Even though the ultimate amount awarded is less than that requested, or the amount is offset by a counterclaim amount, the debt is still considered liquidated and subject to pre-judgment interest.") (citing *Kroger*, *supra*). Defendants are correct only to the extent they argue that a *successful* defense attacking the amount due based on a *factual* dispute as to the reasonable value of the goods or services between the plaintiff and the defendant will render the claim unliquidated. *See, e.g.*, *Dalcor*, 205 Ga. App. at 683. However, Defendants stretch this principle too far by suggesting that *any* bona fide dispute or colorable defense, regardless of level of success, can render a claim unliquidated. The Georgia courts have unequivocally rejected this position. *See Uniflex Corp. v. Saxon*, 198 Ga. App. 445, 446, (1991) ("Even though defendant contested some of the charges

claimed by plaintiff, the jury obviously found the work was completed and payment was due"); *see also Hampshire Homes, Inc.*, 288 Ga. App. at 722 ("A defendant is not entitled to set up a defense against payment, and, when it is established that the defense is invalid, still profit by being absolved from the payment of interest on money illegally retained by it.") (internal citation omitted). This cannot be the law, as this would make nearly every claim on an open account unliquidated. *See id.* (internal citation omitted). Therefore, a defense must be successful and must attack the factual veracity or reasonableness of the amount demanded for the goods or services provided to render a claim unliquidated.

In light of these principles of Georgia law, the Court herein was correct when it awarded prejudgment interest to Whitesell on the claims on which it could grant summary judgment and further when it decided to defer decision on prejudgment interest as to the remaining claims at issue until trial.  Order of August 13, 2020, Dkt. 1408; Order of August 27, 2020, Dkt. 1409. The Court determined that Whitesell's claimed invoices, as identified by their damages expert, Mr. Peter Karutz, identified the claims and dates of the invoices. Order of August 13, 2020, Dkt. 1408, p. 3. Mr. Karutz further identified any pricing discrepancies as to what was paid as compared to what Whitesell asserted was owed. Order of August 13, 2020, Dkt. 1408, pp. 3-4. The Court found that, as to 22 of the 25 subject parts, it could determine the appropriate price as a matter of law because it could read and construe the agreements between the parties[26] without ambiguity. *See* Order of August 13, 2020, Dkt. 1408, p. 20.

In its subsequent order on prejudgment interest, the Court first correctly observed that Whitesell's claim for prejudgment interest must be liquidated in order to succeed under O.C.G.A.

---

[26] This included the SPA as modified or explained by the "Settlement Memorandum" and the "Consent Order." *See* Order of August 13, 2020, Dkt. 1408, pp. 1, 12.

§ 7-4-16. Order of August 27, 2020, Dkt. 1409, p. 1. Then, as to the claims on which it awarded Whitesell judgment, the Court found that because it was able to construe the agreements between the parties and determine pricing as a matter of law, it could award Whitesell prejudgment interest on the $6,429.06 in pricing discrepancy claims on which it rendered summary judgment.  Order of August 27, 2020, Dkt. 1409, pp. 6-7. The Court correctly rejected Defendants' arguments against prejudgment interest because Defendants' argument did not challenge the value of the goods as a matter of fact, but rather Plaintiff's interpretation of the damages calculation as a matter of law.[27] That the Court found itself able to construe the contract as a matter of law confirms that the award of prejudgment interest was correct.

For similar reasons, I must recommend that the Court deny Defendants' request for summary judgment on Whitesell's prejudgment interest claims as to the remaining pricing discrepancy claims and obsolescence invoices. I believe the Court is entitled to allow the fact-finder to render a judgment on these claims before it determines whether prejudgment interest is due.

## *SPECIFIC RECOMMENDATIONS*

1.  As to the PSJ Motion and the Cross Motion made to me, I recommend that the Court enter an Order as follows:

a.  as to the Disputed Notice Obsolescence Claims, the respective Defendant breached the Contract each time it failed to give "formal written notification," defined as a specific letter or email directed to the Contract Administrator for Whitesell, that a part was going obsolete.

---

[27] It is axiomatic that damages fixed by "operation of law" are liquidated, even where less than the amount requested is awarded on judgment. *Certain Underwriters at Lloyds, London v. DTI Logistics, Inc.*, 300 Ga. App. 715 (2009).

b. as to Obsolescence Claims where Whitesell has conceded that the respective Defendant gave proper formal written notification that the underlying parts were going obsolete (that is, on all the Obsolescence Claims other than the Disputed Notice Obsolescence Claims), the amount of inventory for the respective Defendant must pay Whitesell must be calculated according to the Higher Prong of Section 5.7.

c. that as to the Disputed Notice Obsolescence Claims, further pretrial and trial proceedings herein will be governed by the rules set out above under "Consequences," subsection (a).

d. that as to the Obsolescence Claims that are not within the Disputed Notice Obsolescence Claims, further pretrial and trial proceedings herein will be governed by the rules set out above under "Consequences," subsection (b).

e. deny as moot Whitesell's motion to strike the Declaration of Sadler from the Record.

e. denying the PSJ Motion and Cross Motion in all other respects.

2. As to the Prejudgment Interest Motion by Defendants and Response by Plaintiff, I recommend that the Court enter an order as follows:

a. denying Defendants' motion for reconsideration.

b. denying

c. denying Whitesell's request to seek prejudgment interest under O.C.G.A. § 13-6-13.[28]

3. I recommend that the Court enter an order specifying that the rules I have stated above under "**Consequences**," pp. 48-51, will govern the evaluation of the parties' submission of evidence for

---

[28] I note also that Whitesell has requested that I recommend to the Court that Whitesell be allowed to seek prejudgment interest under O.C.G.A. § 13-6-13. Whitesell's brief does not appear to affirmatively argue this point, and in any event, I consider this question settled by the Court and unripe for consideration.

pretrial purposes, so as to allow for pretrial decisions as to the survival of particular claims and defense for jury trial, and will be used for trial purposes.  In order to avoid invading the province of the Court as to pretrial and trial, however, by overly rigid rules set down at this point in these proceedings, I believe such an order should be made subject to the Court's overall prerogative and duty to vary these rules as the parties' pretrial submissions and evidentiary offerings at trial may require.

### *A Final Note*

I hope to make a Second Report and Recommendation, addressing the two remaining motions for summary judgment presented to me by Whitesell, relating to claims other than the Obsolescence Claims, in the near future. Upon receipt of the joint submission by June 28 that I have requested from the parties, I hope to make a further Report and Recommendation.

I have been unable to determine, from a somewhat limited search, whether it would be proper for me to testify concerning the present or any future Report I make, at any hearing the Court may hold on objections to my findings, conclusions and recommendations.  I am somewhat concerned, in light of the complexity of the matters addressed, that I may in this already overlong Report have omitted to mention some point of investigation that I have considered and could easily clear up upon inquiry.  If the Court were to determine that it would be proper and desirable for me to testify at such a hearing, I will of course be available, but I respectfully ask the Court's indulgence in two respects: (1) that prior to June 23 I be allowed to testify remotely by video, and (2) that I hope to be out of the country on a long-planned vacation between Monday, July 4 and Tuesday, July 12.

Respectfully Submitted, this 10th  day of June, 2022.

/s/ Charles C. Stebbins, III
Charles C. Stebbins, III
Special Master

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Special Master's First Report and Recommendation has been filed in to the clerk's electronic filing system and a true copy has been served by electronic mail as follows:

Coleman, Yovanovich & Koester, P.A.
Edmond E. Koester
edservice@cyklawfirm.com
Matthew B. Devisse
mdevisse@cyklawfirm.com
mfoster@cyklawfirm.com
cykservice@cyklawfirm.com

Aloia, Roland, Lubell & Morgan, PLLC
Jack C. Morgan, III
jmorgan@floridalegalrights.com
kturner@floridalegalrights.com

Kilpatrick Townsend & Stockton, LLC
R. Perry Sentell, III
psentell@kilpatricktownsend.com
Laurel Payne Landon
llandon@kilpatricktownsend.com
Joseph H. Huff
jhuff@kilpatricktownsend.com

DLA Piper, LLP
James M. Brogan
James.brogan@dlapiper.com
Matthew A. Goldberg
Matthew.goldberg@dlapiper.com

Alston & Bird LLP
James C. Grant
jim.grant@alston.com
Elizabeth H. Helmer
Elizabeth.helmer@alston.com
Amanda M. Waide
     amanda.waide@alston.com
Jamie S. George
Jamie.george@alston.com

This 10th day of June, 2022.

/s/ Charles C. Stebbins, III
Charles C. Stebbins, III
Special Master